**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EMIGRANT BANK; AND PACIFIC MERCANTILE BANK,<br><br>           Plaintiffs,<br><br>      -against-<br><br>SUNTRUST BANK; TRUIST BANK; AND DOES 1 THROUGH 10, INCLUSIVE,<br><br>           Defendants. | Index No. _____<br><br><br>**COMPLAINT** |

Plaintiffs Emigrant Bank ("Emigrant") and Pacific Mercantile Bank ("PMB," and, collectively with Emigrant, "Plaintiffs"), by and through their counsel Quinn Emanuel Urquhart & Sullivan, LLP, bring this complaint against Defendants SunTrust Bank and Truist Bank (collectively, "SunTrust"), and Defendants Doe 1 through Doe 10 ("Doe Defendants"), alleging as follows:

**<u>Nature of the Case</u>**

1.      Emigrant is a privately-owned bank that is the oldest savings bank in New York City.  PMB is a bank in Orange County, California that provides commercial banking services to businesses, business owners, and professionals.  Defendant SunTrust Bank is a large national commercial bank based in Atlanta, Georgia.  As of December 6, 2019, SunTrust Bank merged with Branch Banking and Trust Company to become Defendant Truist Bank.

2.      Emigrant, PMB, and SunTrust are parties to an Amended and Restated Revolving Credit and Term Loan Agreement, dated as of July 9, 2015, as amended (the "Credit Agreement").  A copy of the Credit Agreement is annexed hereto as **Exhibit A**.  In the Credit Agreement, SunTrust, Emigrant, PMB, and Preferred Bank ("Preferred" and, collectively with

SunTrust, Emigrant, and PMB, the "Lenders") established a $59.5 million revolving credit and term loan facility for their borrower, Our Alchemy, LLC ("Alchemy"), an independent film and video distributor.

3.      The Credit Agreement was secured by a Guaranty and Security Agreement, dated as of September 4, 2014, as amended (the "Guaranty").   A copy of the Guaranty is annexed hereto as **Exhibit B**.   The parties to the Guaranty were SunTrust (on behalf of the Lenders), Alchemy, and Calrissian L.P. ("Calrissian").   Calrissian, the 100% owner of Alchemy, was in turn wholly owned by Virgo Investment Group, LLC and its affiliates (collectively, "Virgo").   In the Guaranty, Calrissian—acting on behalf of Virgo—agreed to guaranty and secure Alchemy's obligations under the Credit Agreement.

4.      The Credit Agreement designated SunTrust as the Administrative Agent on behalf of the Lenders, vesting SunTrust with responsibilities and duties such as, *inter alia*, enforcing the Loan Documents including the Guaranty.  (Ex. A, Credit Agreement §§ 8.1, 9.11, 9.13).

5.      The Credit Agreement vested certain rights in the Lenders, including, *inter alia*, the right of Lenders with a majority stake (the "Required Lenders") to demand that SunTrust, as the Administrative Agent under the Credit Agreement, "exercise all remedies contained in any other Loan Document" and "exercise any other remedies available at law or in equity" if an Event of Default has occurred.  *Id.* § 8.1.  Emigrant and PMB together hold more than 50% of the aggregate outstanding revolving credit exposure and term loans, and thus qualify as "Required Lenders" under the Credit Agreement.

6.      Events of Default under the Credit Agreement have occurred.   In early 2016, Alchemy failed to pay amounts due under the Credit Agreement.   On June 15, 2016, SunTrust, as Administrative Agent, notified Alchemy and Calrissian that all obligations owed under the

Credit Agreement were immediately due and payable (the "Debt Acceleration Notice").  The accelerated debt includes approximately $46 million in unpaid loans, plus interest and other costs.  Neither Alchemy nor Calrissian has made any payment to SunTrust or the other Lenders following the Debt Acceleration Notice.

7.     On July 1, 2016, Alchemy filed a petition under Chapter 7 of Title 11 of the United States Code in the Bankruptcy Court for District of Delaware, under the caption *In re Our Alchemy, LLC* Case No. 16-11596-KG (the "Alchemy Bankruptcy").  The Alchemy Bankruptcy is still pending and being administered by a Chapter 7 trustee.

8.     On August 5, 2016, SunTrust, as Administrative Agent, filed a suit for breach of the Guaranty against Calrissian in the Supreme Court of the State of New York, under the caption *SunTrust Bank v. Calrissian LP*, Index No. 654148/2016.  SunTrust sought damages of approximately $46 million based on Calrissian's breach of the Guaranty.

9.     On February 16, 2017, Calrissian filed a petition under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court for District of Delaware, under the caption *In re Calrissian LP*, Case No. 17-10356-KG (the "Calrissian Bankruptcy").  On August 10, 2018, the Calrissian Bankruptcy was converted to Chapter 7.  On January 9, 2020, the Bankruptcy Court entered an order closing the Calrissian Bankruptcy.

