# EXHIBIT A

Published CUSIP Number: 60038JAA6
60038JAB4
60038JAC2

## AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT

dated as of July 9, 2015

among

## OUR ALCHEMY, LLC

as Borrower

## THE LENDERS FROM TIME TO TIME PARTY HERETO

and

## SUNTRUST BANK

as Administrative Agent

---

## SUNTRUST ROBINSON HUMPHREY, INC.

as Sole Lead Arranger and Sole Bookrunner

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS; CONSTRUCTION** ...................................................................1

    Section 1.1    Definitions.........................................................................................1
    Section 1.2    Classifications of Loans and Borrowings ...............................40
    Section 1.3    Accounting Terms and Determination ....................................40
    Section 1.4    Terms Generally .......................................................................41

**ARTICLE II AMOUNT AND TERMS OF THE COMMITMENTS** ....................................41

    Section 2.1    General Description of Facilities ..............................................41
    Section 2.2    Revolving Loans .......................................................................41
    Section 2.3    Procedure for Revolving Borrowings .......................................42
    Section 2.4    Term Loan Commitments .........................................................42
    Section 2.5    Funding of Borrowings ............................................................42
    Section 2.6    Interest Elections .....................................................................43
    Section 2.7    Optional Reduction and Termination of Commitments............44
    Section 2.8    Repayment of Loans ................................................................45
    Section 2.9    Evidence of Indebtedness .........................................................46
    Section 2.10   Optional Prepayments .............................................................47
    Section 2.11   Mandatory Prepayments .........................................................47
    Section 2.12   Interest on Loans .....................................................................49
    Section 2.13   Fees ..........................................................................................50
    Section 2.14   Computation of Interest and Fees ...........................................50
    Section 2.15   Inability to Determine Interest Rates ......................................50
    Section 2.16   Illegality ..................................................................................51
    Section 2.17   Increased Costs ........................................................................51
    Section 2.18   Funding Indemnity ...................................................................53
    Section 2.19   Taxes .......................................................................................53
    Section 2.20   Payments Generally; Pro Rata Treatment; Sharing of Set-offs ................57
    Section 2.21   Increase of Commitments; Additional Lenders .......................58
    Section 2.22   Mitigation of Obligations.........................................................64
    Section 2.23   Replacement of Lenders ..........................................................65
    Section 2.24   Defaulting Lenders...................................................................65
    Section 2.25   Provisions Relating to the Borrowing Base ..............................66

**ARTICLE III CONDITIONS PRECEDENT TO LOANS** ...............................................68

    Section 3.1    Conditions to Effectiveness .....................................................68
    Section 3.2    Conditions to Initial Borrowing Base Credit for any Item of Product ..............................................................................74
    Section 3.3    Conditions to Each Credit Event.............................................76
    Section 3.4    Delivery of Documents ............................................................77

**ARTICLE IV REPRESENTATIONS AND WARRANTIES**...............................................77

Section 4.1    Existence; Power..................................................................77
Section 4.2    Organizational Power; Authorization ...................................78
Section 4.3    Governmental Approvals; No Conflicts.................................78
Section 4.4    Financial Statements.............................................................78
Section 4.5    Litigation and Environmental Matters ..................................78
Section 4.6    Compliance with Laws and Agreements................................79
Section 4.7    Investment Company Act......................................................79
Section 4.8    Taxes .....................................................................................79
Section 4.9    Margin Regulations...............................................................79
Section 4.10   ERISA....................................................................................79
Section 4.11   Ownership of Property; Intellectual Property; Insurance .........80
Section 4.12   Disclosure .............................................................................81
Section 4.13   Labor Relations.....................................................................81
Section 4.14   Subsidiaries...........................................................................82
Section 4.15   Loan Party Information.........................................................82
Section 4.16   Fictitious Names ...................................................................82
Section 4.17   Responsible Officers.............................................................82
Section 4.18   Solvency................................................................................82
Section 4.19   Deposit and Disbursement Accounts .....................................82
Section 4.20   Collateral Documents............................................................82
Section 4.21   Material Agreements.............................................................83
Section 4.22   Items of Product; Copyrights, Trademarks and Other Rights...................84
Section 4.23   OFAC.....................................................................................85
Section 4.24   Patriot Act .............................................................................85

**ARTICLE V AFFIRMATIVE COVENANTS ........................................................85**

Section 5.1    Financial Statements and Other Information .........................86
Section 5.2    Notices of Material Events.....................................................88
Section 5.3    Existence; Conduct of Business.............................................90
Section 5.4    Compliance with Laws ..........................................................90
Section 5.5    Payment of Obligations.........................................................90
Section 5.6    Books and Records ................................................................90
Section 5.7    Visitation and Inspection; Account Debtor Confirmations;
               Borrowing Base Audits...........................................................90
Section 5.8    Third Party Audit Rights........................................................91
Section 5.9    Maintenance of Properties .....................................................91
Section 5.10   Insurance................................................................................92
Section 5.11   Use of Proceeds; Margin Regulations....................................93
Section 5.12   Casualty and Condemnation ..................................................93
Section 5.13   Cash Management, Collection Accounts .................................93
Section 5.14   Additional Subsidiaries and Collateral ..................................94
Section 5.15   Copyrights and Trademarks ...................................................96
Section 5.16   Laboratories; No Removal .....................................................96
Section 5.17   Distribution Agreements; Licensing Intermediary Agreements;
               Notices of Assignment; Letters of Credit................................97
Section 5.18   Observance of Agreements ....................................................98

ii

Section 5.19    Material Agreements ................................................................99
Section 5.20    Further Assurances ..................................................................99
Section 5.21    Mezzanine Debt Facility .........................................................99

**ARTICLE VI FINANCIAL COVENANTS** ................................................**100**

Section 6.1    Liquidity Ratio .......................................................................101
Section 6.2    Fixed Charge Coverage Ratio ................................................101
Section 6.3    Minimum EBITDA .................................................................101
Section 6.4    Liquidity Covenant.  The Borrower will maintain not less than
               $2,000,000 of liquidity, comprised of not less than $1,000,000 of
               unrestricted and uncommitted cash held in Controlled Accounts
               and/or availability under the Revolving Commitment .............102

**ARTICLE VII NEGATIVE COVENANTS** ...............................................**102**

Section 7.1    Indebtedness and Preferred Equity .......................................102
Section 7.2    Liens .......................................................................................103
Section 7.3    Fundamental Changes .............................................................104
Section 7.4    Investments, Loans, Guarantees ............................................104
Section 7.5    Restricted Payments ...............................................................106
Section 7.6    Sale of Assets .........................................................................106
Section 7.7    Transactions with Affiliates ...................................................107
Section 7.8    Restrictive Agreements ..........................................................107
Section 7.9    Sale/Leaseback Transactions.  The Borrower will not, and will not
               permit any of its Subsidiaries to: .........................................108
Section 7.10   Hedging Transactions ............................................................108
Section 7.11   Amendments to Material Documents ....................................109
Section 7.12   Accounting Changes ...............................................................109
Section 7.13   Lease Obligations ...................................................................109
Section 7.14   Government Regulation ..........................................................109
Section 7.15   ERISA Compliance .................................................................109
Section 7.16   Hazardous Materials ...............................................................110
Section 7.17   No Development of Items of Product .....................................110
Section 7.18   Subsidiaries .............................................................................110
Section 7.19   No Adverse Selection ..............................................................110
Section 7.20   Capital Expenditures ...............................................................110
Section 7.21   Overhead .................................................................................110
Section 7.22   Expenditures for Items of Product .........................................110
Section 7.23   P&A Expenditures for Items of Product ................................111

**ARTICLE VIII EVENTS OF DEFAULT** ..................................................**111**

Section 8.1    Events of Default ....................................................................111
Section 8.2    Application of Proceeds from Collateral ................................114

**ARTICLE IX THE ADMINISTRATIVE AGENT** ...................................**115**

Section 9.1    Appointment of the Administrative Agent .............................115

Section 9.2    Nature of Duties of the Administrative Agent ..........................................116
Section 9.3    Lack of Reliance on the Administrative Agent ...................................116
Section 9.4    Certain Rights of the Administrative Agent...............................................117
Section 9.5    Reliance by the Administrative Agent .....................................................117
Section 9.6    The Administrative Agent in its Individual Capacity .............................117
Section 9.7    Successor Administrative Agent ........................................................117
Section 9.8    Withholding Tax........................................................................................118
Section 9.9    The Administrative Agent May File Proofs of Claim .............................118
Section 9.10   Authorization to Execute Other Loan Documents....................................119
Section 9.11   Collateral and Guaranty Matters ..........................................................119
Section 9.12   Documentation Agent; Syndication Agent................................................120
Section 9.13   Right to Realize on Collateral and Enforce Guarantee............................120
Section 9.14   Secured Bank Product Obligations and Hedging Obligations................121

**ARTICLE X MISCELLANEOUS** ......................................................................................**121**

Section 10.1   Notices .....................................................................................................121
Section 10.2   Waiver; Amendments...............................................................................123
Section 10.3   Expenses; Indemnification......................................................................125
Section 10.4   Successors and Assigns............................................................................127
Section 10.5   Governing Law; Jurisdiction; Consent to Service of Process.................131
Section 10.6   WAIVER OF JURY TRIAL.....................................................................132
Section 10.7   Right of Set-off .......................................................................................132
Section 10.8   Counterparts; Integration ........................................................................133
Section 10.9   Survival ....................................................................................................133
Section 10.10  Severability ..............................................................................................133
Section 10.11  Confidentiality .........................................................................................133
Section 10.12  Interest Rate Limitation ...........................................................................134
Section 10.13  Waiver of Effect of Corporate Seal ..........................................................135
Section 10.14  Patriot Act ................................................................................................135
Section 10.15  No Advisory or Fiduciary Responsibility ................................................135
Section 10.16  Location of Closing...................................................................................135
Section 10.17  Headings ...................................................................................................136
Section 10.18  Effect of Amendment and Restatement of the Existing Credit
               Agreement..............................................................................................136

iv

<u>Annexes</u>

| | |
|---|---|
| Annex A | Acceptable Obligors and Allowable Amounts |
| Annex B | Library Titles |

<u>Exhibits</u>

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Borrowing Base Certificate |
| Exhibit C-1 | Form of Copyright Security Agreement |
| Exhibit C-2 | Form of Copyright Security Agreement Supplement |
| Exhibit D | Form of Guaranty and Security Agreement |
| Exhibit E | Form of Laboratory Access Letter |
| Exhibit F | Form of Laboratory Pledgeholder Agreement |
| Exhibit G | Form of Product Declaration |
| Exhibit H | Form of Monthly Financial Report |
| | |
| Exhibit 2.3 | Form of Notice of Borrowing |
| Exhibit 2.7 | Form of Notice of Conversion/Continuation |
| Exhibit 2.19 | Form of Tax Certificates |
| Exhibit 3.1(b)(ii) | Form of Secretary's Certificate |
| Exhibit 3.1(b)(vi) | Form of Officer's Certificate |
| Exhibit 5.1(c) | Form of Compliance Certificate |

<u>Schedules</u>

| | |
|---|---|
| Schedule I | Commitment Amounts |
| | |
| Schedule 4.5 | Environmental Matters |
| Schedule 4.14 | Subsidiaries |
| Schedule 4.15 | Loan Party Information |
| Schedule 4.16 | Fictitious Names |
| Schedule 4.17 | Responsible Officers |
| Schedule 4.19 | Deposit and Disbursement Accounts |
| Schedule 4.21 | Material Agreements |
| Schedule 4.22 | Items of Product; Copyrights, Trademarks and Other Rights |
| Schedule 7.2 | Existing Liens |
| Schedule 7.4 | Existing Investments |

206771225 v17

## AMENDED AND RESTATED
## REVOLVING CREDIT AND TERM LOAN AGREEMENT

**THIS AMENDED AND RESTATED REVOLVING CREDIT AND TERM LOAN AGREEMENT** (this "Agreement") is made and entered into as of July 9, 2015, by and among OUR ALCHEMY, LLC (F/K/A MILLENNIUM ENTERTAINMENT, LLC), a Delaware limited liability company (the "Borrower"), the several banks and other financial institutions and lenders from time to time party hereto (the "Lenders"), and SUNTRUST BANK, in its capacity as administrative agent for the Lenders (the "Administrative Agent").

### W I T N E S S E T H :

**WHEREAS**, the Borrower is party to that certain Revolving Credit and Term Loan Agreement dated as of September 4, 2014 among the Administrative Agent and the lenders party thereto (as the same has been amended, supplemented or otherwise modified, renewed, restated or replaced from time to time prior to the date hereof, the "Existing Credit Agreement");

**WHEREAS**, the Borrower has requested that the Existing Credit Agreement be amended and restated in its entirety and that the Lenders make available to the Borrower a $26,000,0000 revolving credit facility and term loans in an aggregate principal amount of $19,000,000;

**WHEREAS**, the Borrower, the Lenders and the Administrative Agent have agreed to such amendments, as incorporated herein, and wish to amend and restate the Existing Credit Agreement;

**WHEREAS**, subject to the terms and conditions of this Agreement, the Lenders, to the extent of their respective Commitments as defined herein, are willing severally to establish the requested revolving credit facility in favor of, and severally to make the term loans to, the Borrower;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants herein contained, the Borrower, the Lenders and the Administrative Agent agree as follows:

### ARTICLE I

### DEFINITIONS; CONSTRUCTION

**Section 1.1    Definitions**. In addition to the other terms defined herein, the following terms used herein shall have the meanings herein specified (to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable L/C" shall mean an irrevocable standby letter of credit which: (a) names the Administrative Agent (or a third party Licensing Intermediary, as applicable) as the sole beneficiary thereunder, (if the beneficiary thereunder is a third party Licensing Intermediary) is advised through the Administrative Agent, and otherwise is in form, amount and on terms reasonably acceptable to the Administrative Agent; (b) is payable in Dollars at an office of a Non-Defaulting Lender or another issuing or confirming bank which is acceptable to the

Administrative Agent in its sole discretion; (c) is issued or confirmed by any Person that, on the date of issuance or confirmation of such letter of credit, is a Non-Defaulting Lender and is a bank which the Administrative Agent, in its good-faith discretion, determines to be of acceptable credit quality; and (d) has an expiry date which is no later than the Maturity Date.

"Acceptable Obligor" shall mean any third Person that (i) has been granted exploitation rights in an Item of Product by a Loan Party (or by an Approved Sales Agent on behalf of a Loan Party, or by a Licensing Intermediary) and (ii) is either a Primary Major Acceptable Obligor, a Major Acceptable Obligor, a Non-Major Acceptable Obligor, a Minor Acceptable Obligor, or such other Person or Affiliated Group that is acceptable to the Administrative Agent in its reasonable discretion.

"Additional Lender" shall have the meaning set forth in Section 2.21.

"Adjusted LIBO Rate" means, with respect to each Interest Period for a Eurodollar Loan, (i) the rate *per annum* equal to the London interbank offered rate for deposits in Dollars appearing on Reuters screen page LIBOR 01 (or on any successor or substitute page of such service or any successor to such service, or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, with a maturity comparable to such Interest Period, divided by (ii) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including any marginal, emergency, supplemental, special or other reserves and without benefit of credits for proration, exceptions or offsets that may be available from time to time) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D); provided, that if the rate referred to in clause (i) above is not available at any such time for any reason, then the rate referred to in clause (i) shall instead be the interest rate *per annum*, as determined by the Administrative Agent, to be the arithmetic average of the rates *per annum* at which deposits in Dollars in an amount equal to the amount of such Eurodollar Loan are offered by major banks in the London interbank market to the Administrative Agent at approximately 11:00 a.m. (London time), two (2) Business Days prior to the first day of such Interest Period.

"Administrative Agent" shall have the meaning set forth in the introductory paragraph hereof.

"Administrative Questionnaire" shall mean, with respect to each Lender, an administrative questionnaire in the form provided by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"Affiliate" shall mean, as to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person. For the purposes of this definition, "Control" shall mean the power, directly or indirectly, either to (i) vote 5% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of a Person or (ii) direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by control or otherwise. The terms "Controlled by" and "under common Control with" have the meanings correlative thereto.

2

"Affiliated Group" shall mean a group of Persons, each of which is an Affiliate (other than by reason of having common directors or officers) of some other Person in the group.

"Aggregate Revolving Commitment Amount" shall mean, as of any date of determination, the aggregate principal amount of the Aggregate Revolving Commitments as of such date.

"Aggregate Revolving Commitments" shall mean, collectively, all Revolving Commitments of all Lenders at any time outstanding.

"Allocated Overhead Expenses" shall mean the actual costs for overhead and certain services (such as sales, human resources, accounting, legal and treasury functions) furnished to or on behalf of any Loan Party by the Borrower; provided that Allocated Overhead Expenses (a) may not be billed more frequently than quarterly and then only in arrears, (b) may not include any mark-up and (c) may not be billed to any Loan Party before having been incurred by the Borrower.

"Allowable Amount" shall mean, with respect to any Acceptable Obligor, such amount as specified on Annex A hereto as the maximum aggregate exposure for such Acceptable Obligor (as any such amount may be modified from time to time in accordance with Section 2.25).

"Anti-Terrorism Order" shall mean Executive Order 13224, signed by President George W. Bush on September 24, 2001.

"Applicable Lending Office" shall mean, for each Lender and for each Type of Loan, the "Lending Office" of such Lender (or an Affiliate of such Lender) designated for such Type of Loan in the Administrative Questionnaire submitted by such Lender or such other office of such Lender (or such Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrower as the office by which its Loans of such Type are to be made and maintained.

"Applicable Margin" shall mean, in the case of Base Rate Loans, 3% *per annum*, and in the case of Eurodollar Loans, 4% *per annum*.

"Approved Fund" shall mean any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Sales Agent" shall mean (i) such Person(s) as may be acceptable to the Administrative Agent in its reasonable discretion for a particular type of Item of Product (it being understood that the Administrative Agent may approve an entity as an Approved Sales Agent for a particular type of Item of Product (only)) and (ii) those Person(s) specified on Annex C hereto; provided, however, that the Administrative Agent from time to time may (or shall, if so instructed by the Required Lenders) by written notice to the Borrower remove any such Person as an Approved Sales Agent as the Administrative Agent (or the Required Lenders, as the case may be), acting in good faith, may in its (or their) discretion deem appropriate (which notice

3

shall be prospective only, i.e., such removal shall not be given effect in the context of any Item of Product for which the Loan Parties have already received credit under the Borrowing Base, but such removal shall nevertheless be effective for all other purposes under the Loan Documents immediately upon the Borrower's receipt of such notice).

"Approved Valuation Expert" shall mean any of the following: FTI Consulting, LEK Consulting, Salem Partners LLC or such other independent consultant with experience in film library valuations as may be approved by the Administrative Agent, each of whom shall be jointly retained by the Borrower and the Administrative Agent at the sole cost and expense of the Borrower; provided, however, that the engagement letter with the Approved Valuation Expert shall expressly authorize the Approved Valuation Expert to have direct discussions with the Administrative Agent and, subject to the Administrative Agent's execution of an access agreement in form and substance acceptable to the Approved Valuation Expert and the Administrative Agent, to provide Library Valuation Reports and other information from time to time; provided, further, that the Administrative Agent may (or shall, if so instructed by the Required Lenders) by written notice to the Borrower remove any such Person as an Approved Valuation Expert as the Administrative Agent (or the Required Lenders, as the case may be), acting in good faith, may in its (or their) discretion deem appropriate (which notice shall be prospective only, i.e., such removal shall not be given effect in the context of any Item of Product for which the Loan Parties have already received credit under the Borrowing Base, but such removal shall nevertheless be effective for all other purposes under the Loan Documents immediately upon the Borrower's receipt of such notice).

"Asset Purchase Agreement" shall mean that certain Asset Purchase Agreement dated May 7, 2015 by and between ANConnect, LLC and the Borrower, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time to the extent permitted herein.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 10.4(b)) and accepted by the Administrative Agent, in the form of Exhibit A attached hereto or any other form approved by the Administrative Agent.

"Availability Period" shall mean the period from the Closing Date to but excluding the Revolving Commitment Termination Date.

"Bank Product Obligations" shall mean, collectively, all obligations and other liabilities of any Loan Party to any Bank Product Provider arising with respect to any Bank Products.

"Bank Product Provider" shall mean any Person that, at the time it provides any Bank Product to any Loan Party, (i) is a Lender or an Affiliate of a Lender and (ii) except when the Bank Product Provider is SunTrust Bank and its Affiliates, has provided prior written notice to the Administrative Agent which has been acknowledged by the Borrower of (x) the existence of such Bank Product, (y) the maximum dollar amount of obligations arising thereunder (the "Bank Product Amount") and (z) the methodology to be used by such parties in determining the obligations under such Bank Product from time to time.  In no event shall any Bank Product Provider acting in such capacity be deemed a Lender for purposes hereof to the extent of and as

4

to Bank Products except that each reference to the term "Lender" in Article IX and Section 10.3(b) shall be deemed to include such Bank Product Provider and in no event shall the approval of any such person in its capacity as Bank Product Provider be required in connection with the release or termination of any security interest or Lien of the Administrative Agent. The Bank Product Amount may be changed from time to time upon written notice to the Administrative Agent by the applicable Bank Product Provider. No Bank Product Amount may be established at any time that a Default or Event of Default exists.

"Bank Products" shall mean any of the following services provided to any Loan Party by any Bank Product Provider: (a) any treasury or other cash management services, including deposit accounts, automated clearing house (ACH) origination and other funds transfer, depository (including cash vault and check deposit), zero balance accounts and sweeps, return items processing, controlled disbursement accounts, positive pay, lockboxes and lockbox accounts, account reconciliation and information reporting, payables outsourcing, payroll processing, trade finance services, investment accounts and securities accounts, and (b) card services, including credit cards (including purchasing cards and commercial cards), prepaid cards, including payroll, stored value and gift cards, merchant services processing, and debit card services.

"Base Rate" shall mean the highest of (i) the rate which the Administrative Agent announces from time to time as its prime lending rate, as in effect from time to time, (ii) the Federal Funds Rate, as in effect from time to time, plus one-half of one percent (0.50%) per annum and (iii) the Adjusted LIBO Rate determined on a daily basis for an Interest Period of one (1) month, plus one percent (1.00%) per annum (any changes in such rates to be effective as of the date of any change in such rate). The Administrative Agent's prime lending rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. The Administrative Agent may make commercial loans or other loans at rates of interest at, above, or below the Administrative Agent's prime lending rate.

"Beneficial Owner" shall mean, with respect to any amount paid hereunder or under any other Loan Document, the Person that is the beneficial owner, for U.S. federal income tax purposes, of such payment.

"Borrower" shall have the meaning set forth in the introductory paragraph hereof.

"Borrowing" shall mean a borrowing consisting of Loans of the same Class and Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Base" shall mean, at any date for which the amount thereof is to be determined, an amount equal to the aggregate (without double counting for any receivables, prior collections or items of cost or expense of the Loan Parties) of the following:

(a)     100% of the Loan Parties' unrestricted and uncommitted cash held in a Controlled Account (other than a Collection Account) with respect to which the applicable requirements of Section 5.13(a) are satisfied (i.e., such cash is held in a Controlled Account that is subject to the sole dominion and control of the Administrative Agent);

5

(b)     100% of Eligible Receivables secured by an Acceptable L/C, <u>plus</u>

(c)     95% of Eligible Receivables from an Acceptable Obligor that is a Primary Major Acceptable Obligor, <u>plus</u>

(d)     90%% of Eligible Receivables from an Acceptable Obligor that is a Major Acceptable Obligor, <u>plus</u>

(e)     80% of Eligible Receivables from an Acceptable Obligor that is a Non-Major Acceptable Obligor, <u>plus</u>

(f)     80% of U.S. Theatrical Rentals; <u>plus</u>

(g)     50% of Eligible Receivables from an Acceptable Obligor that is a Minor Acceptable Obligor, <u>plus</u>

(h)     the Library Credit; <u>minus</u>

(i)     the Netflix Release Reserve; <u>minus</u>

(j)     the Red Cloud EBITDA Credit, if applicable; <u>minus</u>

(k)     the Key Man Reserve, if applicable; <u>minus</u>

(l)     to the extent not already deducted or excluded in computing the foregoing, and without duplication of any deductions contained within any of the foregoing components of the Borrowing Base, the aggregate Dollar amount of any payments which a Loan Party is required to pay to any third Person in respect of any receivable or other amount contained within any of the foregoing components of the Borrowing Base (e.g., royalties, residuals, participations, fees, commissions) and any other projected expenses required to be paid to a third Person, in each case, as a direct result of the receipt by the Loan Parties of the applicable receivable arising in connection with such amounts (in the case of amounts which are not due and payable within two (2) years following the date of determination, such amounts shall be discounted to present value on a quarterly basis by a rate of interest equal to the interest rate in effect on the date of computation with respect to Revolving Loans that are Eurodollar Loans);

<u>provided, however, that</u>:

(i)     credit may not be included in the Borrowing Base for any Incomplete Items of Product;

(ii)     credit may not be obtained for any items in the Borrowing Base which are in the aggregate (together with any the aggregate amount of any Borrowing Base credit derived from any other anticipated receivables or revenue from such Person) due from a single Acceptable Obligor in excess of the Allowable Amount with respect to such Acceptable Obligor or, in the case of an Affiliated Group, in the aggregate (together with any Borrowing Base credit derived from any other anticipated receivables or revenue from any of such Persons) due from the relevant entities in such Affiliated Group

6

in excess of the Allowable Amount with respect to such Affiliated Group (but in each case only to the extent of such excess), unless in either case such excess is supported by an Acceptable L/C;

        (iii)    credit may not be obtained for any item in the Borrowing Base except to the extent that the Administrative Agent (for the benefit of the Secured Parties) holds a first priority perfected security interest in the Loan Parties' interests therein under the UCC and applicable law, other than with respect to Permitted Encumbrances of the type described in clause (i) of the definition of such term;

        (iv)    in the event that a default shall be made by a Loan Party or a Licensing Intermediary under a Distribution Agreement or applicable Notice of Assignment or Interparty Agreement (after giving effect to any applicable cure periods thereunder), which, in the determination of the Administrative Agent, results in a substantial adverse effect on the timely collectability of the applicable accounts receivable, credit for the applicable accounts receivable may be removed from or reduced in the Borrowing Base, as determined by the Administrative Agent and promptly notified to the Borrower in writing;

        (v)    no Library Credit may be taken for any Library Title if the Borrower has failed to timely deliver a Library Valuation Report (together with all supporting calculations), as and when required under this Agreement; and

        (vi)    in the event that unsold rights with respect to any of the Library Titles are sold to a Distributor for an amount in excess of $2,500,000 and intended to be included in the Borrowing Base as Eligible Receivables, then the Administrative Agent may, in its sole discretion, cause the Borrower to provide a new Library Valuation Report reflecting an adjustment for such unsold rights within ten (10) Business Days and the Library Valuation Amount (and the Library Credit) shall be recalculated accordingly.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit B, including all annexes, exhibits, schedules and attachments thereto.

"Business Day" shall mean any day other than (i) a Saturday, Sunday or other day on which commercial banks in Atlanta, Georgia or Los Angeles, California are authorized or required by law to close and (ii) if such day relates to a Borrowing of, a payment or prepayment of principal or interest on, a conversion of or into, or an Interest Period for, a Eurodollar Loan or a notice with respect to any of the foregoing, any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures" shall mean, for any period, without duplication, (i) the additions to property, plant and equipment and other capital expenditures of the Borrower and its Subsidiaries that are (or would be) set forth on a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP and (ii) Capital Lease Obligations incurred by the Borrower and its Subsidiaries during such period.  For the avoidance of doubt,

206771225 v17

Capital Expenditures shall exclude the amount that the Loan Parties have advanced for fully paid Rights Acquisition Costs.

"Capital Lease Obligations" of any Person shall mean all obligations of such Person to pay rent or other amounts under any lease (or other arrangement conveying the right to use) of real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" shall mean all shares, options, warrants, general or limited partnership interests, membership interests or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Exchange Act).

"Change in Control" shall mean that (i) Holdco ceases to own and control, directly or indirectly, beneficially and of record, at least 51% of the outstanding shares of the voting equity interests of the Borrower and/or (ii) Sponsor ceases to be the general partner of Holdco and Virgo Societas Partnership (Onshore) III, LP and Virgo Societas Partnership (Offshore) III, LP (or one or more Affiliates thereof) cease to collectively own and control, directly or indirectly, beneficially and of record at least 51% of the outstanding shares of the limited partnership interests of Holdco. For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if such latter Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such controlled Person whether by contract or otherwise.

"Change in Law" shall mean (i) the adoption of any applicable law, rule or regulation after the date of this Agreement, (ii) any change in any applicable law, rule or regulation, or any change in the interpretation, implementation or application thereof, by any Governmental Authority after the date of this Agreement, or (iii) compliance by any Lender (or its Applicable Lending Office) (or, for purposes of Section 2.17(b), by the Parent Company of such Lender, if applicable) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that for purposes of this Agreement, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued (and the Administrative Agent shall give the Borrower similar treatment in connection therewith as it gives other borrowers).

"Change in Management" shall mean (i) Bill Lee shall cease for any reason, including, without limitation, termination of employment, death or disability, to serve as the chief executive officer of the Borrower or to substantially perform the functions and services currently being

8

performed by such individual and (ii) John Avagliano shall cease for any reason, including, without limitation, termination of employment, death or disability, to serve as the chief financial officer of the Borrower or to substantially perform the functions and services currently being performed by such individual, and that a replacement of such individuals reasonably acceptable to the Administrative Agent has not been retained within a period of ninety (90) days following the last day that such individuals shall have ceased to serve in such capacities or to perform such functions and services as aforesaid.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Term Loans and when used in reference to any Commitment, refers to whether such Commitment is a Revolving Commitment or a Term Loan Commitment.

"Closing Date" shall mean the date on which the applicable conditions precedent set forth in Article III have been satisfied or waived in accordance with Section 10.2.

"Code" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time.

"Collateral" shall mean (a) all tangible and intangible property, real and personal, of any Loan Party that is or purports to be the subject of a Lien to the Administrative Agent to secure the whole or any part of the Obligations or any Guarantee thereof, and shall include, without limitation, all casualty insurance proceeds and condemnation awards with respect to any of the foregoing and (b) 100% of the issued and outstanding capital stock, partnership interests, membership interests, beneficial interests or other equity interests of or in each of the Loan Parties, whether now formed or formed hereafter and whether now owned or hereafter acquired; provided, however, that Collateral shall not include any Capital Stock of OA Investment Holdings.

"Collateral Access Agreement" shall mean each landlord waiver or bailee agreement granted to, and in form and substance reasonably acceptable to, the Administrative Agent, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Collateral Documents" shall mean, collectively, the Guaranty and Security Agreement, the Pledge Agreement, the Control Account Agreements, the Perfection Certificate, the Copyright Security Agreement, all Copyright Security Agreement Supplements, all Trademark Security Agreements, all Collateral Access Agreements, all Laboratory Access Letters, all Laboratory Pledgeholder Agreements, all Licensing Intermediary Security Agreements and all other instruments and agreements now or hereafter in existence from time to time that create or purport to create a Lien in favor of the Administrative Agent (for the benefit of the Secured Parties) in connection with the transactions contemplated by the Loan Documents, or that secure or perfect the Liens securing the whole or any part of the Obligations or any Guarantee thereof, all UCC financing statements, fixture filings and stock powers, and all other documents, instruments, agreements and certificates executed and delivered by any Loan Party to the Administrative Agent and/or the Lenders in connection with any of the foregoing, as any of the

206771225 v17

same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Collection Account" shall mean a Controlled Account located at SunTrust Bank which shall serve as a collection account for the receipt of proceeds of Collateral.

"Commitment" shall mean a Revolving Commitment or a Term Loan Commitment or any combination thereof (as the context shall permit or require).

"Commitment Fees" shall have the meaning given to such term in Section 2.13(b).

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended and in effect from time to time, and any successor statute.

"Complete" shall mean, with respect to any Item of Product, that (a) either (i) sufficient Physical Materials and other elements thereof have been delivered to the applicable Loan Party to permit such Loan Party to exhibit such Item of Product in the theatrical, television or other medium for which the Picture is intended for exploitation, or (ii) the applicable Loan Party has delivered to the Administrative Agent a Laboratory Access Letter or Laboratory Pledgeholder Agreement, and such letter or agreement reflects that the Physical Materials described in clause "(i)" are then on deposit at the subject laboratory and that under such letter or agreement the applicable Loan Party has access to or control of (as applicable) a complete final 35mm or 70mm (or other size which has become standard in the industry) composite positive print, video master or other equivalent master copy of such Item of Product as finally cut, main and end titled, edited, scored and assembled, with sound track printed thereon in perfect synchronization with the photographic action and/or animation and fit and ready for exhibition and distribution or broadcast in the medium for which such Item of Product is intended for exploitation then on deposit in an independent laboratory that is a party to such agreement, and (b) the entire Rights Acquisition Cost required to be paid by a Loan Party in order for such Loan Party to acquire the distribution or exploitation rights in and to the subject Item or Product specified in the Rights Acquisition Agreement pursuant to which, among other things, a Loan Party acquires distribution rights in and to such Item of Product from a third Person shall have been paid and there is no condition or event, the occurrence of which might result in the applicable Loan Party losing any of its rights in such Item of Product.

"Compliance Certificate" shall mean a certificate from the principal executive officer or the principal financial officer of the Borrower in the form of, and containing the certifications set forth in, the certificate attached hereto as Exhibit 5.1(c).

"Consolidated Net Income" shall mean, as of any date of determination, the consolidated net income (or loss) of the Borrower and its consolidated Subsidiaries, determined on a combined basis in accordance with GAAP.

"Contractual Obligation" of any Person shall mean any provision of any security issued by such Person or of any agreement, instrument or undertaking under which such Person is obligated or by which it or any of the property in which it has an interest is bound.

10

"Control Account Agreement" shall mean any agreement by and among, *inter alia*, a Loan Party, the Administrative Agent and a depositary bank or securities intermediary at which such Loan Party maintains a Controlled Account, in each case in form and substance satisfactory to the Administrative Agent, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Controlled Account" shall have the meaning set forth in Section 5.13(a).

"Copyright" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"Copyright Security Agreement" shall mean a Copyright Security Agreement, substantially in the form of Exhibit C-1 hereto, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time by delivery of a Copyright Security Agreement Supplement or otherwise.

"Copyright Security Agreement Supplement" shall mean a Copyright Security Agreement Supplement, substantially in the form of Exhibit C-2 hereto.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.12(c).

"Defaulting Lender" shall mean, subject to Section 2.24(c), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject

11

of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.24(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Disposition" shall mean any transaction, or series of related transactions, pursuant to which any Loan Party or any of its Subsidiaries sells, assigns, transfers or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any Person (other than a Loan Party), in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person, excluding licenses of distribution rights in Items of Product entered into in the ordinary course of business of the parties to such transaction and on ordinary business terms.

"Distribution Agreement" shall collectively mean (i) any distribution, license or similar agreement (whether in long form, a deal memo or a purchase order) heretofore or hereafter entered into by a Loan Party (or by a sales agent on behalf of a Loan Party, or by a Licensing Intermediary) with a Distributor with respect to the distribution, sub-distribution, broadcasting, streaming, lease, sublease, transfer, revenue share or other exploitation of one or more Items of Product in the applicable territory in the applicable media described therein, and (ii) any written agreement heretofore or hereafter entered into by a Loan Party, as licensor, and a Distributor, as theatrical exhibitor, with respect to the theatrical rental or sale of one or more Items of Product in the United States, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time subject to the terms hereof and of any corresponding Notice of Assignment or Interparty Agreement.