10.    On December 13, 2019, following discussions between Plaintiffs and SunTrust, Plaintiffs made a formal demand pursuant to Section 8.1 of the Credit Agreement that SunTrust, as Administrative Agent for the Lenders, file suit against Virgo for breach of the Guaranty. Because Calrissian was the alter ego, and/or the actual or ostensible agent of Virgo, Virgo is liable for Calrissian's debt, including repayment of the loan guaranteed.  Plaintiffs also proposed,

in lieu of SunTrust filing suit on its own, that SunTrust cooperate in a suit against Virgo whereby Emigrant would finance the litigation.

11.     SunTrust has refused to agree to either the demand to file suit or the cooperation proposal.  SunTrust has stated that it would only cooperate in any litigation if Emigrant would give SunTrust a full release of all claims, known and unknown.

12.     Virgo owes the Lenders in excess of $50 million pursuant to the Guaranty. Emigrant and PMB have demanded that SunTrust, as Administrative Agent, take legal action to recoup this money because Section 9.13 of the Credit Agreement specifies that the Administrative Agent has the right to enforce the Guaranty.  Emigrant even offered to manage and pay for the litigation, with no cost to SunTrust, despite Emigrant having no obligation to pay more than its proportionate share as one of the Lenders.   But rather than comply with its contractual obligations to pursue legal remedies on behalf of the Lenders, SunTrust instead has sought to leverage its power to take legal action on behalf of the Lenders to seek full and final releases of unknown claims against it.

13.     The Credit Agreement provides in Section 8.1 that, following an Event of Default, SunTrust "shall" exercise any remedies contained in any Loan Document or otherwise available at law or in equity following a written request from the Required Lenders.  By refusing to enforce the Guaranty against Virgo, SunTrust has breached its obligations under the Credit Agreement.  SunTrust's breach of the Credit Agreement will cause damages to Plaintiffs of approximately $26 million, representing their *pro rata* share of the amount due under the Credit Agreement and the Guaranty.

**Jurisdiction and Venue**

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000.

15.     SunTrust has consented to personal jurisdiction and venue in this Court under Section 10.5(b) of the Credit Agreement, in which the parties agreed and submitted to the jurisdiction of the United Stated District Court for the Southern District of New York in any action or proceeding arising out of or relating to the Credit Agreement and waived any objection to venue in this Court for this action.

16.     Furthermore, the Court has personal jurisdiction over SunTrust under CPLR §§ 301 and 302(a) because it regularly does and solicits business within the State of New York, and/or expected or reasonably should have expected that its acts would have consequences within the State of New York.

17.     Venue in this Court also is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

18.     Although the true identity of the Doe Defendants is unknown to Plaintiffs at this time, on information and belief, each Doe Defendant may be found in this District and/or a substantial part of the alleged events and omissions occurred and/or have had a significant effect within this District.

**The Parties**

19.     Emigrant is a New York corporation with its principal place of business at 5 East 42nd Street, New York, New York.

5

20.     PMB is a California corporation with its principal place of business at 949 South Coast Drive, Third Floor, Costa Mesa, California.

21.     SunTrust Bank is a Georgia corporation with its principal place of business at 303 Peachtree Street, Atlanta, Georgia.

22.     Truist Bank is a North Carolina corporation with its principal place of business at 200 West Second Street, Winston-Salem, North Carolina.

23.     The true names and capacities of the Doe Defendants are presently unknown to Plaintiffs despite Plaintiffs' efforts to identify the Doe Defendants.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged herein.  Plaintiffs therefore sue these defendants by such fictitious names and will amend this Complaint to state their true names and capacities when such names have been ascertained.

## Factual Background

24.     Virgo is a private investment fund that purportedly seeks to capitalize on market dislocation and unique investment opportunities.  Virgo was founded in 2009 by Jesse Watson, Mark Perez, and others.

25.     Alchemy, previously called Millennium Entertainment, LLC, is an independent film and video distribution company formed in 2010 by a company called Nu Image.

## Virgo, Acting through Calrissian, Purchases Alchemy

26.     In April 2014, Virgo agreed to purchase Alchemy from Nu Image for $41 million. Virgo agreed to pay $36 million on closing and the remaining $5 million in non-contingent payments over the following four years.

27.     Before closing the transaction, Virgo engaged in due diligence to assess Alchemy's earnings, among other things.  On information and belief, accounting firm Baker

Tilly was retained by Virgo and issued a draft report stating that Alchemy had a low quality of earnings and some of Alchemy's financial reporting could provide a misleading view of Alchemy's earnings.  On information and belief, Virgo's CFO, Perez, asked Baker Tilly to change these negative assessments in the final version of its report, and Baker Tilly complied with Perez's request.

28.     On August 4, 2014, shortly before finalizing the Alchemy purchase agreement, Virgo formed Calrissian as a Delaware limited partnership, with Virgo Service Company as its general partner, and Virgo Societas Partnership III (Onshore), L.P. ("Virgo Onshore"), Virgo Societas Partnership III (Offshore), L.P. ("Virgo Offshore"), and Santa Rita Entertainment, LLC as its limited partners.

29.     Virgo formed Calrissian for the purpose of purchasing 100% of the membership interests in Alchemy on Virgo's behalf.  Calrissian was merely a shell vehicle for Virgo; it never had any offices, employees, or substantial assets other than its equity interest in Alchemy, and it has been entirely controlled and managed by Virgo.  Virgo paid the entire purchase price for Alchemy, and Calrissian was utilized by Virgo to, among other things, exploit the credit facilities provided by the Lenders while avoiding liability to the Lenders (and others).