"Distributor" shall mean any entity which any Loan Party (or a sales agent on behalf of a Loan Party, or a Licensing Intermediary) engages to distribute, broadcast, stream, exhibit or otherwise exploit any Item of Product in any medium or territory.

"Dollar(s)" and the sign "$" shall mean lawful money of the United States.

"Domestic Subsidiary" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state or district thereof.

"Domestic Territory" means the United States and Canada.

"EBITDA" means, for any applicable period for which such amount is being determined, the sum of: (a) Consolidated Net Income for such period, (b) the interest expense that decreased Consolidated Net Income for such period, (c) the amount of all amortization of intangible assets (other than the amortization of Rights Acquisition Costs) for such period deducted in arriving at Consolidated Net Income, (d) the amount of all depreciation expense for such period deducted in arriving at such Consolidated Net Income, (e) the amount of all taxes for such period deducted (if any) in arriving at such Consolidated Net Income, (f) the amount of ultimate participations not payable during such period but deducted in arriving at such Consolidated Net Income, (g) the amount of any non-recurring charges, expenses or losses for such period deducted in arriving at such Consolidated Net Income, and (f) the amount of any Management Fees included in arriving at such Consolidated Net Income.

"Eligible Receivables" shall mean, at any date at which the amount thereof is to be determined, an amount equal to the sum of the following (discounted to present value on a quarterly basis, in the case of amounts which are not due and payable within two (2) years following the date of determination, by a rate of interest equal to the interest rate in effect on the date of computation with respect to Revolving Loans that are Eurodollar Loans): (x) all net amounts which pursuant to a Distribution Agreement are contractually obligated to be paid to a Loan Party (either directly, or indirectly through a Licensing Intermediary) with respect to an Item of Product either unconditionally or subject only to the passage of time or customary delivery requirements, and which are reasonably expected by the Borrower to be payable and collected from an Acceptable Obligor (which net amounts, for the avoidance of doubt, shall include Netflix MGs) or are supported by an Acceptable L/C, cash deposit or other form of credit support acceptable to the Administrative Agent minus (y) the sum, without double-counting, of (i) the following items (based on the Borrower's then best estimates): royalties, third party profit participations, residuals, collection/distribution expenses, home video fulfillment costs, fees, commissions, participations and other payments to third Persons (including any applicable sales agents and Licensing Intermediaries), collection/distribution expenses, fulfillment costs, Taxes (including foreign withholding, remittance and similar Taxes) chargeable in respect of such accounts receivable, and any other projected expenses of a Loan Party arising in connection with such amounts required to be paid to third Persons (including any sales agents and Licensing Intermediaries) as a direct result of such receivable and any other projected expenses of a Loan Party arising in connection with such amounts, (ii) reserves for participations and residuals in the amount of five percent (5%) of such net amount referred to in clause (x) above, (iii) to the extent that an Acceptable Obligor is subject to returns of Item of Product, additional reserves in the amount of thirty-five percent (35%) of such net amount referred to in clause (x) above, provided that reserves in the amount of fifty percent (50%) of such net amount referred to in clause (x) above shall be required with respect to Red Cloud Items of Product, and (iv) the outstanding amount of unrecouped advances made by a Distributor or a sales agent in respect of such accounts receivable to the extent reasonably expected to have to be repaid by a Loan Party, as applicable; provided, that Eligible Receivables shall not include amounts:

(a)     which are in the aggregate (together with any the aggregate amount of any Borrowing Base credit derived from any other anticipated receivables or revenue from such Person) due from a single Acceptable Obligor in excess of the Allowable Amount with respect to such Acceptable Obligor or, in the case of an Affiliated Group, in the aggregate (together with the aggregate amount of any Borrowing Base credit derived from any other anticipated

13

receivables or revenue from any of such Persons) due from the relevant entities in such Affiliated Group in excess of the Allowable Amount with respect to such Affiliated Group (but in each case only to the extent of such excess), unless in either case such excess is supported by an Acceptable L/C;

(b)     which, in the sole judgment of the Administrative Agent, are subject to material conditions precedent to payment (including a material performance obligation or a material executory aspect on the part of a Loan Party or any other party or obligations contingent upon future events not within the relevant Loan Party's direct control within the ordinary course of business including any condition relating to any Item of Product being released in any manner in the Domestic Territory; provided, however, (A) the theatrical release condition set forth in any Netflix Distribution Agreement shall not, for that reason, disqualify such receivable from being an Eligible Receivable for any Qualifying Picture under the Netflix Distribution Agreement so long as the Netflix Release Reserve is reserved from the Borrowing Base for the payment of prints and advertising costs and theatrical releasing costs in connection with the initial theatrical release of such Qualifying Picture in the Domestic Territory);

(c)     which are to be paid in a currency other than Dollars unless such receivables are contractually hedged in a manner satisfactory to the Administrative Agent;

(d)     to the extent included in a Loan Party's estimated bad debts;

(e)     which are either (i) more than one hundred twenty (120) past due or (ii) due from any Acceptable Obligor which has 10% or more of the total receivable amount from such Acceptable Obligor one hundred twenty (120) or more days past due (exclusive of amounts that are being disputed or contested in good faith);

(f)     for which there is a bona fide request for a material credit, adjustment, compromise, offset, counterclaim or dispute; provided, however, that only the amount in question shall be excluded from such receivable;

(g)     which arise from a Distribution Agreement which contractually permits the Acceptable Obligor for such receivable to exercise a right of offset or recoupment for any amount payable to or advanced by such Acceptable Obligor under such Distribution Agreement, against any amount payable with respect to such receivable; provided, that only the maximum amount which such Acceptable Obligor may offset or recoup shall be excluded as an "Eligible Receivable";

(h)     which are attributable to an Item of Product or right in which a Loan Party cannot warrant sufficient title to the underlying rights to justify such receivable;

(i)     to the extent that the Administrative Agent (for the benefit of the Secured Parties) does not have a first priority perfected security interest in the Loan Parties' interests therein under the UCC and applicable law, other than with respect to Permitted Encumbrances of the type described in clause (i) of the definition of such term;

(j)     which are determined by the Administrative Agent in its reasonable discretion, acting in good faith, to be unlikely to be collectible on a timely basis, upon notice

14

from the Administrative Agent to the Borrower (which may be delivered telephonically) and effective ten (10) days subsequent to the Borrower's receipt of such notice (it being understood that any such receivables may be made Eligible Receivables if secured by an Acceptable L/C, cash deposit or other form of credit support acceptable to the Administrative Agent);

(k)     which are payable under a Distribution Agreement in respect of which a fully-executed Notice of Assignment (or an Interparty Agreement) has not been delivered to the Administrative Agent;

(l)     the payment of which is to be through a Licensing Intermediary, unless the terms of Section 5.17(d) have been satisfied with respect to such Licensing Intermediary;

(m)     which relate to an Item of Product as to which the Administrative Agent has not received a fully executed Laboratory Access Letter or a Laboratory Pledgeholder Agreement (as the case may be) for the laboratory holding an original completed set of first generation Physical Materials (or, in the case of digital Physical Materials, a completed set of digital Physical Materials) for such Item of Product;

(n)     which will be subject to reduction or repayment to the extent not earned by performance other than delivery by a Loan Party to such Acceptable Obligor in the ordinary course of business; provided, however, that only the amount subject to reduction or repayment shall be excluded from such receivable;

(o)     which do not become due and payable prior to the date which is twelve (12) months following the Maturity Date; or

(p)     which are determined by the Administrative Agent in its reasonable discretion, acting in good faith, upon notice from the Administrative Agent to the Borrower (which may be delivered telephonically), to be unacceptable.

"Engagement Letter" shall mean that certain Engagement Letter dated as of May 26, 2015 executed by the Sole Lead Arranger and accepted by the Borrower, as the same may be further amended, supplemented or otherwise modified, renewed, restated or replaced from time to time subject to the terms hereof.

"Environmental Indemnity" shall mean each environmental indemnity made by each Loan Party with Real Estate required to be pledged as Collateral in favor of the Administrative Agent for the benefit of the Secured Parties, in each case in form and substance satisfactory to the Administrative Agent.

"Environmental Laws" shall mean all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority relating in any way to the environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters.

"Environmental Liability" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation and remediation, costs of

administrative oversight, fines, natural resource damages, penalties or indemnities), of the Borrower or any of its Subsidiaries directly or indirectly resulting from or based upon (i) any actual or alleged violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (iii) any actual or alleged exposure to any Hazardous Materials, (iv) the Release or threatened Release of any Hazardous Materials or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Contribution" shall have the meaning set forth in Section 5.10(d).

"Equity Cure Right" shall mean the cure right described in Section 6.2 and Section 6.3.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any person that for purposes of Title I or Title IV of ERISA or Section 412 of the Code would be deemed at any relevant time to be a "single employer" or otherwise aggregated with the Borrower or any of its Subsidiaries under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"ERISA Event" shall mean (i) any "reportable event" as defined in Section 4043 of ERISA with respect to a Plan (other than an event as to which the PBGC has waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event); (ii) any failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance or the provision of security under Section 430 of the Code or Section 303 or 4068 of ERISA, or the arising of such a lien or encumbrance, there being or arising any "unpaid minimum required contribution" or "accumulated funding deficiency" (as defined or otherwise set forth in Section 4971 of the Code or Part 3 of Subtitle B of Title 1 of ERISA), whether or not waived, or any filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code or Section 303 of ERISA with respect to any Plan or Multiemployer Plan, or that such filing may be made, or any determination that any Plan is, or is expected to be, in at-risk status under Title IV of ERISA; (iii) any incurrence by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any liability under Title IV of ERISA with respect to any Plan or Multiemployer Plan (other than for premiums due and not delinquent under Section 4007 of ERISA); (iv) any institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings by the PBGC, under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (v) any incurrence by the Borrower, any of its  Subsidiaries or any of their respective ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan, or the receipt by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA; (vi) any receipt by the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice, or any receipt by any Multiemployer Plan from the Borrower, any of its Subsidiaries or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination

16

that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (vii) engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA; or (viii) any filing of a notice of intent to terminate any Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, any filing under Section 4041(c) of ERISA of a notice of intent to terminate any Plan, or the termination of any Plan under Section 4041(c) of ERISA.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" shall have the meaning set forth in Section 8.1.

"Excess Cash Flow" shall mean, as of the end of the applicable Fiscal Year, the excess, if any, of (a) the net sum, without duplication, of (i) the Consolidated Net Income for such Fiscal Year, (ii) the amount of all non-cash charges deducted in arriving at such Consolidated Net Income, (iii) decreases in working capital for such Fiscal Year, and (iv) the aggregate net amount of non-cash losses on the sale or other disposition of property by the Loan Parties during such Fiscal Year, to the extent deducted in arriving at such Consolidated Net Income, minus (b) the net sum, without duplication, of (i) the amount of all non-cash credits included in arriving at such Consolidated Net Income, (ii) the aggregate amount actually paid by the Loan Parties in cash during such Fiscal Year on account of Capital Expenditures (excluding the principal amount of indebtedness incurred in connection with such Capital Expenditures), (iii) the aggregate amount of all prepayments of the Revolving Loans during such Fiscal Year to the extent accompanying permanent optional reductions of the Revolving Commitment (to the extent permitted hereunder), all optional prepayments of the Term Loans during such Fiscal Year (to the extent permitted hereunder), and all amortization prepayments of Term Loan during such Fiscal Year, (iv) the aggregate amount of all regularly scheduled principal payments of a Loan Party's Indebtedness having a maturity of more than one year from the date of creation of the Indebtedness made during such Fiscal Year (other than in respect of any Revolving Loans to the extent there is not an equivalent permanent reduction in the Revolving Commitments), (v) increases in working capital for such Fiscal Year, (vi) the aggregate net amount of non-cash gains on the sale or other disposition of property by the Loan Parties during such Fiscal Year, to the extent included in arriving at such Consolidated Net Income, and (vii) the amount that the Loan Parties have advanced for Rights Acquisition Costs.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended and in effect from time to time.

"Excluded Swap Obligation" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the

17

Guarantee of such Guarantor becomes effective with respect to such related Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.23 to a Lender designated by Borrower) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.19, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.19 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Closing Date" means September 4, 2014.

"Existing Credit Agreement" shall have the meaning set forth in the recitals hereto.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Rate" shall mean, for any day, the rate *per annum* (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with member banks of the Federal Reserve System arranged by Federal funds brokers, as published by the Federal Reserve Bank of New York on the next succeeding Business Day or, if such rate is not so published for any Business Day, the Federal Funds Rate for such day shall be the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of May 26, 2015, executed by the Sole Lead Arranger and accepted by the Borrower, as the same may be further amended, supplemented or otherwise modified, renewed, restated or replaced from time to time subject to the terms hereof.

"Fiscal Quarter" shall mean any fiscal quarter of the Borrower.

18

"<u>Fiscal Year</u>" shall mean any fiscal year of the Borrower.

"<u>Fixed Charge Coverage Ratio</u>" shall mean, as of any date of determination, the ratio of (x) EBITDA, to (y) the aggregate sum of the following (in each case, to the extent paid during the applicable testing period): cash interest payments on any Indebtedness <u>plus</u> cash payments made by any Loan Party on account of any Taxes <u>plus</u> any scheduled principal payments on the Term Loans made pursuant to <u>Section 2.8(b)</u> <u>plus</u> any actual Capital Expenditures made by any Loan Party <u>plus</u> any Management Fees paid by any Loan Party <u>plus</u> the amount of any Merchandising Fee Advance Repayments.

"<u>Foreign Lender</u>" shall mean (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"<u>Foreign Subsidiary</u>" shall mean each Subsidiary of the Borrower that is organized under the laws of a jurisdiction other than one of the fifty states of the United States or the District of Columbia.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States applied on a consistent basis and subject to the terms of <u>Section 1.3</u>.

"<u>Governmental Authority</u>" shall mean the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supranational bodies such as the European Union or the European Central Bank).

"<u>Guarantee</u>" of or by any Person (the "<u>guarantor</u>") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly and including any obligation, direct or indirect, of the guarantor (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) as an account party in respect of any letter of credit or letter of guaranty issued in support of such Indebtedness or obligation; <u>provided</u> that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made or, if not so stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" shall mean collectively Holdco and each of the Subsidiary Loan Parties.

"Guaranty and Security Agreement" shall mean the Guaranty and Security Agreement, dated as of September 4, 2014 and substantially in the form of Exhibit D, made by the Loan Parties in favor of the Administrative Agent for the benefit of the Secured Parties, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Hazardous Materials" shall mean all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedging Obligations" of any Person shall mean any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired under (i) any and all Hedging Transactions, (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Hedging Transactions and (iii) any and all renewals, extensions and modifications of any Hedging Transactions and any and all substitutions for any Hedging Transactions.

"Hedge Termination Value" shall mean, in respect of any one or more Hedge Transactions, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Transactions, (a) for any date on or after the date such Hedge Transactions have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Transactions, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Transactions (which may include a Lender or any Affiliate of a Lender).

"Hedging Transaction" of any Person shall mean (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into by such Person that is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, spot transaction, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with

20

any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Holdco" shall mean Calrissian LP, a Delaware limited partnership.

"Incomplete" shall mean, with respect to any Item of Product, such Item of Product is not Complete.

"Increasing Revolving Lender" shall have the meaning set forth in Section 2.21A.

"Incremental Revolving Commitment" shall have the meaning set forth in Section 2.21A.

"Incremental Revolving Commitment Amount" shall have the meaning set forth in Section 2.21A.

"Increasing Term Lender" shall have the meaning set forth in Section 2.21B.

"Incremental Term Commitment" shall have the meaning set forth in Section 2.21B.

"Incremental Term Commitment Amount" shall have the meaning set forth in Section 2.21B.

"Indebtedness" of any Person shall mean, without duplication, (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations of such Person in respect of the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business; provided that, for purposes of Section 8.1(g), trade payables overdue by more than 120 days shall be included in this definition except to the extent that any of such trade payables are being disputed in good faith and by appropriate measures), (iv) all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person, (v) all Capital Lease Obligations of such Person, (vi) all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, (vii) all Guarantees of such Person of the type of Indebtedness described in clauses (i) through (vi) above, (viii) all Indebtedness of a third party secured by any Lien on property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (ix) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (x) all Off-Balance Sheet Liabilities and (xi) all Hedging Obligations; provided, that Indebtedness shall not include any non-refundable advance made to a Loan Party by a third party Distributor in connection with the distribution or sale of any Item of Product.  The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" shall mean (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the preceding clause (a), Other Taxes.

"Initial Incremental Close Date" has the meaning set forth in Section 2.21B.

"Initial Library Valuation Report" shall mean the Library Valuation Report dated March 19, 2014 issued by Salem Partners LLC, which sets forth a calculation of the Library Valuation Amount as of March 19, 2014.

"Intercreditor Agreement" shall mean an intercreditor agreement among, *inter alia*, a third Person, the applicable Loan Party and the Administrative Agent (on behalf of the Secured Parties) in form and substance satisfactory to the Administrative Agent, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time. For the avoidance of doubt, an Intercreditor Agreement may constitute an Interparty Agreement hereunder (and vice versa).

"Interest Period" shall mean with respect to any Eurodollar Borrowing, a period of one, two, three or six months; provided that:

      (i)    the initial Interest Period for such Borrowing shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of another Type), and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

      (ii)    if any Interest Period would otherwise end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, unless such Business Day falls in another calendar month, in which case such Interest Period would end on the next preceding Business Day;

      (iii)    any Interest Period which begins on the last Business Day of a calendar month or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period shall end on the last Business Day of such calendar month;

      (iv)    each principal installment of the Term Loans shall have an Interest Period ending on each installment payment date and the remaining principal balance (if any) of the Term Loans shall have an Interest Period determined as set forth above; and

      (v)    no Interest Period may extend beyond the Revolving Commitment Termination Date, unless on the Revolving Commitment Termination Date the aggregate outstanding principal amount of Term Loans is equal to or greater than the aggregate principal amount of Eurodollar Loans with Interest Periods expiring after such date, and no Interest Period may extend beyond the Maturity Date.

"Interparty Agreement" shall mean, with respect to an Item of Product, an interparty agreement, among (a) the Administrative Agent, (b) a Loan Party, (c) (if applicable) an Acceptable Obligor or an Approved Sales Agent, and (d) such other Person(s) as the Administrative Agent shall require, which agreement (i) is necessary in the reasonable judgment of the Administrative Agent to allocate the risks of Completion and delivery of such Item of Product and (ii) shall be in form and substance reasonably satisfactory to the Administrative

Agent, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Investments" shall have the meaning set forth in Section 7.4.

"IRS" shall mean the United States Internal Revenue Service.

"Item of Product" shall mean any motion picture, episodic series, film or video tape or other audio-visual or digital work produced for theatrical, non-theatrical or television release or for release in any other medium, in each case whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter developed, with respect to which any Loan Party (i) is the copyright owner or (ii) acquires distribution rights (including, without limitation, each Library Title). The term "Item of Product" shall include, without limitation, the scenario, screenplay, teleplay or script upon which such Item of Product is based, all of the properties thereof, tangible and intangible, and whether now in existence or hereafter to be made or produced, whether or not in possession of the Loan Parties, and all rights therein and thereto, of every kind and character.

"Key Item of Product" means, as of the Closing Date, each Item of Product identified as a Key Item of Product on Schedule 4.22(a) and, after the Closing Date, any Item of Product required to be by the Administrative Agent to be identified as a Key Item of Product on Schedule 4.22(a); provided that any Item of Product with a Rights Acquisition Cost in an amount of $250,000 or more shall constitute, and be identified as, a Key Item of Product.

"Key Man Reserve" shall have the meaning set forth in Section 5.10(d).

"Laboratory" shall mean any laboratory reasonably acceptable to the Administrative Agent which is located in the United States of America (or any other jurisdiction acceptable to the Administrative Agent in its sole discretion, so long as, if requested by the Administrative Agent, appropriate local law security documents in form and substance satisfactory to the Administrative Agent are delivered to the Administrative Agent) and is a party to a Laboratory Pledgeholder Agreement or a Laboratory Access Letter.

"Laboratory Access Letter" shall mean an agreement among (a) a Laboratory holding any Physical Materials (including data backups of work in progress) of any Item of Product to which any Loan Party has a right of access (but does not own such Physical Materials), (b) such Loan Party and (c) the Administrative Agent, substantially in the form of Exhibit E hereto or a form otherwise reasonably acceptable to the Administrative Agent, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Laboratory Pledgeholder Agreement" shall mean an agreement among (i) the applicable Laboratory, (ii) each applicable Loan Party, (iii) the Administrative Agent, and (iv) if applicable, a Distributor, substantially in the form of Exhibit F-1 or Exhibit F-2, as applicable, or in such other form as shall be reasonably acceptable to the Administrative Agent, as the same may be amended, supplemented or otherwise modified, renewed or replaced from time to time.

"Lender-Related Hedge Provider" means any Person that, at the time it enters into a Hedging Transaction with any Loan Party, (i) is a Lender or an Affiliate of a Lender and (ii)

23

except when the Lender-Related Hedge Provider is SunTrust Bank or any of its Affiliates, has provided prior written notice to the Administrative Agent which has been acknowledged by the Borrower of (x) the existence of such Hedging Transaction and (y) the methodology to be used by such parties in determining the obligations under such Hedging Transaction from time to time.  In no event shall any Lender-Related Hedge Provider acting in such capacity be deemed a Lender for purposes hereof to the extent of and as to Hedging Obligations except that each reference to the term "Lender" in Article IX and Section 10.3(b) shall be deemed to include such Lender-Related Hedge Provider.  In no event shall the approval of any such Person in its capacity as Lender-Related Hedge Provider be required in connection with the release or termination of any security interest or Lien of the Administrative Agent.

"Lenders" shall have the meaning set forth in the introductory paragraph hereof and shall include, where appropriate, each Increasing Revolving Lender, Increasing Term Lender and each Additional Lender that joins this Agreement pursuant to Section 2.21.

"Library Advance Rate" shall mean an advance rate equal to 40% of the Library Valuation Amount until June 30, 2016, 35% of the Library Valuation Amount from July 1, 2016 until June 30, 2017 and 30% of the Library Valuation Amount thereafter (for the avoidance of doubt, when calculating the Library Advance Rate, the rate for the preceding period shall apply until such time as the new Library Valuation Report is delivered pursuant to Section 5.1(h) hereof); provided, that if, at the end of each relevant period, actual net revenues included in the most recent Library Valuation are (i) less than 90% but greater than or equal to 80% of the aggregate amount of the projected net revenues during the same period, the Library Advance Rate applicable for such period shall be reduced by 5%, (ii) less than 80% but greater than or equal to 75% of the aggregate amount of the projected net revenues during the same period, the Library Advance Rate applicable for such period shall be reduced by 10%, and (iii) less than 75% of the aggregate amount of the projected net revenues during the same period, the Library Advance Rate applicable for such period shall be reduced by 15%; provided that, in the event that the actual net revenues included in the most recent Library Valuation are less than 75% of the aggregate amount of the projected net revenues during the same period, then the Administrative Agent may, in its sole discretion, cause the Library Valuation Amount to be recalculated as set forth in the last sentence of the definition of "Library Valuation Amount."

"Library Credit" shall mean, as of any date of determination, the product of (x) the Library Advance Rate then in effect multiplied by (y) the then current Library Valuation Amount.

"Library Title" shall mean any of the Item of Product set forth on Annex B hereto and incorporated herein by this reference, as such Annex may be amended, modified or supplemented from time to time by the Borrower with the consent of the Administrative Agent in order to reflect the addition of new Item of Product or (to the extent permitted under this Agreement) the removal of any Item of Product.

"Library Valuation Report" shall mean a written report prepared by an Approved Valuation Expert that sets forth the then current Library Valuation Amount (and the supporting calculations reflecting in reasonable detail how such amount was calculated), which report shall be in form and substance (and shall use methodology, including a discount rate) satisfactory to the Administrative Agent.

24

"Library Valuation Amount" shall mean a valuation of the Borrower's Library Titles (expressly exclusive of any revenues that give rise to any Eligible Receivables credit), using a methodology consistent with the March 19, 2014 valuation delivered to the Administrative Agent and otherwise in form and substance satisfactory to the Administrative Agent, to be performed by an Approved Valuation Expert.  Notwithstanding the foregoing, if, at the end of any Fiscal Year, the actual net revenues included in the most recent Library Valuation Report are less than seventy-five percent (75%) of the aggregate amount of the projected net revenues for the same period, then the Administrative Agent may, in its sole discretion, cause the Borrower to provide a new Library Valuation Report, and the "Library Valuation Amount" in such case shall be the average of (x) the Library Valuation Amount in effect immediately prior to the Administrative Agent's receipt of such new Library Valuation Report and (y) the new Library Valuation Amount reflected in such new Library Valuation Report.

"Licensing Intermediary" shall mean any affiliate of Fintage House or Freeway Entertainment Kft. or any other Person acceptable to the Administrative Agent through which any distribution or other exploitation rights in respect of an Item of Product are transferred as a conduit between a Loan Party and the ultimate licensee; provided in each case the Administrative Agent or the Required Lenders may, by written notice to the Borrower, remove any such Person as a Licensing Intermediary as the Administrative Agent (or the Required Lenders, as the case may be), acting in good faith, may in its (or their) reasonable discretion deem appropriate on a prospective basis with respect to an Item of Product which is not yet subject to an executed Licensing Intermediary Agreement (with respect to an output or a multi-project Licensing Intermediary Agreement, such Item of Product is not yet subject to an executed project-specific exhibit or schedule thereto).  Notwithstanding the foregoing, and for the avoidance of doubt, no Approved Sales Agent shall be considered a Licensing Intermediary hereunder.

"Licensing Intermediary Agreements" shall mean collectively, with respect to any Item of Product, any license or distribution agreement between a Loan Party and a Licensing Intermediary and any sales agency letter or other agreement between a Licensing Intermediary and a sales agent, in each such case, including all addenda, exhibits and schedules attached thereto, pursuant to which such Licensing Intermediary has been granted (or, as applicable, a sales agent has been retained by such Licensing Intermediary as its agent with respect to) certain distribution or other exploitation rights in respect of such Item of Product throughout certain territories, as any such agreement may be amended, supplemented or otherwise modified, renewed or replaced from time to time subject to the terms hereof and of the corresponding Licensing Intermediary Security Agreement.

"Licensing Intermediary Security Agreement" shall mean a security agreement between, inter alia, the Administrative Agent and the applicable Licensing Intermediary, in form and substance satisfactory to the Administrative Agent, as any such agreement may be amended, supplemented or otherwise modified, renewed or replaced from time to time.

"Lien" shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of any of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any

25

conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

"Liquidity Ratio" shall mean, as of the end of the applicable Fiscal Quarter, the ratio (as more fully set forth in the Compliance Certificate delivered from time to time as required hereunder) of (x) the projected known sources for the next twelve (12) months (including without limitation, ending cash on hand and projected Borrowing Base availability (comprised of forecasted Borrowings during the period plus ending excess availability) and cash receipts from operations) to (y) the aggregate amount of all projected known cash uses for the next twelve (12) months (including, without limitation, debt service, amounts to be spent to acquire Items of Product, overhead, and all other projected cash expenditures), as projected by Borrower in good faith.

"Loan Documents" shall mean, collectively, this Agreement, the Collateral Documents, the Engagement Letter, the Fee Letter, each Notice of Borrowing, each Notice of Conversion/Continuation, each Compliance Certificate, each Notice of Assignment, each Interparty Agreement, each Intercreditor Agreement, any promissory notes issued hereunder and any and all other instruments, agreements, documents and writings executed in connection with any of the foregoing, in each case as amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Loan Parties" shall mean the Borrower and the Guarantors.

"Loans" shall mean all Revolving Loans and Term Loans in the aggregate or any of them, as the context shall require, and shall include, where appropriate, any loan made pursuant to Section 2.21.

"Major Acceptable Obligor" shall mean any Acceptable Obligor denoted as such on Annex A hereto with respect to the relevant type(s) of Item of Product designated therein (it being understood that an entity may be approved as a Major Acceptable Obligor for a particular type of Item of Product (only)), as modified from time to time in accordance with Section 2.25.

"Management Fees" shall mean management fees paid by a Loan Party to Holdco or an Affiliate of Holdco not to exceed $250,000 per annum, which may be paid on a semiannual basis; provided, however, that fees for Fiscal Year 2015 shall not exceed $125,000.

"Material Adverse Effect" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences whether or not related, resulting in a material adverse change in, or a material adverse effect on, (i) the business, results of operations, financial condition, assets, liabilities or prospects of the Borrower and its Subsidiaries taken as a whole, (ii) the ability of the Loan Parties to perform any of their respective obligations under the Loan Documents, (iii) the rights and remedies of the Administrative Agent or the Lenders under any of the Loan Documents or (iv) the legality, validity or enforceability of any of the Loan Documents.

26

"Material Agreements" shall mean (i) all agreements, indentures or notes governing the terms of any Material Indebtedness, (ii) all employment and non-compete agreements with senior management, (iii) all leases of Real Estate, (iv) all Plans (and each related trust, if any) and (v) all other agreements, documents, contracts, indentures and instruments pursuant to which (A) any Loan Party are obligated to make payments of $500,000 or more during any Fiscal Year, (B) any Loan Party expects to receive revenue of $500,000 or more during any Fiscal Year or (C) a default, breach or termination thereof could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" shall mean any Indebtedness (other than the Loans) of the Borrower or any of its Subsidiaries individually or in an aggregate committed or outstanding principal amount exceeding $250,000. For purposes of determining the amount of attributed Indebtedness from Hedging Obligations, the "principal amount" of any Hedging Obligations at any time shall be the Net Mark-to-Market Exposure of such Hedging Obligations.

"Maturity Date" shall mean the earlier of (i) September 4, 2018 and (ii) the date on which the principal amount of all outstanding Loans have been declared or automatically have become due and payable (whether by acceleration or otherwise).

"Merchandising Fee Advance Repayments" shall mean any additional merchandising fees paid to Anderson Digital, LLC by Borrower above the standard rate of .25 a unit pursuant to certain agreements between Anderson Digital, LLC and Borrower.

"Mezzanine Debt" shall have the meaning set forth in Section 5.21.

"Mezzanine Debt Facility" shall have the meaning set forth in Section 5.21.

"Minor Acceptable Obligor" shall mean any Acceptable Obligor denoted as such on Annex A hereto with respect to the relevant type(s) of Item of Product designated therein (it being understood that an entity may be approved as a Minor Acceptable Obligor for a particular type of Item of Product (only)), as modified from time to time in accordance with Section 2.25.

"Moody's" shall mean Moody's Investors Service, Inc.

"Multiemployer Plan" shall mean any "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) the Borrower, any of its Subsidiaries or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Borrower, any of its Subsidiaries or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"Net Mark-to-Market Exposure" of any Person shall mean, as of any date of determination with respect to any Hedging Obligation, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from such Hedging Obligation. "Unrealized losses" shall mean the fair market value of the cost to such Person of replacing the Hedging Transaction giving rise to such Hedging Obligation as of the date of determination (assuming such Hedging Transaction were to be terminated as of that date), and "unrealized profits" shall mean the fair market value of the gain to such Person of replacing such Hedging Transaction as

of the date of determination (assuming such Hedging Transaction were to be terminated as of that date).

"Netflix" means Netflix, Inc., a Delaware corporation.

"Netflix MGs" shall mean, with respect to any Item of Product other than a Library Title, the minimum guarantee or license fee due from Netflix related to distribution rights presold to Netflix (i.e., excluding rate card payments) with respect to an Item of Product.

"Netflix Release Reserve" shall mean, to the extent a Netflix MG for an Item of Product is credited as an Eligible Receivable and pursuant to the Netflix Distribution Agreement for such Item of Product the payment of such Netflix MG requires a Domestic Territory theatrical release by a Loan Party, a reserve in the amount determined in good faith by the Borrower (but in no case less than $300,000) to secure and pay for the required prints, advertising and theatrical releasing costs with respect to the initial theatrical release by a Loan Party of the applicable Item of Product sufficient to satisfy the Domestic Territory release requirements with respect to such Item of Product that trigger payment of the Netflix MG under the applicable Netflix Distribution Agreement.

"Non-Defaulting Lender" shall mean, at any time, a Lender that is not a Defaulting Lender.

"Non-Major Acceptable Obligor" shall mean any Acceptable Obligor denoted as such on Annex A hereto with respect to the relevant type(s) of Item of Product designated therein (it being understood that an entity may be approved as a Non-Major Acceptable Obligor for a particular type of Item of Product (only)), as modified from time to time in accordance with Section 2.25.

"Non-U.S. Plan" shall mean any plan, fund (including, without limitation, any superannuation fund) or other similar program established, contributed to (regardless of whether through direct contributions or through employee withholding) or maintained outside the United States by the Borrower or one or more of its Subsidiaries primarily for the benefit of employees of the Borrower or such Subsidiaries residing outside the United States, which plan, fund or other similar program provides, or results in, retirement income, a deferral of income in contemplation of retirement, or payments to be made upon termination of employment, and which plan is not subject to ERISA or the Code.

"Notice of Assignment" shall mean a Notice of Assignment in such form as shall be reasonably acceptable to the Administrative Agent, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Notice of Borrowing" shall have the meaning set forth in Section 2.3.

"Notice of Conversion/Continuation" shall have the meaning set forth in Section 2.6(b).

"OA Investment Holdings" shall mean OA Investment Holdings LLC, a Delaware limited liability company.

28

"<u>Obligations</u>" shall mean (a) all amounts owing by the Loan Parties, the Sponsor or any other Person to the Administrative Agent, any Lender or the Sole Lead Arranger pursuant to or in connection with this Agreement or any other Loan Document or otherwise with respect to any Loan including, without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the Administrative Agent and any Lender incurred pursuant to this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, (b) all Hedging Obligations owed by any Loan Party to any Lender-Related Hedge Provider, and (c) all Bank Product Obligations, together with all renewals, extensions, modifications or refinancings of any of the foregoing; <u>provided</u>, <u>however</u>, that with respect to any Guarantor, the Obligations shall not include any Excluded Swap Obligations.

"<u>OFAC</u>" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

"<u>Off-Balance Sheet Liabilities</u>" of any Person shall mean (i) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (ii) any liability of such Person under any Sale/Leaseback Transactions that do not create a liability on the balance sheet of such Person, (iii) any Synthetic Lease Obligation or (iv) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"<u>OSHA</u>" shall mean the Occupational Safety and Health Act of 1970, as amended from time to time, and any successor statute.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.23</u>).

"<u>Parent Company</u>" shall mean, with respect to a Lender, the "<u>bank holding company</u>" as defined in Regulation Y, if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

29

"Participant" shall have the meaning set forth in Section 10.4(d).

"Participant Register" shall have the meaning set forth in Section 10.4(d).

"Patriot Act" shall mean the USA PATRIOT Improvement and Reauthorization Act of 2005 (Pub. L. 109-177 (signed into law March 9, 2006)), as amended and in effect from time to time.

"Payment Office" shall mean the office of the Administrative Agent located at 303 Peachtree Street, N.E., Atlanta, Georgia 30308, or such other location as to which the Administrative Agent shall have given written notice to the Borrower and the Lenders.

"PBGC" shall mean the U.S. Pension Benefit Guaranty Corporation referred to and defined in ERISA, and any successor entity performing similar functions.

"Perfection Certificate" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"Permitted Asset Sale" shall mean any transfer of a Loan Party's interest in any of the rights in an Item of Product (including derivative rights) to a Person that is not a Loan Party permitted under Section 7.6(i).