30.     On August 18, 2014, Calrissian and Virgo entered into an agreement with Nu Image and certain other parties to purchase all outstanding equity interests in Alchemy for $41 million.  Virgo contributed the entire purchase price.

**SunTrust Agrees to the 2014 Credit Agreement and the Guaranty**

31.     On September 4, 2014, Virgo arranged a Revolving Credit and Term Loan Agreement (the "2014 Credit Agreement") by and among Alchemy as borrower, SunTrust as both a lender and the Administrative Agent, and PMB and Preferred Bank as lenders (SunTrust, PMB, and Preferred are referred to collectively as the "Original Lenders").  A copy of the 2014

Credit Agreement is annexed hereto as **Exhibit C**. Under the 2014 Credit Agreement, the Lenders provided a $20 million revolving loan and a $20 million term loan. Section 3.1(b)(xiv) of the 2014 Credit Agreement required the execution of the Guaranty before the obligations of the Original Lenders to make loans thereunder (the "Loans") became effective.

32.     On or about September 4, 2014, Alchemy and Calrissian executed the Guaranty, and did so, as stated in the agreement's recitals, to "induce the Administrative Agent and the [Original] Lenders to enter into the Credit Agreement and to induce the [Original] Lenders to make their respective extensions of credit to the Borrower thereunder." SunTrust executed the Guaranty as Administrative Agent on behalf of the Original Lenders.

33.     On information and belief, the Guaranty was executed by Calrissian in its capacity as Virgo's agent with Virgo's knowledge and at its direction. In fact, the Guaranty was signed by Virgo's founder and managing partner, Jesse Watson, and the Guaranty provides that required notices to Calrissian are to be sent to Virgo's co-founder, partner, and CFO, Mark Perez, at Virgo Investment Group.

34.     Furthermore, as alleged more fully below, Calrissian is Virgo's alter ego. Virgo completely dominated, controlled, and managed Calrissian, and used its domination, control and management wrongfully, unjustly, and unfairly to harm the Lenders.

**Virgo's Guaranteed Obligations to the Lenders**

35.     Under Section 2.1(a)(i) of the Guaranty, Calrissian, as agent and/or alter ego of Virgo, guaranteed the full repayment of the Loans when due, whether by acceleration or otherwise. Specifically:

> Each Guarantor unconditionally and irrevocably guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, (i) the due and punctual payment of all Obligations, including, without limitation, (A) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar

> proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (B) all other monetary obligations, including fees, costs, expenses and indemnities . . . of each Loan Party and/or any other Person (other than a Secured Party), respectively owing to any Secured Party under the Credit Agreement and/or the other Loan Documents.

Ex. B, Guaranty, Section 2.1(a)(i).

36.     Under Section 2.1(a)(ii) of the Guaranty, Calrissian, again as agent and/or alter ego of Virgo, further guaranteed Alchemy's timely performance of all covenants and obligations under the 2014 Credit Agreement:

> Each Guarantor unconditionally and irrevocably guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety . . . (ii) the due and punctual performance of all covenants, agreements, obligations and liabilities of each Loan Party and/or any other Person (other than a Secured Party) under or pursuant to the Credit Agreement and the other Loan Documents.

*Id.* Section 2.1(a)(ii).

37.     Under Section 2.1(e) of the Guaranty, payment is the only means by which the obligations under Section 2.1(a) of the Guaranty (the "Guaranteed Obligations") may be reduced or limited.  This provision protects the Lenders against virtually any defense to payment of the Guaranteed Obligations.  Section 2.1(e) reads:

> The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (except payment and performance in full of the Guaranteed Obligations), including without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.

*Id.* Section 2.1(e).

38.     Under Section 2.1(i) of the Guaranty, Calrissian, on behalf of Virgo, agreed that "if the maturity of the Guaranteed Obligations is accelerated by bankruptcy or otherwise, such

maturity shall also be deemed accelerated for the purpose of this guarantee without demand or notice to the Guarantor."

39.     Thus, the Guaranty provides on its face that Calrissian guarantees the repayment of up to $40 million.  However, at that time, and unbeknownst to the Original Lenders, Calrissian had virtually no assets and had no ability to repay the Loan Obligations other than by payment by its parent, Virgo.

**Virgo Immediately Siphons $14.5 Million from Alchemy, Crippling Its Finances**

40.     On September 4, 2014, upon the closing of the 2014 Credit Agreement, Virgo—acting through Perez—caused Alchemy to draw $14,539,123.65 from the credit facilities and transfer that sum to Calrissian (the "Virgo Distribution").

41.     Shortly thereafter, on September 17, 2014, Calrissian paid the money to Virgo in two payments:  (i) a $7,110,756.29 transfer to Virgo Onshore, and (ii) a $7,411,931.38 transfer to Virgo Offshore, totaling $14,522,687.67.  Calrissian kept only $16,435.98 (*i.e.*, about one-tenth of one percent of the Virgo Distribution) and Alchemy kept none.