"Permitted Encumbrances" shall mean:

(i)       Liens pursuant to written security agreements (in form and substance and in amounts reasonably acceptable to the Administrative Agent) in favor of guilds with respect to an Item of Product that are required pursuant to collective bargaining agreements;

(ii)      Liens customarily granted or incurred in the ordinary course of business with regard to goods provided or services rendered by laboratories and production houses, record warehouses, common carriers, landlords, warehousemen, mechanics and suppliers of materials and equipment with respect to an Item of Product; provided such Liens are limited to the goods provided or to the goods relating to which services were rendered;

(iii)     Liens in favor of Distributors to secure their right to enjoy their licensed rights with respect to an Item of Product pursuant to Distribution Agreements entered into in the ordinary course of business on terms reasonably satisfactory to the Administrative Agent; provided that the collateral subject to any such Distributor's Lien only consists of the exploitation rights granted to such Distributor with respect to the relevant Items of Product and, to the extent necessary to exercise such exploitation rights, certain other collateral related to such Items of Product;

(iv)      Liens imposed by law for taxes not yet due or the validity or amount which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with

30

GAAP and the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect;

(v)     statutory Liens (other than those of the type described in clause (ii) of this definition) of landlords, carriers, warehousemen, mechanics, materialmen and other Liens imposed by law in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves are being maintained in accordance with GAAP and the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect;

(vi)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(vii)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature (other than completion bonds with respect to Items of Product), in each case in the ordinary course of business;

(viii)     judgment and attachment liens not giving rise to an Event of Default or Liens created by or existing from any litigation or legal proceeding that are currently being contested in good faith by appropriate proceedings diligently conducted (and as to which foreclosure and other enforcement proceedings shall not have been commenced (unless fully bonded or otherwise effectively stayed)) and with respect to which adequate reserves are being maintained in accordance with GAAP;

(ix)     deposits (i) under worker's compensation, unemployment insurance, old age pensions and other Social Security laws or securing liability to insurance carriers under insurance or self-insurance arrangements or (ii) to secure statutory obligations or surety, appeal, performance or other similar bonds (other than completion bonds) and other obligations of a like nature, in each case incurred in the ordinary course of business (other than completion bonds);

(x)     deposits to secure a Loan Party's performance as a lessee under leases of real or personal property in an aggregate amount (for all Loan Parties) not to exceed $1,000,000 at any one time, or such greater amount as the Administrative Agent may approve in its sole discretion;

(xi)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(xii)     easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Loan Parties;

(xiii)   the Liens of the Administrative Agent (for the benefit of the Secured Parties) under this Credit Agreement, the other Loan Documents, any other document contemplated hereby or thereby;

(xiv)   Liens of or granted by any third Person with whom any Loan Party enters into a Rights Acquisition Agreement with respect to any Item of Product, provided the holder of any other Lien with respect to such Item of Product enters into a customary non-disturbance and subordination agreement or other agreement reasonably satisfactory to the Administrative Agent to the effect that such Loan Party's licensed rights will not be terminated or disturbed in any exercise of remedies with respect to such Lien and will be subordinated to Administrative Agent's Lien in such licensed rights at any time on or after the Loan Party acquires rights in the applicable Item of Product; provided that notwithstanding the foregoing, the Borrower's failure to deliver such subordination and/or nondisturbance agreements for any such third Person with respect to an Item of Product shall not, in and of itself, result in a Default or Event of Default, but shall result in the removal of any Borrowing Base credit for such Item of Product or to the extent such Item of Product has not yet been included in the Borrowing Base, the Borrower may not request Borrowing Base credit for such Item of Product; and

(xv)   customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code or common law of banks or other financial institutions where the Borrower or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

"Permitted Investments" shall mean:

(i)   direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof;

(ii)   commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's and in either case maturing within six months from the date of acquisition thereof;

(iii)   certificates of deposit, bankers' acceptances and time deposits maturing within 180 days of the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(iv)   fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (i) above and entered into with a financial institution satisfying the criteria described in clause (iii) above; and

32

(v)     mutual funds investing solely in any one or more of the Permitted Investments described in clauses (i) through (iv) above.

"Permitted Tax Distributions" shall mean tax distributions by a Loan Party (so long as such Loan Party is treated as a pass-through or disregarded entity) to its members ("Tax Distributions") (i) on a quarterly basis, *pro rata* in proportion to their respective percentage interests in such Loan Party (except as otherwise required below), so long as the aggregate amount of such Tax Distributions does not exceed, quarterly, an amount equal to such Loan Party's good faith estimate of the Applicable Tax (as hereinafter defined) with respect to such taxable year, less the amount paid, if any, with respect to prior quarters of such taxable year; and (ii) on an annual basis after the end of such Loan Party's taxable year, to the extent necessary so that the sum of the amounts so distributed under this clause (ii) and the amounts distributed under clause (i) above equals the minimum aggregate amount (the "Applicable Tax") that must be distributed to provide each member with an amount that equals the product of (1) the sum of all items of taxable income or gain allocated to such member for such taxable year less all items of deduction, loss and the loss equivalent of tax credits allocated to such member (or, to the extent applicable, its predecessors in interest) for such taxable year and all prior taxable years to the extent not previously offset by taxable income or gain allocated to such member (or, to the extent applicable, its predecessors in interest) and (2) a percentage equal to ((100%-B) x A) + B, where "A" is the highest marginal federal income tax rate applicable to a corporation or individual (as appropriate) for such preceding taxable year and "B", with respect to each member, is the highest marginal state income tax rate applicable to such member for such preceding taxable year; provided that if the amount distributed to the members of such Loan Party pursuant to clause (i) for the taxable year exceeds the Applicable Tax for such taxable year (including where the amounts included in taxable income of such Loan Party for such taxable year are decreased as a result of an audit, amended return or otherwise), then such excess shall be credited against the next Tax Distributions permitted to be made with respect to subsequent taxable years.

"Permitted Third Party Bank" shall mean any Lender (other than SunTrust Bank) and any other bank or other financial institution approved by the Administrative Agent, (in any such case) with whom any Loan Party maintains a Controlled Account and with whom a Control Account Agreement has been executed.

"Permitted Tranche B Payment Amount" has the meaning set forth in Section 5.21.

"Person" shall mean any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any Governmental Authority.

"Physical Materials" shall mean, with respect to any Item of Product, all tangible personal property relating to such Item of Product, including, without limitation, all exposed film, developed film, positives, negatives, prints, positive prints, answer prints, magnetic tapes and other digital or electronic storage media, special effects, preparing materials (including interpositives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements), sound tracks, cutouts, trims and any and all other physical properties of every kind and nature relating to such Item of Product whether in completed form or in some state of completion, and all masters,

33

duplicates, drafts, versions, variations and copies of each thereof, in all formats whether on film, videotape, disk or other optical or electronic media or otherwise and all music sheets and promotional materials relating to such Item of Product.

"Plan" shall mean any "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) maintained or contributed to by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate has or may have an obligation to contribute, and each such plan that is subject to Title IV of ERISA for the five-year period immediately following the latest date on which the Borrower or any ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"Pledge Agreement" shall mean the Pledge Agreement, dated as of September 4, 2014, made by Holdco in favor of the Administrative Agent for the benefit of the Secured Parties, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Primary Major Acceptable Obligor" shall mean any Major Acceptable Obligor denoted as such on Annex A hereto with respect to the relevant type(s) of Item of Product designated therein (it being understood that an entity may be approved as a Primary Major Acceptable Obligor for a particular type of Item of Product (only)), as modified from time to time in accordance with Section 2.25.

"Pro Rata Share" shall mean (i) with respect to any Class of Commitment or Loan of any Lender at any time, a percentage, the numerator of which shall be such Lender's Commitment of such Class (or if such Commitment has been terminated or expired or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure or Term Loan, as applicable), and the denominator of which shall be the sum of all Commitments of such Class of all Lenders (or if such Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure or Term Loans, as applicable, of all Lenders) and (ii) with respect to all Classes of Commitments and Loans of any Lender at any time, the numerator of which shall be the sum of such Lender's Revolving Commitment (or if such Revolving Commitment has been terminated or expired or the Loans have been declared to be due and payable, such Lender's Revolving Credit Exposure) and Term Loan and the denominator of which shall be the sum of all Lenders' Revolving Commitments (or if such Revolving Commitments have been terminated or expired or the Loans have been declared to be due and payable, all Revolving Credit Exposure of all Lenders funded under such Commitments) and Term Loans.

"Product Declaration" shall mean a declaration substantially in the form of Exhibit L hereto.

"Qualifying Picture" shall mean a motion picture acquired by a Loan Party pursuant to a Rights Acquisition Agreement that is intended to satisfy all of the following requirements: (i) will be filmed primarily in the English language; (ii) will be filmed primarily in color photography; (iii) have a running time of at least 80 minutes and not more than 150 minutes

206771225 v17

(inclusive of main and end titles); and (iv) will be capable of achieving an MPAA rating not more restrictive than "R" (or its equivalent under any revised rating system).

"Real Estate" shall mean all real property owned or leased by the Borrower and/or any of its Subsidiaries.

"Recipient" shall mean, as applicable, (a) the Administrative Agent and (b) any Lender.

"Red Cloud" shall mean certain assets purchased from ANConnect, LLC related to the home video and digital distribution for motion pictures and other audiovisual media in and throughout the United States of America and its territories and protectorate, including, without limitation, ANConnect, LLC's 51% membership interest in Anderson Digital, LLC, as well as the 24.5% membership interests in Anderson Digital, LLC previously owned by each of Steve Lyons and Freyr Thor.

"Red Cloud Acquisition" shall mean the purchase of assets that collectively constitute Red Cloud, including the acquisition of 100% of the membership interests in Anderson Digital, LLC by Borrower.

"Red Cloud EBITDA Credit" shall mean the EBITDA credit provided in connection with the Red Cloud Acquisition (such EBITDA amount determination to be provided by Borrower upon the closing of the Red Cloud Acquisition and reasonably acceptable to the Administrative Agent (on behalf of the Lenders)), in such amounts and with step downs as follows: (a) 1.35x EBITDA through September 30, 2015; (b) 1x EBITDA from October 1, 2015 through December 31, 2015; (c) .75x EBITDA from January 1, 2016 through May 31, 2016; and (d) zero beginning June 1, 2016. The Red Cloud EBITDA Credit shall be in lieu of any otherwise applicable Eligible Receivables calculation with respect to the Eligible Receivables of Red Cloud. At the Borrower's option, Borrower may select to use the otherwise applicable Eligible Receivables calculation with respect to Red Cloud in determining the Borrower's Borrowing Base provided that upon such election, the Red Cloud EBITDA Credit shall no longer be available on a prospective basis (i.e. the Borrower will have zero Red Cloud EBITDA Credit and must use the otherwise applicable Eligible Receivables calculation with respect to Red Cloud).

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

"Regulation Y" shall mean Regulation Y of the Board of Governors of the Federal Reserve System, as the same may be in effect from time to time, and any successor regulations.

35

"<u>Related Parties</u>" shall mean, with respect to any specified Person, such Person's Affiliates and the respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors or other representatives of such Person and such Person's Affiliates.

"<u>Release</u>" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or within any building, structure, facility or fixture.

"<u>Required Lenders</u>" shall mean, at any time, Lenders holding more than 50% of the aggregate outstanding Revolving Commitments and Term Loans at such time or, if the Lenders have no Commitments outstanding, then Lenders holding more than 50% of the aggregate outstanding Revolving Credit Exposure and Term Loans of the Lenders at such time; <u>provided</u> that (i) at any time that there shall be two (2) Lenders, both of the Lenders shall comprise the Required Lenders, and (ii) at any time that there shall be three (3) Lenders, a minimum of two (2) Lenders must comprise the Required Lenders; <u>provided, further,</u> that to the extent that any Lender is a Defaulting Lender, such Defaulting Lender and all of its Revolving Commitments, Revolving Credit Exposure and Term Loans shall be excluded for purposes of determining Required Lenders.

"<u>Requirement of Law</u>" for any Person shall mean the articles or certificate of incorporation (or formation), bylaws, partnership certificate and agreement, or limited liability company certificate of organization and agreement, as the case may be, and other organizational and governing documents of such Person, and any law, treaty, rule or regulation, or determination of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Responsible Officer</u>" shall mean (x) with respect to any Borrowing Base Certificate or any calculation of the Library Valuation Amount required to be delivered by the Borrower under this Agreement, or certifying compliance with the financial covenants set forth in <u>Article VI</u>, the chief financial officer or the treasurer of the Borrower and (y) with respect to all other provisions, any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer or a vice president of the applicable Loan Party or such representative of the applicable Loan Party as may be designated in writing by any one of the foregoing with the consent of the Administrative Agent.

"<u>Restricted Payment</u>" shall mean, for any Person, any dividend or distribution on any class of its Capital Stock, or any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement, defeasance or other acquisition of any shares of its Capital Stock, any Indebtedness subordinated to the Obligations or any Guarantee thereof or any options, warrants or other rights to purchase such Capital Stock or such Indebtedness, whether now or hereafter outstanding, or any management or similar fees, or any other payment of any kind to or for the benefit of an Affiliate of a Loan Party that is not itself a Loan Party (or to or for the benefit of any direct or indirect holders of the Capital Stock of such Affiliate).

36

"Revolving Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Revolving Loans to the Borrower in an aggregate principal amount not exceeding the amount set forth with respect to such Lender on Schedule I, as such schedule may be amended pursuant to Section 2.21A, or, in the case of a Person becoming a Lender after the Closing Date, the amount of the assigned "Revolving Commitment" as provided in the Assignment and Acceptance executed by such Person as an assignee, or the joinder executed by such Person, in each case as such commitment may subsequently be increased or decreased pursuant to the terms hereof.

"Revolving Commitment Termination Date" shall mean the earliest of (i) the Maturity Date and (ii) the date on which the Revolving Commitments are terminated pursuant to Section 2.7.

"Revolving Credit Exposure" shall mean, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Revolving Loans.

"Revolving Loan" shall mean a loan made by a Lender to the Borrower under its Revolving Commitment, which may either be a Base Rate Loan or a Eurodollar Loan.

"Rights Acquisition Agreement" means the agreement pursuant to which, among other things, a Loan Party acquires distribution rights in and to an Item of Product from a third Person.

"Rights Acquisition Cost" means the minimum guarantee or advance required to be paid by a Loan Party in order for such Loan Party to acquire the distribution or exploitation rights in and to the subject Item of Product specified in the applicable Rights Acquisition Agreement.

"S&P" shall mean Standard & Poor's, a division of The McGraw-Hill Companies, Inc.

"Sanctioned Country" shall mean a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treasury.gov/resource-center/sanctions/Pages/default.aspx, or as otherwise published from time to time.

"Sanctioned Person" shall mean (i) a Person named on the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC.

"Secured Parties" shall mean the Administrative Agent, the Lenders, the Lender-Related Hedge Providers and the Bank Product Providers.

"Specified Capital Contribution" shall mean, for any Fiscal Quarter, any equity contribution in cash made to the Borrower after the Closing Date which proceeds are used solely with respect to the exercise of an Equity Cure Right.

"Sole Lead Arranger" shall mean SunTrust Robinson Humphrey, Inc., in its capacity as sole lead arranger in connection with this Agreement.

"Solvent" shall mean, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including subordinated and contingent liabilities, of such Person; (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts and liabilities, including subordinated and contingent liabilities as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities (such as litigation, guaranties and pension plan liabilities) at any time shall be computed as the amount that, in light of all the facts and circumstances existing at the time, represents the amount that would reasonably be expected to become an actual or matured liability.

"Sponsor" shall mean Virgo Service Company LLC, a Delaware limited liability company.

"Subsidiary" shall mean, with respect to any Person (the "parent") at any date, any corporation, partnership, joint venture, limited liability company, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, joint venture, limited liability company, association or other entity (i) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. Unless otherwise indicated, all references to "Subsidiary" hereunder shall mean a Subsidiary of the Borrower.

"Subsidiary Loan Party" shall mean any Subsidiary of the Borrower.

"Swap Obligation" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Synthetic Lease" shall mean a lease transaction under which the parties intend that (i) the lease will be treated as an "operating lease" by the lessee pursuant to Accounting Standards Codification Sections 840-10 and 840-20, as amended, and (ii) the lessee will be entitled to various tax and other benefits ordinarily available to owners (as opposed to lessees) of like property.

"Synthetic Lease Obligations" shall mean, with respect to any Person, the sum of (i) all remaining rental obligations of such Person as lessee under Synthetic Leases which are attributable to principal and, without duplication, (ii) all rental and purchase price payment obligations of such Person under such Synthetic Leases assuming such Person exercises the option to purchase the lease property at the end of the lease term.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees, charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" shall mean a term loan made by a Lender to the Borrower pursuant to Section 2.4.

"Term Loan Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Term Loans to the Borrower in an aggregate principal amount not exceeding the amount set forth with respect to such Lender on Schedule I, as such schedule may be amended pursuant to Section 2.21B, or, in the case of a Person becoming a Lender after the Closing Date, the amount of the assigned "Term Loan Commitment" as provided in the Assignment and Acceptance executed by such Person as an assignee, or the joinder executed by such Person, in each case as such commitment may subsequently be increased or decreased pursuant to the terms hereof.

"Term Commitment Termination Date" shall mean (i) with respect to the Term Loan Commitments available on the Closing Date, upon the making of such Term Loans pursuant to Section 2.4, and (ii) with respect to any Incremental Term Commitment, on the date of the making of Term Loans with respect to such Incremental Term Commitment pursuant to Section 2.4.

"Trademark" shall have the meaning assigned to such term in the Guaranty and Security Agreement.

"Trademark Security Agreement" shall mean any Trademark Security Agreement executed by a Loan Party owning registered Trademarks or applications for Trademarks in favor of the Administrative Agent for the benefit of the Secured Parties, both on the Existing Closing Date and thereafter, as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time.

"Trading with the Enemy Act" shall mean the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 et seq.), as amended and in effect from time to time.

"Type", when used in reference to a Loan or a Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Base Rate.

"Unfunded Pension Liability" of any Plan shall mean the amount, if any, by which the value of the accumulated plan benefits under the Plan, determined on a plan termination basis in accordance with actuarial assumptions at such time consistent with those prescribed by the PBGC for purposes of Section 4044 of ERISA, exceeds the fair market value of all Plan assets allocable to such liabilities under Title IV of ERISA (excluding any accrued but unpaid contributions).

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"United States" or "U.S." shall mean the United States of America.

"U.S. Borrower" shall mean any Borrower that is a U.S. Person.

"U.S. Person" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" shall have the meaning set forth in Section 2.19(g)(ii)(B).

"U.S. Theatrical Rentals" shall mean, at any date at which the amount thereof is to be determined, an amount equal to the accountable gross receipts estimates of a Loan Party's share of revenue, as of such date that are expected to be recognized by a Loan Party from payments by theatrical exhibitors from the theatrical exploitation of a Qualifying Picture as of such date in the United States, as calculated in good faith by such Loan Party based on the contractual terms of the agreements with exhibitors and in accordance with data published by Rentrak and based solely on known domestic box office as of the date of computation; provided that, in the event that that the Administrative Agent disagrees with a Loan Party's calculation, the Administrative Agent may revise such calculation in its sole discretion and in good faith.

"Virgo" means Virgo Investment Group LLC, a Delaware limited liability company.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" shall mean the Borrower, any other Loan Party or the Administrative Agent, as applicable.

**Section 1.2    Classifications of Loans and Borrowings.**    For purposes of this Agreement, Loans may be classified and referred to by Class (e.g. "Revolving Loan" or "Term Loan") or by Type (e.g. "Eurodollar Loan" or "Base Rate Loan") or by Class and Type (e.g. "Revolving Eurodollar Loan"). Borrowings also may be classified and referred to by Class (e.g. "Revolving Borrowing") or by Type (e.g. "Eurodollar Borrowing") or by Class and Type (e.g. "Revolving Eurodollar Borrowing").

**Section 1.3    Accounting Terms and Determination.**   Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a basis consistent with the most recent audited consolidated financial statement of the Borrower delivered pursuant to Section 5.1(a)(i); provided that if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VI to eliminate the effect of any change in GAAP on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the

40

Required Lenders. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification Section 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of any Loan Party or any Subsidiary of any Loan Party at "fair value", as defined therein.

**Section 1.4    Terms Generally.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the word "to" means "to but excluding". Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as it was originally executed or as it may from time to time be amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "hereof", "herein" and "hereunder" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision hereof, (iv) all references to Articles, Annexes, Sections, Exhibits and Schedules shall be construed to refer to Articles, Annexes, Sections, Exhibits and Schedules to this Agreement and (v) all references to a specific time (e.g., "11:00 a.m."), unless otherwise indicated, shall be deemed to be a reference to Eastern time.

## ARTICLE II

## AMOUNT AND TERMS OF THE COMMITMENTS

**Section 2.1    General Description of Facilities.** Subject to and upon the terms and conditions herein set forth, (i) the Lenders hereby establish in favor of the Borrower a revolving credit facility pursuant to which each Lender severally agrees (to the extent of such Lender's Revolving Commitment) to make Revolving Loans to the Borrower in accordance with Section 2.2; and (ii) each Lender severally agrees to make a Term Loan to the Borrower in a principal amount not exceeding such Lender's Term Loan Commitment on the Closing Date.

**Section 2.2    Revolving Loans.** Subject to the terms and conditions set forth herein, each Lender severally agrees to make Revolving Loans, ratably in proportion to its Pro Rata Share of the Aggregate Revolving Commitments, to the Borrower, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Revolving Commitment or (b) a mandatory prepayment event by the Borrower under Section 2.11(a)(iii). During the Availability Period, the Borrower shall be entitled to borrow, prepay and reborrow Revolving Loans in accordance with the terms and conditions of this Agreement; provided that the Borrower may not borrow or reborrow should there exist a Default or Event of Default.

41

**Section 2.3    Procedure for Revolving Borrowings**.  The Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Revolving Borrowing, substantially in the form of Exhibit 2.3 attached hereto (a "Notice of Borrowing"), (x) prior to 11:00 a.m. one (1) Business Day prior to the requested date of each Base Rate Borrowing and (y) prior to 11:00 a.m. three (3) Business Days prior to the requested date of each Eurodollar Borrowing.  Each Notice of Borrowing shall be irrevocable and shall specify (i) the aggregate principal amount of such Borrowing, (ii) the date of such Borrowing (which shall be a Business Day), (iii) the Type of such Revolving Loan comprising such Borrowing and (iv) in the case of a Eurodollar Borrowing, the duration of the initial Interest Period applicable thereto (subject to the provisions of the definition of Interest Period).  Each Revolving Borrowing shall consist entirely of Base Rate Loans or Eurodollar Loans, as the Borrower may request.  The aggregate principal amount of each Eurodollar Borrowing and each Base Rate Borrowing shall not be less than $100,000 or a larger multiple of $100,000.  At no time shall the total number of Eurodollar Borrowings outstanding at any time exceed ten (10).  The Borrower shall not be permitted to request Revolving Borrowings hereunder more frequently than once per week.  Promptly following the receipt of a Notice of Borrowing in accordance herewith, the Administrative Agent shall advise each Lender of the details thereof and the amount of such Lender's Revolving Loan to be made as part of the requested Revolving Borrowing.

**Section 2.4    Term Loan Commitments**.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make, ratably in proportion to its Pro Rata Share of the Term Loan Commitments, (i) a term loan to the Borrower on the Closing Date in a principal amount equal to $19,000,000; and (ii) to the extent there is an Incremental Term Commitment, a term loan to the Borrower for the purpose of paying Tranche B (or a portion thereof) of the Mezzanine Debt Agreement in a principal amount equal to the amount of the Incremental Term Commitment.  The Term Loans may be, from time to time, Base Rate Loans or Eurodollar Loans or a combination thereof.  The execution and delivery of this Agreement by the Borrower and the satisfaction of all conditions precedent pursuant to Section 3.1 shall be deemed to constitute the Borrower's request to borrow the Term Loans on dates provided in this Section.

**Section 2.5    Funding of Borrowings**.

(a)    Each Lender will make available each Loan to be made by it hereunder on the proposed date thereof by wire transfer in immediately available funds by 11:00 a.m. to the Administrative Agent at the Payment Office.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts that it receives, in like funds by the close of business on such proposed date, to an account maintained by the Borrower with the Administrative Agent or, at the Borrower's option, by effecting a wire transfer of such amounts to an account designated by the Borrower to the Administrative Agent.

(b)    Unless the Administrative Agent shall have been notified by any Lender prior to 5:00 p.m. one (1) Business Day prior to the date of a Borrowing in which such Lender is to participate that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date, and the Administrative

206771225 v17

Agent, in reliance on such assumption, may make available to the Borrower on such date a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender on the date of such Borrowing, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest (x) at the Federal Funds Rate until the second Business Day after such demand and (y) at the Base Rate at all times thereafter. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower shall immediately pay such corresponding amount to the Administrative Agent together with interest at the rate specified for such Borrowing. Nothing in this subsection shall be deemed to relieve any Lender from its obligation to fund its Pro Rata Share of any Borrowing hereunder or to prejudice any rights which the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(c)     All Revolving Borrowings shall be made by the Lenders on the basis of their respective Pro Rata Shares. No Lender shall be responsible for any default by any other Lender in its obligations hereunder, and each Lender shall be obligated to make its Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Loans hereunder.

**Section 2.6    Interest Elections.**

(a)     Each Revolving Borrowing and Term Loan initially shall be of the Type specified in the applicable Notice of Borrowing. Thereafter, the Borrower may elect to convert such Borrowing into a different Type or to continue such Borrowing, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)     To make an election pursuant to this Section, the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of each Borrowing that is to be converted or continued, as the case may be, substantially in the form of Exhibit 2.7 attached hereto (a "Notice of Conversion/Continuation") (x) prior to 11:00 a.m. one (1) Business Day prior to the requested date of a conversion into a Base Rate Borrowing and (y) prior to 11:00 a.m. three (3) Business Days prior to a continuation of or conversion into a Eurodollar Borrowing. Each such Notice of Conversion/Continuation shall be irrevocable and shall specify (i) the Borrowing to which such Notice of Conversion/Continuation applies and, if different options are being elected with respect to different portions thereof, the portions thereof that are to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) shall be specified for each resulting Borrowing), (ii) the effective date of the election made pursuant to such Notice of Conversion/Continuation, which shall be a Business Day, (iii) whether the resulting Borrowing is to be a Base Rate Borrowing or a Eurodollar Borrowing, and (iv) if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of "Interest Period". If any such Notice of Conversion/Continuation requests a Eurodollar

43

Borrowing but does not specify an Interest Period, the Borrower shall be deemed to have selected an Interest Period of one month. The principal amount of any resulting Borrowing shall satisfy the minimum borrowing amount for Eurodollar Borrowings and Base Rate Borrowings set forth in Section 2.3.

(c)     If, on the expiration of any Interest Period in respect of any Eurodollar Borrowing, the Borrower shall have failed to deliver a Notice of Conversion/Continuation, then, unless such Borrowing is repaid as provided herein, the Borrower shall be deemed to have elected to convert such Borrowing to a Base Rate Borrowing. No Borrowing may be converted into, or continued as, a Eurodollar Borrowing if a Default or an Event of Default exists, unless the Administrative Agent and each of the Lenders shall have otherwise consented in writing. No conversion of any Eurodollar Loan shall be permitted except on the last day of the Interest Period in respect thereof.

(d)     Upon receipt of any Notice of Conversion/Continuation, the Administrative Agent shall promptly notify each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

**Section 2.7     Optional Reduction and Termination of Commitments**.

(a)     Unless previously terminated, all Revolving Commitments shall terminate on the Revolving Commitment Termination Date. The applicable tranche of the Term Loan Commitments shall terminate on the applicable Term Commitment Termination Date.

(b)     Upon at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent (which notice shall be irrevocable), the Borrower may reduce the Aggregate Revolving Commitments in part or terminate the Aggregate Revolving Commitments in whole; provided that (i) any partial reduction shall apply to reduce proportionately and permanently the Revolving Commitment of each Lender, (ii) any partial reduction pursuant to this Section shall be in an amount of at least $1,000,000 and any larger multiple of $1,000,000, and (iii) no such reduction shall be permitted which would reduce the Aggregate Revolving Commitment Amount to an amount less than the aggregate outstanding Revolving Credit Exposure of all Lenders.

(c)     With the written approval of the Administrative Agent, the Borrower may terminate (on a non-ratable basis) the unused amount of the Revolving Commitment of a Defaulting Lender, and in such event the provisions of Section 2.24 will apply to all amounts thereafter paid by the Borrower for the account of any such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts); provided that such termination will not be deemed to be a waiver or release of any claim that the Borrower, the Administrative Agent or any other Lender may have against such Defaulting Lender.

(d)     Simultaneously with each termination or reduction of the Aggregate Revolving Commitments or any Revolving Commitment pursuant to subsection (b) or (c) of this Section, the Borrower shall pay to the Administrative Agent for the benefit of each Lender

all accrued and unpaid Commitment Fees on the amount of the Revolving Commitments so terminated or reduced through the date of such termination or reduction.

(e)     The Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid by such Lender to Lenders of funds borrowed by it to make or carry its Eurodollar Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a borrowing of any Eurodollar Loan does not occur on a date specified therefor in a Notice of Borrowing, or a conversion to or continuation of any Eurodollar Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation; (ii) if any prepayment or other principal payment of, or any conversion of, any of its Eurodollar Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Loans is not made on any date specified in a notice of prepayment given by the Borrower.

**Section 2.8     Repayment of Loans**.

(a)     <u>Revolving Loans</u>.  The outstanding principal amount of all Revolving Loans shall be due and payable (together with accrued and unpaid interest thereon) on the Revolving Commitment Termination Date.

(b)     <u>Term Loans</u>.  The Borrower unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of the Term Loan of such Lender in installments payable on the last day of each Fiscal Quarter of the Borrower (commencing with the Fiscal Quarter ending December 31, 2015), with each such quarterly installment being in an aggregate principal amount for all Lenders equal to (x) 25% multiplied by (y) the product of (i) the applicable percentage of the aggregate amount of the Term Loan Commitments that is set forth below for such period multiplied by (ii) $19,000,000 (or, to the extent that the Term Loan Commitment is increased pursuant to <u>Section 2.21B</u>, an amount equal to the amount of the Term Loan Commitments after any upsize and reallocation pursuant to <u>Section 2.21B</u>) (and on such other date(s) and in such other amounts as may be required from time to time pursuant to this Agreement):

| Facility Period | % of Term Loan Commitments to be Repaid (for all Lenders) |
|---|---|
| Period 1 (commencing with the Fiscal Quarter ending September 30, 2015 through the Fiscal Quarter ending June 30, 2016) | 15% per annum |
| Period 2 (commencing with the Fiscal Quarter | 20% per annum |

45

| ending September 30, 2016 and each Fiscal Quarter thereafter) | |
|---|---|

*provided* that any voluntary prepayment of the Term Loans pursuant to <u>Section 2.10</u> shall reduce or eliminate, in order of maturity, the four (4) quarterly installments payable under this Section that immediately follow such voluntary prepayment, and, to the extent the amount of such voluntary prepayment exceeds the amount of quarterly installments payable with respect to the immediately succeeding four Fiscal Quarters, such excess may be applied *pro rata* against all remaining quarterly installments payable under this Section; <u>provided further</u> that the Borrower shall receive a $500,000 credit on the installment payment due on September 30, 2015 such that the amount otherwise owing under this <u>Section 2.8</u> shall be reduced $500,000; and <u>provided further</u> that, to the extent not previously paid, the aggregate unpaid principal balance of the Term Loans shall be due and payable in full on the Maturity Date. Any such prepayment shall be applied as follows: <u>first</u>, to the Term Loans that constitute Base Rate Loans until the same shall have been paid in full, *pro rata* to the Lenders based on their Pro Rata Shares of such Term Loans; and <u>second</u>, to the Term Loans that constitute Eurodollar Loans, *pro rata* to the Lenders based on their Pro Rata Shares of such Term Loans.

**Section 2.9   <u>Evidence of Indebtedness</u>.**

(a)   Each Lender shall maintain in accordance with its usual practice appropriate records evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable thereon and paid to such Lender from time to time under this Agreement. The Administrative Agent shall maintain appropriate records in which shall be recorded (i) the Revolving Commitment and the Term Loan Commitment of each Lender, (ii) the amount of each Loan made hereunder by each Lender, the Class and Type thereof and, in the case of each Eurodollar Loan, the Interest Period applicable thereto, (iii) the date of any continuation of any Loan pursuant to <u>Section 2.6</u>, (iv) the date of any conversion of all or a portion of any Loan to another Type pursuant to <u>Section 2.6</u>, (v) the date and amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder in respect of the Loans and (vi) both the date and amount of any sum received by the Administrative Agent hereunder from the Borrower in respect of the Loans and each Lender's Pro Rata Share thereof. The entries made in such records shall be rebuttable *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; <u>provided</u> that the failure or delay of any Lender or the Administrative Agent in maintaining or making entries into any such record or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans (both principal and unpaid accrued interest) of such Lender in accordance with the terms of this Agreement.

(b)   This Agreement evidences the obligation of the Borrower to repay the Loans and is being executed as a "<u>noteless</u>" credit agreement. However, at the request of any Lender at any time, the Borrower agrees that it will prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form approved by the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times

46

(including after assignment permitted hereunder) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**Section 2.10   Optional Prepayments**.   The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, without premium or penalty, by giving written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent no later than (i) in the case of any prepayment of any Eurodollar Borrowing, 11:00 a.m. not less than three (3) Business Days prior to the date of such prepayment and (ii) in the case of any prepayment of any Base Rate Borrowing, not less than one (1) Business Day prior to the date of such prepayment.   Each such notice shall be irrevocable and shall specify the proposed date of such prepayment and the principal amount of each Borrowing or portion thereof to be prepaid, with such principal prepayment to be in an amount not less than $100,000.   Upon receipt of any such notice, the Administrative Agent shall promptly notify each affected Lender of the contents thereof and of such Lender's Pro Rata Share of any such prepayment.   If such notice is given, the aggregate amount specified in such notice shall be due and payable on the date designated in such notice, together with accrued interest to such date on the amount so prepaid in accordance with Section 2.12(d); provided that if a Eurodollar Borrowing is prepaid on a date other than the last day of an Interest Period applicable thereto, the Borrower shall also pay all amounts required pursuant to Section 2.18.   Each partial prepayment of any Loan shall be in an amount that would be permitted in the case of an advance of a Revolving Borrowing of the same Type pursuant to Section 2.2.   Each prepayment of a Borrowing shall be applied ratably to the Loans comprising such Borrowing and, in the case of a prepayment of a Term Loan Borrowing, as set forth in Section 2.8(b).

**Section 2.11   Mandatory Prepayments**.

(a)      (i)      No later than the Business Day following the date of receipt by any Loan Party of any proceeds from any issuance of Indebtedness or equity securities (including any Specified Capital Contribution) by a Loan Party, the Borrower shall prepay the Obligations in an amount equal to all such proceeds, net of (x) underwriting discounts and commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by a Loan Party in connection therewith to non-Affiliates and (y) Taxes paid or payable as a result thereof; provided that the Borrower shall not be required to prepay the Obligations with respect to (i) proceeds of Indebtedness permitted under Section 7.1 and (ii) proceeds of Capital Stock issued by a Loan Party to another Loan Party (excluding any Specified Capital Contribution).

(ii)      Immediately upon receipt by any Loan Party of any proceeds of any Permitted Asset Sale, the Borrower shall immediately repay the Obligations in an amount equal to such proceeds, net of (x) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by a Loan Party in connection therewith to non-Affiliates and (y) Taxes paid or payable as a result thereof.