42.     The Virgo Distribution had the effect of doubling Alchemy's debt, from approximately $15 million to over $31 million, and left Alchemy with unreasonably little capital. Consequently, Alchemy suffered from substantial liquidity and cash flow problems.

43.     On March 31, 2015, Alchemy transferred $3,051,945.21 (which included accrued interest) to Calrissian.  Calrissian immediately made two payments to Virgo:  (i) a $1,494,326.60 transfer to Virgo Onshore, and (ii) a $1,557,618.60 transfer to Virgo Offshore, totaling $3,051,945.20.  Calrissian, apparently, kept $0.01.

**Alchemy's Financial Performance Is Inflated by a "Channel-Stuffing" Scheme**

44.     On information and belief, Alchemy's financial reports for 2014 and 2015 were inflated by a "channel stuffing" scheme.  Channel stuffing is a business practice used to inflate

sales and earnings figures by sending retailers more products than they are expected to sell to the public, and then the excess product is returned in a different reporting period.  On information and belief, Virgo executives, including Perez, were aware of and/or complicit in this scheme but did not disclose it to SunTrust or the Lenders in order to maintain their financing.

45.     On information and belief, Alchemy inflated its reported financial performance in other ways as well.  On information and belief, Virgo executives, including Perez, were aware of and/or complicit in the inflation of Alchemy's reported financial performance but did not disclose it to SunTrust or the Lenders in order to maintain their financing.

46.     In addition, on information and belief, Alchemy's borrowing base was improperly inflated through, *inter alia*, the use of a knowingly false low return rate for DVDs, at a time when actual return rates were much higher because sales of DVDs had declined.

47.     Virgo concealed Alchemy's improper financial reporting prior to the Original Credit Agreement, prior to the Credit Agreement in July 2015, and during its management and operation of Alchemy and Calrissian in order to induce SunTrust and the Lenders to agree to and to maintain the credit facilities.

**Virgo Causes Alchemy to Purchase Distressed ANConnect Assets**

48.     In January 2015, Virgo considered a potential acquisition of a video and digital distribution business from a company named ANConnect.  The negotiations were led by Virgo's Perez.  Alchemy pursued the ANConnect transaction despite the fact that Alchemy's core business was suffering from the financial stress of the Virgo Distribution and other issues.

49.     ANConnect and Alchemy executed an Asset Purchase Agreement dated May 7, 2015.  The aggregate purchase price for the assets was approximately $37 million.  Alchemy also agreed to assume certain liabilities of ANConnect.  The ANConnect transaction closed on July 9, 2015.

50.     Liquidity and cash flow were ongoing problems at Alchemy in the months leading up to the closing of the ANConnect transaction.  On information and belief, Virgo's Watson and Perez understood that Alchemy desperately needed additional loan commitments in order to survive.

51.     On information and belief, Alchemy vastly overpaid for the package of assets and liabilities it received from ANConnect.  There were numerous red flags indicating that the purchase price was inflated and much greater than the actual value of the assets acquired.  Virgo concealed the problems with the ANConnect transaction from SunTrust and the Lenders.  For example, in a May 29, 2015 presentation by Alchemy CEO Bill Lee, Alchemy CFO John Avagliano, and Virgo's Perez, the Lenders were told that acquisition of ANConnect's physical business would "generat[e] significant free cash flow and enabl[e] favorable working capital with 100% 'services' model."

52.     Alchemy's already insufficient cash flow significantly worsened once the deal closed, due in large part to the liabilities assumed by Alchemy.  Almost immediately after the closing, creditors of ANConnect were contacting Alchemy demanding payment, and a short time later, Alchemy was unable to meet its obligations as they became due.

53.     Indeed, from the time of the Credit Agreement, Virgo's Perez was aware that Alchemy was suffering from severe liquidity issues and a lack of working capital.  These concerns about Alchemy's true financial position were not disclosed to SunTrust or the Lenders.

**Plaintiffs Amend the Credit Agreement with SunTrust and Alchemy**

54.     The 2014 Credit Agreement was amended, restated and superseded by the Credit Agreement, dated as of July 9, 2015 (as further amended, supplemented or otherwise modified).

55.     On July 10, 2015, Emigrant entered into a contract entitled Term Loan Joinder Agreement with Alchemy, SunTrust, PMB, and Preferred.  A copy of the Term Loan Joinder

12

Agreement is annexed hereto as **Exhibit D**.  Pursuant to the Term Loan Joinder Agreement, Emigrant agreed to an Incremental Term Commitment in the aggregate amount of $14.5 million, and the parties agreed to join Emigrant as a Lender under the Credit Agreement.

56.     Following the Term Loan Joinder Agreement, the Lenders in the Credit Agreement were SunTrust (as Lender and Administrative Agent), Emigrant, PMB, and Preferred (*i.e.*, the Lenders).  As part of the transaction, the Guaranty was amended with Calrissian, as Virgo's agent and/or alter ego, guaranteeing Alchemy's obligations under the Credit Agreement.