(iii)      If at any time either (a) (x) the sum of the aggregate Revolving Credit Exposure of all Lenders plus the aggregate amount of the then outstanding Term Loans of all Lenders exceeds (y) the sum of Aggregate Revolving Commitment Amount then in effect

47

plus the aggregate principal amount of all Term Loan Commitments then in effect or (b) (x) the sum of the aggregate Revolving Credit Exposure of all Lenders plus the aggregate amount of the then outstanding Term Loans of all Lenders exceeds (y) the Borrowing Base then in effect, the Borrower shall immediately prepay the Obligations in an amount equal to such excess.

(iv)     Any prepayments made by the Borrower pursuant to subsection (i), (ii) or (iii) of this subsection (a) shall be applied as follows:  first, to the Administrative Agent's fees and reimbursable expenses then due and payable pursuant to any of the Loan Documents; second, to all reimbursable expenses of the Lenders then due and payable pursuant to any of the Loan Documents, *pro rata* to the Lenders based on their respective *pro rata* shares of such fees and expenses; third, to interest and fees then due and payable hereunder, *pro rata* to the Lenders based on their respective *pro rata* shares of such interest and fees; fourth, to the principal balance of the Term Loans, until the same shall have been paid in full, *pro rata* to the Lenders based on their Pro Rata Shares of the Term Loans; and fifth, to the principal balance of the Revolving Loans, until the same shall have been paid in full, *pro rata* to the Lenders based on their respective Revolving Commitments.  The Revolving Commitments of the Lenders shall not be permanently reduced by the amount of any prepayments made pursuant to clause fifth above, unless an Event of Default has occurred and is continuing and the Administrative Agent and the Required Lenders so request.

(b)     The Borrower shall prepay the Term Loans in an amount equal to fifty percent (50%) of the Excess Cash Flow (if any) for each Fiscal Year, beginning the Fiscal Year ended December 31, 2015.  Any such prepayment shall be due and payable to the Administrative Agent for the account of each Lender within one hundred twenty (120) days after the end of the applicable Fiscal Year.  Any such prepayment shall be accompanied by a certificate signed by the Borrower's chief financial officer certifying in reasonable detail the manner in which Excess Cash Flow and the resulting prepayment were calculated, which certificate shall be in form and substance reasonably satisfactory to the Administrative Agent. Any such prepayment made by the Borrower shall be applied as follows:  first, to the Term Loans that constitute Base Rate Loans until the same shall have been paid in full, *pro rata* to the Lenders based on their Pro Rata Shares of such Term Loans; and second, to the Term Loans that constitute Eurodollar Loans, *pro rata* to the Lenders based on their Pro Rata Shares of such Term Loans.

(c)     Simultaneously with each termination and/or optional reduction of the Aggregate Revolving Commitments pursuant to Section 2.7 hereof, the Borrower shall pay to the Administrative Agent for the benefit of the Lenders an amount equal to the excess (if any) of (i) the aggregate outstanding Revolving Credit Exposure of all Lenders over (ii) the reduced Aggregate Revolving Commitment Amount.  Any such prepayment made by the Borrower shall be applied as follows:  first, to the Revolving Loans that constitute Base Rate Loans until the same shall have been paid in full, *pro rata* to the Lenders based on their Pro Rata Shares of such Revolving Loans; and second, to the Revolving Loans that constitute Eurodollar Loans, *pro rata* to the Lenders based on their Pro Rata Shares of such Revolving Loans.

(d)     So long as an Event of Default has not occurred and is not continuing, any proceeds of the Collateral may be used by the Loan Parties in any manner (including repayment of the Obligations) which is lawful and would not violate any of the provisions of

48

this Agreement or any of the other Loan Documents, except as otherwise set forth in any Intercreditor Agreement (or any other agreement among, *inter alia*, the Administrative Agent, a Loan Party and a third Person) pursuant to which the Administrative Agent has committed thereunder to pay to such third Person a portion of the cash flow derived from an Item of Product.

(e)     Notwithstanding anything to the contrary in this Section, if an Event of Default has occurred and is continuing, subject to the terms of any Intercreditor Agreement (or any other agreement among, *inter alia*, the Administrative Agent, a Loan Party and a third Person), all proceeds of the Collateral shall be applied to satisfy the Obligations in the manner set forth in Section 8.2.

**Section 2.12   Interest on Loans.**

(a)     The Borrower shall pay interest on (i) each Base Rate Loan at the Base Rate plus the Applicable Margin in effect from time to time and (ii) each Eurodollar Loan at the Adjusted LIBO Rate for the applicable Interest Period in effect for such Loan plus the Applicable Margin in effect from time to time.

(b)     Notwithstanding subsections (a) and (b) of this Section, at the option of the Required Lenders if an Event of Default has occurred and is continuing, and automatically after acceleration or with respect to any past due amount hereunder, the Borrower shall pay interest ("Default Interest") with respect to all Eurodollar Loans at the rate *per annum* equal to 200 basis points above the otherwise applicable interest rate for such Eurodollar Loans for the then-current Interest Period until the last day of such Interest Period, and thereafter, and with respect to all Base Rate Loans and all other Obligations hereunder (other than Loans), at the rate *per annum* equal to 200 basis points above the otherwise applicable interest rate for Base Rate Loans.

(c)     Interest on the principal amount of all Loans shall accrue from and including the date such Loans are made to but excluding the date of any repayment thereof. Interest on all outstanding Base Rate Loans shall be payable quarterly in arrears on the last day of each March, June, September and December and on the Revolving Commitment Termination Date or the Maturity Date, as the case may be.  Interest on all outstanding Eurodollar Loans shall be payable on the last day of each Interest Period applicable thereto, and, in the case of any Eurodollar Loans having an Interest Period in excess of three months, on each day which occurs every three months after the initial date of such Interest Period, and on the Revolving Commitment Termination Date or the Maturity Date, as the case may be. Interest on any Loan which is converted into a Loan of another Type or which is repaid or prepaid shall be payable on the date of such conversion or on the date of any such repayment or prepayment (on the amount repaid or prepaid) thereof.  All Default Interest shall be payable on demand.

(d)     The Administrative Agent shall determine each interest rate applicable to the Loans hereunder and shall promptly notify the Borrower and the Lenders of such rate in writing (or by telephone, promptly confirmed in writing).  Any such determination shall be conclusive and binding for all purposes, absent manifest error.

49

**Section 2.13   Fees**.

(a)   The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times previously agreed upon in writing by the Borrower and the Administrative Agent.

(b)   The Borrower agrees to pay to the Administrative Agent for the account of each Lender an aggregate commitment fee (the "Commitment Fees") equal to 0.50% per annum, computed on a daily basis and on the basis of a 360 day year, on the amount by which such Lender's Revolving Commitment in effect on such day exceeds such Lender's Pro Rata Share of the Revolving Credit Exposure in effect on such day. For purposes of computing the Commitment Fees, the Revolving Commitment of each Lender shall be deemed used to the extent of the outstanding Revolving Loans of such Lender. Accrued fees under this subsection (b) shall be payable quarterly in arrears on the last day of each March, June, September and December, commencing on September 30, 2015, and on the Revolving Commitment Termination Date (and, if later, the date the Loans shall be repaid in their entirety); provided that any such fees accruing after the Revolving Commitment Termination Date shall be payable on demand.

(c)   The Borrower shall pay on the Existing Closing Date to the Administrative Agent and to the Sole Lead Arranger all fees set forth in the Fee Letter that are respectively due and payable to such Person on the Existing Closing Date (the Sole Lead Arranger acknowledges receipt of such fees). The Borrower shall also pay on the Existing Closing Date to the Sole Lead Arranger (for the benefit of the Lenders) all upfront fees previously agreed in writing.

(d)   The Borrower agrees to pay all other fees set forth in the Fee Letter, as when the same become due and payable.

**Section 2.14   Computation of Interest and Fees**.   Interest hereunder based on the Administrative Agent's prime lending rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year) and paid for the actual number of days elapsed (including the first day but excluding the last day). All other interest and all fees hereunder shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day). Each determination by the Administrative Agent of an interest rate or fee hereunder shall be made in good faith and, except for manifest error, shall be final, conclusive and binding for all purposes.

**Section 2.15   Inability to Determine Interest Rates**.   If, prior to the commencement of any Interest Period for any Eurodollar Borrowing:

(i)   the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant interbank market, adequate means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period, or

(ii)    the Administrative Agent shall have received notice from the Required Lenders that the Adjusted LIBO Rate does not adequately and fairly reflect the cost to such Lenders of making, funding or maintaining their Eurodollar Loans for such Interest Period,

the Administrative Agent shall give written notice (or telephonic notice, promptly confirmed in writing) to the Borrower and to the Lenders as soon as practicable thereafter.  Until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) the obligations of the Lenders to make Eurodollar Revolving Loans or to continue or convert outstanding Loans as or into Eurodollar Loans shall be suspended and (ii) all such affected Loans shall be converted into Base Rate Loans on the last day of the then current Interest Period applicable thereto unless the Borrower prepays such Loans in accordance with this Agreement.  Unless the Borrower notifies the Administrative Agent at least one (1) Business Day before the date of any Eurodollar Borrowing for which a Notice of Borrowing has previously been given that it elects not to borrow, continue or convert to a Eurodollar Borrowing on such date, then such Revolving Borrowing shall be made as, continued as or converted into a Base Rate Borrowing.

Section 2.16  **Illegality**.  If any Change in Law shall make it unlawful or impossible for any Lender to make, maintain or fund any Eurodollar Loan and such Lender shall so notify the Administrative Agent, the Administrative Agent shall promptly give notice thereof to the Borrower and the other Lenders, whereupon until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such suspension no longer exist, the obligation of such Lender to make Eurodollar Revolving Loans, or to continue or convert outstanding Loans as or into Eurodollar Loans, shall be suspended.  In the case of the making of a Eurodollar Borrowing, such Lender's Revolving Loan shall be made as a Base Rate Loan as part of the same Revolving Borrowing for the same Interest Period and, if the affected Eurodollar Loan is then outstanding, such Loan shall be converted to a Base Rate Loan either (i) on the last day of the then current Interest Period applicable to such Eurodollar Loan if such Lender may lawfully continue to maintain such Loan to such date or (ii) immediately if such Lender shall determine that it may not lawfully continue to maintain such Eurodollar Loan to such date.  Notwithstanding the foregoing, the affected Lender shall, prior to giving such notice to the Administrative Agent, designate a different Applicable Lending Office if such designation would avoid the need for giving such notice and if such designation would not otherwise be disadvantageous to such Lender in the good faith exercise of its discretion.

Section 2.17  **Increased Costs**.

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement that is not otherwise included in the determination of the Adjusted LIBO Rate hereunder against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate); or

(ii)    impose on any Lender or the eurodollar interbank market any other condition affecting this Agreement or any Eurodollar Loans made by such Lender;

and the result of any of the foregoing is to increase the cost to such Lender of making, converting into, continuing or maintaining a Eurodollar Loan or to reduce the amount received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, from time to time, such Lender may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such increased costs or reduced amounts, and within five (5) Business Days after receipt of such notice and demand the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for any such increased costs incurred or reduction suffered.

(b)     If any Lender shall have determined that on or after the date of this Agreement any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital (or on the capital of the Parent Company of such Lender) as a consequence of its obligations hereunder to a level below that which such Lender or such Parent Company could have achieved but for such Change in Law (taking into consideration such Lender's policies or the policies of such Parent Company with respect to capital adequacy and liquidity), then, from time to time, such Lender may provide the Borrower (with a copy thereof to the Administrative Agent) with written notice and demand with respect to such reduced amounts, and within five (5) Business Days after receipt of such notice and demand the Borrower shall pay to such Lender such additional amounts as will compensate such Lender or such Parent Company for any such reduction suffered.

(c)     A certificate of such Lender setting forth the amount or amounts necessary to compensate such Lender or the Parent Company of such Lender, as the case may be, specified in subsection (a) or (b) of this Section shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive, absent manifest error.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, however, that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 2.17 for any increased costs or reductions incurred more than two hundred seventy (270) days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided, further, that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Each Lender agrees that after it becomes aware of the occurrence of an event or the existence of a condition that (i) would cause it to incur any increased cost hereunder or render it unable to perform its agreements hereunder for the reasons specifically set forth in Section 2.15, Section 2.16 or this Section 2.17 or (ii) would require the Borrower to pay an increased amount under Section 2.15, Section 2.16 or this Section 2.17, it will use commercially reasonable efforts to notify the Borrower of such event or condition and, to the extent not inconsistent with such Lender's internal policies, will use its reasonable efforts to make, fund or maintain the affected Loans of such Lender, through another Lending Office of such Lender if as a result thereof the additional monies which would otherwise be required to be paid or the reduction of amounts receivable by such Lender thereunder in respect of such Loans or participations therein would be materially reduced, or such inability to perform would

52

cease to exist, or the increased costs which would otherwise be required to be paid in respect of such Loans or participations therein pursuant to Section 2.15, Section 2.16 or this Section 2.17 would be materially reduced or taxes or other amounts otherwise payable under Section 2.15, Section 2.16 or this Section 2.17 would be materially reduced, and if, as determined by the Issuing Bank or such Lender, in its sole discretion, the making, funding or maintaining of such Loans, through such other Lending Office would not otherwise adversely affect such Loans or such Lender.  Notwithstanding the foregoing, a failure on the part of any Lender to provide notice or take any other action pursuant to this Section 2.17(e) shall not affect the Borrower's obligation to make any payments or deductions required by this Article 2.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender (as the case may be) in connection with any such designation or assignment.

Section 2.18   **Funding Indemnity**.  In the event of (a) the payment of any principal of a Eurodollar Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion or continuation of a Eurodollar Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure by the Borrower to borrow, prepay, convert or continue any Eurodollar Loan on the date specified in any applicable notice (regardless of whether such notice is withdrawn or revoked), then, in any such event, the Borrower shall compensate each Lender, within five (5) Business Days after written demand from such Lender, for any loss, cost or expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense shall be deemed to include an amount determined by such Lender to be the excess, if any, of (A) the amount of interest that would have accrued on the principal amount of such Eurodollar Loan if such event had not occurred at the Adjusted LIBO Rate applicable to such Eurodollar Loan for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Eurodollar Loan) over (B) the amount of interest that would accrue on the principal amount of such Eurodollar Loan for the same period if the Adjusted LIBO Rate were set on the date such Eurodollar Loan was prepaid or converted or the date on which the Borrower failed to borrow, convert or continue such Eurodollar Loan.  A certificate as to any additional amount payable under this Section submitted to the Borrower by any Lender (with a copy to the Administrative Agent) shall be conclusive, absent manifest error.

Section 2.19   **Taxes**.

(a)   Defined Terms.  For purposes of this Section 2.19, the term "applicable law" includes FATCA.

(b)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such

53

deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)      Payment of Other Taxes by the Borrower.   The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)      Indemnification by the Borrower.   The Borrower shall indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)      Indemnification by the Lenders.   Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Borrower has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.4(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.   Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)      Evidence of Payments.   As soon as practicable after any payment of Taxes by the Borrower or any other Loan Party to a Governmental Authority pursuant to this Section 2.19, the Borrower or other Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)      Status of Lenders. (i)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably

requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.19(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(I)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN, or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN, or IRS Form W-8BEN-E, as applicable establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)     executed originals of IRS Form W-8ECI;

(III)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit 2.19A to the effect that such

Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable); or

(IV)    to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.19B or Exhibit 2.19C, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.19D on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

56

(h)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.19 (including by the payment of additional amounts pursuant to this Section 2.19), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)     Survival.  Each party's obligations under this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 2.20   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.**

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.17, 2.18 or 2.19, or otherwise) prior to 11:00 a.m. on the date when due, in immediately available funds, free and clear of any defenses, rights of set-off, counterclaim, or withholding or deduction of taxes. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at the Payment Office, except that payments pursuant to Sections 2.17, 2.18 or 2.19 and 10.3 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be made payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans that would result in such Lender receiving payment of a greater proportion of the aggregate amount

57

of its Revolving Credit Exposure, Term Loans and accrued interest and fees thereon than the proportion received by any other Lender with respect to its Revolving Credit Exposure or Term Loans, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Revolving Credit Exposure and Term Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Revolving Credit Exposure and Term Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this subsection shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Credit Exposure or Term Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this subsection shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(c)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount or amounts due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

**Section 2.21   Increase of Commitments; Additional Lenders**.

A. **Revolving Commitments**.

(a)     From time to time after the Closing Date and in accordance with this Section, the Borrower and one or more Increasing Revolving Lenders or Additional Lenders (each as defined below) may enter into an agreement to increase the aggregate Revolving Commitments hereunder (each such increase, an "Incremental Revolving Commitment") so long as the following conditions are satisfied:

(i)     the aggregate principal amount of all such Incremental Revolving Commitments made pursuant to this Section shall not exceed $15,000,000 (the principal amount of each such Incremental Revolving Commitment, the "Incremental Revolving Commitment Amount");

58

(ii)     the Borrower shall execute and deliver such documents and instruments and take such other actions as may be reasonably required by the Administrative Agent in connection with and at the time of any such proposed increase;

(iii)    at the time of and immediately after giving effect to any such proposed increase, no Default or Event of Default shall exist, all representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects), and, since March 31, 2015, there shall have been no change which has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(iv)    any Incremental Revolving Commitments provided pursuant to this Section shall have a termination date no earlier than the Revolving Commitment Termination Date;

(v)     the Administrative Agent shall have received a Compliance Certificate which demonstrates that the Borrower and its Subsidiaries are in pro forma compliance with each of the financial covenants set forth in Article VI as of the most recently ended Fiscal Quarter for which financial statements are required to have been delivered, calculated as if all such Incremental Revolving Commitments had been established (and all of the Revolving Commitments, as so increased, have been fully funded) as of the first day of the relevant period for testing compliance;

(vi)    any collateral securing any such Incremental Revolving Commitments shall also secure all other Obligations on a *pari passu* basis; and

(vii)   all other terms and conditions with respect to any such Incremental Revolving Commitments shall be reasonably satisfactory to the Administrative Agent.

(b)     The Borrower shall provide at least 30 days' written notice to the Administrative Agent (who shall promptly provide a copy of such notice to each Lender) of any proposal to establish an Incremental Revolving Commitment. The Borrower may also, but is not required to, specify any fees offered to those Lenders (the "Increasing Revolving Lenders") that agree to increase the principal amount of their Revolving Commitments, which fees shall be based upon the amount by which any such Lender is willing to increase the principal amount of its Revolving Commitment, in accordance with the Fee Letter. Each Increasing Revolving Lender shall as soon as practicable, and in any case within 15 days following receipt of such notice, specify in a written notice to the Borrower and the Administrative Agent the amount of such proposed Incremental Revolving Commitment that it is willing to provide. No Lender (or any successor thereto) shall have any obligation, express or implied, to offer to increase the aggregate principal amount of its Revolving Commitment, and any decision by a Lender to increase its Revolving Commitment shall be made in its sole discretion independently from any other Lender.  Only the consent of each Increasing Revolving Lender shall be required for an increase in the aggregate principal amount of the Revolving Commitments, pursuant to this Section. No Lender which declines to increase the

59

principal amount of its Revolving Commitment may be replaced with respect to its existing Revolving Commitment as a result thereof without such Lender's consent.  If any Lender shall fail to notify the Borrower and the Administrative Agent in writing about whether it will increase its Revolving Commitment within 15 days after receipt of such notice, such Lender shall be deemed to have declined to increase its Revolving Commitment.  The Borrower may accept some or all of the offered amounts or designate new lenders that are acceptable to the Administrative Agent (such approval not to be unreasonably withheld) as additional Lenders hereunder in accordance with this Section (the "Additional Lenders"), which Additional Lenders may assume all or a portion of such Incremental Revolving Commitment.  The Borrower and the Administrative Agent shall have discretion jointly to adjust the allocation of such Incremental Revolving Commitments among the Increasing Revolving Lenders and the Additional Lenders.  The sum of the increase in the Revolving Commitments of the Increasing Revolving Lenders plus the Revolving Commitments of the Additional Lenders shall not in the aggregate exceed the unsubscribed amount of the Incremental Revolving Commitment Amount.

(c)     Subject to subsections (a) and (b) of this Section 2.21A, any increase requested by the Borrower shall be effective upon (I) payment to the Administrative Agent of all fees, expenses and other amounts due and payable on or prior to the effective date of such increase (including all fees set forth in the Fee Letter that are due and payable to the Sole Lead Arranger in connection with such increase, and all upfront fees previously agreed in writing in connection with such increase (which upfront fees shall be paid to the Sole Arranger for the benefit of any applicable Increasing Revolving Lender(s) and any applicable Additional Lender(s))) and (II) delivery to the Administrative Agent of each of the following documents:

(i)     an originally executed copy of an instrument of joinder, in form and substance reasonably acceptable to the Administrative Agent, executed by the Borrower, by each Additional Lender and by each Increasing Revolving Lender, setting forth the new Revolving Commitments of such Lenders and setting forth the agreement of each Additional Lender to become a party to this Agreement and to be bound by all of the terms and provisions hereof;

(ii)     such evidence of appropriate corporate authorization on the part of the Borrower with respect to such Incremental Revolving Commitment and such opinions of counsel for the Borrower with respect to such Incremental Revolving Commitment as the Administrative Agent may reasonably request;

(iii)     a certificate of the Borrower signed by a Responsible Officer, in form and substance reasonably acceptable to the Administrative Agent, certifying that each of the conditions in subsection (a) of this Section has been satisfied;

(iv)     to the extent requested by any Additional Lender or any Increasing Revolving Lender, executed promissory notes evidencing such Incremental Revolving Commitments, issued by the Borrower in accordance with Section 2.9; and

60

(v)    any other certificates or documents that the Administrative Agent shall reasonably request, in form and substance reasonably satisfactory to the Administrative Agent.

Upon the effectiveness of any such Incremental Revolving Commitment, the Commitments and Pro Rata Share of each Lender will be adjusted to give effect to the Incremental Revolving Commitments, as applicable, and Schedule I shall automatically be deemed amended accordingly.

(d)    If any Incremental Revolving Commitments are to have terms that are different from the Revolving Commitments outstanding immediately prior to such incurrence (any such Incremental Revolving Commitments, the "Non-Conforming Revolving Credit Extensions"), all such terms shall be as set forth in a separate assumption agreement among the Borrower, the Lenders providing such Incremental Revolving Commitments and the Administrative Agent, the execution and delivery of which agreement shall be a condition to the effectiveness of the Non-Conforming Revolving Credit Extensions.  If the Borrower incurs Incremental Revolving Commitments under this Section, regardless of whether such Incremental Revolving Commitments are Non-Conforming Revolving Credit Extensions, the Borrower shall, after such time, repay and incur Revolving Loans ratably as between the Incremental Revolving Commitments and the Revolving Commitments outstanding immediately prior to such incurrence.  Notwithstanding anything to the contrary in Section 10.2, the Administrative Agent is expressly permitted to amend the Loan Documents to the extent necessary to give effect to any increase pursuant to this Section and mechanical changes necessary or advisable in connection therewith (including amendments to implement the requirements in the preceding two sentences, amendments to ensure *pro rata* allocations of Eurodollar Loans and Base Rate Loans between Loans incurred pursuant to this Section and Loans outstanding immediately prior to any such incurrence).

## B. **Term Commitments**.

(a)    From time to time after the Closing Date and in accordance with this Section, the Borrower and one or more Increasing Term Lenders or Additional Lenders (each as defined below) may enter into an agreement to increase the aggregate Term Loan Commitments hereunder (each such increase, an "Incremental Term Commitment") so long as the following conditions are satisfied:

(i)    the aggregate principal amount of all such Incremental Term Commitments made pursuant to this Section shall not exceed $14,500,000 (the principal amount of each such Incremental Term Commitment, the "Incremental Term Commitment Amount");

(ii)    if the Incremental Term Commitment closes at any time after the date that is two (2) weeks after the Closing Date (the "Initial Incremental Close Date") or to the extent requested by any Additional Lender, the Borrower shall execute and deliver such documents and instruments and take such other actions as may be reasonably required by the Administrative Agent in connection with and at the time of any such proposed increase;

61

(iii)    at the time of and immediately after giving effect to any such proposed increase, no Default or Event of Default shall exist, all representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects), and, since March 31, 2015, there shall have been no change which has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(iv)    any Incremental Term Commitments provided pursuant to this Section shall have a termination date no earlier than as set forth in item (ii) of the definition of Term Commitment Termination Date;

(v)    if the Incremental Term Commitment closes at any time Initial Incremental Closing Date, the Administrative Agent shall have received a Compliance Certificate which demonstrates that the Borrower and its Subsidiaries are in pro forma compliance with each of the financial covenants set forth in Article VI as of the most recently ended Fiscal Quarter for which financial statements are required to have been delivered, calculated as if all such Incremental Term Commitments had been established (and all of the Term Loan Commitments, as so increased, have been fully funded) as of the first day of the relevant period for testing compliance;

(vi)    any collateral securing any such Incremental Term Commitments shall also secure all other Obligations on a *pari passu* basis; and

(vii)    all other terms and conditions with respect to any such Incremental Term Commitments shall be reasonably satisfactory to the Administrative Agent, and such Incremental Term Commitments shall be deemed satisfactory so long as: (A) such Incremental Term Commitments close on or before the Initial Incremental Close Date, and (B) the terms and conditions with respect to any such Incremental Term Commitments are the same as the Term Loan Commitments in place as of the Closing Date.

(b)    On any date that is on or prior to the Initial Incremental Close Date, the Borrower shall provide at least 3 days' written notice to the Administrative Agent (who shall promptly provide a copy of such notice to each Lender) of any proposal to establish an Incremental Term Commitment. On any date that is after to the Initial Incremental Close Date, the Borrower shall provide at least 30 days' written notice to the Administrative Agent (who shall promptly provide a copy of such notice to each Lender) of any proposal to establish an Incremental Term Commitment. The Borrower may also, but is not required to, specify any fees offered to those Lenders (the "Increasing Term Lenders") that agree to increase the principal amount of their Term Loan Commitments, which fees shall be based upon the amount by which any such Lender is willing to increase the principal amount of its Term Loan Commitment, in accordance with the Fee Letter. Each Increasing Term Lender shall as soon as practicable, and in any case within 15 days (if after the Initial Incremental Close Date, and 2 days, if on or prior to the Initial Incremental Close Date) following receipt of such notice, specify in a written notice to the Borrower and the Administrative Agent the amount of such

proposed Incremental Term Commitment that it is willing to provide.  No Lender (or any successor thereto) shall have any obligation, express or implied, to offer to increase the aggregate principal amount of its Term Loan Commitment, and any decision by a Lender to increase its Term Loan Commitment shall be made in its sole discretion independently from any other Lender.  Only the consent of each Increasing Term Lender shall be required for an increase in the aggregate principal amount of the Term Loan Commitments, pursuant to this Section.  No Lender which declines to increase the principal amount of its Term Loan Commitment may be replaced with respect to its existing Term Loan Commitment as a result thereof without such Lender's consent.  If any Lender shall fail to notify the Borrower and the Administrative Agent in writing about whether it will increase its Term Loan Commitment within 15 days (if after the Initial Incremental Close Date and 2 days, if on or prior to the Initial Incremental Close Date) after receipt of such notice, such Lender shall be deemed to have declined to increase its Term Loan Commitment.  The Borrower may accept some or all of the offered amounts or designate Additional Lenders, which Additional Lenders may assume all or a portion of such Incremental Term Commitment.  The Borrower and the Administrative Agent shall have discretion jointly to adjust the allocation of such Incremental Term Commitments among the Increasing Term Lenders and the Additional Lenders.  On or prior to the Initial Incremental Close Date, the Administrative Agent shall also have discretion to reallocate the Term Loan Commitments (including any such Incremental Term Commitment) to Revolving Commitments, and reallocate the Revolving Commitments to Term Loan Commitments, so long as the applicable Lenders (or Additional Lenders) consent to such reallocation.  The sum of the increase in the Term Loan Commitments of the Increasing Term Lenders plus the Term Loan Commitments of the Additional Lenders shall not in the aggregate exceed the unsubscribed amount of the Incremental Term Commitment Amount.

(c)     Subject to subsections (a) and (b) of this Section 2.21B, any increase requested by the Borrower shall be effective upon (I) payment to the Administrative Agent of all fees, expenses and other amounts due and payable on or prior to the effective date of such increase (including all fees set forth in the Fee Letter that are due and payable to the Sole Lead Arranger in connection with such increase, and all upfront fees previously agreed in writing in connection with such increase (which upfront fees shall be paid to the Sole Arranger for the benefit of any applicable Increasing Lender(s) and any applicable Additional Lender(s))) and (II) delivery to the Administrative Agent of each of the following documents:

(i)     an originally executed copy of an instrument of joinder, in form and substance reasonably acceptable to the Administrative Agent, executed by the Borrower, by each Additional Lender and by each Increasing Lender, setting forth the new Term Loan Commitments of such Lenders and setting forth the agreement of each Additional Lender to become a party to this Agreement and to be bound by all of the terms and provisions hereof;

(ii)     such evidence of appropriate corporate authorization on the part of the Borrower with respect to such Incremental Term Commitment and (if after the Initial Incremental Close Date) such opinions of counsel for the Borrower with respect to such Incremental Term Commitment as the Administrative Agent may reasonably request;

(iii)     a certificate of the Borrower signed by a Responsible Officer, in form and substance reasonably acceptable to the Administrative Agent, certifying that each of the conditions in subsection (a) of this Section has been satisfied;

(iv)     to the extent requested by any Additional Lender or any Increasing Lender, executed promissory notes evidencing such Incremental Term Commitments, issued by the Borrower in accordance with Section 2.9; and

(v)     if the Incremental Term Commitment closes at any time after the Initial Incremental Close Date or to the extent requested by any Additional Lender, any other certificates or documents that the Administrative Agent shall reasonably request, in form and substance reasonably satisfactory to the Administrative Agent.

Upon the effectiveness of any such Incremental Term Commitment, the Commitments and Pro Rata Share of each Lender will be adjusted to give effect to the Incremental Term Commitments, as applicable, and Schedule I shall automatically be deemed amended accordingly.

(d)     If any Incremental Term Commitments are to have terms that are different from the Term Loan Commitments outstanding immediately prior to such incurrence (any such Incremental Term Commitments, the "Non-Conforming Term Credit Extensions"), all such terms shall be as set forth in a separate assumption agreement among the Borrower, the Lenders providing such Incremental Term Commitments and the Administrative Agent, the execution and delivery of which agreement shall be a condition to the effectiveness of the Non-Conforming Term Credit Extensions.  If the Borrower incurs Incremental Term Commitments under this Section, regardless of whether such Incremental Term Commitments are Non-Conforming Term Credit Extensions, the Borrower shall, after such time, repay and incur Term Loans ratably as between the Incremental Term Commitments and the Term Loan Commitments outstanding immediately prior to such incurrence.  Notwithstanding anything to the contrary in Section 10.2, the Administrative Agent is expressly permitted to amend the Loan Documents to the extent necessary to give effect to any increase pursuant to this Section and mechanical changes necessary or advisable in connection therewith (including amendments to implement the requirements in the preceding two sentences, amendments to ensure *pro rata* allocations of Eurodollar Loans and Base Rate Loans between Loans incurred pursuant to this Section and Loans outstanding immediately prior to any such incurrence).

**Section 2.22   Mitigation of Obligations**.  If any Lender requests compensation under Section 2.17, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.19, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the sole judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable under Section 2.17 or Section 2.19, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all costs and expenses incurred by any Lender in connection with such designation or assignment.

206771225 v17

Section 2.23   **Replacement of Lenders**.  If (a) any Lender requests compensation under Section 2.17, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.19, or (b) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions set forth in Section 10.4(b)), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.17 or 2.19, as applicable) and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender) (a "Replacement Lender"); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal amount of all Loans owed to it, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such outstanding principal and accrued interest) and from the Borrower (in the case of all other amounts), and (iii) in the case of a claim for compensation under Section 2.17 or payments required to be made pursuant to Section 2.19, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.24   **Defaulting Lenders**.

(a)   <u>Defaulting Lender Adjustments</u>.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)   Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders and in Section 10.2.

(ii)   Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.7 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>third</u>, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; <u>fourth</u>, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, so long as no Default or Event of Default exists,

65

to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the applicable conditions set forth in Article III were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders *pro rata* in accordance with the Commitments under the applicable facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.24(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    No Defaulting Lender shall be entitled to receive any Commitment Fee pursuant to Section 2.13(b) for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held *pro rata* by the Lenders in accordance with the applicable Commitments, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**Section 2.25    Provisions Relating to the Borrowing Base.**

(a)    The Administrative Agent or the Required Lenders may from time to time by written notice to the Borrower (i) remove any Acceptable Obligor or Affiliated Group from Annex A, or (ii) decrease the Allowable Amount for any Acceptable Obligor or Affiliated Group, (iii) reclassify any Acceptable Obligor or Affiliated Group into a different category of Acceptable Obligor or Affiliated Group (as the case may be), or (iv) modify the type(s) of Item(s) of Product permitted for such Acceptable Obligor or Affiliated Group, in each case as the Administrative Agent or the Required Lenders, as the case may be, acting in good faith may deem appropriate as a result of a change in the circumstances of such Acceptable Obligor or Affiliated Group or experience with regard to the set offs or deductions taken or asserted by the Acceptable Obligor or a member of its Affiliated Group with regard to prior credits

included in the Borrowing Base; provided, however, that any such removal, decrease, reclassification or modification shall be effective on a prospective basis only and shall not be effective (x) with respect to any Acceptable Obligor or Affiliated Group if, prior to the Borrower's receipt of such notice, any of the Loan Parties has executed a deal memo or other written agreement with such Acceptable Obligor or Affiliated Group with respect to amounts to be paid to such Loan Party solely in connection with a single Item of Product and such execution occurs not more than thirty (30) days prior to the initial extension of credit made hereunder in respect of such Item of Product and/or (y) to the extent that giving effect to such notice would otherwise result in a mandatory prepayment by the Borrower under Section 2.11(a)(iii) (but such notice shall nevertheless be effective for all other purposes under this Agreement), subject to the provisos in subsections (d) and (e) of this Section.   The Administrative Agent and the Required Lenders, as applicable, agree to consult with the Borrower regarding any removal, decrease, reclassification or modification contemplated hereby to the extent practicable and permitted by applicable law, provided that the failure to do so shall not render ineffective any such removal, decrease, reclassification or modification, and any such removal, decrease, reclassification or modification shall be effective notwithstanding any such consultation.

(b)     The Required Lenders may (either independently or after a request has been received from the Borrower) from time to time by written notice to the Borrower, as they may in their discretion deem appropriate, (i) add or reinstate an Acceptable Obligor or Affiliated Group to Annex A, (ii) increase the Allowable Amount for any Acceptable Obligor or Affiliated Group, (iii) reclassify any Acceptable Obligor or Affiliated Group into a different category of Acceptable Obligor or (iv) modify the type(s) of Item(s) of Product permitted for such Acceptable Obligor.

(c)     In the event either Administrative Agent or the Required Lenders notify the Borrower that an Acceptable Obligor or Affiliated Group is removed from Annex A in accordance with subsection (a) of this Section, no new Eligible Receivables with respect to such Person or Affiliated Group may be included in the Borrowing Base, and any existing Eligible Receivables may no longer be included in the Borrowing Base for purposes of further Loans made hereunder, in each case subsequent to such notice, unless supported by an Acceptable L/C or the Required Lenders thereafter notify the Borrower that such Acceptable Obligor or Affiliated Group is reinstated as an Acceptable Obligor in accordance with subsection (b) of this Section.