57.     Following the Term Loan Joinder Agreement, the Lenders' commitments were:

| Lender | Revolver Allocation | Term Loan Allocation | Total Allocation | Percentage |
|---|---|---|---|---|
| SunTrust | $9,533,333.34 | $12,283,333.34 | $21,816,666.68 | 36.67% |
| PMB | 6,933,333.33 | 8,933,333.33 | 15,866,666.66 | 26.67% |
| Emigrant | 6,500,000.00 | 8,375,000.00 | 14,875,000.00 | 25.00% |
| Preferred | 3,033,333.33 | 3,908,333.33 | 6,941,666.66 | 11.67% |
| **Total** | **$26,000,000.00** | **$33,500,000.00** | **$59,500,000.00** | **100%** |

58.     Upon the closing of the Credit Agreement, the Lenders provided approximately $20 million of additional financing.  But rather than use the funds for Alchemy's business or to strengthen Calrissian's finances, Virgo paid itself instead.  In July 2015, Virgo caused Alchemy to draw $14.1 million from the newly established credit facility and to pay the entire sum to Virgo through a series of transfers: $3,033,534.25 was paid to Calrissian on July 10, 2015 and subsequently transferred to Virgo, while $10,181,733.54 was transferred from Alchemy to Virgo's affiliate, OA Investment Partners LLC, on July 23, 2015.  These transfers rendered Alchemy and Calrissian insolvent.

59.     On information and belief, at the time the Credit Agreement went into effect, Alchemy's borrowing base was overstated by approximately $10 million.  On information and belief, Virgo executives, including Perez, knew that the borrowing base was not being calculated

properly, in part due to excessive DVD returns and "channel-stuffing."  As a result, Alchemy was headed for a liquidity crisis.  None of this was disclosed to SunTrust or the other Lenders. In fact, on information and belief, Virgo's Perez knowingly caused Alchemy to present improper borrowing base certificates to SunTrust and knowingly provided false assurances regarding Alchemy's finances in order to provide time to secure additional financing.

60.     On information and belief, on December 23, 2015, Virgo caused Alchemy to transfer an additional $2 million to Virgo's affiliate OA Investment Partners, LLC.

**SunTrust Accelerates the Guaranteed Obligations**

*Reservation of Rights – Letter No. 1*

61.     On January 19, 2016, SunTrust sent Alchemy a Reservation of Rights Letter ("Letter No. 1") notifying Alchemy of the occurrence and continuation of certain Events of Default under the Credit Agreement.

62.     Specifically, Events of Default occurred under Section 8.1(a) of the Credit Agreement, which provides that an Event of Default occurs when "the Borrower shall fail to pay any principal of any Loan, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or otherwise," and under Section 8.1(d) of the Credit Agreement, which provides that an Event of Default occurs when the "Borrower shall fail to observe or perform any covenant or agreement contained in Section 5.1, 5.2, or 5.3 . . . or Article VI or VII."  Alchemy failed to give "prompt written notice" of the foregoing Events of Default, as required under Section 5.2(a) of the Credit Agreement, which also constitutes an Event of Default under Section 8.1(d).

63.     In Letter No. 1, SunTrust (on behalf of the Lenders) expressly reserved its right to exercise any and all of its available rights, remedies, powers, privileges, claims and causes of

action under the Loan Documents as a result of the Events of Default in existence or any other Event of Default occurring at any time.

### *Reservation of Rights – Letter No. 2*

64.    On March 3, 2016, SunTrust sent Alchemy a second Reservation of Rights Letter ("Letter No. 2") notifying Alchemy of the occurrence and continuation of certain Events of Default under the Credit Agreement.

65.    In Letter No. 2, SunTrust (on behalf of the Lenders) again expressly reserved its right to exercise any and all of its available rights, remedies, powers, privileges, claims and causes of action under the Loan Documents as a result of the Events of Default in existence or any other Event of Default occurring at any time.

### *The Forbearance Agreement*

66.    Based on, *inter alia*, the Events of Default alleged above, and certain anticipated future defaults, SunTrust, as Administrative Agent, the Lenders, Alchemy, and Calrissian (again acting as Virgo's agent and/or alter-ego) entered into a Forbearance Agreement as of April 20, 2016 (the "Forbearance Agreement").  A copy of the Forbearance Agreement is annexed hereto as **Exhibit E**.  The Forbearance Agreement arose from Alchemy's request that SunTrust and the Lenders forbear from pursuing the remedies provided in the Credit Agreement for a specified period.

67.    Pursuant to Section 4(a) of the Forbearance Agreement, SunTrust and the Lenders agreed not to take certain legal action against Alchemy or Calrissian relating to the Existing Defaults and the Anticipated Defaults during the forbearance period.  Pursuant to Section 6 of the Forbearance Agreement, the parties agreed that upon the termination of the forbearance period, SunTrust (on behalf of the Lenders) would be entitled to exercise any or all remedies available under the Credit Agreement.

15

*Reservation of Rights – Letter No. 3*

68.     On May 5, 2016, SunTrust sent Alchemy a third Reservation of Rights Letter ("Letter No. 3") notifying the company of the occurrence and continuation of certain Termination Events under the Forbearance Agreement.