(d)     In the event either Administrative Agent or the Required Lenders notify the Borrower that the Allowable Amount with respect to an Acceptable Obligor or Affiliated Group is to be reduced in accordance with subsection (a) of this Section, (i) no new Eligible Receivables with respect to such Acceptable Obligor or Affiliated Group may be included in a Borrowing Base subsequent to such notice if such inclusion would result in the aggregate amount of Eligible Receivables from such Acceptable Obligor or Affiliated Group being in excess of the Allowable Amount for such Acceptable Obligor or Affiliated Group after giving effect to such reduction, and (ii) no further Loans shall be made on the basis of Eligible Receivables with respect to such Acceptable Obligor or Affiliated Group subsequent to such notice if such Loans would result in a mandatory prepayment by the Borrower under Section 2.11(a)(iii) after giving effect to such reduction, in each case to the extent of such excess only,

67

unless such excess is supported by an Acceptable L/C or the Required Lenders thereafter notify the Borrower that the Allowable Amount for such Acceptable Obligor or Affiliated Group is increased in accordance with subsection (b) of this Section.

(e)     In the event either Administrative Agent or the Required Lenders notify the Borrower that any Acceptable Obligor or Affiliated Group is reclassified into a different category of Acceptable Obligor with the effect of reducing the advance rates in the Borrowing Base with respect to Eligible Receivables with respect to such Acceptable Obligor or Affiliated Group in accordance with subsection (a) of this Section, (i) any additional Eligible Receivables from such Acceptable Obligor may be included in a Borrowing Base subsequent to such notice only if classified at the new category of Acceptable Obligor or Affiliated Group and at the new advance rate after giving effect to such reclassification, and (ii) no further Loans shall be made on the basis of existing Eligible Receivables from such Acceptable Obligor or Affiliated Group subsequent to such notice if such Loans would result in a mandatory prepayment by the Borrower under Section 2.11(a)(iii) after giving effect to such reduction, in each case unless the Required Lenders thereafter notify the Borrower that such Acceptable Obligor or Affiliated Group is reclassified in accordance with subsection (b) of this Section.

(f)     In the event either Administrative Agent or the Required Lenders notify the Borrower that the type(s) of Item(s) of Product permitted for an Acceptable Obligor or Affiliated Group have been modified so as to eliminate a particular type of permitted Item of Product with respect to such Acceptable Obligor or Affiliated Group in accordance with subsection (a) of this Section, no new Eligible Receivables with respect to such Person or Affiliated Group may be included in the Borrowing Base in respect of such eliminated type of permitted Item of Product.

## ARTICLE III

## CONDITIONS PRECEDENT TO LOANS

**Section 3.1     Conditions to Effectiveness**.   The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied:

(a)     Payment of Fees and Costs.   The Administrative Agent shall have received payment of all fees, expenses and other amounts due and payable on or prior to the Closing Date, including, without limitation, reimbursement or payment of all out-of-pocket expenses of the Administrative Agent, the Sole Lead Arranger and their Affiliates (including reasonable fees, charges and disbursements of counsel to the Administrative Agent) required to be reimbursed or paid by the Borrower hereunder, under any other Loan Document, under the Existing Credit Agreement and under any agreement with the Administrative Agent or the Sole Lead Arranger.

(b)     Documents.   The Administrative Agent (or its counsel) shall have received the following, each to be in form and substance satisfactory to the Administrative Agent:

(i)     a counterpart of this Agreement signed by or on behalf of each party hereto or written evidence satisfactory to the Administrative Agent (which may include facsimile transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement;

(ii)     a certificate of the signed by the manager, general partner, Secretary, or a Responsible Officer of each Loan Party and of the Sponsor in the form of Exhibit 3.1(b)(ii), attaching and certifying copies of its bylaws, partnership agreement or limited liability company agreement, and of the resolutions of its board of directors or other equivalent governing body, or comparable organizational documents and authorizations, authorizing the execution, delivery and performance of the Loan Documents to which it is a party and certifying the name, title and true signature of each officer of such Person executing the Loan Documents to which it is a party;

(iii)     certified copies of the articles or certificate of incorporation, certificate of organization or limited partnership, or other registered organizational documents of each Loan Party and of the Sponsor (including any foreign qualification documents), together with certificates of good standing or existence, as may be available from the Secretary of State of the jurisdiction of organization of such Person and each other jurisdiction where such Person is required to be qualified to do business as a foreign entity;

(iv)     a correct and complete organizational chart reflecting the organizational structure of Holdco, its Subsidiaries and its equity holders;

(v)     a favorable written opinion of Stroock & Stroock & Lavan LLP, counsel to the Loan Parties and the Sponsor, addressed to the Administrative Agent and each of the Lenders, and covering such matters relating to the Loan Parties, the Sponsor, the Loan Documents and the transactions contemplated therein as the Administrative Agent or the Required Lenders shall reasonably request;

(vi)     a certificate in the form of Exhibit 3.1(b)(vi), dated the Closing Date and signed by a Responsible Officer of the Borrower, certifying that after giving effect to the funding of the Term Loans and any initial Revolving Borrowing, (x) no Default, Event of Default or event that would result in a mandatory prepayment by the Borrower under Section 2.11(a)(iii) exists, (y) all representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects) and (z) since March 31, 2015, there shall have been no change which has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect;

(vii)     a duly executed Borrowing Base Certificate dated as of July 9, 2015;

(viii)   a duly executed Notice of Borrowing for any initial Revolving Borrowing;

(ix)   a duly executed funds disbursement agreement, together with a report setting forth the sources and uses of the proceeds hereof;

(x)   certified copies of all consents, approvals, authorizations, registrations and filings and orders required or advisable to be made or obtained under any Requirement of Law, or by any Contractual Obligation of any Loan Party, in connection with the execution, delivery, performance, validity and enforceability of the Loan Documents or any of the transactions contemplated thereby, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect and all applicable waiting periods shall have expired, and no investigation or inquiry by any governmental authority regarding the Commitments or any transaction being financed with the proceeds thereof shall be ongoing;

(xi)   copies of respect to the Borrower and its Subsidiaries, (1) the internally prepared quarterly financial statements of the Borrower and its Subsidiaries on a consolidated basis for the Fiscal Quarter ended June 30, 2014, (2) the audited consolidated and unaudited financial statements for the Borrower and its Subsidiaries for the Fiscal Year ended December 31, 2013 and (2) financial projections on a quarterly basis for the Fiscal Year ended December 31, 2014 and annually thereafter through 2018;

(xii)   a duly completed and executed Compliance Certificate, including calculations of the financial covenants set forth in Article VI hereof as of March 31, 2015, calculated on a *pro forma* basis as if the Term Loans and any initial Revolving Borrowing had been funded as of the first day of the relevant period for testing compliance (and setting forth in reasonable detail such calculations);

(xiii)   a certificate, dated as of the Closing Date and signed by the chief executive officer or the chief financial officer of each Loan Party, confirming that each Loan Party is Solvent before and after giving effect to the funding of the Term Loans and any initial Revolving Borrowing and the consummation of the transactions contemplated to occur on the Closing Date;

(xiv)   the Guaranty and Security Agreement, duly executed by the Loan Parties, together with (A) UCC financing statements and other applicable documents under the laws of all necessary or appropriate jurisdictions with respect to the perfection of the Liens granted under the Guaranty and Security Agreement, as requested by the Administrative Agent in order to perfect such Liens, duly authorized by the Loan Parties, (B) copies of favorable UCC, tax, judgment, lien, copyright office and patent and trademark office search reports in all necessary or appropriate jurisdictions and under all legal and trade names of the Loan Parties, as requested by the Administrative Agent, indicating that there are no prior Liens on any of the Collateral subject thereto other than Permitted Encumbrances and Liens to be released on the Closing Date, (C) a Perfection Certificate, duly completed and executed by the Borrower, (D) a duly executed Copyright Security Agreement and Trademark Security Agreement, (E) to the extent certificated,

70

original certificates evidencing all issued and outstanding shares of Capital Stock of all Subsidiaries owned directly by any Loan Party (or, if the pledge of all of the voting Capital Stock of any Foreign Subsidiary would result in materially adverse tax consequences, limited to 65% of the issued and outstanding voting Capital Stock of such Foreign Subsidiary and 100% of the issued and outstanding non-voting Capital Stock of such Foreign Subsidiary, as applicable) and (F) with respect to any certificated Capital Stock of any Subsidiary that is subject to the foregoing clause (E), stock or membership interest powers or other appropriate instruments of transfer executed in blank;

(xv)     the Pledge Agreement, duly executed by Holdco, together with (A) a UCC financing statement and any other applicable documents under the laws of all necessary or appropriate jurisdictions with respect to the perfection of the Lien granted under the Pledge Agreement, as requested by the Administrative Agent in order to perfect such Lien, duly authorized by Holdco, (B) copies of favorable UCC, tax, judgment and lien search reports in all necessary or appropriate jurisdictions and under all legal and trade names of Holdco, as requested by the Administrative Agent, indicating that there are no prior Liens on any of the Collateral subject thereto other than and Liens to be released on the Closing Date, (C) a Perfection Certificate, duly completed and executed by Holdco, (D) to the extent certificated, original certificates evidencing all issued and outstanding shares of Capital Stock of the Borrower and (E) with respect to any certificated Capital Stock of the Borrower, stock or membership interest powers or other appropriate instruments of transfer executed in blank;

(xvi)    Control Account Agreements, duly executed by each Permitted Third Party Bank and the applicable Loan Party;

(xvii)   Laboratory Access Letters (together with the related access letters in favor of the relevant Loan Parties) and Laboratory Pledgeholder Agreements, as applicable, for each Item of Product;

(xviii)  evidence satisfactory to the Administrative Agent that (i) each Loan Party has sufficient right, title and interest in and to its respective Collateral and other assets which it purports to own (including appropriate licenses under copyright), as set forth in the documents and other materials presented to the Administrative Agent prior to the Closing Date, to (as applicable) enable the applicable Loan Party to perform its obligations under the Distribution Agreements, the Licensing Intermediary Agreements and all other Material Agreements to which it is a party, and to grant to the Administrative Agent (for the benefit of the Secured Parties) the security interests contemplated by the Collateral Documents and (ii) all UCC financing statements, copyright filings, trademark filings and other filings under applicable law necessary to provide the Administrative Agent (for the benefit of the Secured Parties) with a perfected Lien in such Collateral (with the priority contemplated by Section 4.20) have been filed or delivered to the Administrative Agent in satisfactory form for filing;

(xix)    [reserved];

(xx)     copies of all Material Agreements;

(xxi)    (i) a summary of all existing insurance coverage maintained by any Loan Party, (ii) evidence acceptable to the Administrative Agent that the insurance policies required by Section 5.10, have been obtained and are in full force and effect, and (iii) certificates of insurance (accompanied by appropriate endorsements) with respect to all existing insurance coverage which certificates and endorsements shall name the Administrative Agent (to the extent that none of the Secured Parties shall be liable for premiums or calls) as additional insured and (with respect to any applicable insurance) loss payee and shall evidence the Borrower's compliance with Section 5.10(e);

(xxii)   an engagement letter for the services of Salem Partners LLC in its role as the initial Approved Valuation Expert, duly executed by such Person, the Borrower and the Administrative Agent, in form and substance acceptable to the Administrative Agent;

(xxiii)  the Initial Library Valuation Report, duly executed by the Approved Valuation Expert, together with a calculation of the initial Library Valuation Amount (calculated as of March 19, 2014, in accordance with the definition of such term) certified by a Responsible Officer of the Borrower;

(xxiv)   with respect to each receivable of a Loan Party as of the Closing Date, a Notice of Assignment duly executed by each party thereto, together with (i) evidence that each such Notice of Assignment has been delivered to the applicable account debtor and (ii) the corresponding Distribution Agreement (or other agreement) related thereto; provided that, Borrower shall have sixty (60) days from the Closing Date to provide Borrower's vendor number with respect to Best Buy; and  provided, further, that Borrower shall have thirty (30) days from the Closing Date to provide Borrower's vendor number with respect to Sam's Club; and provided, further, that, Borrower shall not be required to make such delivery with respect to any Eligible Receivables of Red Cloud until such time as Borrower intends to include such Eligible Receivables in the Borrowing Base;

(xxv)    receipt of the most recent domestic and, if appropriate, foreign tax returns and extension filings of the Borrower prior to its acquisition by Holdco;

(xxvi)   an omnibus amendment excluding Holdco's equity investment in OA Investment Holdings from the Guaranty and Security Agreement, the Pledge Agreement, the Trademark Security Agreement and the Copyright Security Agreement;

(xxvii)  new UCC financing statements referencing this Agreement and reflecting the collateral package as of the Closing Date (reflecting, *inter alia*, the exclusion of the equity in OA Investment Holdings);

(xxviii) such other documentation and information as the Administrative Agent may reasonably request.

(c)      Collection Account.  The Borrower shall have established a Collection Account with SunTrust Bank.

(d)     Litigation.  No litigation, inquiry, injunction or restraining order shall be pending, entered or, to the knowledge of the Borrower, threatened, which involves any of the transactions contemplated hereby and by the other Loan Documents or could reasonably be expected to have a Material Adverse Effect.

(e)     No Material Adverse Effect.  Since March 31, 2015, there shall have been no change which has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(f)     Required Consents and Approvals.  The Administrative Agent shall be satisfied that (i) all required consents and approvals have been obtained with respect to the transactions contemplated hereby and by the other Loan Documents from all Governmental Authorities with jurisdiction over the business and activities of any Loan Party and from any other Person whose consent or approval the Administrative Agent in its reasonable discretion deems necessary to the transactions contemplated hereby and by the other Loan Documents, and (ii) all such consents and approvals remain in full force and effect.

(g)     Federal Reserve Regulations.  The Administrative Agent shall be satisfied that the provisions of Regulation T, Regulation U and Regulation X will not be violated by the transactions contemplated hereby.

(h)     Compliance with Laws and Material Agreements.  The Administrative Agent shall be satisfied that the transactions contemplated hereby and by the other Loan Documents will not (i) violate any provision of applicable law, or any order of any court or other agency of the United States or any state thereof applicable to any Loan Party or any of their respective properties or assets or (ii) conflict with, or result in a default, breach or right of termination or acceleration under, any Material Agreement.

(i)     Approval of Counsel to the Administrative Agent.  All legal matters incident to this Agreement and the other transactions contemplated hereby shall be reasonably satisfactory to Akin Gump Strauss Hauer & Feld LLP, counsel to the Administrative Agent.

(j)     Due Diligence.  The Administrative Agent shall have completed and be satisfied with a due diligence investigation relating to all matters in connection with the Loans and the Red Cloud Acquisition.

(k)     Patriot Act.  The Administrative Agent shall have received any information required and requested by Administrative Agent or any Lender under or in connection with the Patriot Act.

(l)     Red Cloud Acquisition.  The Red Cloud Acquisition shall have been completed, and the Administrative Agent shall have received and approved copies of the Asset Purchase Agreement and agreements with respect to the purchase of the remaining 49% membership interests in Anderson Digital, LLC (such documentation to be in form and substance acceptable to the Administrative Agent in its sole discretion) and all other documents in connection therewith as determined by Administrative Agent in its sole and absolute discretion, including, without limitation, evidence that Borrower owns 100% of the

73

membership interests in Anderson Digital, LLC and that such interests are not subject to divestment or termination for any reason whatsoever.

(m) <u>Mezzanine Debt Facility</u>. The concurrent closing of the Mezzanine Debt Facility, and the Administrative Agent shall have received and approved copies of the loan agreement with respect to the Mezzanine Debt Facility, such documentation to be in form and substance acceptable to the Administrative Agent in its sole discretion.

Without limiting the generality of the provisions of this Section, for purposes of determining compliance with the conditions specified in this Section, each Lender that has signed this Agreement shall be deemed to have consented to, approved of, accepted or been satisfied with each document or other matter required thereunder to be consented to, approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**Section 3.2    <u>Conditions to Initial Borrowing Base Credit for any Item of Product</u>**. The ability of the Borrower to obtain initial Borrowing Base credit for an Item of Product, and the obligation of each Lender to make any Loan supported thereby, and are subject to the satisfaction of the following conditions (to the extent applicable to such Item of Product); <u>provided</u>, <u>however</u>, that the parties hereto acknowledge that each of the conditions set forth this <u>Section 3.2</u> in respect of all Items of Product approved for inclusion under the Borrowing Base under the Existing Credit Agreement prior to the date hereof are deemed satisfied for all purposes hereunder:

(a) <u>Product Declaration</u>. The Administrative Agent shall have received a Product Declaration in respect of such Item of Product, duly executed by an Authorized Officer of the Borrower and in form and substance acceptable to the Administrative Agent; <u>provided</u> that the foregoing shall not apply to any Item of Product that is an existing asset of a Loan Party, and that has been Completed, as of the Closing Date.

(b) <u>Item of Product Documents</u>. The Administrative Agent shall have received the following (which shall be in form and substance acceptable to the Administrative Agent):

(i) fully-executed copies of all then existing Distribution Agreements and sales agency agreements in respect of such Item of Product;

(ii) a fully-executed copy of a Notice of Assignment (or an Interparty Agreement) from each applicable Acceptable Obligor with respect to any Eligible Receivables to be included in the Borrowing Base at such time relating to such Item of Product;

(iii) with respect to each Licensing Intermediary that has entered into any then existing Distribution Agreement for such Item of Product, a fully-executed copy of all then existing Licensing Intermediary Agreements entered into by such Licensing Intermediary with respect to such Item of Product and a fully-executed Licensing Intermediary Security Agreement (accompanied by all other documentation required by <u>Section 5.17(d)</u>); and

     (iv) certificates or binders of insurance for such Item of Product as required by <u>Section 5.10</u>, together with endorsements naming the Administrative Agent (to the extent that none of the Secured Parties shall be liable for premiums or calls) as an "additional insured" and (with respect to any applicable insurance) as a "loss payee".

    (c) <u>Chain of Title</u>.  If such Item of Product is a Key Item of Product, the Administrative Agent shall have received copies of all agreements, Rights Acquisition Agreements, instruments of transfer or other instruments (including, without limitation, chain of title documents and third Person Lien termination or subordination documents) necessary to establish, to the reasonable satisfaction of the Administrative Agent, the applicable Loan Party's ownership (or rights under license) of sufficient rights in such Key Item of Product to enable such Loan Party to exploit such Key Item of Product and to grant to the Administrative Agent (for the benefit of the Secured Parties) the security interests in such Key Item of Product contemplated under the Loan Documents (with the priority contemplated by <u>Section 4.20</u>), together with evidence reflecting that the relevant documents have been submitted for recording with the U.S. Copyright Office.

    (d) <u>Security Documents</u>.  The Administrative Agent shall have received the following (all of which shall be in form and substance acceptable to the Administrative Agent):

     (i) a Copyright Security Agreement Supplement for such Item of Product, duly executed by the Loan Parties;

     (ii) Laboratory Access Letter(s) (together with the related access letters in favor of the relevant Loan Parties) or Laboratory Pledgeholder Agreement(s), as applicable, for such Item of Product, duly executed by each party thereto;

     (iii) a Trademark Security Agreement (together with any related trademark license agreement), if applicable, duly executed by the Loan Parties; and

     (iv) (in satisfactory form for filing) any financing statements or other security documents or filings necessary or reasonably requested by the Administrative Agent to provide to it with a first priority perfected security interest (with the priority contemplated by <u>Section 4.20</u>) in the applicable Loan Party's interest in such Item of Product.

    (e) <u>Lien Searches</u>.  The Administrative Agent shall have received UCC, copyright office, patent and trademark office (if requested by the Administrative Agent), and such other searches reasonably requested by it and reasonably satisfactory to it indicating that no other filings (other than in connection with Permitted Encumbrances) are of record in any jurisdiction in which it shall be necessary or desirable for the Administrative Agent to make a filing in order to provide the Administrative Agent (for the benefit of the Secured Parties) with a first priority perfected security interest in the Collateral (with the priority contemplated by <u>Section 4.20</u>).

    (f) <u>Payment of Purchase Price for an Acquired Item of Product</u>.  If such Item of Product has been (or will be) acquired from a Person that is not a Loan Party, that portion of the Rights Acquisition Costs necessary to effect a transfer of sufficient rights, title and interest in

such Item of Product to the applicable Loan Party to enable such Loan Party (i) to grant to the Administrative Agent (for the benefit of the Secured Parties) the security interest in such Item of Product contemplated under the Loan Documents (with the priority contemplated by Section 4.20), (ii) to distribute or otherwise exploit such Item of Product and (iii) to otherwise comply with the Distribution Agreements and any other agreement entered into by a Loan Party with respect to such Item of Product, has been paid or is being contemporaneously paid from the proceeds of a requested Borrowing or cash of a Loan Party.

(g)     Updated Schedules.  The Administrative Agent shall have received an updated version of Schedule 4.22, to the extent required to reflect the information relating to such Item of Product pertinent to such Schedule (and only to the extent there have been any changes thereto since the version of the Schedule previously delivered to the Administrative Agent hereunder).

**Section 3.3     Conditions to Each Credit Event**.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial Borrowing) is subject to the satisfaction of the following conditions:

(a)     No Default, Event of Default or Mandatory Prepayment Event.  At the time of and immediately after giving effect to such Borrowing no Default, Event of Default or event that would result in a mandatory prepayment by the Borrower under Section 2.11(a)(iii) shall exist.

(b)     Accuracy of Representations and Warranties.  At the time of and immediately after giving effect to such Borrowing all of the respective representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects (other than those representations and warranties that are expressly qualified by a Material Adverse Effect or other materiality, in which case such representations and warranties shall be true and correct in all respects).

(c)     No Material Adverse Effect.  Since March 31, 2015, there shall have been no change which has had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(d)     Notice of Borrowing.  The Borrower shall have delivered a duly executed Notice of Borrowing for any Revolving Borrowing.

(e)     Qualifying Picture.  If any of the proceeds of such Borrowing are to be used to acquire a new Item of Product that is a motion picture and not a Library Title, the Borrower shall have demonstrated to the satisfaction of the Administrative Agent that such Item of Product satisfies the criteria for a Qualifying Picture.

(f)     Borrowing Base Certificate.  The Administrative Agent shall have received a Borrowing Base Certificate dated as of a date within five (5) days prior to the requested Borrowing date, duly executed by a Responsible Officer of the Borrower, and demonstrating to the satisfaction of the Administrative Agent that after giving effect to such Borrowing no mandatory prepayment event under Section 2.11(a)(iii) would result therefrom.

(g)      <u>Eligible Receivables</u>.  With respect to any Eligible Receivables for an Item of Product that are included in the Borrowing Base Certificate delivered to the Administrative Agent in connection with such Borrowing, the Administrative Agent shall have received the following (all of which shall be in form and substance acceptable to the Administrative Agent), in each case, to the extent not previously delivered to the Administrative Agent: fully-executed copies of all Distribution Agreements in respect of such Eligible Receivables, together with (A) a copy of a fully-executed Notice of Assignment (or an Interparty Agreement) with respect to each such Distribution Agreement; and (B) (if any of such Distribution Agreements were entered into by a Licensing Intermediary) a fully-executed copy of all then existing Licensing Intermediary Agreements entered into by such Licensing Intermediary with respect to such Item of Product and a fully-executed Licensing Intermediary Security Agreement therefor (accompanied by all other documentation required by <u>Section 5.17(d)</u>).

(h)      <u>Acceptable L/Cs</u>.  If any Eligible Receivables for an Item of Product that are included in the Borrowing Base Certificate delivered to the Administrative Agent in connection with such Borrowing are secured by an Acceptable L/C, the Administrative Agent shall have received an issued original (or, where applicable, an issued copy) of such Acceptable L/C in form and substance reasonably acceptable to the Administrative Agent.

(i)      <u>Other Documents</u>.  The Administrative Agent shall have received such other documents, certificates, information or legal opinions as the Administrative Agent or the Required Lenders may reasonably request, all in form and substance satisfactory to the Administrative Agent or the Required Lenders.

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in subsections (a), (b) and (c) of this Section.

**Section 3.4    Delivery of Documents**.  All of the Loan Documents, certificates, legal opinions and other documents and papers referred to in this Article, unless otherwise specified, shall be delivered to the Administrative Agent for the account of each of the Lenders and in sufficient counterparts or copies for each of the Lenders and shall be in form and substance satisfactory in all respects to the Administrative Agent.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each Lender as follows:

**Section 4.1    Existence; Power**.  The Borrower and each of its Subsidiaries (i) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted, and (iii) is duly qualified to do business, and is in good standing, in each jurisdiction where such qualification is required, except where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect.

77

**Section 4.2**   **Organizational Power; Authorization**.   The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party are within such Loan Party's organizational powers and have been duly authorized by all necessary organizational and, if required, shareholder, partner or member action.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party, will constitute, valid and binding obligations of the Borrower or such Loan Party (as the case may be), enforceable against it in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

**Section 4.3**   **Governmental Approvals; No Conflicts**.   The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party (a) do not require any consent or approval of, registration or filing with, or any action by, any Governmental Authority, except those as have been obtained or made and are in full force and effect and except for filings necessary to perfect or maintain perfection of the Liens created under the Loan Documents, (b) will not violate any Requirement of Law applicable to the Borrower or any of its Subsidiaries or any judgment, order or ruling of any Governmental Authority, (c) will not violate or result in a default under, or create any right to terminate, any Contractual Obligation of the Borrower or any of its Subsidiaries or any of its assets or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Subsidiaries and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries, except Liens (if any) created under the Loan Documents.

**Section 4.4**   **Financial Statements**.   The most recent (i) audited consolidated balance sheet of the Borrower and its Subsidiaries as of the applicable Fiscal Year then ended, and the related audited consolidated statements of income, members' equity and cash flows for such Fiscal Year, and the related notes and supplemental information for such audited statements and (ii) unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of the applicable Fiscal Quarter then ended, and the related unaudited consolidated statements of income and cash flows for such Fiscal Quarter and the year-to-date period then ended, in each case, delivered pursuant to Section 3.1(b)(x), 5.1(a)(i) or 5.1(b) hereof (as applicable), fairly present the consolidated financial condition of the Borrower and its Subsidiaries as of the applicable date and the consolidated results of operations for such periods in conformity with GAAP consistently applied, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii).  Since March 31, 2015, there have been no changes with respect to the Borrower and its Subsidiaries which have had or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**Section 4.5**   **Litigation and Environmental Matters**.

(a)   No litigation, investigation or proceeding of or before any arbitrators or Governmental Authorities is pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect or (ii) which in any manner draws into question the validity or enforceability of this Agreement or any other Loan Document.

78

(b)     Except for the matters set forth on Schedule 4.5, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

**Section 4.6    Compliance with Laws and Agreements**.  The Borrower and each of its Subsidiaries is in compliance with (a) all Requirements of Law and all judgments, decrees and orders of any Governmental Authority and (b) all indentures, agreements or other instruments binding upon it or its properties, except where non-compliance, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 4.7    Investment Company Act**.    Neither the Borrower nor any of its Subsidiaries is (a) an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under, the Investment Company Act of 1940, as amended and in effect from time to time, or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from, or registration or filing with, any Governmental Authority in connection therewith.

**Section 4.8    Taxes**.   The Borrower and its Subsidiaries and each other Person for whose taxes the Borrower or any of its Subsidiaries could become liable have timely filed or caused to be filed all Federal income tax returns and all other material tax returns that are required to be filed by them, and have paid all taxes shown to be due and payable on such returns or on any assessments made against it or its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority, except where the same are currently being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as the case may be, has set aside on its books adequate reserves in accordance with GAAP.  The charges, accruals and reserves on the books of the Borrower and its Subsidiaries in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

**Section 4.9    Margin Regulations**.  None of the proceeds of any of the Loans will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of such terms under Regulation U or for any purpose that violates the provisions of Regulation T, Regulation U or Regulation X.  Neither the Borrower nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock".

**Section 4.10   ERISA**.  Each Plan (if any) is in substantial compliance in form and operation with its terms and with ERISA and the Code (including, without limitation, the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations.  Each Plan (and each related trust, if any) which is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue

79

Service, and nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would adversely affect the issuance of a favorable determination letter or otherwise adversely affect such qualification). No ERISA Event has occurred or is reasonably expected to occur. There exists no Unfunded Pension Liability with respect to any Plan. None of the Borrower, any of its Subsidiaries or any ERISA Affiliate is making or accruing an obligation to make contributions, or has, within any of the five calendar years immediately preceding the date this assurance is given or deemed given, made or accrued an obligation to make, contributions to any Multiemployer Plan. There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits) or, to the knowledge of the Borrower, any of its Subsidiaries or any ERISA Affiliate, threatened, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to result in liability to the Borrower or any of its Subsidiaries. The Borrower, each of its Subsidiaries and each ERISA Affiliate have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, by the terms of such Plan or Multiemployer Plan, respectively, or by any contract or agreement requiring contributions to a Plan or Multiemployer Plan. No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA. None of the Borrower, any of its Subsidiaries or any ERISA Affiliate have ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions. Each Non-U.S. Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities, except as would not reasonably be expected to result in liability to the Borrower or any of its Subsidiaries. All contributions required to be made with respect to a Non-U.S. Plan have been timely made. Neither the Borrower nor any of its Subsidiaries has incurred any obligation in connection with the termination of, or withdrawal from, any Non-U.S. Plan. The present value of the accrued benefit liabilities (whether or not vested) under each Non-U.S. Plan, determined as of the end of the Borrower's most recently ended Fiscal Year on the basis of reasonable actuarial assumptions, did not exceed the current value of the assets of such Non-U.S. Plan allocable to such benefit liabilities.

### Section 4.11   Ownership of Property; Intellectual Property; Insurance.

(a)     Each of the Borrower and its Subsidiaries has good title to, or valid leasehold interests in, all of its properties and assets material to the operation of its business, including all such properties and assets reflected in the most recent audited consolidated balance sheet of the Borrower referred to in Section 4.4 or purported to have been acquired by the Borrower or any of its Subsidiaries after said date (except as sold or otherwise disposed of in the ordinary course of business), in each case free and clear of Liens prohibited by this Agreement. All leases that individually or in the aggregate are material to the business or operations of the Borrower and its Subsidiaries are valid and subsisting and are in full force.

80

(b)    Each of the Borrower and its Subsidiaries owns, or is licensed or otherwise has the right to use, all copyrights, trademarks, service marks, trade names, patents and other intellectual property material to its business, and (to the best of the Borrower's knowledge) the use thereof by the Borrower and its Subsidiaries does not infringe in any material respect on the rights of any other Person.

(c)    Each of the Loan Parties has sufficient right, title and interest in each Item of Product owned by or licensed to it (including under copyright) to enable it (i) with regard to each Item of Product exploited by it or on its behalf, to exploit such Item of Product and (ii) to perform its Contractual Obligations relating to each such Item of Product.

(d)    As of the Closing Date, neither the Borrower nor any of its Subsidiaries owns any Real Estate.

(e)    The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or any applicable Subsidiary operates. All such insurance coverage complies with all applicable requirements set forth in this Agreement and any other Loan Documents.

Section 4.12 **Disclosure**. The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments, and corporate or other restrictions to which the Borrower or any of its Subsidiaries is subject, and all other matters known to any of them, that, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports (including, without limitation, any reports that the Borrower is required to file with the Securities and Exchange Commission), financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation or syndication of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by any other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements herein or therein, taken as a whole in light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 4.13 **Labor Relations**. There are no strikes, lockouts or other material labor disputes or grievances against the Borrower or any of its Subsidiaries, or, to the Borrower's knowledge, threatened against or affecting the Borrower or any of its Subsidiaries, and no significant unfair labor practice charges or grievances are pending against the Borrower or any of its Subsidiaries, or, to the Borrower's knowledge, threatened against any of them before any Governmental Authority. All payments due from the Borrower or any of its Subsidiaries pursuant to the provisions of any collective bargaining agreement have been paid or accrued as a liability on the books of the Borrower or any such Subsidiary, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

**Section 4.14   Subsidiaries.**   Schedule 4.14 sets forth a true and complete list of each Loan Party and of each Subsidiary of a Loan Party, reflecting as to each such Person, in each case as of the Closing Date or as of the most recent date on which such Schedule is required to be updated in accordance with Section 5.1(c)(iii) (as the case may be): (a) the name of such Person, (b) the jurisdiction of incorporation or organization of such Person, (c) each jurisdiction in which such Person is qualified as a foreign entity (if any), (d) the type of entity of such Person, (e) the number of each class of outstanding Equity Interests of such Person, (f) the ownership interest of the applicable Loan Party in such Person (broken down by class of outstanding Equity Interests of such Person), and (g) whether such Person is a Subsidiary Loan Party.

**Section 4.15   Loan Party Information.**   Schedule 4.15 sets forth a true and complete list with respect to each Loan Party, reflecting as to each such Person, in each case as of the Closing Date or as of the most recent date on which such Schedule is required to be updated in accordance with Section 5.1(c)(iii) (as the case may be): (a) the address of its chief executive office, (b) the address of its principal place of business, (c) all of the places where it keeps (or intends to keep) the records concerning its Collateral or keeps (or intends to keep) any material goods included in its Collateral, (d) its U.S. federal taxpayer identification number (or, in the case of any Foreign Subsidiary that does not have a U.S. taxpayer identification number, its unique identification number issued to it by the jurisdiction of its incorporation or organization) and (e) its organization identification number.

**Section 4.16   Fictitious Names.**   Except as disclosed on Schedule 4.16, no Loan Party has done business, is doing business or intends to do business other than under its full legal name, including, without limitation, under any trade name or other "doing business as" name.

**Section 4.17   Responsible Officers.**   Set forth on Schedule 4.17 are the respective Responsible Officers of each Loan Party, holding the offices indicated next to their respective names, as of the Closing Date or as of the most recent date such Schedule was required to be updated in accordance with Section 5.1(c)(iii) (as the case may be), and such Responsible Officers are the duly elected and qualified officers of such Loan Party and are duly authorized to execute and deliver, on behalf of the respective Loan Party, each of the Loan Documents to which such Loan Party is a party.

**Section 4.18   Solvency.**   After giving effect to the execution and delivery of the Loan Documents and the making of the Loans under this Agreement, each Loan Party is Solvent.

**Section 4.19   Deposit and Disbursement Accounts.**   Schedule 4.19 lists all banks and other financial institutions at which any Loan Party maintains a deposit account, lockbox account, disbursement account, investment account or other similar account as of the Closing Date, and such Schedule correctly identifies the name, address and telephone number of each such financial institution, the name in which the account is held, the type of the account, and the complete account number therefor.

**Section 4.20   Collateral Documents.**

(a)      The Guaranty and Security Agreement is effective to create in favor of the Administrative Agent for the ratable benefit of the Secured Parties a legal, valid and enforceable security interest in the Collateral subject thereto, and when UCC financing statements in appropriate form are filed in the offices specified on Schedule 3 to the Guaranty and Security Agreement, the Guaranty and Security Agreement shall constitute a fully perfected Lien (to the extent that such Lien may be perfected by the filing of a UCC financing statement) on, and security interest in, all right, title and interest of the grantors thereunder in such Collateral, in each case prior and superior in right to any other Person, other than with respect to Liens expressly permitted by <u>Section 7.2(b)</u> (but only to the extent constituting a Permitted Encumbrances of the type described in clause (i) or (ii) or, to the extent agreed in writing by the Administrative Agent pursuant to an Intercreditor Agreement or an Interparty Agreement, in clause (iii), (iv) or (v) of the definition of such term) or by <u>Section 7.2(c)</u>. When the certificates evidencing any of the Capital Stock pledged pursuant to the Guaranty and Security Agreement are delivered to the Administrative Agent, together with appropriate stock powers or other similar instruments of transfer duly executed in blank, the Liens in such Capital Stock shall be fully perfected first priority security interests, perfected by "<u>control</u>" as defined in the UCC. When a Control Account Agreement with respect to any deposit account of a Loan Party maintained at a Permitted Third Party Bank is executed and delivered to the Administrative Agent, the Liens in such deposit account shall be fully perfected first priority security interests, perfected by "<u>control</u>" as defined in the UCC.