69.     In Letter No. 3, SunTrust (on behalf of the Lenders) expressly reserved its right to exercise any and all of its available rights, remedies, powers, privileges, claims and causes of action as a result of the Events of Default in existence or any other Event of Default occurring at any time.

*Reservation of Rights – Letter No. 4*

70.     On May 18, 2016, SunTrust sent Alchemy a fourth Reservation of Rights Letter ("Letter No. 4"), notifying Alchemy that:

> (i) the Forbearance Period (as defined in the Forbearance Agreement) has terminated, (ii) certain of the Existing Defaults (as defined in the Forbearance Agreement) are continuing, (iii) certain of the Anticipated Events of Default (as defined in the Forbearance Agreement) are now Events of Default, and (iv) the Administrative Agent (on behalf of the Lenders) is entitled to exercise any and all of its rights and remedies under the Fundamental Documents.

71.     In Letter No. 4, SunTrust (on behalf of the Lenders) again expressly reserved its right to exercise any and all of its available rights, remedies, powers, privileges, claims and causes of action as a result of the Events of Default in existence or any other Event of Default occurring at any time.

*Notice of Debt Acceleration*

72.     On June 15, 2016, SunTrust sent Alchemy and Calrissian the Debt Acceleration Notice.  A copy of the Debt Acceleration Notice is annexed hereto as **Exhibit F.**  In the Debt Acceleration Notice, SunTrust informed Alchemy and Calrissian that Alchemy had not cured any of the Existing Defaults identified in the reservation of rights letters.  Therefore, under

Section 8.1 of the Credit Agreement, SunTrust (on behalf of the Lenders) notified Alchemy and Calrissian that it was, *inter alia*, accelerating the obligations owed under the Credit Agreement.

73.     As a result of the Debt Acceleration Notice, and pursuant to Section 2.1(i) of the Guaranty, the Guaranteed Obligations were accelerated.

**Alchemy Files for Chapter 7 Relief and Triggers an Additional Event of Default**

74.     On July 1, 2016, Alchemy initiated the Alchemy Bankruptcy seeking to liquidate its assets under Chapter 7 of the Bankruptcy Code. In doing so, Alchemy triggered an additional Event of Default under Section 8.1(g) of the Credit Agreement. The Alchemy Bankruptcy remains pending.

**Virgo Fails to Honor the Guaranty**

75.     As with the Debt Acceleration Notice, Alchemy's bankruptcy filing and inability to pay its debts as they came due accelerated the maturity of the Guaranteed Obligations under the Guaranty, making them immediately due and payable. However, Calrissian has not paid the Guaranteed Obligations.

76.     At all relevant times, a principal-agent relationship existed between Virgo and Calrissian. Calrissian entered into the Guaranty as Virgo's actual or ostensible agent. The Lenders were led to believe by Virgo's actions and representations that it was Calrissian's principal and would fulfill its obligations under the Guaranty.

77.     Furthermore, Calrissian is Virgo's alter ego. Virgo dominated, controlled and managed Calrissian, and Calrissian had virtually no assets, no independent offices, and no employees. Virgo directed that funds distributed to Calrissian be paid to Virgo entities, leaving Calrissian insolvent. Virgo used Calrissian unjustly and unfairly as a shell to control Alchemy, misrepresent Alchemy's finances to the Lenders, and misappropriate funds advanced to Alchemy and Calrissian.

78.     Virgo, as the principal and/or alter ego of Calrissian, is responsible to pay the Guaranteed Obligations under the Guaranty.

79.     SunTrust, as Administrative Agent, has a valid and enforceable contractual relationship with Calrissian and Virgo under the Guaranty.  On information and belief, SunTrust performed all of its duties and obligations under the Guaranty.  Calrissian and Virgo, as Calrissian's principal and/or alter ego, have breached the Guaranty by failing, *inter alia*, to satisfy the Guaranteed Obligations.  As of the date of the Debt Acceleration Notice, Virgo was required to pay SunTrust all amounts owed under the Loan Documents.  Despite the foregoing, Virgo has failed to pay SunTrust or the Lenders any amounts owed under any of the Loan Documents.  The Lenders have been damaged by Virgo's breach.  Therefore, SunTrust, as Administrative Agent on behalf of the Lenders, has a valid claim for relief against Virgo.

**SunTrust Breaches the Credit Agreement**

80.     Section 8.1 of the Credit Agreement defines "Events of Default" under the Credit Agreement and establishes the right of the Lenders with a majority stake in the debt to cause SunTrust, as Administrative Agent, to enforce the Lenders' rights under all Loan Documents, including the Guaranty.   In particular, Section 8.1 states in part that if an Event of Default occurs:

> then, and in every such event (other than an event described in subsection (h) or (i) of this Section) and at any time thereafter during the continuance of such event, the Administrative Agent may, ***and upon the written request of the Required Lenders shall***, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, whereupon the Commitment of each Lender shall terminate immediately, (ii) declare the principal of and any accrued interest on the Loans, and all other Obligations owing hereunder, to be, whereupon the same shall become, due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, (iii) ***exercise all remedies contained in any other Loan Document***, and (iv) ***exercise any other remedies available at law or in equity***; provided that, if an Event of Default specified in

either subsection (h) or (i) shall occur, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon, and all fees and all other Obligations shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

Ex. A, Credit Agreement, § 8.1 (emphasis added).