(b)      When the filings described in the first sentence of subsection (a) of this Section are made and when, if applicable, the Copyright Security Agreement and any Copyright Security Agreement Supplements are filed in the United States Copyright Office and the Trademark Security Agreements are filed in the United States Patent and Trademark Office, the Guaranty and Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Copyrights and Trademarks, if any, in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Copyright Office or the United States Patent and Trademark Office, as applicable, in each case prior and superior in right to any other Person, other than with respect to Permitted Encumbrances of the type described in clause (i) or (to the extent agreed in writing by the Administrative Agent pursuant to an Intercreditor Agreement or an Interparty Agreement) in clause (iii), (iv) or (v) of the definition of such term.

**Section 4.21**  **Material Agreements**.  As of the Closing Date, all Material Agreements of the Borrower and its Subsidiaries are described on <u>Schedule 4.21</u>, and each such Material Agreement is in full force and effect.  The Borrower does not have any knowledge of any pending amendments or threatened termination of any of the Material Agreements outside of the ordinary course of business.  As of the Closing Date, the Borrower has delivered to the Administrative Agent a true, complete and correct copy of each Material Agreement (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

206771225 v17

**Section 4.22    Items of Product; Copyrights, Trademarks and Other Rights.**

(a)    The Items of Product listed on Schedule 4.22(a) comprise all of the Items of Product in which any Loan Party has any right, title or interest (either directly, through a joint venture, partnership, license or otherwise) as of the Closing Date or as of the most recent date such Schedule was required to be updated in accordance with Section 3.2(g) or Section 5.1(c)(iii) (as the case may be).  Set forth across from the title of each such Item of Product on Schedule 4.22(a) is listed (i) the copyright registration number (or with respect to pending applications for registration, the filing receipt/control number), (ii) the name of the relevant copyright registrant (or, with respect to pending applications the applicant for copyright registration), and (iii) the nature of all interests held by the relevant Loan Party (*i.e.*, whether owned by, optioned by, assigned to, and/or licensed to, such Loan Party) in such Item of Product, unless waived by the Administrative Agent.  The Loan Party holding such interests has duly recorded or caused to be duly recorded (or, with respect to pending applications for registration, has submitted for recordation) such interests with the U.S. Copyright Office and has delivered copies of all such recordations to the Administrative Agent to the extent required hereunder.  Schedule 4.22(a) also identifies the location of the best available Physical Materials owned by any Loan Party or to which any Loan Party has a right to access in relation to each Item of Product.  To the best of the Borrower's knowledge, all such Items of Product and all component parts thereof do not and will not violate or infringe upon any copyright, right of privacy, trademark, patent, trade name, performing right or any literary, dramatic, musical, artistic, personal, private, civil, contract, property or copyright right or any other right of any Person or contain any libelous or slanderous material.  There is no claim, suit, action or proceeding pending or, to the best of the Borrower's knowledge, threatened against any Loan Party or any other Person that involves a claim of infringement of any copyright with respect to any Item of Product listed on Schedule 4.22(a), and the Borrower has no knowledge of any existing infringement by any other Person of any copyright with respect to any Item of Product listed on Schedule 4.22(a) which, in each case, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each Item of Product set forth on Schedule 4.22(a) as of the Closing Date has been included in the Copyright Security Agreement delivered to the Administrative Agent pursuant to Section 3.1.

(b)    Schedule 4.22(b)(i) lists all the trademarks registered and applications for trademark registration filed by any Loan Party and identifies the Loan Party which registered or filed each such trademark, (ii) specifies as to each, the jurisdictions in which such trademark registrations have been issued (or, if applicable, in which applications for such registrations have been filed), including the respective registration or application numbers and applicable dates of registration or application, and (iii) specifies as to any and all, as applicable, material licenses, sublicenses and other material agreements to which any Loan Party is a party and/or pursuant to which any Person is authorized to use such trademark, in each such case as of the Closing Date or as of the most recent date such Schedule was required to be updated in accordance with Section 3.2(l) or Section 5.1(c)(iii) (as the case may be).  There is no claim, suit, action or proceeding pending or, to the best of the Borrower's knowledge, threatened against any Loan Party or any other Person that involves a claim of infringement of any trademark listed on Schedule 4.22(b), and the Borrower has no knowledge of any existing infringement by any other Person of any trademark listed on Schedule 4.22(b) which, in each case, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Each trademark

84

set forth on Schedule 4.22(b) as of the Closing Date has been included in the Trademark Security Agreement delivered to the Administrative Agent pursuant to Section 3.1.

(c)     Except as disclosed on Schedule 4.22(c), all applications and registrations for all copyrights, trademarks, service marks, trade names and service names in which any Loan Party has any right, title or interest are valid and in full force and effect (other than applications and registrations for copyrights, trademarks, service marks, trade names and service names that in the aggregate are not material) and are not and will not be subject to the payment of any Taxes or maintenance fees or the taking of any other actions by any Loan Party to maintain their validity or effectiveness.

**Section 4.23   OFAC**.  Neither any Loan Party nor any of its Subsidiaries or Affiliates (i) is a Sanctioned Person, (ii) has any of its assets in Sanctioned Countries, or (iii) derives any of its operating income from investments in, or transactions with, Sanctioned Persons or Sanctioned Countries.  No part of the proceeds of any Loans hereunder will be used directly or indirectly to fund any operations in, finance any investments or activities in or make any payments to a Sanctioned Person or a Sanctioned Country or for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended and in effect from time to time.

**Section 4.24   Patriot Act**.  Neither any Loan Party nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act or any enabling legislation or executive order relating thereto.  Neither any Loan Party nor any or its Subsidiaries is in violation of (a) the Trading with the Enemy Act, (b) any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act.  None of the Loan Parties (i) is a blocked person described in Section 1 of the Anti-Terrorism Order or (ii) to the best of its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

**Section 4.25   Existing Security Documents.**  As of the Closing Date, none of the Loan Parties or any Affiliate thereof has taken any action to void or terminate any security documentation entered into by or delivered in favor of the Administrative Agent as administrative agent under the Existing Credit Agreement and, to the best of each Loan Party's knowledge, all such security documentation remains in full force and effect with the same relative priority as existed prior to the Closing Date.

## ARTICLE V

## AFFIRMATIVE COVENANTS

The Borrower covenants and agrees that so long as any Lender has a Commitment hereunder or any Obligation remains unpaid or outstanding:

**Section 5.1**    **Financial Statements and Other Information**.   The Borrower will deliver (or cause to be delivered) to the Administrative Agent and each Lender:

(a)    (i)    as soon as available and in any event within 120 days after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year ended December 31, 2014), a copy of the annual audited report for such Fiscal Year for the Borrower and its Subsidiaries, containing a consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Year and the related consolidated statements of income, members' equity and cash flows (together with all footnotes thereto) of the Borrower and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and reported on by an independent public accountant of nationally recognized standing (without a "going concern" or like qualification, exception or explanation and without any qualification or exception as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and the results of operations of the Borrower and its Subsidiaries for such Fiscal Year on a consolidated basis in accordance with GAAP and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(ii)    as soon as available and in any event within 120 days after the end of each Fiscal Year of the Holdco (commencing with the Fiscal Year ended December 31, 2014), a copy of the annual audited report for such Fiscal Year for the Holdco and its Subsidiaries, containing a consolidated balance sheet of the Holdco and its Subsidiaries as of the end of such Fiscal Year and the related consolidated statements of income, members' equity and cash flows (together with all footnotes thereto) of the Holdco and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and reported on by an independent public accountant of nationally recognized standing (without a "going concern" or like qualification, exception or explanation and without any qualification or exception as to the scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and the results of operations of the Holdco and its Subsidiaries for such Fiscal Year on a consolidated basis in accordance with GAAP and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards; provided, however, that the Lenders hereby waive the requirement for Holdco to deliver a copy of the annual audited report for Fiscal Year ended December 31, 2014 for the Holdco and its Subsidiaries;

(b)    (i) as soon as available and in any event within 45 days after the end of each Fiscal Quarter of the Borrower (commencing with the Fiscal Quarter ended December 31, 2014), an unaudited consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such Fiscal Quarter and the related unaudited consolidated statements of income and cash flows of the Borrower and its Subsidiaries for such Fiscal Quarter and the then elapsed portion of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter and the corresponding portion of the Borrower's previous Fiscal Year, together with a narrative report containing management's discussion and analysis of such financial statements and (ii) as soon as available and in any event within 30 days after the last

86

day of each calendar month (commencing March 2015), financial reports in the form attached hereto as Exhibit H;

     (c)    concurrently with the delivery of the financial statements referred to in subsections (a)(i) and (b)(i) of this Section (other than the financial statements for the fourth Fiscal Quarter of each Fiscal Year delivered pursuant to subsection (b)(i) of this Section):

     (i)    a Compliance Certificate signed by the chief executive officer or the chief financial officer of the Borrower (i) certifying as to whether there exists a Default or Event of Default on the date of such certificate and, if a Default or an Event of Default then exists, specifying the details thereof and the action which the Borrower has taken or proposes to take with respect thereto, (ii) setting forth in reasonable detail calculations demonstrating compliance with the financial covenants set forth in Article VI as of the end of the applicable Fiscal Year (with computations as of the end of each Fiscal Quarter for the applicable period) or Fiscal Quarter, (iii) specifying any change in the identity of the Borrower's Subsidiaries as of the end of the applicable Fiscal Year or Fiscal Quarter from the Subsidiaries identified to the Lenders on the Closing Date or in the prior Compliance Certificate, as the case may be, (iv) stating whether any change in GAAP or the application thereof has occurred since the date of the most recently delivered audited financial statements of the Borrower and its Subsidiaries, and, if any change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate, (v) specifying the amount of all Restricted Payments (broken down by category), Permitted Asset Sales and other Dispositions, and issuances of Capital Stock that were made by any Loan Party during the applicable Fiscal Year (with computations as of the end of each Fiscal Quarter for the applicable period) or Fiscal Quarter, (vi) identifying any changes of the type described in Section 7.3 hereof that have not been previously reported by the Borrower, (vii) identifying the occurrence of any events which gave rise to a mandatory prepayment event under Section 2.11(a)(iii) during the applicable Fiscal Year or Fiscal Quarter and (viii) describing each Material Agreement entered into by any Loan Party since the date of the most recent Compliance Certificate delivered under this subsection and (to the extent not previously delivered to the Administrative Agent) attaching a fully-executed copy thereof;

     (ii)    a brief narrative report by management outlining the business, financial condition and results of operations of the Borrower and its Subsidiaries, in a form reasonably acceptable to the Administrative Agent; and

     (iii)    updated copies of Schedules 4.14, 4.15, 4.17 and 4.22 hereto which are to be true and accurate as of the date of delivery thereof (as opposed to the end of the Fiscal Year or Fiscal Quarter with respect to which the financial statements are being delivered);

     (d)    concurrently with the delivery of the financial statements referred to in subsection (a)(i) above, a certificate of the accounting firm that reported on such financial statements stating whether they obtained any knowledge during the course of their examination of such financial statements of any Default or Event of Default (which certificate may be limited to the extent required by accounting rules or guidelines);

87

206771225 v17

(e)    as soon as available and in any event within 45 days after the end of each Fiscal Year of the Borrower (commencing with the Fiscal Year ending December 31, 2014), forecasts and a pro forma budget for the succeeding Fiscal Year (broken out by Fiscal Quarter), containing an income statement, balance sheet and statement of cash flow;

(f)    within fifteen (15) days after the end of each month (commencing with the first full month following the Closing Date), a new Borrowing Base Certificate computed as of the last day of the immediately prior month, setting forth the amount of each component included in the Borrowing Base, and attaching reasonably detailed schedules showing the calculation of each such component and supporting materials, certified by a Responsible Officer of the Borrower;

(g)    concurrently with the delivery of each Borrowing Base Certificate as set forth in Section (f) above, a return report with respect to returns made for the preceding rolling twelve month period, in form and substance acceptable to the Administrative Agent;

(h)    within 90 days after each December 31 (commencing with December 31, 2014), the Borrower shall (i) cause the Approved Valuation Expert to deliver to the Administrative Agent a new Library Valuation Report and (ii) deliver to the Administrative Agent a certificate of a Responsible Officer of the Borrower which calculates the then current Library Valuation Amount (in accordance with the definition of such term);

(i)    within ten (10) days after receipt thereof by the Borrower, copies of all management letters received by the Borrower from its auditors;

(j)    promptly upon written request therefor, any information required by the Administrative Agent or any Lender under or in connection with the Patriot Act;

(k)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all functions of said Commission, or with any national securities exchange, or distributed by the Borrower to its equity holders generally, as the case may be; and

(l)    promptly following any request therefor, such other information regarding the results of operations, business affairs and financial condition of the Borrower or any of its Subsidiaries as the Administrative Agent or any Lender may reasonably request.

**Section 5.2    Notices of Material Events**.    The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    the filing or commencement of, or any material development in, any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of the Borrower, affecting the Borrower or any of its Subsidiaries which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

88

(c)    the occurrence of any event or any other development by which the Borrower or any of its Subsidiaries (i) fails to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) becomes subject to any Environmental Liability, (iii) receives notice of any claim with respect to any Environmental Liability, or (iv) becomes aware of any basis for any Environmental Liability, in each case which, either individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(d)    promptly and in any event within 15 days after (i) the Borrower, any of its Subsidiaries or any ERISA Affiliate knows or has reason to know that any ERISA Event has occurred, a certificate of the chief financial officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by the Borrower, such Subsidiary or such ERISA Affiliate from the PBGC or any other governmental agency with respect thereto, and (ii) becoming aware (1) that there has been an increase in Unfunded Pension Liabilities (not taking into account Plans with negative Unfunded Pension Liabilities) since the date the representations hereunder are given or deemed given, or from any prior notice, as applicable, (2) of the existence of any Withdrawal Liability, (3) of the adoption of, or the commencement of contributions to, any Plan subject to Section 412 of the Code by the Borrower, any of its Subsidiaries or any ERISA Affiliate, or (4) of the adoption of any amendment to a Plan subject to Section 412 of the Code which results in a material increase in contribution obligations of the Borrower, any of its Subsidiaries or any ERISA Affiliate, a detailed written description thereof from the chief financial officer of the Borrower;

(e)    the payment of any Restricted Payment (and, with respect to a Permitted Tax Distribution, accompanied by a detailed calculation thereof from the chief financial officer of the Borrower);

(f)    the occurrence of any default or event of default, or the receipt by the Borrower or any of its Subsidiaries of any written notice of an alleged default or event of default, with respect to any Material Indebtedness of the Borrower or any of its Subsidiaries;

(g)    any proposed material amendment or modification to any Material Agreement (together with a copy thereof), and prompt notice of any termination, expiration or loss of any Material Agreement that, individually or in the aggregate, could reasonably be expected to result in a mandatory prepayment event under Section 2.11(a)(iii) or a Material Adverse Effect; and

(h)    any other development that results in, or could reasonably be expected to result in, a mandatory prepayment event under Section 2.11(a)(iii) or a Material Adverse Effect.

The Borrower will furnish to the Administrative Agent and each Lender the following:

(x)     promptly and in any event at least 30 days prior thereto, notice of any change (i) in any Loan Party's legal name, (ii) in any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), (iii) in any Loan Party's identity or legal structure, (iv) in any Loan Party's federal taxpayer identification number or organizational number or (v) in any Loan Party's jurisdiction of organization; and

(y)     as soon as available and in any event within 30 days after receipt thereof, a copy of any environmental report or site assessment obtained by or for the Borrower or any of its Subsidiaries after the Closing Date on any Real Estate.

Each notice or other document delivered under this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice or other document and any action taken or proposed to be taken with respect thereto.

**Section 5.3     Existence; Conduct of Business**.  The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence and its respective rights, licenses, permits, privileges, franchises, copyrights, trademarks, trade names, patents and other intellectual property material to the conduct of its business; provided that nothing in this Section shall prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3.

**Section 5.4     Compliance with Laws**.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and requirements of any Governmental Authority applicable to its business and properties, including, without limitation, all Environmental Laws, ERISA and OSHA, except where the failure to do so, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.5     Payment of Obligations**.  The Borrower will, and will cause each of its Subsidiaries to, pay and discharge at or before maturity all of its obligations and liabilities (including, without limitation, all taxes, assessments and other governmental charges, levies and all other claims that could result in a statutory Lien) before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**Section 5.6     Books and Records**.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities to the extent necessary to prepare the consolidated financial statements of the Borrower in conformity with GAAP.

**Section 5.7     Visitation and Inspection; Account Debtor Confirmations; Borrowing Base Audits**.

(a)      The Borrower will, and will cause each of its Subsidiaries to, permit any representative of the Administrative Agent or any Lender to visit and inspect its properties, to examine its books and records and to make copies and take extracts therefrom, and to discuss its affairs, finances and accounts with any of its officers and with its independent certified public accountants, all at such reasonable times and as often as the Administrative Agent or any Lender may reasonably request after reasonable prior notice to the Borrower; provided that if an Event of Default has occurred and is continuing, no prior notice shall be required; and provided further that, so long as no Event of Default shall have occurred and be continuing, no more than one such audit or examination per Fiscal Year shall be conducted at the expense of the Borrower.

(b)      If at any time when no Event of Default has occurred and is continuing, the Administrative Agent wishes to confirm with account debtors and other payors the amounts and terms of any or all receivables of any Loan Party, the Administrative Agent will so notify the Borrower.  The Administrative Agent agrees to have such confirmation made through the Borrower's auditors.  If for any reason such auditors fail to proceed with the confirmations in a timely manner, the Administrative Agent may proceed to make such confirmations directly with account debtors and other payors after prior written notice to the Borrower.  Such confirmation shall be limited to once each Fiscal Year unless an Event of Default shall have occurred and be continuing.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent shall be entitled to confirm directly with account debtors and other payors, the amounts and terms of all accounts receivable of the Loan Parties.

(c)      The Borrower will, and will cause each of its Subsidiaries to, permit the Administrative Agent and its representatives (accompanied by any Lenders) to conduct field audits of the Borrowing Base and procedures and controls relating thereto at the expense of the Borrower once each Fiscal Year upon reasonable notice (which may be delivered telephonically) and during regular business hours (in each case unless an Event of Default shall have occurred and be continuing, in which case no such limitations shall apply).

**Section 5.8      Third Party Audit Rights**.  The Borrower will, and will cause each Loan Party Subsidiary to, promptly notify the Administrative Agent of, and at all times allow the Administrative Agent and its designees access to the results of, all audits conducted by (i) any Loan Party with respect to any Distributor or (ii) any other contract counterparty of any Loan Party or any Licensing Intermediary.  Upon the reasonable request of the Administrative Agent and in meaningful consultation with Borrower, to the extent that the applicable Loan Party (or, as applicable, a Licensing Intermediary) shall have the right to conduct such audits, the Borrower will, and will cause each Loan Party Subsidiary to, exercise (and, as applicable, will cause each Licensing Intermediary to exercise) their audit rights with respect to any such Distributor or other contract counterparty.  If any Loan Party fails to initiate such audit within a reasonable period of time following the Administrative Agent's reasonable request or if an Event of Default shall have occurred and be continuing, the Administrative Agent shall have the right to exercise directly such Loan Party's audit rights (and the right to request any applicable Licensing Intermediary to exercise its audit rights) under any agreement with respect to any Item of Product included in the Collateral.

**Section 5.9      Maintenance of Properties**.  The Borrower will, and will cause each of its Subsidiaries to, (a) keep and maintain its tangible properties which are material to the conduct

of its business in good repair, working order and condition (ordinary wear and tear excepted) and (b) (i) from time to time make (or cause to be made) all necessary and proper repairs, renewals, replacements, additions and improvements thereto, and (ii) comply at all times with the provisions of all Material Agreements to which it is a party so as to prevent any loss or forfeiture thereof or thereunder unless compliance therewith is being currently contested in good faith by appropriate proceedings and appropriate reserves have been established in accordance with GAAP.

Section 5.10   **Insurance**.  The Borrower will, and will cause each of its Subsidiaries to:

(a)      Keep its assets which are of an insurable character insured (to the extent and for the time periods consistent with, or greater than, customary industry standards) by financially sound and reputable insurers against all risks of loss or damage by fire, explosion, theft or other hazards which are included under extended coverage in amounts not less than the insurable replacement value of the property insured or such lesser amounts, and with such self-insured retention or deductible levels, as are consistent with normal industry standards, and in any event in no less than the amount required by any Distribution Agreement on which any Borrowing Base credit is extended.

(b)      Maintain with financially sound and reputable insurers, insurance against other hazards and risks and liability to Persons and property to the extent and in the manner consistent with, or greater than, customary standards (including, for the avoidance of doubt, "Errors and Omissions" insurance subsequent to the expiration of the time periods described in clause (c) below), and in any event in no less than the amount required by any Distribution Agreement on which any Borrowing Base credit is extended.

(c)      Maintain, or cause to be maintained, in from the date of acquisition of each Item of Product acquired by any Loan Party, through the Maturity Date and as otherwise required by any Distribution Agreement or any other applicable contracts, an "Errors and Omissions" policy covering such Item of Product, and cause such Errors and Omissions policy to provide coverage to the extent and in such manner as is customary for Items of Product of like type, but at a minimum, to the extent, in the amount and in such manner as is required by any Distribution Agreement on which any Borrowing Base credit is extended.

(d)      Maintain, or cause to be maintained, in effect at all times a key man life insurance policy in an amount not less than $5,000,000 for Bill Lee; provided, however, that the requirements of the foregoing key man life insurance policy shall not apply if either (i) the Borrower maintains a reserve under the Borrowing Base at all times in the amount equal to $750,000 ("Key Man Reserve") or (ii) the Sponsor, Holdco, or one or more of their respective Affiliates makes an equity contribution in an amount equal to $750,000 to Borrower (the "Equity Contribution"); provided further that the Key Man Reserve and the Equity Contribution may be combined such that the foregoing key man life insurance policy shall not apply if the aggregate amount of Key Man Reserve and Equity Contribution together equal $750,000.

(e)      Cause all such above-described insurance (excluding worker's compensation insurance) (i) to provide for the benefit of the Administrative Agent that at least thirty (30) days' prior written notice of cancellation, termination, non-renewal or lapse or

material change of coverage shall be given to the Administrative Agent; (ii) to name the Administrative Agent (for the benefit of the Secured Parties) as a loss payee (except for (x) "Errors and Omissions" insurance and other third party liability insurance, and (y) key man insurance, for which rights thereunder shall at all times be assigned to the Administrative Agent (for the benefit of the Secured Parties) pursuant to an assignment agreement in form and substance reasonably satisfactory to the Administrative Agent); provided, that so long as no Event of Default has occurred or is continuing, property insurance proceeds may be used to repair damage in respect of which such proceeds were received; and (iii) to the extent that none of the Secured Parties shall be liable for premiums or calls, to name the Administrative Agent as additional insured, including under any "Errors and Omissions" insurance policy.

(f)    Upon the request of the Administrative Agent from time to time, furnish to the Administrative Agent a certificate of a Responsible Officer of the Borrower setting forth the nature and extent of all insurance maintained by the Borrower and its Subsidiaries in accordance with this Section.

Section 5.11  **Use of Proceeds; Margin Regulations**.  The Borrower will use the proceeds of all Loans (i) to pay interest, fees and costs under this Agreement and the other Loan Documents (including transaction costs incurred through the Closing Date, any increase in the aggregate Revolving Commitments or Term Loan Commitments, or any amendment or other modification of the Loan Documents), (ii) to finance the ongoing working capital needs and Capital Expenditures of the Borrower, (iii) to the extent there is an Incremental Term Commitment, for the purpose of paying Tranche B (or a portion thereof) of the Mezzanine Debt Agreement in a principal amount equal to the Permitted Tranche B Payment Amount; and (iv) to finance the Red Cloud Acquisition.  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that would violate any rule or regulation of the Board of Governors of the Federal Reserve System, including Regulation T, Regulation U or Regulation X.

Section 5.12  **Casualty and Condemnation**.  The Borrower (a) will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of any Collateral or the commencement of any action or preceding for the taking of any material portion of any Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) will ensure that the net cash proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with the applicable provisions of this Agreement and the Collateral Documents.

Section 5.13  **Cash Management, Collection Accounts**.  The Borrower shall, and shall cause its Subsidiaries to:

(a)    maintain all cash management and treasury business with SunTrust Bank or a Lender or (with the prior approval of the Administrative Agent) a Permitted Third Party Bank (other than a Lender), including, without limitation, all deposit accounts, disbursement accounts, investment accounts and lockbox accounts (other than zero-balance accounts for the purpose of managing local disbursements, payroll, withholding and other fiduciary accounts, all of which the Loan Parties may maintain without restriction) (each such deposit account,

93

disbursement account, investment account and lockbox account, a "Controlled Account"); each Controlled Account shall be a cash collateral account, with all cash, checks and other similar items of payment in such account securing payment of the Obligations, and in which the Borrower and each of its Subsidiaries shall have granted a first priority Lien to the Administrative Agent, on behalf of the Secured Parties, perfected either automatically under the UCC (with respect to Controlled Accounts at SunTrust Bank) or subject to Control Account Agreements; and each Controlled Account shall be under the control (within the meaning of Section 9-104 of the UCC) of the Administrative Agent, provided that, unless an Event of Default has occurred and is continuing, the Borrower may (and may permit its Subsidiaries to) withdraw and use proceeds in the Controlled Accounts for application to any lawful purpose not prohibited by the provisions of this Agreement or any other Loan Document, subject only to the Administrative Agent's right to withdraw and use such proceeds to make payments in accordance with any contractual commitments made by the Administrative Agent to third Persons pursuant to any Interparty Agreement or Intercreditor Agreement relating to such proceeds;

(b)     direct (and cause each Licensing Intermediary to direct), by a Notice of Assignment (or by an Interparty Agreement or by any other document acceptable to the Administrative Agent), all Persons who become Distributors, Licensing Intermediaries or other account debtors of any Loan Party (whether directly or through a Licensing Intermediary) to make payments owing to a Loan Party under or in connection with any Distribution Agreements, Licensing Intermediary Agreements or other agreement directly to (i) a Collection Account or (ii) in the case of foreign receivables under certain Distribution Agreements, an account of a Licensing Intermediary pursuant to arrangements that satisfy the requirements set forth in Section 5.17(d); and

(c)     in the event a Loan Party receives such payment directly from any Person or pursuant to a letter of credit or otherwise, deposit promptly, and in any event no later than 10 Business Days after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all accounts and other Collateral into a Collection Account.

**Section 5.14    Additional Subsidiaries and Collateral**.

(a)     In the event that, subsequent to the Closing Date, any Person becomes a Subsidiary of a Loan Party, whether pursuant to formation, acquisition or otherwise, (x) the Borrower shall promptly notify the Administrative Agent and the Lenders thereof and (y) within 30 days after such Person becomes a Subsidiary of a Loan Party (or, with respect to a Foreign Subsidiary, if the Administrative Agent determines in its sole discretion that the Borrower is working in good faith, such longer period as the Administrative Agent shall permit not to exceed 60 additional days), the Borrower shall cause such Subsidiary (i) to become a new Guarantor and to grant Liens in favor of the Administrative Agent in all of its personal property by executing and delivering to the Administrative Agent a supplement to the Guaranty and Security Agreement in form and substance reasonably satisfactory to the Administrative Agent, executing and delivering a Copyright Security Agreement Supplement and a Trademark Security Agreement, as applicable, and authorizing and delivering, at the request of the Administrative Agent, such UCC financing statements or similar instruments required by the

94

Administrative Agent to perfect the Liens in favor of the Administrative Agent and granted under any of the Loan Documents and (ii) to deliver all such other documentation (including, without limitation, certified organizational documents, resolutions, lien searches, insurance policies and, with respect to a Foreign Subsidiary, local law governed security documents) and take all such other actions as the Administrative Agent may reasonably request in connection with any of the foregoing; provided, however, that the requirements of the foregoing clause (y) shall not apply to a non-wholly-owned Subsidiary in which the Investments by the Loan Parties do not exceed the limits set forth in Section 7.4(j) hereof or OA Investment Holdings.

(b)  In addition, within 30 days after the date any Person becomes a Domestic Subsidiary of a Loan Party (unless such Person is a non-wholly-owned Subsidiary in which the Investments by the Loan Parties do not exceed the limits set forth in Section 7.4(j) hereof and excluding OA Investment Holdings), the Borrower shall, or shall cause the applicable Loan Party to, (i) pledge all of the Capital Stock of such Domestic Subsidiary to the Administrative Agent as security for the Obligations by executing and delivering a supplement to the Guaranty and Security Agreement in form and substance satisfactory to the Administrative Agent, and (ii) deliver the original certificates (if any) evidencing such pledged Capital Stock to the Administrative Agent, together with appropriate powers executed in blank.

(c)  In addition, within 30 days after the date any Person becomes a Foreign Subsidiary of a Loan Party (or, if the Administrative Agent determines in its sole discretion that the Borrower is working in good faith, such longer period as the Administrative Agent shall permit not to exceed 60 additional days), whether pursuant to formation, acquisition or otherwise (unless such Person is a non-wholly-owned Subsidiary in which the Investments by the Loan Parties do not exceed the limits set forth in Section 7.4(j) hereof), and to the extent such Foreign Subsidiary is owned directly by a Loan Party, the Borrower shall, or shall cause the applicable Loan Party to, (i) pledge all of the Capital Stock of such Foreign Subsidiary (or, if the pledge of all of the voting Capital Stock of such Foreign Subsidiary would result in materially adverse tax consequences, then such pledge shall be limited to 65% of the issued and outstanding voting Capital Stock and 100% of the issued and outstanding non-voting Capital Stock of such Foreign Subsidiary, as applicable) to the Administrative Agent as security for the Obligations pursuant to a pledge agreement in form and substance satisfactory to the Administrative Agent, (ii) deliver the original certificates (if any) evidencing such pledged Capital Stock to the Administrative Agent, together with appropriate powers executed in blank and (iii) deliver all such other documentation and take all such other actions as the Administrative Agent may reasonably request in connection with any of the foregoing.

(d)  The Borrower agrees that, following the delivery of any Collateral Documents required to be executed and delivered by this Section, the Administrative Agent shall have a valid and enforceable perfected Lien on the property required to be pledged pursuant to subsections (a), (b) and (c) of this Section (to the extent that such Lien can be perfected by execution, delivery and/or recording of the Collateral Documents or UCC financing statements, or possession of such Collateral), free and clear of all Liens other than Liens expressly permitted by Section 7.2, and with the priority contemplated by Section 4.20. All actions to be taken pursuant to this Section shall be at the expense of the Borrower or the applicable Loan Party, and shall be taken to the reasonable satisfaction of the Administrative Agent.

**Section 5.15   Copyrights and Trademarks**.  The Borrower will, and will cause each Subsidiary Loan Party to:

(a)      As soon as practicable but no later than (i) thirty (30) days after (A) any Loan Party acquires any copyright or copyrightable interest in an Item of Product or (B) to the extent any Loan Party is or becomes the copyright proprietor thereof or otherwise acquires a copyrightable interest therein, but not later than the initial exploitation or exhibition of an Item of Product (or, if such Item of Product is an episodic series or program, any episode thereof), and (ii) within fifteen (15) days after any Loan Party acquires any trademark, trade name, service mark or service name, in each case of clauses (i) and (ii) above, take any and all actions necessary to register the copyright for, or such other copyrightable interest in, such Item of Product, such script or teleplay, or such trademark, service mark, trade name or service name, respectively, in the name of such Loan Party (subject to a Lien, with the priority contemplated by Section 4.20, in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the Copyright Security Agreement and a Trademark Security Agreement) in conformity with the laws of the United States and such other jurisdictions as the Administrative Agent may reasonably specify, and promptly deliver to the Administrative Agent (x) written evidence of the submission for registration and subsequently of registration of any and all such copyrights, copyrightable interests, trademarks, service marks, trade names or service names of the Loan Parties for inclusion in the Collateral and (y) a Copyright Security Agreement Supplement relating to such copyright or such other copyrightable interest or a Trademark Security Agreement relating to such trademark, trade name, service mark or service name, in each case, executed by the relevant Loan Parties.

(b)      Obtain instruments of transfer or other documents evidencing the interest of any Loan Party with respect to the copyright relating to any Item of Product in which such Loan Party owns a copyrightable interest and any trademark, trade name, service mark or service name which such Loan Party acquires, and promptly record, or cause to be recorded, if such interest may be recorded with the U.S. Copyright Office, the U.S. Patent and Trademark Office or such other jurisdictions, such instruments of transfer in the assignment records of the U.S. Copyright Office, the U.S. Patent and Trademark Office or such other jurisdictions as the Administrative Agent may reasonably specify.

**Section 5.16   Laboratories; No Removal**.

(a)      To the extent any Loan Party has control over, or rights to receive, any of the Physical Materials relating to any Item of Product, promptly deliver or cause to be delivered to a Laboratory or Laboratories or other entity reasonably acceptable to the Administrative Agent all digital materials, all negative and preprint material, master tapes and all sound track materials with respect to each such Item of Product and deliver to the Administrative Agent a fully executed Laboratory Pledgeholder Agreement with respect to such materials.  To the extent that any Loan Party has only rights of access to such digital materials, preprint material or master tapes and has not created duplicate materials sufficient to exploit its rights and has not stored such duplicate materials at a Laboratory that has delivered a Laboratory Pledgeholder Agreement to the Administrative Agent, the applicable Loan Party shall deliver to the Administrative Agent a fully executed Laboratory Access Letter (accompanied by the related laboratory access letter granted in favor of such Loan Party) covering such materials.  Prior to a Loan Party requesting

96

any such Laboratory to deliver any such digital materials, negative or other preprint or sound track material or master tapes to another Laboratory, such Loan Party shall provide the Administrative Agent with a Laboratory Pledgeholder Agreement or Laboratory Access Letter (accompanied by the related laboratory access letter granted in favor of such Loan Party), as appropriate, executed by such other Laboratory and all other parties to such Laboratory Pledgeholder Agreement or Laboratory Access Letter, as the case may be; provided, however, that a Loan Party may move duplicates of any such Physical Materials to another Laboratory without a Laboratory Pledgeholder Agreement or Laboratory Access Letter in place so long as (i) if the value of any such duplicate is less than $1,000, a Laboratory has signed a Laboratory Pledgeholder Agreement or Laboratory Access Letter (as applicable) with respect to the originals of such duplicate Physical Materials; and (ii) if the value of any such duplicate is $1,000 or more, a Laboratory has signed a Laboratory Pledgeholder Agreement or Laboratory Access Letter (as applicable) with respect to the originals of such duplicate Physical Materials, and such Loan Party delivers a Laboratory Pledgeholder Agreement or Laboratory Access Letter (as applicable) with respect to the new Laboratory within five (5) Business Days after the date of the transfer to such Laboratory. Each Loan Party hereby agrees not to deliver or remove or cause the delivery or removal of the original digital materials, negative, and film or sound materials or master tapes with respect to any Item of Product owned by any Loan Party or in which any Loan Party has an interest to a location outside the United States without the prior written consent of the Administrative Agent.