81.     The Credit Agreement defines Required Lenders as "Lenders holding more than 50% of the aggregate outstanding Revolving Commitments and Term Loans." *Id.* § 1.1. Emigrant and PMB combined have held and continue to hold approximately 51.67% of the aggregate outstanding Revolving Commitments and Term Loans, and thus constitute Required Lenders.

82.     On September 28, 2016, SunTrust engaged Hemming Morse, LLP ("Hemming Morse") to assist in an investigation of potential claims against Alchemy, Calrissian, Virgo, and other entities.  The Lenders, including Emigrant and PMB, contributed to the payment of Hemming Morse's fees for this engagement.

83.     On March 23, 2017, Emigrant and PMB sent SunTrust a written request as Required Lenders under the Credit Agreement, requesting that SunTrust share any information received as part of Hemming Morse's investigation, as well as all of Hemming Morse's work product.  SunTrust denied this request on April 27, 2017.

84.     On information and belief, based on Hemming Morse's work product and other information, SunTrust concluded that the Lenders have colorable claims against Virgo.

85.     Emigrant and PMB engaged in discussions with SunTrust regarding potential claims against Virgo, including a claim for breach of the Guaranty as the principal and/or alter ego of Calrissian.  However, these discussions did not lead to an agreement because SunTrust

insisted on a general release of all claims, known and unknown, before it would proceed or cooperate with Plaintiffs to file such a lawsuit.

86.     On December 13, 2019, Emigrant and PMB, as Required Lenders, served SunTrust with a formal written request pursuant to Section 8.1 of the Credit Agreement. Emigrant and PMB identified Events of Default that had occurred (including, *inter alia*, Alchemy's failure to pay its debts when due), and requested that SunTrust, as Administrative Agent, "exercise all remedies at law and in equity, including all remedies available under any of the Loan Documents, to seek payment in full of all Obligations under the Loan Documents, including interest, attorney's fees, and costs."   A copy of the December 13, 2019 letter is annexed hereto as **Exhibit G**.

87.     In particular, as Required Lenders, Emigrant and PMB requested that SunTrust, as Administrative Agent, file a lawsuit on behalf of the Lenders against Virgo for breach of the Guaranty on the grounds that Virgo was Calrissian's principal and/or alter ego.   SunTrust is empowered by Section 9.13 of the Credit Agreement to enforce the Guaranty on behalf of the Lenders, and as a party to the Guaranty, SunTrust has the right to bring suit.  Emigrant and PMB further requested that SunTrust retain Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") to file and prosecute the lawsuit.  Emigrant and PMB also presented a proposal in which Emigrant would manage and pay for the lawsuit against Virgo, with SunTrust having no liability for the litigation costs.

88.     After receiving no response to their letter of December 13, 2019, Emigrant and PMB again wrote to SunTrust on December 19, 2019, reiterating their request that SunTrust take legal action against Virgo on behalf of the Lenders or agree to a cooperation proposal.

89.     On January 3, 2020, SunTrust rejected both the demand to file suit and the cooperation proposal.  SunTrust stated that it would only cooperate in any litigation if Emigrant and PMB gave SunTrust a full and final general release of all known and unknown claims.

90.     Emigrant and PMB responded to SunTrust's letter on January 9, 2020, again requesting that SunTrust comply with its obligations under Section 8.1 of the Credit Agreement to "exercise all remedies contained in any other Loan Document" and "exercise any other remedies available at law or in equity" by filing a lawsuit on behalf of the Lenders against Virgo for breach of the Guaranty or by entering into a litigation cooperation agreement without insisting on a full general release of known and unknown claims.

91.     Despite further discussions between the parties, as of the filing of this Complaint, SunTrust has not agreed to file a lawsuit or enter into a litigation cooperation agreement without a full general release of known and unknown claims.

**FIRST CLAIM FOR RELIEF**
**AGAINST SUNTRUST**
**(Breach of Contract – Credit Agreement)**

92.     Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-91 as if set forth fully herein.

93.     The Credit Agreement is a valid and enforceable contract among Emigrant, PMB and SunTrust, among others.

94.     Emigrant and PMB have performed all of their duties and obligations under the Credit Agreement, except to the extent excused by the conduct of SunTrust.

95.     Pursuant to the Credit Agreement, SunTrust, as Administrative Agent, has contractual duties and obligations to exercise all remedies contained in the Loan Documents or

any other remedies available at law or in equity upon request by the Required Lenders if an Event of Default has occurred.

96.     As alleged above, SunTrust, as Administrative Agent, has a valid claim for relief against Virgo on behalf of the Lenders under the Guaranty because Virgo is the principal and/or alter ego of Calrissian.  As further alleged above, Emigrant and PMB, as Required Lenders, have made a formal request under the Credit Agreement that SunTrust exercise all remedies contained in the Loan Documents or any other remedies available at law or in equity.