(b)     With respect to an Item of Product that is Completed or acquired after the date hereof, promptly after such Completion or acquisition, deliver to the Administrative Agent and the Laboratories that are signatories to Laboratory Pledgeholder Agreements a revised schedule of the Physical Materials therefor on deposit with such Laboratories to the extent applicable.

**Section 5.17  Distribution Agreements; Licensing Intermediary Agreements; Notices of Assignment; Letters of Credit**.  The Borrower will, and will cause each of its Subsidiaries to:

(a)     (i) Prior to the execution of any Distribution Agreement or Licensing Intermediary Agreement under which a Loan Party (or a Licensing Intermediary, as the case may be) is expected to receive revenues of in excess of $500,000, provide the Administrative Agent with a substantially final form of such agreement, and (ii) promptly, and in any event within ten (10) Business Days of receipt thereof, deliver or make available to the Administrative Agent true and complete copies of (x) each such new Distribution Agreement and each such new Licensing Intermediary Agreement and (y) all amendments, supplements and other modifications to any existing Distribution Agreements and Licensing Intermediary Agreements which support any Borrowing Base credit; provided, however, that the Borrower shall deliver any amendments to the Distribution Agreements with respect to Netflix, Inc. within two (2) Business Days of any Loan Party's circulation (or receipt) of same.

(b)     From time to time (i) furnish to the Administrative Agent such information and reports regarding the Distribution Agreements and the Licensing Intermediary Agreements as the Administrative Agent may reasonably request, and (ii) upon the occurrence and during the continuance of an Event of Default, at the request of the Administrative Agent,

97

make such demands and requests to the other parties to such Distribution Agreements and Licensing Intermediary Agreements for information and reports or for action as the applicable Loan Party (or Licensing Intermediary, as the case may be) is entitled to make under each such Distribution Agreement and Licensing Intermediary Agreement.

(c)   .   Cause each Distribution Agreement (or Notice of Assignment or Interparty Agreement entered into in connection therewith) to provide that any and all payments to be made in favor of a Loan Party thereunder shall be remitted directly to a Collection Account or to a Licensing Intermediary in a manner that satisfies the parameters described in subsection (d) below.

(d)   Cause each Licensing Intermediary that has entered into a Distribution Agreement (i) to execute and deliver to the Administrative Agent a Licensing Intermediary Security Agreement, which such agreement shall in any event grant to the Administrative Agent (for the benefit of the Secured Parties) a first priority accommodation security interest in any distribution or other exploitation rights with respect to an Item of Product which are to be remitted to or through such Licensing Intermediary, and in any proceeds thereof (including any letters of credit), (ii) to agree in writing to remit all gross receipts with respect to each Item of Product received by such Licensing Intermediary, net of its customary fees and expenses, to a Collection Account within two (2) Business Days after its receipt thereof and (iii) to enter into arrangements satisfactory to the Administrative Agent ensuring that such net receipts will not be co-mingled with the assets of such Licensing Intermediary that are not related to an Item of Product.

(e)   Promptly upon receipt thereof by a Loan Party, deliver to the Administrative Agent to be held as part of the Collateral, the original of all letters of credit (including any amendments thereto) for which a Loan Party is the beneficiary (whether pursuant to a Distribution Agreement or otherwise) after the date hereof; provided, that so long as no Event of Default shall have occurred and be continuing, the Administrative Agent shall, upon written request by the applicable Loan Party, release any such letter of credit to such Loan Party in order to permit such Loan Party to present such letter of credit at the time of a drawing.

(f)   Take all commercially reasonable action on its part to be performed necessary to effect timely payments under all letters of credit for which a Loan Party or a Licensing Intermediary is the beneficiary, including, without limitation, timely preparation, acquisition and presentation of all documents, drafts or other instruments required to effect payment thereunder.

**Section 5.18   Observance of Agreements**.  The Borrower will, and will cause each of its Subsidiaries to, duly observe and perform all material terms and conditions of each Distribution Agreement, each Licensing Intermediary Agreement and all other Material Agreements to which it is a party or with respect to which it has been assigned rights or has assumed obligations relating to the distribution or other exploitation of each Item of Product that the failure of which would be reasonably likely to result in a Material Adverse Effect, and diligently protect and enforce (or cause to be protected and enforced) the rights of the Borrower and its Subsidiaries under all such agreements in a manner consistent with prudent business judgment.

**Section 5.19   Material Agreements**.   To the extent not previously provided, the Borrower shall provide, or shall cause each of its Subsidiaries to provide, to the Administrative Agent a substantially final form of any Material Agreement or any amendment, alteration, modification, or waiver to a Material Agreement prior to the execution thereof, and promptly following the execution of any such document, and in any event within ten (10) Business Days of receipt thereof, deliver or make available to the Administrative Agent true and complete executed copies thereof.

**Section 5.20   Further Assurances**.   The Borrower will, and will cause each other Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), which may be required under any applicable law, or which the Administrative Agent or the Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created by the Collateral Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties.   The Borrower also agrees to provide to the Administrative Agent, from time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents.

**Section 5.21   Mezzanine Debt Facility**.   The Borrower will enter into an unsecured mezzanine facility (the "Mezzanine Debt Facility") complying with the requirements set forth in this Section 5.21 with OA Investment Partners LLC or its Affiliate in a principal amount not to exceed $20,357,142.86 (the "Mezzanine Debt"), in two tranches.   The first tranche of the Mezzanine Debt Facility ("Tranche A") shall be in a principal amount not to exceed $10,000,000.   The second tranche of the Mezzanine Debt Facility ("Tranche B") shall be in a principal amount not to exceed $10,175,893.

(b)    The Mezzanine Debt shall mature no earlier than six months after the Maturity Date.

(c)    The Mezzanine Debt may be drawn in multiple tranches up to the maximum principal amount of Mezzanine Debt, subject to any permanent reduction of such amount pursuant to item (d) below, at any time upon written request by the Borrower.

(d)    No payments of principal shall be made with respect to the Mezzanine Debt except as follows and no such principal payments shall be made after the occurrence of an Event of Default hereunder: (1) with respect to Tranche A, (i)  the Borrower may repay up to $2,500,000 of the Mezzanine Debt of Tranche A on or after June 30, 2016 provided that the Borrower has maintained and will maintain, both before and after giving effect to such payment, (A) a Borrowing Base of not less than 135% of the amount of outstanding Obligations hereunder and (B) a minimum EBITDA of not less than $20,000,000 for the previous consecutive twelve months; (ii) the Borrower may repay up to an additional $2,500,000 of the Mezzanine Debt of Tranche A on or after June 30, 2016 provided that the Borrower has maintained and will maintain, both before and after giving effect to such payment, (A) a Borrowing Base of not less than 135% of the amount of outstanding Obligations hereunder and (B) a minimum EBITDA of not less than $22,000,000 for the previous consecutive twelve months; and (iii) the Borrower

99

may repay up to an additional $5,000,000 of the Mezzanine Debt of Tranche A on or after January 1, 2017 provided that the Borrower has maintained and will maintain, both before and after giving effect to such payment, (A) a Borrowing Base of not less than 150% of the amount of outstanding Obligations under the Facility and (B) a minimum EBITDA of not less than $24,000,000 for the previous consecutive twelve months; and (2) with respect to Tranche B, the Borrower may repay up to $10,175,893 of the Mezzanine Debt of Tranche B with the proceeds of Term Loans made with respect to the Incremental Term Commitments hereunder only on and after such date that there is an Incremental Term Commitment in the amount of $14,500,000 pursuant to Section 2.21B hereof (and if the amount of such Incremental Term Commitment is less than $14,500,000, then the Borrower may repay Mezzanine Debt with respect to Tranche B in an amount of up to the aggregate of: (x) the pro rata amount of the Additional Lender's Incremental Term Commitment that has been allocated to the Term Loan Commitments plus (y) the pro rata amount of the Revolving Lenders Revolving Commitments that has been reallocated to the Term Loan Commitments after the date that the Incremental Term Commitment is finalized) (the "Permitted Tranche B Payment Amount").  Any portion of the Tranche B outstanding after the Permitted Tranche B Payment Amount is made may not be repaid until after the Obligations hereunder are repaid in full in cash.

(e)     Any payment of principal pursuant to item (c) above shall permanently reduce the amount of the Mezzanine Debt available to the Borrower in an amount equal to such payment.

(f)     Compliance with the EBITDA thresholds set forth in item (c)(1) above shall be certified by the Borrower in a certificate setting forth in reasonable detail calculations demonstrating compliance with such threshold, as of the most recently month (such that prepayments occurring on June 30, 2016 shall be supported by May 31, 2016 data and prepayments occurring on January 1, 2017 shall be supported by November 30, 2016 data) as well as calculations demonstrating pro forma compliance with such thresholds. Compliance with the Borrowing Base thresholds set forth in item (c)(1) above shall be certified by the Borrower in a certificate and shall reflect the most recent required Borrowing Base as of such date and on a pro forma basis.

(g)     Cash interest on Tranche A of the Mezzanine Debt shall accrue at a rate not higher than 8.00% per annum and no cash interest shall be payable after the occurrence of an Event of Default hereunder that has not been cured or waived.  Cash interest on Tranche B of the Mezzanine Debt shall accrue at a rate not higher than Eurodollar plus 4.00% and no cash interest shall be payable after the occurrence of an Event of Default hereunder that has not been cured or waived.  No interest may be paid in kind with respect to the Mezzanine Debt.

## ARTICLE VI

## FINANCIAL COVENANTS

The Borrower covenants and agrees that so long as any Lender has a Commitment hereunder or any Obligation remains unpaid or outstanding:

**Section 6.1**     **Liquidity Ratio**.  The Borrower will maintain, as of the end of each Fiscal Quarter, commencing with the Fiscal Quarter ending on December 31, 2014, a Liquidity Ratio of not less than 1.10:1.00.

**Section 6.2**     **Fixed Charge Coverage Ratio**.  The Borrower will maintain, as of the end of any consecutive rolling four (4) Fiscal Quarters, a Fixed Charge Coverage Ratio of not less than 1.50:1.00.  Holdco will have an Equity Cure Right (such equity contributed being applied dollar-for-dollar) to avoid a default under this Section 6.2 if the following conditions are satisfied: (i) such new equity provided by Holdco is sufficient to cause Borrower's compliance with the Fixed Charge Coverage Ratio and such equity is used to pay down principal of the Term Loan and (after the Term Loan is repaid in full) the Revolving Loan, (ii) such cure is made within ten (10) Business Days following the date on which the Compliance Certificate certifying to such ratio is required to be delivered to the Administrative Agent pursuant to Section 5.1(c), (iii) such cure may be exercised up to four separate occasions in the aggregate when combined with the Equity Cure Right described in Section 6.3 below, but no more than twice in any calendar year in the aggregate when combined with the Equity Cure Right described in Section 6.3 below, and (iv) such new equity provided by Holdco pursuant to such cure shall not exceed an aggregate amount of $5,000,000 over the life of the Loans; provided that such additional equity shall be treated as additional cash received by the Loan Parties in the last quarter of the applicable testing period (and in each testing period which includes such quarter).

**Section 6.3**     **Minimum EBITDA**.  The Borrower will maintain, as of the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2015 and measured at each Fiscal Year end thereafter, EBITDA amounts of not less than:

      (i)    $17,400,000 as of the end of Fiscal Year 2015 (pro forma for the Red Cloud Acquisition);

      (ii)    $18,500,000 as of the end of Fiscal Year 2016;

      (iii)    $19,100,000 as of the end of Fiscal Year 2017; and

      (iv)    $19,700,000 as of the end of Fiscal Year 2018.

Holdco will have an Equity Cure Right (such equity contributed being applied dollar-for-dollar) to avoid a default under this Section 6.3 if the following conditions are satisfied: (i) such new equity provided by Holdco is sufficient to cause Borrower's compliance with the minimum EBITDA amounts required under this Section 6.3 and such equity is used to pay down principal of the Term Loan and (after the Term Loan is repaid in full) the Revolving Loan, (ii) such cure is made within ten (10) Business Days following the date on which the Compliance Certificate certifying to such EBITDA amounts is required to be delivered to the Administrative Agent pursuant to Section 5.1(c), (iii) such cure may be exercised up to four separate occasions in the aggregate when combined with the Equity Cure Right described in Section 6.2 above, but no more than twice in any calendar year in the aggregate when combined with the Equity Cure Right described in Section 6.2 above, and (iv) such new equity provided by Holdco pursuant to such cure shall not exceed an aggregate amount of $10,000,000 over the life of the Loans in the aggregate when combined with any new equity provided by Holdco pursuant to Section 6.2

above; underlined_provided that such additional equity shall be treated as additional cash received by the Loan Parties in the last quarter of the applicable testing period (and in each testing period which includes such quarter).

**Section 6.4    Liquidity Covenant**.    The Borrower will maintain not less than $2,000,000 of liquidity, comprised of not less than $1,000,000 of unrestricted and uncommitted cash held in Controlled Accounts and/or availability under the Revolving Commitment.

# ARTICLE VII

# NEGATIVE COVENANTS

The Borrower covenants and agrees that so long as any Lender has a Commitment hereunder or any Obligation remains outstanding:

**Section 7.1    Indebtedness and Preferred Equity**.    The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness created pursuant to the Loan Documents;

(b)    unsecured liabilities for acquisitions of rights in Items of Product and trade payables incurred in the ordinary course of business and payable on normal trade terms and not otherwise prohibited hereunder;

(c)    ordinary course liabilities relating to profit participations and other contingent compensation, including royalties, deferments and guild residuals with respect to the distribution, acquisition or other exploitation of Items of Product;

(d)    Indebtedness of the Borrower owing to any Subsidiary and of any Subsidiary owing to the Borrower or any other Subsidiary; provided that any such Indebtedness that is owed by a Subsidiary that is not a Subsidiary Loan Party shall be subject to Section 7.4(j);

(e)    Indebtedness arising in connection with transactions contemplated by Section 7.9 hereof;

(f)    Guarantees permitted under Section 7.4;

(g)    Hedging Obligations permitted by Section 7.10;

(h)    Unsecured Indebtedness under the Mezzanine Debt Facility;

(i)    Indebtedness incurred in the ordinary course of business owed in respect of any overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing-house transfers of funds in an aggregate principal amount not to exceed $100,000 at any time outstanding;

102

(j)     customary advances from Laboratories or other vendors made in the ordinary course of business in connection with the services rendered or to be rendered to the Loan Parties in connection with Physical Materials not to exceed $250,000 in the aggregate at any one time outstanding;

(k)     other unsecured Indebtedness of the Borrower or its Subsidiaries in an aggregate principal amount not to exceed $250,000 at any time outstanding; and

(l)     Indebtedness of the Borrower or its Subsidiaries to Sony DADC US Inc. ("Sony") for advances made by Sony in connection with that certain Replication and Distribution Services Agreement, dated as of September 15, 2008, by and between Sony and the Borrower (as successor-in-interest to First Look Studios, Inc.).

The Borrower will not, and will not permit any Subsidiary to, issue any preferred stock or other preferred equity interest that (i) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise, (ii) is or may become redeemable or repurchaseable by the Borrower or such Subsidiary at the option of the holder thereof, in whole or in part, or (iii) is convertible or exchangeable at the option of the holder thereof for Indebtedness or preferred stock or any other preferred equity interest described in this paragraph, on or prior to, in the case of clause (i), (ii) or (iii), the first anniversary of the Revolving Commitment Termination Date.

No proceeds of the Loans, and no cash of any Loan Party other than the Borrower or Holdco shall be used for any contingent or non-contingent payments in connection with the Red Cloud Acquisition except as set forth in the Asset Purchase Agreement.

Section 7.2     Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien on any of its assets or property now owned or hereafter acquired, except:

(a)     Liens securing the Obligations; provided that no Liens may secure Hedging Obligations or Bank Product Obligations without securing all other Obligations on a basis at least pari passu with such Hedging Obligations or Bank Product Obligations and subject to the priority of payments set forth in Section 2.20 and Section 8.2;

(b)     Permitted Encumbrances;

(c)     Liens on any property or asset of the Borrower or any of its Subsidiaries existing on the date hereof and set forth on Schedule 7.2; provided that such Liens shall not apply to any other property or asset of the Borrower or any Subsidiary;

(d)     Liens to secure transactions contemplated by Section 7.9 to the extent permitted thereunder;

(e)     Liens securing the Indebtedness set forth in Section 7.1(l), provided such Liens are subject to subordination agreement or other agreement reasonably satisfactory to the Administrative Agent which subordinates such Liens to Administrative Agent's Lien hereunder; and

(f)     extensions, renewals, or replacements of any Lien referred to in subsections (b) through (e) of this Section; provided that the principal amount of the Indebtedness secured thereby is not increased and that any such extension, renewal or replacement is limited to the assets originally encumbered thereby.

**Section 7.3     Fundamental Changes**.  The Borrower will not, and will not permit any of its Subsidiaries to:

(a)     merge into or consolidate into any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired) or all or substantially all of the Capital Stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired) or liquidate or dissolve; provided that if, at the time thereof and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing, (i) the Borrower or any Subsidiary may merge with a Person if the Borrower (or, if the Borrower is not a party to such merger, a Subsidiary) is the surviving Person, (ii) any Subsidiary may merge into another Subsidiary, provided that if any party to such merger is a Subsidiary Loan Party, the Subsidiary Loan Party shall be the surviving Person, (iii) any Subsidiary may sell, transfer, lease or otherwise dispose of all or substantially all of its assets to the Borrower or to a Subsidiary Loan Party, and (iv) any Subsidiary (other than a Subsidiary Loan Party) may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders; provided, further, that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 7.4;

(b)     engage in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the date hereof and businesses reasonably related thereto; or

(c)     change (i) the location of its chief executive office or principal place of business, (ii) any of the locations where it keeps any material portion of the Collateral or any books and records with respect to the Collateral, or (iii) its name or jurisdiction of formation or organization without, in each case, (x) giving the Administrative Agent ten (10) days' prior written notice of such change, and (y) filing (or authorizing the Administrative Agent to file) any additional Uniform Commercial Code financing statements (or foreign equivalent), and such other documents reasonably requested by Administrative Agent to maintain perfection of the security interest of the Administrative Agent (for the benefit of the Secured Parties), in the Collateral.

**Section 7.4     Investments, Loans, Guarantees**.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Capital Stock, evidence of Indebtedness or other securities (including any option, warrant, or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person (all of the foregoing being collectively called "Investments"), or purchase or otherwise

104

acquire (in one transaction or a series of transactions) any assets of any other Person that constitute a business unit, or create or form any Subsidiary, except:

    (a)   Investments (other than Permitted Investments) existing on the date hereof and set forth on <u>Schedule 7.4</u> (including Investments in Subsidiaries);

    (b)   Permitted Investments;

    (c)   Guarantees by the Borrower and its Subsidiaries constituting Indebtedness permitted by <u>Section 7.1</u>; <u>provided</u> that the aggregate principal amount of Indebtedness of Subsidiaries that are not Subsidiary Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in subsection (j) of this Section;

    (d)   performance guarantees in the ordinary course of business to licensees or laboratories which are providing services in connection with the acquisition, distribution or other exploitation of any Item of Product by or for any Loan Party;

    (e)   the endorsement of negotiable instruments for deposit or collection in the ordinary course of business;

    (f)   the Guarantees made by the Loan Parties pursuant to the Guaranty and Security Agreement;

    (g)   customary Guarantees in connection with participations and deferments relating to an Item of Product made in the ordinary course of business;

    (h)   Guarantees of obligations of another Loan Party that the Loan Party could have incurred directly as a primary obligor without violating the terms of any of the Loan Document;

    (i)   Investments made by a Loan Party in or to any other Loan Party;

    (j)   Investments made by a Loan Party in or to any Subsidiary that is not itself a Subsidiary Loan Party; <u>provided</u> that the aggregate amount of Investments by the Loan Parties in or to, and Guarantees by the Loan Parties of Indebtedness of, any Subsidiary that is not a Subsidiary Loan Party (including all such Investments and Guarantees existing on the Closing Date) shall not exceed $100,000 at any time outstanding or $300,000 in the aggregate for all such Subsidiaries;

    (k)   loans or advances to employees, officers or directors of the Borrower or any of its Subsidiaries in the ordinary course of business for travel, relocation and related expenses; <u>provided</u> that the aggregate amount of all such loans and advances does not exceed $100,000 at any time outstanding;

    (l)   Hedging Transactions permitted by <u>Section 7.10</u>;

    (m)   Investments in anticipation of or in connection with the exploitation of Items of Product;

(n)     Investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers, customers or other debtors, or in settlement of delinquent obligations arising in the ordinary course of business; and

(o)     The Red Cloud Acquisition.

**Section 7.5     Restricted Payments**.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except as follows (in each case, <u>provided</u> no Default or Event of Default has occurred and is continuing or would occur after taking in account such payments):

(a)     dividends payable by the Borrower solely in interests of any class of its common equity; <u>provided</u> that such Capital Stock is pledged to the Administrative Agent (for the benefit of the Secured Parties) pursuant to the Pledge Agreement;

(b)     Restricted Payments made by any Subsidiary to the Borrower or to another Subsidiary, on at least a *pro rata* basis with any other equity holder if such Subsidiary is not wholly owned by the Borrower or by another wholly owned Subsidiary;

(c)     Permitted Tax Distributions;

(d)     payments to the Borrower of Allocated Overhead Expenses, subject to the limitations set forth in <u>Section 7.22</u>;

(e)     payments with respect to the Mezzanine Debt as permitted herein; and

(f)     payment of Management Fees as permitted herein.

**Section 7.6     Sale of Assets**.  The Borrower will not, and will not permit any of its Subsidiaries to, convey, sell, lease, assign, transfer or otherwise dispose of any of its assets, business or property or, in the case of any Subsidiary, any shares of such Subsidiary's Capital Stock, in each case whether now owned or hereafter acquired, to any Person other than the Borrower or a Subsidiary Loan Party (or to qualify directors if required by applicable law), except:

(a)     the sale or other Disposition for fair market value of obsolete or worn out property or other property not necessary for operations disposed of in the ordinary course of business;

(b)     the sale, discount or other Disposition of notes, accounts receivable or other obligations owing to any Loan Party for the purpose of collection of accounts receivable in the ordinary course of business; <u>provided</u> that the Loan Parties shall be entitled to sell, liquidate or otherwise transfer tax deductions, rebates, credits and/or refunds so long as the transactions relating thereto are on terms (including an acceptable present-valued rate of return on the asset being transferred) and pursuant to documentation satisfactory to the Administrative Agent;

(c)     to the extent permitted under <u>Section 7.9</u>;

106

(d)     any sale, transfer, assignment or other Disposition of equipment to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds thereof are reasonably promptly applied to the purchase price of such replacement property;

(e)     dispositions of Permitted Investments; and

(f)     licenses and sales of exploitation rights in an Item of Product in the ordinary course of business pursuant to Distribution Agreements and Licensing Intermediary Agreements.

**Section 7.7    Transactions with Affiliates**.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)     in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than could be obtained on an arm's-length basis from unrelated third Persons;

(b)     transactions solely between or among Loan Parties;

(c)     any Restricted Payment permitted by Section 7.5;

(d)     the payment of Management Fees as permitted herein;

(e)     payments with respect to the Mezzanine Debt as permitted herein; and

(f)     as otherwise approved by the Administrative Agent.

**Section 7.8    Restrictive Agreements**.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement that prohibits, restricts or imposes any condition upon (a) either (i) the ability of the Borrower or any of its Subsidiaries to create, incur or permit any Lien upon any of its assets or properties, whether now owned or hereafter acquired, in favor of the Administrative Agent (for the benefit of the Secured Parties) or in favor of any Person(s) refinancing the Indebtedness under the Loan Documents or (ii) requiring an obligation to be secured as a result of any Lien being granted to the Administrative Agent (for the benefit of the Secured Parties) or to any Person(s) refinancing the Indebtedness under the Loan Documents or (b) the ability of any of its Subsidiaries to pay dividends or other distributions with respect to its Capital Stock, to make or repay loans or advances to the Borrower or any other Subsidiary thereof, to Guarantee Indebtedness of the Borrower or any other Subsidiary thereof or to transfer any of its property or assets to the Borrower or any other Subsidiary thereof; provided that (i) the foregoing shall not apply to restrictions or conditions imposed by law or by this Agreement or any other Loan Document and (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is sold and such sale is permitted hereunder.

**Section 7.9    Sale/Leaseback Transactions.**   The Borrower will not, and will not permit any of its Subsidiaries to:

(a)    enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use ·for substantially the same purpose or purposes as the property sold or transferred (each, a "Sale/Leaseback Transaction"), unless at the time such Sale/Leaseback Transaction is entered into (a) no Default or Event of Default has occurred and is continuing, (b) after giving *pro forma* effect to such Sale/Leaseback Transaction, the Borrower is in compliance with the financial covenants set forth in Article VI, (c) the Borrower has delivered a certificate to the Lenders certifying the conditions set forth in clauses (a) and (b) and setting forth in reasonable detail calculations demonstrating pro forma compliance with the financial covenants set forth in Article VI; or

(b)    enter into any Sale/Leaseback Transaction with any Person or Persons, whereby in contemporaneous transactions any Loan Party sells essentially all of its right, title and interest in an Item of Product and acquires or licenses the right to distribute or exploit such Item of Product in media and markets accounting for substantially all the value of such Item of Product, except such transactions as are evidenced by documentation acceptable to the Administrative Agent in its sole discretion; provided, however, with the consent of the Administrative Agent, a Loan Party may enter into a Sale/Leaseback Transaction and the Administrative Agent will release its Liens relating to the relevant Item of Product, subject to reattachment to all of the exploitation rights, for equivalent periods as were held by such Loan Party immediately prior to such Sale/Leaseback Transaction provided the transaction (i) would not decrease the amount of revenue to be received by such Loan Party by more than a nominal amount (or delay the anticipated timing of receipt of such revenue), (ii) would not result in the Administrative Agent (for the benefit of the Secured Parties) not having a perfected Lien in the portion of gross receipts to be applied in satisfaction of the Obligations (subject to no other Liens other than Permitted Encumbrances of the type described in clause (i) of the definition of such term) or in the other items of Collateral (with the priority contemplated by Section 4.20 hereof), and (iii) is subject to customary documentation reasonably acceptable to the Administrative Agent.

**Section 7.10   Hedging Transactions**.   The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Hedging Transaction, other than Hedging Transactions entered into in the ordinary course of business to hedge or mitigate risks to which the Borrower or any of its Subsidiaries is exposed in the conduct of its business or the management of its liabilities.   Solely for the avoidance of doubt, the Borrower acknowledges that a Hedging Transaction entered into for speculative purposes or of a speculative nature (which shall be deemed to include any Hedging Transaction under which the Borrower or any of its Subsidiaries is or may become obliged to make any payment (i) in connection with the purchase by any third party of any Capital Stock or any Indebtedness or (ii) as a result of changes in the market value of any Capital Stock or any Indebtedness) is not a Hedging Transaction entered into in the ordinary course of business to hedge or mitigate risks.

**Section 7.11   Amendments to Material Documents**. The Borrower will not, and will not permit any of its Subsidiaries to, amend, alter, modify, terminate or waive, or permit any amendment, alteration, modification, termination or waiver of, (i) its certificate of formation, limited liability company agreement or other organizational documents or (ii) any agreement with respect to which such Person has been assigned rights or has assumed obligations relating to the distribution or other exploitation of an Item of Product, any Distribution Agreement, or any other Material Agreement to which such Person is a party (except in any manner that would not (x) have an adverse effect on the Borrower or any of its Subsidiaries, any Secured Party or any Secured Party's respective rights under the Loan Documents or (y) result in a mandatory prepayment event under Section 2.11(a)(iii)), (in each such case under the foregoing clauses (i) and (ii)) without the prior written consent of the Required Lenders.

**Section 7.12   Accounting Changes**.   The Borrower will not, and will not permit any of its Subsidiaries to, make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change the fiscal year end of the Borrower or of any of its Subsidiaries, except to change the fiscal year end of a Subsidiary to conform its fiscal year end to that of the Borrower.

**Section 7.13   Lease Obligations**.   The Borrower will not, and will not permit any of its Subsidiaries to, create or suffer to exist any obligations for the payment under operating leases or agreements to lease (but excluding any Capital Lease Obligations having a term of five years or more) which would cause the present value of the direct or contingent liabilities of the Borrower and its Subsidiaries under such leases or agreements to lease, on a consolidated basis, to exceed $500,000 in the aggregate in any Fiscal Year.

**Section 7.14   Government Regulation**.   The Borrower will not, and will not permit any of its Subsidiaries to, (a) be or become subject at any time to any law, regulation or list of any Governmental Authority of the United States (including, without limitation, the OFAC list) that prohibits or limits the Lenders or the Administrative Agent from making any advance or extension of credit to the Borrower or from otherwise conducting business with the Loan Parties, or (b) fail to provide documentary and other evidence of the identity of the Loan Parties as may be requested by the Lenders or the Administrative Agent at any time to enable the Lenders or the Administrative Agent to verify the identity of the Loan Parties or to comply with any applicable law or regulation, including, without limitation, Section 326 of the Patriot Act at 31 U.S.C. Section 5318.

**Section 7.15   ERISA Compliance**.   The Borrower will not, and will not permit any of its Subsidiaries to, engage in a non-exempt "prohibited transaction", as defined in Section 406 of ERISA or Section 4975 of the Code, with respect to any Plan or Multiemployer Plan or knowingly consent to any other "party in interest" or any "disqualified person", as such terms are defined in Section 3(14) of ERISA and Section 4975(e)(2) of the Code, respectively, engaging in any non-exempt "prohibited transaction", with respect to any Plan or Multiemployer Plan; or permit any Plan to fail to satisfy the minimum funding standard (within the meaning of Section 302 of ERISA or Section 412 of the Code), unless such failure shall have been waived in advance by the Internal Revenue Service; or terminate any Plan in a manner which could result in the imposition of a Lien on any property of any Loan Party pursuant to Section 4068 of ERISA; or breach or knowingly permit any employee or officer or any trustee or administrator of

206771225 v17

any Plan to breach any fiduciary responsibility imposed under Title I of ERISA with respect to any Plan; or engage in any transaction which would result in the incurrence of a liability under Section 4069 of ERISA; or fail to make contributions to a Plan or Multiemployer Plan which could result in the imposition of a Lien on any property of any Loan Party pursuant to Section 303(k) of ERISA or Section 430(k) of the Code, if the occurrence of any of the foregoing events (alone or in the aggregate) would result in a liability which would be reasonably likely to result in a Material Adverse Effect.

Section 7.16   **Hazardous Materials**.  The Borrower will not, and will not permit any of its Subsidiaries to, cause or permit any of its properties or assets to be used to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce or process Hazardous Materials, except in compliance in all material respects with all applicable Environmental Laws, nor Release or permit or suffer any Release as a result of any intentional act or omission on its part of Hazardous Materials onto any such property or asset in violation of any Environmental Law, in each case except where the same could not have a Material Adverse Effect.

Section 7.17   **No Development of Items of Product**.  The Borrower will not, and will not permit any of its Subsidiaries to, engage in any production, co-financing or development activities with respect to any Item of Product.

Section 7.18   **Subsidiaries**.  The Borrower will not, and will not permit any of its Subsidiaries to, acquire or create any new direct or indirect Subsidiary except to the extent that (i) such Subsidiaries are wholly-owned, directly or indirectly, by the Borrower and (ii) the applicable requirements of Section 5.14 have been met with respect to such Subsidiary.

Section 7.19   **No Adverse Selection**.  The Borrower will not, and will not permit any of its Subsidiaries to, permit any motion picture, episodic series or other audio-visual or digital work produced for theatrical, non-theatrical or television release, or for release in any other medium, in each case whether long form, short form or episodic and whether recorded on film, videotape, cassette, cartridge, disc or on or by any other means, method, process or device whether now known or hereafter developed, to be acquired or exploited by the Holdco, the Borrower or any of their Subsidiaries (excluding OA Investment Holdings), other than an Item of Product which constitutes Collateral.

Section 7.20   **Capital Expenditures**.  The Borrower and its Subsidiaries will not make or incur Capital Expenditures in excess of $1,000,000 during any Fiscal Year.

Section 7.21   **Overhead**.  The Borrower and its Subsidiaries will not pay or incur any overhead expenses (including management fees and Allocated Overhead Expenses) in excess of $19,700,000 in the aggregate for Fiscal Year 2015, $20,800,000 in the aggregate for Fiscal Year 2016, $22,200,000 in the aggregate for Fiscal Year 2017 and $23,500,000 in the aggregate for Fiscal Year 2018 (prior to the Maturity Date).

Section 7.22   **Expenditures for Items of Product**.

110

(a)    The Borrower and its Subsidiaries will not pay or incur any amounts in connection with Rights Acquisition Costs with respect to one or more Items of Product in excess of the following amounts:

(i)    $33,000,000 in the aggregate for Fiscal Year 2015;

(ii)   $36,300,000 in the aggregate for Fiscal Year 2016;

(iii)  $40,000,000 in the aggregate for Fiscal Year 2017; and

(iv)   $44,000,000 in the aggregate, prior to the Maturity Date, for Fiscal Year 2018.

(b)    The Borrower and its Subsidiaries will not pay or incur any Rights Acquisition Costs in excess of $3,500,000 for Fiscal Year 2015, $4,000,000 for Fiscal Year 2016 and $5,000,000 for any period after Fiscal Year 2016 in connection any one single Item of Product.

(c)    With respect to any Item of Product referred to in subsections (a) and (b) of this Section, the foregoing limitations shall only take into account the excess of (x) the aggregate amounts paid or incurred with respect to such Item of Product as of the applicable date of computation minus (y) the aggregate amount of any Eligible Receivables attributed to such Item of Product (as reflected on the most recent Borrowing Base Certificate received by the Administrative Agent) as of the applicable date of computation.