97.     SunTrust has breached the Credit Agreement by, *inter alia*, failing to exercise all remedies contained in the Loan Documents or any other remedies available at law or in equity upon request by the Required Lenders after Events of Default had occurred, and insisting on a full general release by Emigrant and PMB as a condition to performing its duties under the contract.

98.     Plaintiffs have suffered substantial damages as a direct and proximate result of SunTrust's breaches of the Credit Agreement in an amount to be determined at trial in excess of $26,000,000.

**SECOND CLAIM FOR RELIEF**
**AGAINST SUNTRUST**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

99.     Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-91, and 93-98, as if set forth fully herein.

100.    Implied in all contracts governed by New York law is a covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing provides that a party shall not do anything that will have the effect of interfering with or damaging the right of another party to receive the benefits of the contract.

101.    SunTrust has interfered with and damaged Emigrant's and PMB's receipt of benefits under the Credit Agreement, and thus breached the implied covenant of good faith and fair dealing, by failing to enforce the Guaranty against Virgo.  Defendants' failure to act deprives Emigrant and PMB of the benefits of the agreement which establishes SunTrust as the party responsible for enforcing the Guaranty for the benefit of the Lenders.

102.    SunTrust further interfered with and damaged Emigrant and PMB's receipt of benefits under the Credit Agreement, and thus breached the implied covenant of good faith and fair dealing, by requiring that Emigrant and PMB agree to a release of all known and unknown claims before SunTrust would agree to take action to enforce the Guaranty.  By insisting on a full release of all claims before fulfilling its contractual duties, SunTrust has acted in bad faith.

103.    Plaintiffs have suffered substantial damages as a direct and proximate result of SunTrust's breaches of the implied covenant of good faith and fair dealing in an amount to be determined at trial in excess of $26,000,000.

### THIRD CLAIM FOR RELIEF
### AGAINST SUNTRUST
### (Breach of Contract – Term Loan Joinder Agreement)

104.    Plaintiffs repeat, re-allege, and incorporate by reference each of the allegations of paragraphs 1-91, 93-98, and 100-103, as if set forth fully herein.

105.    The Term Loan Joinder Agreement is a valid and enforceable contract between Emigrant, PMB, and SunTrust, among others.

106.    Emigrant and PMB have performed all of their duties and obligations under the Term Loan Joinder Agreement, except to the extent excused by the conduct of SunTrust.

107.    Pursuant to the Term Loan Joinder Agreement, SunTrust was appointed and authorized "to exercise such powers under the Credit Agreement and the other Loan Documents

as are delegated to the Administrative Agent, as the case may be, by the terms thereof, together with such powers as are reasonable incidental thereto . . . ."  As alleged above, SunTrust has the power, and the contractual duties and obligations, under the Credit Agreement to exercise all remedies contained in the Loan Documents or any other remedies available at law or in equity to recover the amount of the obligations owed under the Credit Agreement and the Guaranty if an Event of Default has occurred.

108.   As further alleged above, SunTrust, as Administrative Agent, has a valid claim for relief against Virgo on behalf of the Lenders under the Guaranty, on the grounds that Virgo is the principal and/or alter ego of Calrissian, and Emigrant and PMB have made a formal request under the Credit Agreement for SunTrust to exercise all remedies contained in the Loan Documents or any other remedies available at law or in equity.

109.   SunTrust has breached the Term Loan Joinder Agreement, including the implied covenant of good faith and fair dealing therein, by, *inter alia*, failing to exercise all remedies contained in the Loan Documents or any other remedies available at law or in equity upon request by the Required Lenders after Events of Default had occurred; failing to provide information relevant to the exercise of such remedies; and insisting on a full general release by Emigrant as a condition to performing its duties under the contract.

110.   Plaintiffs have suffered substantial damages as a direct and proximate result of SunTrust's breaches of the Term Loan Joinder Agreement in an amount to be determined at trial in excess of $26,000,000.

## Prayer for Relief

WHEREFORE, Plaintiffs Emigrant Bank and Pacific Mercantile Bank respectfully request:

      (a)    An award in favor of the Plaintiffs and against SunTrust on all claims asserted in this Complaint;

      (b)    Compensatory damages, in an amount in excess of $26,000,000, to be proven at trial;

      (c)    Reasonable costs and attorneys' fees incurred in this action, as provided under Section 10.3 of the Credit Agreement;

      (e)    Pre-judgment interest on all damages; and

      (f)    Such other relief as the Court deems just and proper.

Dated: New York, New York
      March 18, 2020

                  QUINN EMANUEL URQUHART &
                    SULLIVAN, LLP

              By:    */s/ Corey Worcester*
                    Corey Worcester
                    Leigha Empson
                    51 Madison Avenue, 22nd Floor
                    New York, NY 10010
                    Telephone: (212) 849-7000
                    Facsimile: (212) 849-7100

                    Gary E. Gans
                    (*pro hac vice* forthcoming)
                    Sage R. Vanden Heuvel
                    (*pro hac vice* forthcoming)
                    865 S. Figueroa Street, 10th Floor
                    Los Angeles, CA 90017
                    Telephone: (213) 443-3000
                    Facsimile: (213) 443-3100

                    *Attorneys for Plaintiffs Emigrant Bank and*
                    *Pacific Mercantile Bank*