Section 7.23   **P&A Expenditures for Items of Product.**   The Borrower and its Subsidiaries will not pay or incur any prints and advertising ("P&A") expenditures on account of any single Item of Product in excess of $2,000,000 for Fiscal Year 2015, $4,000,000 for Fiscal Year 2016 and $5,000,000 for any period after Fiscal Year 2016.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.1    **Events of Default.**   If any of the following events (each, an "Event of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment or otherwise; or

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount payable under subsection (a) of this Section or an amount related to a Bank Product Obligation) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days; or

(c)     any representation or warranty made or deemed made by or on behalf of the Borrower or any of its Subsidiaries or Holdco in or in connection with this Agreement or any other Loan Document (including the Schedules attached hereto and thereto), or in any amendments or modifications hereof or waivers hereunder, or in any certificate, report, financial statement or other document submitted to the Administrative Agent or the Lenders by any Loan Party or any representative of any Loan Party pursuant to or in connection with this Agreement or any other Loan Document shall prove to be incorrect in any material respect (other than any representation or warranty that is expressly qualified by a Material Adverse Effect or other materiality, in which case such representation or warranty shall prove to be incorrect in any respect) when made or deemed made or submitted; or

(d)     the Borrower shall fail to observe or perform any covenant or agreement contained in Section 5.1, 5.2, or 5.3 (with respect to the Borrower's legal existence) or Article VI or VII; or

(e)     any Loan Party shall fail to observe or perform any covenant or agreement contained in this Agreement (other than those referred to in subsections (a), (b) and (d) of this Section) or any other Loan Document or related to any Bank Product Obligation, and such failure shall remain unremedied for 30 days after the earlier of (i) any officer of the Borrower becomes aware of such failure, or (ii) notice thereof shall have been given to the Borrower by the Administrative Agent or any Lender; or

(f)     (i) any Loan Party (whether as primary obligor or as guarantor or other surety) shall fail to pay any principal of, or premium or interest on, any Material Indebtedness (other than any Hedging Obligation) that is outstanding, when and as the same shall become due and payable (whether at scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument evidencing or governing such Indebtedness; or any other event shall occur or condition shall exist under any agreement or instrument relating to any Material Indebtedness and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of such Indebtedness; or any Material Indebtedness shall be declared to be due and payable, or required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, or any offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof or (ii) there occurs under any Hedging Transaction an Early Termination Date (as defined in such Hedge Transaction) resulting from (A) any event of default under such Hedging Transaction as to which the Borrower or any of its Subsidiaries is the Defaulting Party (as defined in such Hedging Transaction) and the Hedge Termination Value owed by the Borrower or such Subsidiary as a result thereof is greater than $250,000 or (B) any Termination Event (as so defined) under such Hedging Transaction as to which the Borrower or any Subsidiary is an Affected Party (as so defined) and the Hedge Termination Value owed by the Borrower or such Subsidiary as a result thereof is greater than $250,000 and is not paid; or

(g)     Holdco, the Borrower, or any Subsidiary of the Borrower shall (i) commence a voluntary case or other proceeding or file any petition seeking liquidation,

112

reorganization or other relief under any federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a custodian, trustee, receiver, liquidator or other similar official of it or any substantial part of its property, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in subsection (i) of this subsection, (iii) apply for or consent to the appointment of a custodian, trustee, receiver, liquidator or other similar official for, Holdco, the Borrower, or any Subsidiary of the Borrower or for a substantial part of such Person's assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, or (vi) take any action for the purpose of effecting any of the foregoing; or

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Holdco, the Borrower, or any Subsidiary of the Borrower or any of such Person's debts, or any substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect or (ii) the appointment of a custodian, trustee, receiver, liquidator or other similar official for Holdco, the Borrower, or any Subsidiary of the Borrower or for a substantial part of such Person's assets, and in any such case, such proceeding or petition shall remain undismissed for a period of 60 days or an order or decree approving or ordering any of the foregoing shall be entered; or

(i)    Holdco, the Borrower, or any Subsidiary of the Borrower shall become unable to pay, shall admit in writing its inability to pay, or shall generally fail to pay, its debts as they become due, or shall make a general assignment for the benefit of its creditors; or

(j)    (i) an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with other ERISA Events that have occurred, could reasonably be expected to result in liability to the Borrower and its Subsidiaries in an aggregate amount exceeding $250,000, (ii) there is or arises an Unfunded Pension Liability (not taking into account Plans with negative Unfunded Pension Liability) in an aggregate amount exceeding $250,000, or (iii) there is or arises any potential Withdrawal Liability in an aggregate amount exceeding $250,000; or

(k)    any judgment or order for the payment of money (to the extent not paid or fully covered by insurance) in excess of $250,000 in the aggregate shall be rendered against the Borrower or any of its Subsidiaries, and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be a period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(l)    any non-monetary judgment or order shall be rendered against the Borrower or any of its Subsidiaries that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, and there shall be a period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(m)    a Change in Control shall occur or exist; or

113

(n)     a Change in Management shall occur or exist; or

(o)     any provision of any Collateral Document shall for any reason cease to be valid and binding on, or enforceable against, any Loan Party, or any Loan Party shall so state in writing, or any Loan Party shall seek to terminate its obligation under any Collateral Document (other than the release of any guaranty or collateral to the extent permitted pursuant to Section 9.11); or

(p)     any Lien purported to be created under any Collateral Document shall fail or cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral, with the priority required by the applicable Collateral Documents; or

(q)     any Event of Default (as defined in the Mezzanine Debt Facility) or any other event shall occur or condition shall exist under the Mezzanine Debt Facility and shall continue after the applicable grace period, if any, specified in such agreement, if the effect of such event or condition is to accelerate, or permit the acceleration of, the maturity of the Mezzanine Debt; or the Mezzanine Debt shall be declared to be due and payable, or required to be prepaid or redeemed (other than as expressly permitted in Section 5.21), purchased or defeased, or any offer to prepay, redeem, purchase or defease the Mezzanine Debt shall be required to be made, in each case prior to the stated maturity thereof;

then, and in every such event (other than an event described in subsection (h) or (i) of this Section) and at any time thereafter during the continuance of such event, the Administrative Agent may, and upon the written request of the Required Lenders shall, by notice to the Borrower, take any or all of the following actions, at the same or different times:  (i) terminate the Commitments, whereupon the Commitment of each Lender shall terminate immediately, (ii) declare the principal of and any accrued interest on the Loans, and all other Obligations owing hereunder, to be, whereupon the same shall become, due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, (iii) exercise all remedies contained in any other Loan Document, and (iv) exercise any other remedies available at law or in equity; provided that, if an Event of Default specified in either subsection (h) or (i) shall occur, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon, and all fees and all other Obligations shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

**Section 8.2    Application of Proceeds from Collateral**.  All proceeds from each sale of, or other realization upon, all or any part of the Collateral by any Secured Party after an Event of Default arises shall be applied as follows:

(a)     first, to the reimbursable expenses of the Administrative Agent incurred in connection with such sale or other realization upon the Collateral, until the same shall have been paid in full;

114

(b)    second, to the fees and other reimbursable expenses of the Administrative Agent then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(c)    third, to all reimbursable expenses, if any, of the Lenders then due and payable pursuant to any of the Loan Documents, until the same shall have been paid in full;

(d)    fourth, to the fees and interest then due and payable under the terms of this Agreement, until the same shall have been paid in full;

(e)    fifth, to the aggregate outstanding principal amount of the Loans, the Bank Product Obligations and the Net Mark-to-Market Exposure of the Hedging Obligations that constitute Obligations, until the same shall have been paid in full, allocated *pro rata* among the Secured Parties based on their respective *pro rata* shares of the aggregate amount of such Loans, Bank Product Obligations and Net Mark-to-Market Exposure of such Hedging Obligations; and

(f)    sixth, to the extent any proceeds remain, to the Borrower, or as otherwise agreed by the Administrative Agent in any Intercreditor Agreement or Interparty Agreement, or as otherwise provided by a court of competent jurisdiction.

All amounts allocated pursuant to the foregoing clauses third through fifth to the Lenders as a result of amounts owed to the Lenders under the Loan Documents shall be allocated among, and distributed to, the Lenders *pro rata* based on their respective Pro Rata Shares.

Notwithstanding the foregoing, (a) no amount received from any Guarantor (including any proceeds of any sale of, or other realization upon, all or any part of the Collateral owned by such Guarantor) shall be applied to any Excluded Swap Obligation of such Guarantor and (b) Bank Product Obligations and Hedging Obligations shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the Bank Product Provider or the Lender-Related Hedge Provider, as the case may be. Each Bank Product Provider or Lender-Related Hedge Provider that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article IX hereof for itself and its Affiliates as if a "Lender" party hereto.

## ARTICLE IX

## THE ADMINISTRATIVE AGENT

**Section 9.1    Appointment of the Administrative Agent**.  Each Lender irrevocably appoints SunTrust Bank as the Administrative Agent and authorizes it to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent under this Agreement and the other Loan Documents, together with all such actions and powers that are reasonably incidental thereto.  The Administrative Agent may perform any of its duties hereunder or under the other Loan Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent

115

or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions set forth in this Article shall apply to any such sub-agent, attorney-in-fact or Related Party and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

  **Section 9.2 Nature of Duties of the Administrative Agent**.  The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Agreement and the other Loan Documents.  Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except those discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.2), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries or Holdco that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity.  The Administrative Agent shall not be liable for any action taken or not taken by it, its sub-agents or its attorneys-in-fact with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.2) or in the absence of its own gross negligence or willful misconduct.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents or attorneys-in-fact selected by it with reasonable care.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof (which notice shall include an express reference to such event being a "Default" or "Event of Default" hereunder) is given to the Administrative Agent by the Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements, or other terms and conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article III or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.  The Administrative Agent may consult with legal counsel (including counsel for the Borrower) concerning all matters pertaining to such duties.

  **Section 9.3 Lack of Reliance on the Administrative Agent**.  Each of the Lenders acknowledges that it has, independently and without reliance upon the Administrative Agent or

any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each of the Lenders also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, continue to make its own decisions in taking or not taking any action under or based on this Agreement, any related agreement or any document furnished hereunder or thereunder.

Section 9.4     **Certain Rights of the Administrative Agent**.  If the Administrative Agent shall request instructions from the Required Lenders with respect to any action or actions (including the failure to act) in connection with this Agreement, the Administrative Agent shall be entitled to refrain from such act or taking such act unless and until it shall have received instructions from such Lenders, and the Administrative Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders where required by the terms of this Agreement.

Section 9.5     **Reliance by the Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it to be genuine and to have been signed, sent or made by the proper Person.  The Administrative Agent may also rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by it and shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.

Section 9.6     **The Administrative Agent in its Individual Capacity**.  The bank serving as the Administrative Agent shall have the same rights and powers under this Agreement and any other Loan Document in its capacity as a Lender as any other Lender and may exercise or refrain from exercising the same as though it were not the Administrative Agent; and the terms "Lenders", "Required Lenders", or any similar terms shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity.  The bank acting as the Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if it were not the Administrative Agent hereunder.

Section 9.7     **Successor Administrative Agent**.

(a)     The Administrative Agent may resign at any time by giving notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent, subject to approval by the Borrower provided that no Default or Event of Default shall exist at such time.  If no successor Administrative Agent shall have been so appointed, and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor

117

Administrative Agent which shall be a commercial bank organized under the laws of the United States or any state thereof or a bank which maintains an office in the United States.

(b)      Upon the acceptance of its appointment as the Administrative Agent hereunder by a successor, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  If, within 45 days after written notice is given of the retiring Administrative Agent's resignation under this Section, no successor Administrative Agent shall have been appointed and shall have accepted such appointment, then on such 45th day (i) the retiring Administrative Agent's resignation shall become effective, (ii) the retiring Administrative Agent shall thereupon be discharged from its duties and obligations under the Loan Documents and (iii) the Required Lenders shall thereafter perform all duties of the retiring Administrative Agent under the Loan Documents until such time as the Required Lenders appoint a successor Administrative Agent as provided above.  After any retiring Administrative Agent's resignation hereunder, the provisions of this Article shall continue in effect for the benefit of such retiring Administrative Agent and its representatives and agents in respect of any actions taken or not taken by any of them while it was serving as the Administrative Agent.

**Section 9.8      Withholding Tax**.  To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or any other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender (because the appropriate form was not delivered or was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

**Section 9.9      The Administrative Agent May File Proofs of Claim**.

(a)      In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or any Revolving Credit Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans or Revolving Credit Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be

118

necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and its agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 10.3</u>) allowed in such judicial proceeding; and

(ii)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same.

(b)     Any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 10.3</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

**Section 9.10   Authorization to Execute Other Loan Documents**.  Each Lender hereby authorizes the Administrative Agent to execute on behalf of all Lenders all Loan Documents (including, without limitation, the Collateral Documents and any subordination agreements) other than this Agreement.

**Section 9.11   Collateral and Guaranty Matters**.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion:

(a)     to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the termination of all Commitments and the payment in full of all Obligations (other than contingent indemnification obligations) (ii) that is sold or otherwise disposed of, or to be sold or otherwise disposed of, as part of or in connection with any sale or other Disposition permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing in accordance with <u>Section 10.2</u>;

(b)     to release any Loan Party from its obligations under the applicable Collateral Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder;

(c)     to determine that the cost to a Loan Party is disproportionate to the benefit to be realized by the Secured Parties by perfecting a Lien in a given asset or group of assets included in the Collateral (including any bank account) and that such Loan Party should not be required to perfect such Lien in favor of the Administrative Agent (for the benefit of the Secured Parties);

119

       (d)     to appoint subagents to be the holder of record of a Lien to be granted to the Administrative Agent (for the benefit of the Secured Parties);

       (e)     to confirm in writing the right of Quiet Enjoyment (as defined in the Guaranty and Security Agreement) of Distributors pursuant to the terms of the Guaranty and Security Agreement;

       (f)     to determine when a Lender is or becomes a Defaulting Lender;

       (g)     to enter into Interparty Agreements, Intercreditor Agreements and/or subordination agreements on terms acceptable to the Administrative Agent with (A) unions and/or guilds with respect to the security interests in favor of such unions and/or guilds required pursuant to the terms of collective bargaining agreements, (B) any Distributor having any rights to any Item of Product, (C) Persons providing any services in connection with any Item of Product, (D) Persons providing tax benefit, production subsidies and/or similar arrangements for any Item of Product or (E) sales agents or licensing intermediaries which are permitted by the terms hereof to be involved in the distribution of any Item of Product;

       (h)     to approve the terms and conditions of any Sale/Leaseback Transaction, to the extent the Administrative Agent reasonably determines that such transaction will provide a positive net benefit towards the applicable Item of Product and to take any action it deems appropriate to facilitate the completion of such transaction;

       (i)     to accept (and, subject to compliance with Section 2.21, the Administrative Agent shall accept) Incremental Revolving Commitments pursuant to Section 2.21; and

       (j)     to enter into and perform its obligations under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under the applicable Collateral Documents pursuant to this Section. In each case as specified in this Section, the Administrative Agent is authorized, at the Borrower's expense, to execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the Liens granted under the applicable Collateral Documents, or to release such Loan Party from its obligations under the applicable Collateral Documents, in each case in accordance with the terms of the Loan Documents and this Section.

     **Section 9.12   Documentation Agent; Syndication Agent**.   Each Lender hereby designates the Administrative Agent as Documentation Agent and agrees that the Documentation Agent, in such capacity, shall have no duties or obligations under any Loan Documents to any Lender or any Loan Party.   Each Lender hereby designates the Administrative Agent as Syndication Agent and agrees that the Syndication Agent, in such capacity, shall have no duties or obligations under any Loan Documents to any Lender or any Loan Party.

     **Section 9.13   Right to Realize on Collateral and Enforce Guarantee**.   Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the

Administrative Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Collateral Documents, it being understood and agreed that all powers, rights and remedies hereunder and under the Collateral Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale or other disposition.

**Section 9.14   Secured Bank Product Obligations and Hedging Obligations**.   No Bank Product Provider or Lender-Related Hedge Provider that obtains the benefits of Section 8.2, the Collateral Documents or any Collateral by virtue of the provisions hereof or of any other Loan Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Bank Product Obligations and Hedging Obligations unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Bank Product Provider or Lender-Related Hedge Provider, as the case may be.

## ARTICLE X

## MISCELLANEOUS

**Section 10.1   Notices**.

    (a)    Written Notices.

       (i)    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications to any party herein to be effective shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

To the Borrower:        Our Alchemy, LLC
                         5900 Wilshire Boulevard, Floor 18
                         Los Angeles, California 90036
                         Attention: Bill Lee
                         Facsimile Number: 323-937-0750
                         Email: blee@ouralchemy.com

To the Administrative Agent:

SunTrust Bank
303 Peachtree Street, N.E. / 32nd Floor
Atlanta, Georgia 30308
Attention:  J. Matthew Rowand
Facsimile Number:  (404) 588-7189
Email:  matt.rowand @suntrust.com

With a copy (for
Information purposes only) to:

SunTrust Bank
Agency Services
303 Peachtree Street, N.E. / 25th Floor
Atlanta, Georgia 30308
Attention:  Doug Weltz
Facsimile Number:  (404) 221-2001
Email:  douglas.weltz@suntrust.com

and

Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, California  90067
Attention:  John Burke, Esq.
Facsimile Number:  (310) 229-1001
Email:  jburke@akingump.com

To SunTrust Bank:

SunTrust Bank
Agency Services
303 Peachtree Street, N.E. / 25th Floor
Atlanta, Georgia 30308
Attention:  Doug Weltz
Facsimile Number:  (404) 221-2001
Email:  douglas.weltz@suntrust.com

To any other Lender:

the address set forth in the Administrative
Questionnaire or the Assignment
and Acceptance executed by such Lender

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.  All such notices and other communications shall be effective upon actual receipt by the relevant Person or, if delivered by overnight courier service, upon the first Business Day after the date deposited with such courier service for overnight (next-day) delivery or, if sent by facsimile, upon transmittal in legible form by facsimile machine or, if mailed, upon the third Business Day after the date deposited into the mail or, if delivered by hand, upon delivery; provided that notices delivered to the Administrative Agent Lender

122

shall not be effective until actually received by such Person at its address specified in this Section.

(ii)     Any agreement of the Administrative Agent or any Lender herein to receive certain notices by telephone or facsimile is solely for the convenience and at the request of the Borrower. The Administrative Agent and each Lender shall be entitled to rely on the authority of any Person purporting to be a Person authorized by the Borrower to give such notice and the Administrative Agent and the Lenders shall not have any liability to the Borrower or other Person on account of any action taken or not taken by the Administrative Agent or any Lender in reliance upon such telephonic or facsimile notice. The obligation of the Borrower to repay the Loans and all other Obligations hereunder shall not be affected in any way or to any extent by any failure of the Administrative Agent or any Lender to receive written confirmation of any telephonic or facsimile notice or the receipt by the Administrative Agent or any Lender of a confirmation which is at variance with the terms understood by the Administrative Agent and such Lender to be contained in any such telephonic or facsimile notice.

(b)     Electronic Communications.

(i)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including email and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II unless such Lender and the Administrative Agent have agreed to receive notices under any Section thereof by electronic communication and have agreed to the procedures governing such communications. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(ii)     Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**Section 10.2   Waiver; Amendments.**

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document, and no course of dealing between the Borrower and the Administrative Agent or any Lender, shall operate as a

123

waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies provided by law.  No waiver of any provision of this Agreement or of any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by subsection (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Except to the extent specifically provided to the contrary in any other provision of this Agreement, no amendment or waiver of any provision of this Agreement or of the other Loan Documents (other than the Engagement Letter and the Fee Letter), nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Required Lenders, or the Borrower and the Administrative Agent with the consent of the Required Lenders, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that, in addition to the consent of the Required Lenders, no amendment, waiver or consent shall:

(i)    increase the Commitment of any Lender without the written consent of such Lender;

(ii)    reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby;

(iii)    postpone the date fixed for any payment of any principal of, or interest on, any Loan or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment, without the written consent of each Lender affected thereby;

(iv)    change Section 2.20(b) in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender;

(v)    change any of the provisions of this subsection (b) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the consent of each Lender;

(vi)    change the definition of "EBITDA" without the consent of each Lender;

(vii)    release all or substantially all of the guarantors, or limit the liability of such guarantors, under any guaranty agreement guaranteeing any of the Obligations, without the written consent of each Lender; or

(viii)   release all or substantially all collateral (if any) securing any of the Obligations, without the written consent of each Lender;

provided, further, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights, duties or obligations of the Administrative Agent without the prior written consent of such Person.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended, and amounts payable to such Lender hereunder may not be permanently reduced, without the consent of such Lender (other than reductions in fees and interest in which such reduction does not disproportionately affect such Lender). Notwithstanding anything contained herein to the contrary, this Agreement may be amended and restated without the consent of any Lender (but with the consent of the Borrower and the Administrative Agent) if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated (but such Lender shall continue to be entitled to the benefits of Sections 2.17, 2.18, 2.19 and 10.3), such Lender shall have no other commitment or other obligation hereunder and such Lender shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement.

**Section 10.3   Expenses; Indemnification.**

(a)    The Borrower shall pay (on the Closing Date and thereafter on demand) (i) all reasonable, out-of-pocket costs and expenses of the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and its Affiliates, in connection with the syndication of the credit facilities provided for herein, the due diligence in anticipation of the consummation of the transactions contemplated in this Agreement (including costs incurred in connection with legal, title and collateral diligence (including library valuation) prior to the Closing Date) and the preparation and administration of the Loan Documents and any amendments, modifications or waivers thereof (whether or not the transactions contemplated in this Agreement or any other Loan Document shall be consummated), including, but not limited to, the reasonable out-of-pocket costs and charges of accountants and of audits or field examinations conducted by the Administrative Agent in connection with the administration of this Agreement, the verification of financial data and the transactions contemplated hereby, and (ii) all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel) incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees,

125

charges and disbursements of any outside counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from, and shall reimburse each Indemnitee upon its demand for, all fees and time charges and disbursements for outside attorneys of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third Person or by the Borrower, any other Loan Party, the Sponsor or any of their respective Affiliates arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third Person or by the Borrower, any other Loan Party, the Sponsor or any of their respective Affiliates, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from (x) the gross negligence or willful misconduct of or breach of this Agreement or any other Loan Document by such Indemnitee or any Related Party of such Indemnitee or (y) any disputes solely among Indemnitees and not arising out of any action or inaction of the Borrower, any other Loan Party, the Sponsor or any of their respective Affiliates. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through Syndtrak, Intralinks or any other Internet or intranet website, except as a result of such Indemnitee's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment. The Borrower shall not (and shall not permit any other Loan Party, the Sponsor or any of their respective Affiliates to), without the prior written consent of any Indemnitee, effect any settlement of any pending or threatened proceeding in respect of which such Indemnitee is a party and indemnity has been sought hereunder by such Indemnitee, unless such settlement includes an unconditional release of such Indemnitee from all liability on claims that are the subject matter of such indemnity. The foregoing agreements shall be in addition to any rights that any Indemnitee may have at common law or otherwise, including, but not limited to, any right to contribution.

(c)     The Borrower shall pay, and hold the Administrative Agent and each of the Lenders harmless from and against, any and all present and future stamp, documentary, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein or any payments due thereunder, and save the Administrative Agent and each Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission to pay such taxes.

(d)     To the extent that the Borrower fails to pay any amount required to be paid to the Administrative Agent under subsection (a), (b) or (c) hereof, each Lender severally agrees to pay to the Administrative Agent such Lender's *pro rata* share (in accordance with its respective Revolving Commitment (or Revolving Credit Exposure, as applicable) and Term Loan determined as of the time that the unreimbursed expense or indemnity payment is sought)

126

of such unpaid amount; provided that the unreimbursed expense or indemnified payment, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(e)     TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER SHALL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST ANY INDEMNITEE, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO ACTUAL OR DIRECT DAMAGES) ARISING OUT OF, IN CONNECTION WITH OR AS A RESULT OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE TRANSACTIONS CONTEMPLATED THEREIN, ANY LOAN OR THE USE OF PROCEEDS THEREOF.

(f)     All amounts due under this Section shall be payable promptly after written demand therefor.

**Section 10.4   Successors and Assigns**.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments, Loans and other Revolving Credit Exposure at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments, Loans and other Revolving Credit Exposure at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose

127

includes Loans and Revolving Credit Exposure outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans and Revolving Credit Exposure of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Acceptance, as of the Trade Date) shall not be less than $1,000,000 with respect to Term Loans and $5,000,000 with respect to Revolving Loans and in minimum increments of $1,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans, other Revolving Credit Exposure or the Commitments assigned, except that this subsection (b)(ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Commitments on a non-*pro rata* basis.

(iii)    Required Consents.   No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of such Lender or an Approved Fund of such Lender;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required unless such assignment is of a Term Loan to a Lender, an Affiliate of such Lender or an Approved Fund of such Lender.

(iv)    Assignment and Acceptance.  The parties to each assignment shall deliver to the Administrative Agent (A) a duly executed Assignment and Acceptance, (B) a processing and recordation fee of $3,500, (C) an Administrative Questionnaire unless the assignee is already a Lender and (D) the documents required under Section 2.19(e).

(v)     No Assignment to Certain Persons.  No such assignment shall be made to (A) the Borrower or any of the Borrower's Affiliates or Subsidiaries or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B).

128

(vi)   <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural person.

(vii)   <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 2.17</u>, <u>2.18</u>, <u>2.19</u> and <u>10.3</u> with respect to facts and circumstances occurring prior to the effective date of such assignment; <u>provided</u> that, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.  If the consent of the Borrower to an assignment is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified above), the Borrower shall be deemed to have given its consent unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after notice thereof has actually been delivered by the assigning Lender (through the Administrative Agent) to the Borrower.

(c)   The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in Atlanta, Georgia a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans and

129

Revolving Credit Exposure owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Information contained in the Register with respect to any Lender shall be available for inspection by such Lender at any reasonable time and from time to time upon reasonable prior notice; information contained in the Register shall also be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice. In establishing and maintaining the Register, the Administrative Agent shall serve as the Borrower's agent solely for tax purposes and solely with respect to the actions described in this Section, and the Borrower hereby agrees that, to the extent SunTrust Bank serves in such capacity, SunTrust Bank and its officers, directors, employees, agents, sub-agents and affiliates shall constitute "Indemnitees".

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person, the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to the following to the extent affecting such Participant:  (i) increase the Commitment of such Lender; (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder; (iii) postpone the date fixed for any payment of any principal of, or interest on, any Loan or any fees hereunder or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date for the termination or reduction of any Commitment; (iv) change Section 2.20(b) in a manner that would alter the *pro rata* sharing of payments required thereby; (v) change any of the provisions of Section 10.2(b) or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders which are required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder; (vi) release all or substantially all of the guarantors, or limit the liability of such guarantors, under any guaranty agreement guaranteeing any of the Obligations; or (vii) release all or substantially all collateral (if any) securing any of the Obligations.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.17, 2.18 and 2.19 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; provided that such Participant agrees to be subject to Section 2.22 as though it were a Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.20 as though it were a Lender.

130

Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register in the United States on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. The Borrower and the Administrative Agent shall have inspection rights to such Participant Register (upon reasonable prior notice to the applicable Lender) solely for purposes of demonstrating that such Loans or other obligations under the Loan Documents are in "registered form" for purposes of the Code.

(e)     A Participant shall not be entitled to receive any greater payment under Sections 2.17 and 2.19 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 2.19 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.19(e) and (i) as though it were a Lender.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including, without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**Section 10.5   Governing Law; Jurisdiction; Consent to Service of Process.**

(a)     This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with and be governed by the law (without giving effect to the conflict of law principles thereof except for Sections 5-1401 and 5-1402 of the New York General Obligations Law) of the State of New York.

(b)     The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York, and of the Supreme Court of the State of New York sitting in New York county, and of any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such District Court or such New York state court or, to the extent permitted by applicable law, such appellate court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other

manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)     The Borrower irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in subsection (b) of this Section and brought in any court referred to in subsection (b) of this Section.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in <u>Section 10.1</u>.  Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

Section 10.6  <u>**WAIVER OF JURY TRIAL**</u>.     EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION,  SEEK  TO  ENFORCE  THE  FOREGOING  WAIVER,  AND  (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF ANY PARTY HERETO TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

Section 10.7  <u>Right of Set-off</u>.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, each Lender shall have the right, at any time or from time to time upon the occurrence and during the continuance of an Event of Default, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of the Borrower at any time held or other obligations at any time owing by such Lender to or for the credit or the account of the Borrower against any and all Obligations held by such Lender irrespective of whether such Lender shall have made demand hereunder and although such Obligations may be unmatured; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.24(b)</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for

206771225 v17

the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees promptly to notify the Administrative Agent and the Borrower after any such set-off and any application made by such Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application. Each Lender agrees to apply all amounts collected from any such set-off to the Obligations before applying such amounts to any other Indebtedness or other obligations owed by the Borrower and any of its Subsidiaries to such Lender.

Section 10.8   **Counterparts; Integration**.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart to this Agreement or any other Loan Document by facsimile transmission or by electronic mail in pdf format shall be as effective as delivery of a manually executed counterpart hereof, and the parties waive any right they may have to object to said treatment.  This Agreement, the Engagement Letter, the Fee Letter, the other Loan Documents, and any separate letter agreements relating to any fees payable to the Administrative Agent and its Affiliates constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters.

Section 10.9   **Survival**.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates, reports, notices or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.17, 2.18, 2.19, and 10.3 and Article IX shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 10.10   **Severability**.   Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.11   **Confidentiality**.   Each of the Administrative Agent and the Lenders agrees to take normal and reasonable precautions to maintain the confidentiality of any information relating to the Borrower or any of its Subsidiaries or any of their respective

133

businesses, to the extent designated in writing as confidential and provided to it by the Borrower or any of its Subsidiaries, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower or any of its Subsidiaries, except that such information may be disclosed (i) to any Related Party of the Administrative Agent or any such Lender including, without limitation, accountants, legal counsel and other advisors, (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iii) to the extent requested by any regulatory agency or authority purporting to have jurisdiction over it (including any self-regulatory authority such as the National Association of Insurance Commissioners), (iv) to the extent that such information becomes publicly available other than as a result of a breach of this Section, or which becomes available to the Administrative Agent, any Lender or any Related Party of any of the foregoing on a non-confidential basis from a source other than the Borrower or any of its Subsidiaries, (v) in connection with the exercise of any remedy hereunder or under any other Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Documents or the enforcement of rights hereunder or thereunder, (vi) subject to execution by such Person of an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, or (B) any actual or prospective party (or its Related Parties) to any swap or derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder, (vii) to any rating agency, (viii) to the CUSIP Service Bureau or any similar organization, or (ix) with the consent of the Borrower.  Any Person required to maintain the confidentiality of any information as provided for in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such information as such Person would accord its own confidential information.  In the event of any conflict between the terms of this Section and those of any other Contractual Obligation entered into with any Loan Party (whether or not a Loan Document), the terms of this Section shall govern.  The commitments under this Section shall terminate, with respect to a particular Person, two (2) years after the earlier of (x) the termination of this Agreement, (y) the termination of such Person's Commitments and (z) the date on which such Person ceases to be a party to this Agreement.

       **Section 10.12 <u>Interest Rate Limitation</u>**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which may be treated as interest on such Loan under applicable law (collectively, the "<u>Charges</u>"), shall exceed the maximum lawful rate of interest (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by a Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment (to the extent permitted by applicable law), shall have been received by such Lender.

**Section 10.13 <u>Waiver of Effect of Corporate Seal</u>.** The Borrower represents and warrants that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Requirement of Law, agrees that this Agreement is delivered by the Borrower under seal and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

**Section 10.14 <u>Patriot Act</u>.** The Administrative Agent and each Lender hereby notifies the Loan Parties that, pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the Patriot Act.

**Section 10.15 <u>No Advisory or Fiduciary Responsibility</u>.** In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower and each other Loan Party acknowledges and agrees and acknowledges its Affiliates' understanding that (i) (A) the services regarding this Agreement provided by the Administrative Agent and/or the Lenders are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each of the Borrower and the other Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (C) the Borrower and each other Loan Party is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Loan Party or any of their respective Affiliates, or any other Person, and (B) neither the Administrative Agent nor any Lender has any obligation to the Borrower, any other Loan Party or any of their Affiliates with respect to the transaction contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and each of the Administrative Agent and the Lenders has no obligation to disclose any of such interests to the Borrower, any other Loan Party or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and the other Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 10.16 <u>Location of Closing</u>.** Each Lender acknowledges and agrees that it has delivered, with the intent to be bound, its executed counterparts of this Agreement to the Administrative Agent, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, New York 10036-6745 (marked for the attention of such Person as the Administrative Agent or its counsel may direct prior to the Closing Date). The Borrower acknowledges and agrees that it has delivered, with the intent to be bound, its executed

counterparts of this Agreement and each other Loan Document, together with all other documents, instruments, opinions, certificates and other items required under Section 3.1, to the Administrative Agent, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, New York  10036-6745 (marked for the attention of such Person as the Administrative Agent or its counsel may direct prior to the Closing Date.  All parties agree that the closing of the transactions contemplated by this Agreement has occurred in New York.

**Section 10.17 Headings**.  Section headings used herein and the table of contents hereto are for convenience only and are not to affect the construction of or be taken into consideration in interpreting this Agreement.

**Section 10.18 Effect of Amendment and Restatement of the Existing Credit Agreement.**

(a)    On the Closing Date, the Existing Credit Agreement shall be amended, restated and superseded in its entirety.  The parties hereto acknowledge and agree that (i) this Credit Agreement and the other documents entered into in connection herewith do not constitute a novation, payment and reborrowing, or termination of the "Obligations" (as defined in the Existing Credit Agreement) under the Existing Credit Agreement, as in effect prior to the Closing Date and (ii) such "Obligations" are in all respects continuing (as amended and restated hereby) as indebtedness and obligations outstanding under this Credit Agreement.

(b)    Except to the extent that any Loan Document (as defined in the Existing Credit Agreement) is being explicitly terminated, replaced or amended and restated in connection with the amendment and restatement being implemented hereby, each such Loan Document shall continue to be in full force and effect and is hereby ratified and confirmed in all respects, except that, from and after the Closing Date, each reference in any such Loan Document to the "Credit Agreement", "thereunder", "thereof" or words of like import shall be deemed to mean references to this "amended and restated" Credit Agreement.  Each Loan Party hereby (i) reaffirms each of its commitments in any such Loan Document, (ii) reaffirms each guarantee, pledge and grant of a security interest made in favor of the Administrative Agent under or in connection with the Existing Credit Agreement and any Loan Documents entered into in connection therewith and (iii) agrees that notwithstanding the amendment and restatement of the Credit Agreement such guarantees, pledges and grants in favor of the Administrative Agent shall continue in full force and effect.

(c)    In connection with the amendment and restatement of the Existing Credit Agreement, each Loan Party releases, waives and discharges any claims or causes of action which it may have against the Administrative Agent and each of the Lenders (as each such term is defined in the Existing Credit Agreement) and any of the other holders of the Obligations (as defined in the Existing Credit Agreement) arising under the Existing Credit Agreement or any of the other Loan Documents (as defined in the Existing Credit Agreement) or relating to their performance thereunder.

*(remainder of page left intentionally blank)*

206771225 v17

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**OUR ALCHEMY, LLC**

By: _____

Name:

Title:

**SUNTRUST BANK**
as the Administrative Agent and as a Lender

By: _____

Name:

Title:

**PACIFIC MERCANTILE BANK**, as a Lender

By: _____

Name:

Title:

**PREFERRED BANK**, as a Lender

By: _____

Name:

Title:

Signature Page to
Amended and Restated Revolving Credit and Term Loan Agreement
(Our Alchemy, LLC)

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**OUR ALCHEMY, LLC**

By: _____
Name:
Title:

**SUNTRUST BANK**
as the Administrative Agent and as a Lender

By: _____
Name: Elizabeth Greene
Title: SVP

**PACIFIC MERCANTILE BANK**, as a Lender

By: _____
Name:
Title:

**PREFERRED BANK**, as a Lender

By: _____
Name:
Title:

Signature Page to
Amended and Restated Revolving Credit and Term Loan Agreement
(Our Alchemy, LLC)

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**OUR ALCHEMY, LLC**

By: _____
      Name:
      Title:

**SUNTRUST BANK**
as the Administrative Agent and as a Lender

By: _____
      Name:
      Title:

**PACIFIC MERCANTILE BANK**, as a Lender

By: _____
      Name:  Sandy McKerroll
      Title:   Senior Vice President

**PREFERRED BANK**, as a Lender

By: _____
      Name:
      Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**OUR ALCHEMY, LLC**

By: _____
     Name:
     Title:

**SUNTRUST BANK**
as the Administrative Agent and as a Lender

By: _____
     Name:
     Title:

**PACIFIC MERCANTILE BANK**, as a Lender

By: _____
     Name:
     Title:

**PREFERRED BANK**, as a Lender

By: _____
     Name: ANNA BAGDASARIAN
     Title: SVP

Signature Page to
Amended and Restated Revolving Credit and Term Loan Agreement
(Our Alchemy, LLC)