# EXHIBIT B

**GUARANTY AND SECURITY AGREEMENT**


dated as of September 4, 2014


made by


**MILLENNIUM ENTERTAINMENT, LLC**
as Borrower


and


**THE OTHER GRANTORS FROM TIME TO TIME PARTY HERETO**

in favor of

**SUNTRUST BANK**
as Administrative Agent

205551474 v2

# TABLE OF CONTENTS

**ARTICLE I**        **DEFINITIONS** ................................................................................... 1
    Section 1.1    Definitions ............................................................................... 1
    Section 1.2    Other Definitional Provisions; References ........................... 4

**ARTICLE II**     **GUARANTEE** ................................................................................... 4
    Section 2.1    Guarantee ................................................................................ 4
    Section 2.2    Payments ................................................................................. 7

**ARTICLE III**    **GRANT OF SECURITY INTEREST** ............................................ 7
    Section 3.1    Grant of Security Interest ....................................................... 7
    Section 3.2    Transfer of Pledged Securities .............................................. 8
    Section 3.3    Assignment of Rights Only .................................................... 8

**ARTICLE IV**    **Acknowledgments, Waivers and Consents** ............................... 9
    Section 4.1    Acknowledgments, Waivers and Consents ............................ 9
    Section 4.2    No Subrogation, Contribution or Reimbursement ............... 11

**ARTICLE V**     **REPRESENTATIONS AND WARRANTIES** .............................. 12
    Section 5.1    Confirmation of Representations in Credit Agreement ........ 12
    Section 5.2    Benefit to the Guarantors ..................................................... 12
    Section 5.3    Grantor Information .............................................................. 12
    Section 5.4    Prior Names, Prior Chief Executive Offices ....................... 12
    Section 5.5    Goods .................................................................................... 12
    Section 5.6    Chattel Paper ........................................................................ 13
    Section 5.7    Truth of Information; Accounts ............................................ 13
    Section 5.8    Governmental Obligors ........................................................ 13
    Section 5.9    Copyrights, Patents and Trademarks .................................... 13
    Section 5.10   Vehicles ................................................................................ 13
    Section 5.11   Ownership ............................................................................. 13
    Section 5.12   Filing Offices ....................................................................... 13
    Section 5.13   Pledged Securities ................................................................ 14

**ARTICLE VI**    **COVENANTS** ............................................................................... 14
    Section 6.1    Covenants in Credit Agreement ........................................... 14
    Section 6.2    Maintenance of Perfected Security Interests; Further Documentation ............... 14
    Section 6.3    Maintenance of Records ....................................................... 15
    Section 6.4    Further Identification of Collateral ...................................... 15
    Section 6.5    Changes in Names, Locations ............................................... 16
    Section 6.6    Compliance with Contractual Obligations ............................ 16
    Section 6.7    Limitations on Dispositions of Collateral ............................ 16
    Section 6.8    Pledged Securities ................................................................ 16
    Section 6.9    Instruments and Tangible Chattel Paper ............................... 17
    Section 6.10   Defense of Copyrights and Trademarks ............................... 17
    Section 6.11   Commercial Tort Claims ...................................................... 17
    Section 6.12   Required Notifications ......................................................... 18
    Section 6.13   No Insolvency Actions .......................................................... 18

**ARTICLE VII**   **REMEDIAL PROVISIONS** ......................................................... 18
    Section 7.1    Pledged Securities ................................................................ 18
    Section 7.2    Proceeds ............................................................................... 19
    Section 7.3    Grantors to Hold in Trust ..................................................... 19
    Section 7.4    Collections, Etc. ................................................................... 20

| Section 7.5 | UCC and Other Remedies | 20 |
| Section 7.6 | Private Sales of Pledged Securities | 21 |
| Section 7.7 | Waiver; Deficiency | 21 |
| Section 7.8 | Non-Judicial Enforcement | 22 |
| **ARTICLE VIII** | **THE ADMINISTRATIVE AGENT** | **22** |
| Section 8.1 | The Administrative Agent's Appointment as Attorney-in-Fact | 22 |
| Section 8.2 | Duty of the Administrative Agent | 23 |
| Section 8.3 | Filing of Financing Statements | 24 |
| Section 8.4 | Authority of the Administrative Agent | 24 |
| Section 8.5 | Releases of Collateral | 24 |
| Section 8.6 | Quiet Enjoyment of Distributors | 24 |
| Section 8.7 | Assignment by the Administrative Agent | 25 |
| Section 8.8 | Secured Parties | 25 |
| **ARTICLE IX** | **SUBORDINATION OF INDEBTEDNESS** | **25** |
| Section 9.1 | Subordination of All Guarantor Claims | 25 |
| Section 9.2 | Claims in Bankruptcy | 25 |
| Section 9.3 | Payments Held in Trust | 26 |
| Section 9.4 | Liens Subordinate | 26 |
| Section 9.5 | Notation of Records | 26 |
| **ARTICLE X** | **MISCELLANEOUS** | **26** |
| Section 10.1 | Notices | 26 |
| Section 10.2 | Waiver | 26 |
| Section 10.3 | Amendments in Writing | 27 |
| Section 10.4 | Payment of Expenses, Indemnification | 27 |
| Section 10.5 | Successors and Assigns | 27 |
| Section 10.6 | Governing Law; Submission to Jurisdiction | 27 |
| Section 10.7 | WAIVER OF JURY TRIAL | 28 |
| Section 10.8 | Acknowledgments | 28 |
| Section 10.9 | Additional Grantors | 29 |
| Section 10.10 | Set-Off | 29 |
| Section 10.11 | Releases | 30 |
| Section 10.12 | Reinstatement | 30 |
| Section 10.13 | Acceptance | 31 |
| Section 10.14 | Counterparts; Integration | 31 |
| Section 10.15 | Survival | 31 |
| Section 10.16 | Severability | 31 |
| Section 10.17 | Waiver of Effect of Corporate Seal | 31 |
| Section 10.18 | Captions | 32 |
| **ARTICLE XI** | **KEEPWELL** | **32** |

205551474 v2

<u>Schedules</u>

Schedule 1   Notice Addresses
Schedule 2   Pledged Securities
Schedule 3   Filing Offices
Schedule 4   Grantor Information
Schedule 5   Prior Names and Prior Chief Executive Offices
Schedule 6   Patents and Patent Licenses
Schedule 7   Vehicles

<u>Annexes</u>

Annex I   Form of Assumption Agreement
Annex II   Form of Supplement
Annex III   Form of Acknowledgment and Consent

205551474 v2

## GUARANTY AND SECURITY AGREEMENT

**THIS GUARANTY AND SECURITY AGREEMENT**, dated as of September 4, 2014, is made by Millennium Entertainment, LLC, a Delaware limited liability company (the "Borrower"), Holdco and certain Subsidiaries of the Borrower identified on the signature pages hereto as "Guarantors" (together with the Borrower and any other Subsidiary of the Borrower that becomes a party hereto from time to time after the date hereof, each, a "Grantor" and, collectively, the "Grantors"), in favor of SunTrust Bank, as administrative agent (in such capacity, together with its successors in such capacity, the "Administrative Agent") for the Secured Parties (as defined below).

**WHEREAS,** the Borrower is entering into that certain Revolving Credit and Term Loan Agreement, dated as of the date hereof, by and among the Borrower, the Lenders from time to time parties thereto and the Administrative Agent, providing for revolving credit and term loan facilities (as amended, restated, supplemented, replaced, increased, refinanced or otherwise modified from time to time, the "Credit Agreement"); and

**WHEREAS,** it is a condition precedent to the obligations of the Lenders and the Administrative Agent under the Loan Documents that the Grantors are required to enter into this Agreement, pursuant to which the Grantors (other than the Borrower) shall guaranty all Obligations of the Borrower and the Grantors (including the Borrower) shall grant Liens on all of their personal property to the Administrative Agent, on behalf of the Secured Parties, to secure their respective Obligations;

**NOW, THEREFORE,** in consideration of the premises and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Administrative Agent, for the ratable benefit of the Secured Parties, as follows:

## ARTICLE I

## DEFINITIONS

### Section 1.1   Definitions.

(a)     Each term defined above shall have the meaning set forth above for all purposes of this Agreement.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings assigned to such terms in the Credit Agreement, and the terms "Account Debtor", "Accounts", "Chattel Paper", "Commercial Tort Claims", "Deposit Accounts", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Payment Intangibles", "Proceeds", "Supporting Obligations", and "Tangible Chattel Paper" shall have the meanings assigned to such terms in the UCC as in effect on the date hereof:

(b)     The following terms shall have the following meanings:

"Agreement" shall mean this Guaranty and Security Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Collateral" shall have the meaning set forth in Section 3.1.

"Copyright Licenses" shall mean any and all present and future agreements providing for the granting of any right in or to Copyrights (whether the applicable Grantor is licensee or licensor

thereunder), including, without limitation, any thereof referred to in Schedule 4.22 to the Credit Agreement (as such schedule may be amended, supplemented or otherwise modified from time to time).

"Copyrights" shall mean, collectively, with respect to each Grantor, all copyrights, whether registered or unregistered, owned by or assigned to such Grantor and all registrations and applications for the foregoing (whether by statutory or common law, whether established or registered in the United States, any State thereof, or any other country or any political subdivision thereof and, in each case, whether owned by or licensed to such Grantor), and all goodwill associated therewith, now existing or hereafter adopted or acquired, together with any and all (i) rights and privileges arising under applicable law with respect to such Grantor's use of any copyrights, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof, including, without limitation, any thereof referred to in Schedule 4.22 to the Credit Agreement (as such schedule may be amended, supplemented or otherwise modified from time to time).

"Excluded Property" shall mean any voting Capital Stock in excess of 65% of the issued and outstanding voting Capital Stock of any Foreign Subsidiary owned by any Grantor; provided that "Excluded Property" shall not include any proceeds, products, substitutions or replacements of Excluded Property (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Property).

"Guaranteed Obligations" shall have the meaning set forth in Section 2.1(a).

"Guarantors" shall mean, collectively, each Grantor other than the Borrower.

"Issuers" shall mean, collectively, each issuer of a Pledged Security.

"Monetary Obligation" shall mean a monetary obligation secured by Goods or owed under a lease of Goods and includes a monetary obligation with respect to software used in Goods.

"Note" shall mean an instrument that evidences a promise to pay a Monetary Obligation and any other instrument within the description of "promissory note" as defined in Article 9 of the UCC.

"Patent Licenses" shall mean any and all present and future agreements providing for the granting of any right in or to Patents (whether the applicable Grantor is licensee or licensor thereunder), including, without limitation, any thereof referred to in Schedule 6 hereto.

"Patents" shall mean, collectively, with respect to each Grantor, all letters patent issued or assigned to, and all patent applications and registrations made by, such Grantor (whether established or registered or recorded in the United States, any State thereof or any other country or any political subdivision thereof and, in each case, whether owned by or licensed to such Grantor), and all goodwill associated therewith, now existing or hereafter adopted or acquired, together with any and all (i) rights and privileges arising under applicable law with respect to such Grantor's use of any patents, (ii) inventions and improvements described and claimed therein, (iii) reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof and amendments thereto, and rights to obtain any of the foregoing, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for

2

past, present or future infringements thereof, including, without limitation, any thereof referred to in <u>Schedule 6</u> hereto.

"<u>Pledged Certificated Stock</u>" shall mean all certificated securities and any other Capital Stock or Stock Equivalent of any Person, other than Excluded Property, evidenced by a certificate, instrument or other similar document, in each case owned by any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including in each case those interests set forth on <u>Schedule 2</u> to the extent such interests are certificated.

"<u>Pledged Securities</u>" shall mean, collectively, all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"<u>Pledged Uncertificated Stock</u>" shall mean any Capital Stock or Stock Equivalent of any Person, other than Pledged Certificated Stock and Excluded Property, in each case owned by any Grantor, including all right, title and interest of any Grantor as a limited or general partner in any partnership or as a member of any limited liability company not constituting Pledged Certificated Stock, all right, title and interest of any Grantor in, to and under any organizational document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including in each case those interests set forth on <u>Schedule 2</u> to the extent such interests are not certificated.

"<u>Qualified ECP Guarantor</u>" shall mean, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Secured Obligations</u>" shall have the meaning set forth in <u>Section 3.1</u>.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended and in effect from time to time.

"<u>Stock Equivalents</u>" shall mean all securities convertible into or exchangeable for Capital Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Capital Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"<u>Trademark Licenses</u>" shall mean any and all present and future agreements providing for the granting of any right in or to Trademarks (whether the applicable Grantor is licensee or licensor thereunder), including, without limitation, any thereof referred to in Schedule 4.22 to the Credit Agreement (as such schedule may be amended, supplemented or otherwise modified from time to time).

"<u>Trademarks</u>" shall mean, collectively, with respect to each Grantor, all trademarks, service marks, slogans, logos, certification marks, trade dress, uniform resource locations (URL's), domain names, corporate names, trade names and other source or business identifiers, whether registered or unregistered, owned by or assigned to such Grantor and all registrations and applications for the foregoing (whether by statutory or common law, whether established or registered in the United States, any State thereof, or any other country or any political subdivision thereof and, in each case, whether owned by or licensed to such Grantor), and all goodwill associated therewith, now existing or hereafter adopted or acquired, together with any and all (i) rights and privileges arising under applicable law with

3

respect to such Grantor's use of any trademarks, (ii) reissues, continuations, extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof, including, without limitation, any thereof referred to in Schedule 4.22 to the Credit Agreement (as such schedule may be amended, supplemented or otherwise modified from time to time).

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York except as such term may be used in connection with the perfection of the Collateral and then the applicable jurisdiction with respect to such affected Collateral shall apply.

"Vehicles" shall mean all vehicles covered by a certificate of title law of any state and, in any event, shall include, without limitation, any vehicles listed on Schedule 7 and all tires and other appurtenances to any of the foregoing.

Section 1.2    Other Definitional Provisions; References.  The definition of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Schedules and Annexes shall, unless otherwise stated, be construed to refer to Articles and Sections of, and Schedules and Annexes to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (f) the term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form; and (g) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including".  Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

## ARTICLE II

## GUARANTEE

Section 2.1    Guarantee.

(a)    Each Guarantor unconditionally and irrevocably guarantees, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, (i) the due and punctual payment of all Obligations, including, without limitation, (A) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or

4

otherwise and (B) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of each Loan Party and/or any other Person (other than a Secured Party) respectively owing to any Secured Party under the Credit Agreement and/or the other Loan Documents; and (ii) the due and punctual performance of all covenants, agreements, obligations and liabilities of each Loan Party and/or any other Person (other than a Secured Party) under or pursuant to the Credit Agreement and the other Loan Documents (all the monetary and other obligations referred to in the preceding clauses (i) and (ii) being collectively called the "Guaranteed Obligations").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice to or further assent from such Guarantor, and that such Guarantor will remain bound upon its guarantee notwithstanding any extension or renewal of any Guaranteed Obligations.

(b)     Each Guarantor further agrees that its guarantee is a continuing guaranty, shall secure the Guaranteed Obligations and any ultimate balance thereof, notwithstanding that the Borrower or any other Persons may from time to time satisfy the Guaranteed Obligations in whole or in part and thereafter incur further Guaranteed Obligations, and that its guarantee constitutes a guaranty of performance and of payment when due and not just of collection, and waives any right to require that any resort be had by the Administrative Agent or any Secured Party to any of the security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any other Secured Party in favor of the Borrower or any other Guarantor, or to any other Person.

(c)     Each Guarantor hereby expressly assumes all responsibilities to remain informed of the financial condition of the Borrower, the other Guarantors and any other guarantors of the Guaranteed Obligations and any circumstances affecting the Collateral (including the Pledged Securities) or the ability of the Borrower to perform under the Credit Agreement.

(d)     Each Guarantor's obligations hereunder shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any instrument evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to its guarantee.  The Administrative Agent and the other Secured Parties make no representation or warranty with respect to any such circumstances and have no duty or responsibility whatsoever to any Guarantor with respect to the management and maintenance of the Guaranteed Obligations or any collateral security for the Guaranteed Obligations.

(e)     The obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (except payment and performance in full of the Guaranteed Obligations), including, without limitation, any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any other Secured Party to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision hereof or thereof, by any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of such Guarantor or would otherwise operate as a discharge of such Guarantor as a matter of law, unless and until the Guaranteed Obligations are indefeasibly paid and performed in full and the Commitments have terminated.

5

(f)       It is the intent of each Guarantor and the Administrative Agent that the maximum obligations of the Guarantors hereunder shall be, but not in excess of:

(i)       in a case or proceeding commenced by or against any Guarantor under the provisions of Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended and in effect from time to time (the "Bankruptcy Code"), on or within one year from the date on which any of the Guaranteed Obligations are incurred, the maximum amount which would not otherwise cause the Guaranteed Obligations (or any other obligations of such Guarantor owed to the Administrative Agent or the Secured Parties) to be avoidable or unenforceable against such Guarantor under (i) Section 548 of the Bankruptcy Code or (ii) any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

(ii)       in a case or proceeding commenced by or against any Guarantor under the Bankruptcy Code subsequent to one year from the date on which any of the Guaranteed Obligations are incurred, the maximum amount which would not otherwise cause the Guaranteed Obligations (or any other obligations of such Guarantor to the Administrative Agent or the Secured Parties) to be avoidable or unenforceable against such Guarantor under any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

(iii)       in a case or proceeding commenced by or against any Guarantor under any law, statute or regulation other than the Bankruptcy Code (including, without limitation, any other bankruptcy, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar debtor relief laws), the maximum amount which would not otherwise cause the Guaranteed Obligations (or any other obligations of such Guarantor to the Administrative Agent or the Secured Parties) to be avoidable or unenforceable against such Guarantor under such law, statute or regulation, including, without limitation, any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding.

(g)       The substantive laws under which the possible avoidance or unenforceability of the Guaranteed Obligations (or any other obligations of such Guarantor to the Administrative Agent or the Secured Parties) as may be determined in any case or proceeding shall hereinafter be referred to as the "Avoidance Provisions".  To the extent set forth in subsections (f)(i), (ii) and (iii) of this Section, but only to the extent that the Guaranteed Obligations would otherwise be subject to avoidance or found unenforceable under the Avoidance Provisions, if any Guarantor is not deemed to have received valuable consideration, fair value or reasonably equivalent value for the Guaranteed Obligations, or if the Guaranteed Obligations would render such Guarantor insolvent, or leave such Guarantor with an unreasonably small capital to conduct its business, or cause such Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Guaranteed Obligations are deemed to have been incurred under the Avoidance Provisions and after giving effect to the contribution by such Guarantor, the maximum Guaranteed Obligations for which such Guarantor shall be liable hereunder shall be reduced to that amount which, after giving effect thereto, would not cause the Guaranteed Obligations (or any other obligations of such Guarantor to the Administrative Agent or the Secured Parties), as so reduced, to be subject to avoidance or unenforceability under the Avoidance Provisions.

(h)       This Section is intended solely to preserve the rights of the Administrative Agent and the Secured Parties hereunder to the maximum extent that would not cause the Guaranteed

205551474 v2

Obligations of such Guarantor to be subject to avoidance or unenforceability under the Avoidance Provisions, and neither the Grantors nor any other Person shall have any right or claim under this Section as against the Administrative Agent or any Secured Party that would not otherwise be available to such Person under the Avoidance Provisions.

(i)     Each Guarantor agrees that if the maturity of any of the Guaranteed Obligations is accelerated by bankruptcy or otherwise, such maturity shall also be deemed accelerated for the purpose of this guarantee without demand or notice to such Guarantor.  The guarantee contained in this Article shall remain in full force and effect until all Guaranteed Obligations are irrevocably satisfied in full and all Commitments have been irrevocably terminated, notwithstanding that, from time to time during the term of the Credit Agreement, no Obligations may be outstanding.

**Section 2.2     Payments**.   Each Guarantor hereby agrees and guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in U.S. dollars at the office of the Administrative Agent specified pursuant to the Credit Agreement.

# ARTICLE III

## GRANT OF SECURITY INTEREST

**Section 3.1     Grant of Security Interest**.   Each Grantor hereby pledges, assigns and transfers to the Administrative Agent, and grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a continuing security interest in, and a right to set off against, all of its personal and real property, tangible and intangible, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, wherever located or situated, and whether now existing or hereafter coming into existence (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations and all other obligations respectively owed to any Secured Party by any Grantor or any other Person under any of the Loan Documents (collectively, the "Secured Obligations"), including, but not limited to, all of such Grantor's right, title and interest in, to and under any of the following:

(a)     all Accounts and Chattel Paper;

(b)     all Copyrights and Copyright Licenses;

(c)     all Commercial Tort Claims;

(d)     all contracts;

(e)     all Deposit Accounts;

(f)     all Documents;

(g)     all General Intangibles;

(h)     all Goods (including, without limitation, all Inventory, all Equipment and all Fixtures);

(i)     all Instruments;

205551474 v2

(j)    all Investment Property;

(k)    all Letter-of-Credit Rights;

(l)    all Notes and all intercompany obligations between the Loan Parties;

(m)    all Patents and Patent Licenses;

(n)    all Pledged Securities;

(o)    all Trademarks and Trademark Licenses;

(p)    all Vehicles;

(q)    all books and records, Supporting Obligations and related letters of credit or other claims and causes of action, in each case to the extent pertaining to the Collateral; and

(r)    to the extent not otherwise included, substitutions, replacements, accessions, products and other Proceeds (including, without limitation, insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) of any or all of the foregoing and all collateral security, guarantees and other Supporting Obligations given with respect to any of the foregoing;

provided that, notwithstanding the foregoing, no Lien or security interest is hereby granted on any Excluded Property, and, to the extent that any Collateral later becomes Excluded Property, the Lien granted hereunder will automatically be deemed to have been released; and provided, further, that if and when any property shall cease to be Excluded Property, a Lien on and security interest in such property shall automatically be deemed granted therein.

**Section 3.2**    **Transfer of Pledged Securities**.  On or prior to the Closing Date, as security for the due and punctual payment of the Obligations, each Grantor shall deliver to the Administrative Agent (or a Person designated by the Administrative Agent) all certificates and instruments representing or evidencing its Pledged Certificated Stock, accompanied by an undated stock power or other equivalent instrument of transfer (in such form that is acceptable to the Administrative Agent) covering such certificates or instruments duly executed in blank by such Grantor, any required transfer tax stamps and such other instruments or documents relating thereto as the Administrative Agent or its counsel shall reasonably request to effect the pledge of such Grantor's Pledged Securities to the Administrative Agent. Notwithstanding the preceding sentence, all Pledged Certificated Stock must be delivered or transferred in such manner, and each Grantor shall take all such further action as may be requested by the Administrative Agent, as to permit the Administrative Agent to be a "protected purchaser" to the extent of its security interest as provided in Section 8-303 of the UCC.

**Section 3.3**    **Assignment of Rights Only**.  The Administrative Agent has under this Agreement an assignment of and Lien on only the benefits of and rights under the Collateral, and shall not assume any obligations or duties thereunder.  All such obligations and duties of a Grantor shall be and remain enforceable only against such Grantor and shall not be enforceable against the Administrative Agent.  Anything herein to the contrary notwithstanding, each Grantor shall at all times remain liable to observe and perform all of its duties and obligations under all agreements included in its Collateral, and the Administrative Agent's exercise of any of its rights with respect to such Collateral shall not release such Grantor from any of such duties and obligations.  Neither the Administrative Agent nor any other Secured Party shall have any obligation or liability under any Account, Chattel Paper or Payment

205551474 v2

Intangible (or any agreement giving rise thereto) or under any other agreement included in the Collateral by reason of or arising out of this Agreement or the receipt by the Administrative Agent or any such other Secured Party of any payment relating thereto, nor shall the Administrative Agent or any other Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account, Chattel Paper or Payment Intangible (or any agreement giving rise thereto) or under any other agreement included in the Collateral or to make any payment with respect thereto or thereunder, to make any inquiry as to the nature or the sufficiency of any payment received by it thereunder or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

### ARTICLE IV

### Acknowledgments, Waivers and Consents

**Section 4.1**   **Acknowledgments, Waivers and Consents**.

(a)   Each Guarantor acknowledges and agrees that the obligations undertaken by it under this Agreement involve the guarantee of, and each Grantor acknowledges and agrees that the obligations undertaken by it under this Agreement involve the provision of collateral security for, Obligations of Persons other than such Guarantor and that such Grantor's guarantee and provision of collateral security for the Secured Obligations are absolute, irrevocable and unconditional under any and all circumstances.  In full recognition and furtherance of the foregoing, each Grantor understands and agrees, to the fullest extent permitted under applicable law and except as may otherwise be expressly and specifically provided in the Loan Documents, that each Grantor shall remain obligated hereunder (including, without limitation, with respect to each Guarantor the guarantee made by it herein and, with respect to each Grantor, the collateral security provided by such Grantor herein), and the enforceability and effectiveness of this Agreement and the liability of such Grantor, and the rights, remedies, powers and privileges of the Administrative Agent and the other Secured Parties under this Agreement and the other Loan Documents, shall not be affected, limited, reduced, discharged or terminated in any way:

(i)   notwithstanding that, without any reservation of rights against any Grantor and without notice to or further assent by any Grantor, (A) any demand for payment of any of the Secured Obligations made by the Administrative Agent or any other Secured Party may be rescinded by the Administrative Agent or such other Secured Party and any of the Secured Obligations continued; (B) the Secured Obligations, the liability of any other Person upon or for any part thereof or any collateral security or guarantee therefor or right of offset with respect thereto may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by, or any indulgence or forbearance in respect thereof granted by, the Administrative Agent or any other Secured Party; (C) the Credit Agreement, the other Loan Documents and all other documents executed and delivered in connection therewith or in connection with Hedging Obligations and Bank Product Obligations included as Obligations may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders, all Lenders, or the other parties thereto, as the case may be) may deem advisable from time to time; (D) the Borrower, any Guarantor or any other Person may from time to time accept or enter into new or additional agreements, security documents, guarantees or other instruments in addition to, in exchange for or relative to any Loan Document, all or any part of the Secured Obligations or any Collateral now or in the future serving as security for the Secured Obligations; (E) any collateral security, guarantee or right of offset at any time held by the Administrative Agent or any other Secured Party for the payment of the Secured Obligations may be sold, exchanged, waived, surrendered or

9

released; and (F) any other event shall occur which constitutes a defense or release of sureties generally; and

(ii)      regardless of, and each Grantor hereby expressly waives to the fullest extent permitted by law any defense now or in the future arising by reason of, (A) the illegality, invalidity or unenforceability of the Credit Agreement, any other Loan Document, any of the Secured Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Administrative Agent or any other Secured Party; (B) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Grantor or any other Person against the Administrative Agent or any other Secured Party; (C) the insolvency, bankruptcy arrangement, reorganization, adjustment, composition, liquidation, disability, dissolution or lack of power of any Grantor or any other Person at any time liable for the payment of all or part of the Secured Obligations or the failure of the Administrative Agent or any other Secured Party to file or enforce a claim in bankruptcy or other proceeding with respect to any Person, or any sale, lease or transfer of any or all of the assets of any Grantor, or any changes in the holders of the Capital Stock of any Grantor; (D) the fact that any Collateral or Lien contemplated or intended to be given, created or granted as security for the repayment of the Secured Obligations shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other Lien, it being recognized and agreed by each of the Grantors that it is not entering into this Agreement in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectability or value of any of the Collateral for the Secured Obligations; (E) any failure of the Administrative Agent or any other Secured Party to marshal assets in favor of any Grantor or any other Person, to exhaust any collateral for all or any part of the Secured Obligations, to pursue or exhaust any right, remedy, power or privilege it may have against any Grantor or any other Person or to take any action whatsoever to mitigate or reduce any Grantor's liability under this Agreement or any other Loan Document; (F) any law which provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation; (G) the possibility that the Secured Obligations may at any time and from time to time exceed the aggregate liability of such Grantor under this Agreement; or (H) any other circumstance or act whatsoever, including any action or omission of the type described in subsection (a)(i) of this Section (with or without notice to or knowledge of any Grantor), which constitutes, or might be construed to constitute, an equitable or legal discharge or defense of the Borrower for the Obligations, or of such Guarantor under the guarantee contained in <u>Article II</u>, or with respect to the collateral security provided by such Grantor herein, or which might be available to a surety or guarantor, in bankruptcy or in any other instance.

(b)      Each Grantor hereby waives to the extent permitted by law (i) except as expressly provided otherwise in any Loan Document, all notices to such Grantor, or to any other Person, including, but not limited to, notices of the acceptance of this Agreement, the guarantee contained in <u>Article II</u> or the provision of collateral security provided herein, or the creation, renewal, extension, modification or accrual of any Secured Obligations, or notice of or proof of reliance by the Administrative Agent or any other Secured Party upon the guarantee contained in <u>Article II</u> or upon the collateral security provided herein, or of default in the payment or performance of any of the Secured Obligations owed to the Administrative Agent or any other Secured Party and enforcement of any right or remedy with respect thereto, or notice of any other matters relating thereto; the Secured Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in <u>Article II</u> and the collateral security provided herein and no notice of creation of the Secured Obligations or any extension of credit

205551474 v2

already or hereafter contracted by or extended to the Borrower need be given to any Grantor, and all dealings between the Borrower and any of the Grantors, on the one hand, and the Administrative Agent and the other Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in Article II and on the collateral security provided herein; (ii) diligence and demand of payment, presentment, protest, dishonor and notice of dishonor; (iii) any statute of limitations affecting any Grantor's liability hereunder or the enforcement thereof; (iv) all rights of revocation with respect to the Secured Obligations, the guarantee contained in Article II and the provision of collateral security herein; and (v) all principles or provisions of law which conflict with the terms of this Agreement and which can, as a matter of law, be waived.

(c)    When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Grantor, the Administrative Agent or any other Secured Party may, but shall be under no obligation to, join or make a similar demand on or otherwise pursue or exhaust such rights and remedies as it may have against the Borrower, any other Grantor or any other Person or against any collateral security or guarantee for the Secured Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any other Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Grantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Grantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Grantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent or any other Secured Party against any Grantor.  For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.  Neither the Administrative Agent nor any other Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Secured Obligations or for the guarantee contained in Article II or any property subject thereto.

(d)    WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS AGREEMENT, EACH GRANTOR HEREBY ABSOLUTELY, KNOWINGLY, UNCONDITIONALLY, AND EXPRESSLY WAIVES AND AGREES NOT TO ASSERT ANY AND ALL BENEFITS OR DEFENSES ARISING DIRECTLY OR INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799, 2808, 2809, 2810, 2815, 2819, 2820, 2821, 2822, 2825, 2839, 2845, 2848, 2849, AND 2850, UCC SECTIONS 3116, 3118, 3119, 3419, 3605, 9504, AND 9507, AND CHAPTER 2 OF TITLE 14 OF PART 4 OF DIVISION 3 OF THE CALIFORNIA CIVIL CODE.

Section 4.2    No Subrogation, Contribution or Reimbursement.  Until the irrevocable payment in full in cash of all of the Secured Obligations and the irrevocable termination of the Credit Agreement and all of the Commitments, notwithstanding any payment made by any Grantor hereunder or any set-off or application of funds of any Grantor by the Administrative Agent or any other Secured Party, no Grantor shall be entitled to be subrogated to any of the rights of the Administrative Agent or any other Secured Party against the Borrower or any other Grantor or any collateral security or guarantee or right of offset held by the Administrative Agent or any other Secured Party for the payment of the Secured Obligations, nor shall any Grantor seek or be entitled to seek any indemnity, exoneration, participation, contribution or reimbursement from the Borrower or any other Grantor in respect of payments made by such Grantor hereunder, and each Grantor hereby expressly waives, releases and agrees not to exercise any or all such rights of subrogation, reimbursement, indemnity and contribution. Each Grantor further agrees that to the extent that such waiver and release set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement, indemnity and contribution such Grantor may have against the Borrower or any other Grantor or against any collateral or security or guarantee or right of offset held by the Administrative

11

Agent or any other Secured Party shall be junior and subordinate to any rights the Administrative Agent and the other Secured Parties may have against the Borrower and such Grantor and to all right, title and interest the Administrative Agent and the other Secured Parties may have in such collateral or security or guarantee or right of offset.  The Administrative Agent, for the benefit of the Secured Parties, may use, sell or dispose of any item of collateral or security that is subject to any Lien granted to the Administrative Agent under any of the Loan Documents as it sees fit without regard to any subrogation rights any Grantor may have, and upon any disposition or sale, any rights of subrogation any Grantor may have shall terminate.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the other Secured Parties to enter into the Credit Agreement and the other Loan Documents, to induce the Lenders to make their respective extensions of credit to the Borrower thereunder and to induce the Lender-Related Hedge Providers and the Bank Product Providers to enter into Hedging Obligations and Bank Product Obligations with the Grantors, each Grantor represents and warrants to the Administrative Agent and each other Secured Party as follows:

**Section 5.1** **Confirmation of Representations in Credit Agreement**.  Each Grantor represents and warrants to the Secured Parties that the representations and warranties set forth in Article IV of the Credit Agreement as they relate to such Grantor (in its capacity as a Loan Party or a Subsidiary of the Borrower, as the case may be) or to the Loan Documents to which such Grantor is a party are true and correct in all material respects; provided that each reference in each such representation and warranty to the Borrower's knowledge shall, for the purposes of this Section, be deemed to be a reference to such Guarantor's knowledge.

**Section 5.2** **Benefit to the Guarantors**.  As of the Closing Date, the Borrower is a member of an affiliated group of companies that includes each Guarantor, and the Borrower and the Guarantors are engaged in related businesses permitted pursuant to Section 7.3(b) of the Credit Agreement.  Each Guarantor is a Subsidiary of the Borrower, and the guaranty and surety obligations of each Guarantor pursuant to this Agreement reasonably may be expected to benefit, directly or indirectly, such Guarantor; and each Guarantor has determined that this Agreement is necessary and convenient to the conduct, promotion and attainment of the business of such Guarantor and the Borrower.

**Section 5.3** **Grantor Information**.  On the Closing Date, Schedule 4 sets forth: (a) the correct legal name of such Grantor, (b) such Grantor's jurisdiction of organization, (c) such Grantor's chief executive office (or sole place of business), (d) all of the places where such Grantor keeps (or intends to keep) the records concerning its Collateral or any material goods included in the Collateral, (e) such Grantor's organizational identification number and (f) such Grantor's U.S. taxpayer identification number.

**Section 5.4** **Prior Names, Prior Chief Executive Offices**.  Schedule 5 correctly sets forth (a) all names and trade names that such Grantor has used in the last five years and (b) the chief executive office of such Grantor over the last five years (if different from that which is set forth in Schedule 4).

**Section 5.5** **Goods**.  Other than with respect to Physical Materials subject to a Laboratory Pledgeholder Agreement, no portion of the Collateral constituting Goods with an aggregate value of $100,000 or more is at any time in the possession of a bailee that has issued a negotiable or non-negotiable document covering such Collateral.

12

**Section 5.6**     **Chattel Paper**.  No Collateral constituting Chattel Paper or Instruments contains any statement therein to the effect that such Collateral has been assigned to an identified party other than the Administrative Agent, and the grant of a security interest in such Collateral in favor of the Administrative Agent hereunder does not violate the rights of any other Person as a secured party.

**Section 5.7**     **Truth of Information; Accounts**.  All information with respect to the Collateral set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by such Grantor to the Administrative Agent or any other Secured Party, and all other written information heretofore or hereafter furnished by such Grantor to the Administrative Agent or any other Secured Party, is and will be true and correct in all material respects as of the date furnished.  The amount represented by such Grantor to the Administrative Agent and the other Secured Parties from time to time as owing by each Account Debtor or by all Account Debtors in respect of the Accounts, Chattel Paper and Payment Intangibles will at such time be the correct amount actually owing by such Account Debtor or Account Debtors thereunder.

**Section 5.8**     **Governmental Obligors**.  None of the Account Debtors on such Grantor's Accounts, Chattel Paper or Payment Intangibles is a Governmental Authority, except to the extent such Accounts, Chattel Paper or Payment Intangibles have an aggregate value of less than $50,000.

**Section 5.9**     **Copyrights, Patents and Trademarks**.  Schedule 6 includes all Patents and Patent Licenses owned by such Grantor in its own name as of the Closing Date.  Schedule 4.22 to the Credit Agreement includes (i) all Copyrights and Copyright Licenses owned by such Grantor in its own name as of the Closing Date and (ii) all Trademarks and Trademark Licenses owned by such Grantor in its own name as of the Closing Date.  To the best of each such Grantor's knowledge, each Patent and Trademark is valid, subsisting, unexpired and enforceable and has not been abandoned.  Except as set forth in any such Schedule, none of such Patents, Trademarks and Copyrights is the subject of any licensing or franchise agreement.  No holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of any Patent, Trademark or Copyright.  No action or proceeding is pending (i) seeking to limit, cancel or question the validity of any Patent, Trademark or Copyright, or (ii) which, if adversely determined, would have a material adverse effect on the value of any Patent, Trademark or Copyright.

**Section 5.10**     **Vehicles**.  All Vehicles owned by such Grantor as of the Closing Date that are not encumbered by Liens permitted under the Credit Agreement are listed on Schedule 7, and such Grantor shall take all actions requested by the Administrative Agent to perfect the Administrative Agent's security interest in such Vehicles.

**Section 5.11**     **Ownership**.  Each Grantor is the legal and beneficial owner of its Collateral and has the right to pledge, sell, assign or transfer the same.  There is no Adverse Claim with respect to the Collateral governed by Article 8 of the UCC.

**Section 5.12**     **Filing Offices**.  Schedule 3 hereto sets forth the appropriate office where UCC financing statements are required to be filed against any Grantor in order to perfect the Administrative Agent's security interests in the Collateral, to the extent such security interests can be perfected by filing under the UCC.  No Grantor has authenticated any agreement authorizing any secured party thereunder to file a financing statement with respect to any of the Collateral, except with respect to Liens expressly permitted under the Credit Agreement.

**Section 5.13**   **Pledged Securities**.

(a)     All of such Grantor's Pledged Securities are duly authorized, validly issued, fully paid and non-assessable, and are owned and held by such Grantor, free and clear of any Liens, other than those created pursuant to this Agreement, and there are no restrictions on the transfer of such Pledged Securities other than as a result of this Agreement or applicable law.

(b)     As of the date hereof, there are no outstanding rights, warrants, options, conversion or similar rights currently outstanding with respect to, and no agreements to purchase or otherwise acquire, any Capital Stock or any other Stock Equivalent of any Issuer; and there are no securities or obligations of any kind convertible into any Capital Stock or any other Stock Equivalent of any Issuer.

(c)     Such Grantor's Pledged Securities (i) are not dealt in or traded on a securities exchange or in a securities market and (ii) are a Security governed by Article 8 of the UCC.

(d)     Schedule 2 hereto sets forth all such Grantor's Pledged Securities as of the date hereof.

(e)     As of the date hereof, such Grantor has no Pledged Certificated Stock, except the Pledged Certificated Stock owned by Borrower and listed on Schedule 2 hereto.

## ARTICLE VI

## COVENANTS

Each Grantor covenants and agrees with the Administrative Agent and the other Secured Parties that, from and after the date of this Agreement until the irrevocable payment in full in cash of all of the Secured Obligations and the irrevocable termination of the Credit Agreement and all of the Commitments:

**Section 6.1**   **Covenants in Credit Agreement**.  In the case of each Guarantor, such Guarantor shall take, or shall refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Guarantor or any of its Subsidiaries.

**Section 6.2**   **Maintenance of Perfected Security Interests; Further Documentation**.

(a)     Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 4.20 of the Credit Agreement and shall defend such security interest against the claims and demands of all Persons whomsoever, except for Liens expressly permitted under Section 7.2 of the Credit Agreement.

(b)     At any time and from time to time, upon the request of the Administrative Agent, and at the sole expense of such Grantor, such Grantor will promptly and duly give, execute, deliver, endorse, file or record any and all financing statements, continuation statements, amendments, notices (including, without limitation, notifications to financial institutions and any other Person), contracts, agreements, assignments, certificates, stock powers or other instruments, obtain any and all governmental approvals and consents and take or cause to be taken any and all steps or acts that may be necessary or advisable or as the Administrative Agent may reasonably request to create, perfect, establish the priority

14

of, or to preserve the validity, perfection or priority of, the Liens granted by this Agreement or to enable the Administrative Agent or any other Secured Party to enforce its rights, remedies, powers and privileges under this Agreement with respect to such Liens or to otherwise obtain or preserve the full benefits of this Agreement and the rights, powers and privileges herein granted, and such Grantor hereby irrevocably makes, constitutes and appoints the Administrative Agent as such Grantor's attorney-in-fact with full power to prepare, execute (if a signature is required) and file in the name of such Grantor all such instruments for the foregoing purposes (such power being coupled with an interest and is irrevocable until this Agreement is terminated and the security interests created hereby are released), and all acts of such attorney being hereby ratified and confirmed by such Grantor.

(c)     Without limiting the obligations of the Grantors under subsection (b) of this Section, (i) upon the request of the Administrative Agent, such Grantor shall take or cause to be taken all actions (other than any actions required to be taken by the Administrative Agent) requested by the Administrative Agent to cause the Administrative Agent to (A) have "control" (within the meaning of Sections 9-104, 9-105, 9-106, and 9-107 of the UCC) over any Collateral constituting Deposit Accounts, Electronic Chattel Paper, Investment Property (including the Pledged Securities), or Letter-of-Credit Rights, including, without limitation, executing and delivering any agreements, in form and substance satisfactory to the Administrative Agent, with securities intermediaries, issuers or other Persons in order to establish "control", and each Grantor shall promptly notify the Administrative Agent and the other Secured Parties of such Grantor's acquisition of any such Collateral, and (B) be a "protected purchaser" (as defined in Section 8-303 of the UCC); (ii) with respect to Collateral other than certificated securities and Goods covered by a document in the possession of a Person other than such Grantor or the Administrative Agent, such Grantor shall obtain written acknowledgment that such Person holds possession for the Administrative Agent's benefit; and (iii) with respect to any Collateral constituting Goods that are in the possession of a bailee, such Grantor shall provide prompt notice to the Administrative Agent of any such Collateral then in the possession of such bailee, and such Grantor shall take or cause to be taken all actions (other than any actions required to be taken by the Administrative Agent) necessary or requested by the Administrative Agent to cause the Administrative Agent to have a perfected security interest in such Collateral under applicable law.

(d)     This Section and the obligations imposed on each Grantor by this Section shall be interpreted as broadly as possible in favor of the Administrative Agent and the other Secured Parties in order to effectuate the purpose and intent of this Agreement.

**Section 6.3**     **Maintenance of Records**.  Such Grantor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral, including, without limitation, a record of all payments received and all credits granted with respect to the Accounts comprising any part of the Collateral.   For the Administrative Agent's and the other Secured Parties' further security, the Administrative Agent, for the ratable benefit of the Secured Parties, shall have a security interest in all of such Grantor's books and records pertaining to the Collateral.   To the extent necessary to perfect the security interest of the Administrative Agent, for the benefit of the Secured Parties, in the Collateral, such Grantor will mark its books and records (and shall cause each Issuer to mark its books and records) to reflect the security interest granted pursuant to this Agreement.

**Section 6.4**     **Further Identification of Collateral**.   Such Grantor will furnish to the Administrative Agent and the other Secured Parties from time to time, at such Grantor's sole cost and expense, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Administrative Agent may reasonably request, all in reasonable detail.

15

**Section 6.5    Changes in Names, Locations**.    Such Grantor recognizes that financing statements pertaining to the Collateral have been or may be filed where such Grantor is organized. Without limitation of any other covenant herein, such Grantor will not cause or permit (i) any change to be made in its legal name, identity or corporate, limited liability company, or limited partnership structure or (ii) any change to (A) the identity of any warehouseman, common carrier, other third party transporter, bailee or any agent or processor in possession or control of any Collateral or (B) such Grantor's jurisdiction of organization, unless such Grantor shall have first (1) notified the Administrative Agent of such change at least 30 days prior to the date of such change, and (2) taken all action reasonably requested by the Administrative Agent for the purpose of maintaining the perfection and priority of the Administrative Agent's security interests under this Agreement, and unless such Grantor shall otherwise be in compliance with Section 7.3 of the Credit Agreement.  In any notice furnished pursuant to this Section, such Grantor will expressly state in a conspicuous manner that the notice is required by this Agreement and contains facts that may require additional filings of financing statements or other notices for the purposes of continuing perfection of the Administrative Agent's security interest in the Collateral.

**Section 6.6    Compliance with Contractual Obligations**.    Such Grantor will perform and comply in all material respects with all of its contractual obligations relating to the Collateral in a manner consistent with prudent business judgment.

**Section 6.7    Limitations on Dispositions of Collateral**.    The Administrative Agent and the other Secured Parties do not authorize the Grantors to, and such Grantor agrees not to, sell, transfer, lease or otherwise dispose of any of the Collateral, or attempt, offer or contract to do so, except to the extent expressly permitted by the Credit Agreement.

**Section 6.8    Pledged Securities**.

(a)    If such Grantor shall become entitled to receive or shall receive any stock certificate or other instrument (including, without limitation, any certificate or instrument representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate or instrument issued in connection with any reorganization), option or rights in respect of the Capital Stock or other equity interests of any nature of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares (or such other interests) of the Pledged Securities, or otherwise in respect thereof, except as otherwise provided herein or in the Credit Agreement, such Grantor shall accept the same as the agent of the Administrative Agent and the other Secured Parties, hold the same in trust for the Administrative Agent and the other Secured Parties and deliver the same forthwith to the Administrative Agent in the exact form received, duly endorsed by such Grantor to the Administrative Agent, if required, together with an undated stock power or other equivalent instrument of transfer acceptable to the Administrative Agent covering such certificate or instrument duly executed in blank by such Grantor and with, if the Administrative Agent so requests, signature guaranteed, to be held by the Administrative Agent, subject to the terms hereof, as additional collateral security for the Secured Obligations.

(b)    Without the prior written consent of the Administrative Agent, such Grantor will not (i) unless otherwise permitted hereby, vote to enable, or take any other action to permit, any Issuer to issue any Capital Stock or other equity interests of any nature or to issue any other securities or interests convertible into or granting the right to purchase or exchange for any Capital Stock or other equity interests of any nature of any Issuer, (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Pledged Securities or Proceeds thereof (except pursuant to a transaction expressly permitted by the Credit Agreement), (iii) create, incur or permit to exist any Lien (except for Liens permitted by Section 7.2 of the Credit Agreement) or option in favor of, or any claim of any Person with respect to, any of the Pledged Securities or Proceeds thereof, or any interest therein, except for the

205551474 v2

security interests created by this Agreement or (iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or the Administrative Agent to sell, assign or transfer any of the Pledged Securities or Proceeds thereof.

(c)     In the case of each Grantor which is an Issuer, and each other Issuer that executes the Acknowledgment and Consent in the form of <u>Annex III</u> (which the applicable Grantor shall use its commercially reasonable efforts to obtain from each such other Issuer), such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Pledged Securities issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify the Administrative Agent promptly in writing of the occurrence of any of the events described in subsection (a) of this Section with respect to the Pledged Securities issued by it and (iii) the terms of <u>Section 7.1(c)</u> and <u>Section 7.6</u> shall apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to <u>Section 7.1(c)</u> or <u>Section 7.6</u> with respect to the Pledged Securities issued by it.

(d)     Such Grantor shall furnish to the Administrative Agent such powers and other equivalent instruments of transfer as may be required by the Administrative Agent to assure the transferability of and the perfection of the security interest in the Pledged Securities when and as often as may be reasonably requested by the Administrative Agent.

(e)     The Pledged Securities will constitute not less than 100% of the Capital Stock or other equity interests of the Issuer thereof owned by any Grantor, except Pledged Securities of any Foreign Subsidiary shall be limited to not more than 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of such Foreign Subsidiary.

(f)     If any Grantor acquires any Pledged Securities after executing this Agreement, it shall execute a Supplement to this Agreement in the form of <u>Annex II</u> with respect to such Pledged Securities and deliver such Supplement to the Administrative Agent promptly thereafter.

**Section 6.9     <u>Instruments and Tangible Chattel Paper</u>**.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument or Tangible Chattel Paper and the value of such Instruments and Tangible Chattel Paper in the aggregate is $100,000 or more, each such Instrument or Tangible Chattel Paper, shall be delivered to the Administrative Agent as soon as practicable, duly endorsed in a manner satisfactory to the Administrative Agent to be held as Collateral pursuant to this Agreement.

**Section 6.10     <u>Defense of Copyrights and Trademarks</u>**.  In the event that any Copyright or Trademark included in the Collateral is infringed, misappropriated or diluted by a third Person, such Grantor shall promptly notify the Administrative Agent after it learns thereof and shall, unless such Grantor shall reasonably determine that such Copyright or Trademark is immaterial to such Grantor which determination such Grantor shall promptly report to the Administrative Agent, promptly sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution, or take such other actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Copyright or Trademark.

**Section 6.11     <u>Commercial Tort Claims</u>**.  If such Grantor shall at any time hold or acquire a Commercial Tort Claim that satisfies the requirements of the following sentence, such Grantor shall, within 30 days after such Commercial Tort Claim satisfies such requirements, notify the Administrative Agent in a writing signed by such Grantor containing a brief description thereof, and granting to the Administrative Agent in such writing (for the benefit of the Secured Parties) a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and

205551474 v2

substance reasonably satisfactory to the Administrative Agent.  The provisions of the preceding sentence shall apply only to a Commercial Tort Claim that satisfies the following requirements: (i) the monetary value claimed by or payable to the relevant Grantor in connection with such Commercial Tort Claim shall exceed $100,000, and (ii) either (A) such Grantor shall have filed a law suit or counterclaim or otherwise commenced legal proceedings (including, without limitation, arbitration proceedings) against the Person against whom such Commercial Tort Claim is made, or (B) such Grantor and the Person against whom such Commercial Tort Claim is asserted shall have entered into a settlement agreement with respect to such Commercial Tort Claim.  In addition, to the extent that the existence of any Commercial Tort Claim held or acquired by any Grantor is disclosed by such Grantor in any public filing with the Securities Exchange Commission or any successor thereto or analogous Governmental Authority, or to the extent that the existence of any such Commercial Tort Claim is disclosed in any press release issued by any Grantor, then, upon the request of the Administrative Agent, the relevant Grantor shall, within 30 days after such request is made, transmit to the Administrative Agent and the other Secured Parties a writing signed by such Grantor containing a brief description of such Commercial Tort Claim and granting to the Administrative Agent in such writing (for the benefit of the Secured Parties) a security interest therein and in the Proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Administrative Agent.

**Section 6.12   Required Notifications**.  Such Grantor shall notify the Administrative Agent, in writing, promptly upon any authorized officer, manager or member-manager of such Grantor obtaining knowledge of: (a) any Lien on any of its Collateral which would adversely affect the ability of the Administrative Agent to exercise any of its remedies hereunder, (b) either (i) the institution of any action, suit, proceeding, investigation or arbitration by any Governmental Authority or other Person against or adversely affecting its Collateral (each, a "Proceeding") or (ii) the threat of any Proceeding, (c) any material development in any Proceeding described in the preceding clauses (b)(i) or (b)(ii), or (d) the occurrence of any other event which could reasonably be expected to impair the value of any of its Collateral or the security interests created hereby.  Additionally, such Grantor shall (x) upon written request by the Administrative Agent or the Required Lenders, promptly give the Administrative Agent written notice of the status of any Proceeding and (y) provide such other information as from time to time is available to such Grantor to enable the Administrative Agent and the Lenders to evaluate any matter identified in any notice given to the Administrative Agent pursuant to the preceding sentence.

**Section 6.13   No Insolvency Actions**.  Such Grantor shall not institute nor consent to the institution of any proceeding under any Debtor Relief Law with respect to such Grantor or any Issuer, and not make (nor permit any Issuer to make) an assignment for the benefit of creditors; nor apply for nor consent to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for such Grantor or any Issuer or for all or any material part of any such Person's property.

# ARTICLE VII

## REMEDIAL PROVISIONS

**Section 7.1   Pledged Securities**.

(a)      Unless an Event of Default shall have occurred and be continuing and the Administrative Agent shall have given notice to the relevant Grantor of the Administrative Agent's intent to exercise its corresponding rights pursuant to subsection (b) of this Section, each Grantor shall be permitted to receive all cash dividends paid in respect of the Pledged Securities paid in the normal course of business of the relevant Issuer, to the extent permitted in the Credit Agreement, and to exercise all voting and corporate rights with respect to the Pledged Securities.

(b)     If an Event of Default shall occur and be continuing, then at any time in the Administrative Agent's discretion, without notice, (i) the Administrative Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Securities and make application thereof to the Obligations in accordance with Section 2.11(e) of the Credit Agreement, and (ii) any or all of the Pledged Securities shall be registered in the name of the Administrative Agent or its nominee, and the Administrative Agent or its nominee may thereafter exercise (x) all voting, corporate and other rights pertaining to such Pledged Securities at any meeting of shareholders (or other equivalent body) of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Securities upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the organizational structure of any Issuer, or upon the exercise by any Grantor or the Administrative Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent may determine), all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Pledged Securities pledged by such Grantor hereunder (and each Issuer party hereto hereby agrees) to (i) comply with any instruction received by it from the Administrative Agent in writing (x) after an Event of Default has occurred and is continuing and (y) that is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Pledged Securities directly to the Administrative Agent.

(d)     After the occurrence and during the continuation of an Event of Default, if the Issuer of any Pledged Securities is the subject of bankruptcy, insolvency, receivership, custodianship or other proceedings under the supervision of any Governmental Authority, then all rights of the Grantor in respect thereof to exercise the voting and other consensual rights which such Grantor would otherwise be entitled to exercise with respect to the Pledged Securities issued by such Issuer shall cease, and all such rights shall thereupon become vested in the Administrative Agent who shall thereupon have the sole right to exercise such voting and other consensual rights, but the Administrative Agent shall have no duty to exercise any such voting or other consensual rights and shall not be responsible for any failure to do so or delay in so doing.

**Section 7.2     Proceeds**.  If a Grantor receives payment from any Person or proceeds under a letter of credit or otherwise, which payment should have been remitted directly to the Collection Account, such Grantor shall promptly remit (and in any event no later than 10 Business Days after receipt thereof) such payment or proceeds to the Collection Account to be applied in accordance with the terms of the Credit Agreement.

**Section 7.3     Grantors to Hold in Trust**.  Upon the occurrence and during the continuance of an Event of Default (or a Default under Section 8.1(i) of the Credit Agreement), each Grantor will, upon receipt by it of any revenue, income, profits or other sums in which a security interest is granted by this Agreement, payable pursuant to any agreement or otherwise, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the sum or instrument in trust for the Administrative Agent (for the benefit of the Secured Parties), segregate such sum or instrument from their own assets and forthwith, without any notice, demand or other action whatsoever (all notices,

205551474 v2

demands, or other actions on the part of the Secured Parties being expressly waived), endorse, transfer and deliver any such sums or instruments or both, to the Administrative Agent to be applied to the repayment of the Obligations in accordance with the provisions of Section 8.2 of the Credit Agreement.

**Section 7.4**     **Collections, Etc.**.  Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may, in its sole discretion, in its name (on behalf of the Secured Parties) or in the name of any Grantor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral, but shall be under no obligation to do so, or the Administrative Agent may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of, any Grantor.  The Administrative Agent will not be required to take any steps to preserve any rights against parties with prior claims on the Collateral. Upon and during the continuance of an Event of Default, if any Grantor fails to make any payment or take any action required hereunder, the Administrative Agent may make such payments and take all such actions as the Administrative Agent reasonably deems necessary to protect the Administrative Agent's (on behalf of the Secured Parties) security interests in the Collateral and the value thereof, and the Administrative Agent is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any Liens that in the judgment of the Administrative Agent appear to be equal to, prior to, or superior to, the security interest of the Administrative Agent (on behalf of the Secured Parties) in the Collateral (to the extent not expressly permitted by Section 4.20 of the Credit Agreement to be superior to the Liens of the Administrative Agent) and any Liens not expressly permitted by the Credit Agreement.

**Section 7.5**     **UCC and Other Remedies**.

(a)     If an Event of Default shall occur and be continuing, the Administrative Agent, on behalf of the Secured Parties, may exercise in its discretion, in addition to all other rights, remedies, powers and privileges granted to them in this Agreement, the other Loan Documents, and in any other instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights, remedies, powers and privileges of a secured party under the UCC (regardless of whether the UCC is in effect in the jurisdiction where such rights, remedies, powers or privileges are asserted) or any other applicable law or otherwise available at law or equity.  Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, presentments, protests, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any other Secured Party or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Administrative Agent or any other Secured Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released.  If an Event of Default shall occur and be continuing, each Grantor further agrees, at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  Any such sale or transfer by the Administrative Agent either to itself or to any other Person shall be absolutely free from any claim of right by any Grantor, including any equity or right of redemption, stay or appraisal which such Grantor

20

has or may have under any rule of law, regulation or statute now existing or hereafter adopted. Upon any such sale or transfer, the Administrative Agent shall have the right to deliver, assign and transfer to the purchaser or transferee thereof the Collateral so sold or transferred. The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section, after deducting all costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Administrative Agent and the other Secured Parties hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, in accordance with Section 8.2 of the Credit Agreement, and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, Section 9-615 of the UCC, need the Administrative Agent account for the surplus, if any, to any Grantor. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Administrative Agent or any other Secured Party arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(b)     In the event that the Administrative Agent elects not to sell the Collateral, the Administrative Agent retains its rights to dispose of or utilize the Collateral or any part or parts thereof in any manner authorized or permitted by law or in equity and to apply the proceeds of the same towards payment of the Secured Obligations. Each and every method of disposition of the Collateral described in this Agreement shall constitute disposition in a commercially reasonable manner. The Administrative Agent may appoint any Person as agent to perform any act or acts necessary or incident to any sale or transfer of the Collateral.

**Section 7.6** **Private Sales of Pledged Securities**. Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Securities, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Securities for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so. Each Grantor agrees to use its best efforts to do or cause to be done all such other acts as may reasonably be necessary to make such sale or sales of all or any portion of the Pledged Securities pursuant to this Section valid and binding and in compliance with any and all other applicable Requirements of Law. Each Grantor further agrees that a breach of any of the covenants contained in this Section will cause irreparable injury to the Administrative Agent and the other Secured Parties, that the Administrative Agent and the other Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants.

**Section 7.7** **Waiver; Deficiency**. Each Grantor waives and agrees not to assert any rights or privileges which it may acquire under the UCC or any other applicable law. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the Obligations or its Guaranteed Obligations, as the case may be, and the fees and disbursements of

any attorneys employed by the Administrative Agent or any other Secured Party to collect such deficiency.

**Section 7.8     Non-Judicial Enforcement**.  The Administrative Agent may enforce its rights hereunder without prior judicial process or judicial hearing, and, to the extent permitted by law, each Grantor expressly waives any and all legal rights which might otherwise require the Administrative Agent to enforce its rights by judicial process.

## ARTICLE VIII

## THE ADMINISTRATIVE AGENT

**Section 8.1     The Administrative Agent's Appointment as Attorney-in-Fact**.

(a)     Each Grantor hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all reasonably appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Administrative Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following:

(i)     pay or discharge Taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(ii)     execute, in connection with any sale provided for in Section 7.5 or Section 7.6, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(iii)     (A) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct; (B) take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Account, Instrument, General Intangible, Chattel Paper or Payment Intangible or with respect to any other Collateral, and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any or all such moneys due under any Account, Instrument or General Intangible or with respect to any other Collateral whenever payable; (C) ask or demand for, collect, and receive payment of and receipt for any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (D) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (E) receive, change the address for delivery, open and dispose of mail addressed to any Grantor, and execute, assign and endorse negotiable and other instruments for the payment of money, documents of title or other evidences of payment, shipment or storage for any form of Collateral on behalf of and in the name of any Grantor; (F) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (G) defend any suit, action or proceeding brought against

22

such Grantor with respect to any Collateral; (H) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Administrative Agent may deem appropriate; (I) assign any Patent or Trademark (along with the goodwill of the business to which any such Trademark pertains) throughout the world for such term or terms, on such conditions, and in such manner as the Administrative Agent shall in its sole discretion determine; and (J) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and do, at the Administrative Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Administrative Agent deems necessary to protect, preserve or realize upon the Collateral and the Administrative Agent's and the other Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this subsection to the contrary notwithstanding, the Administrative Agent agrees that it will not exercise any rights under the power of attorney provided for in this subsection unless an Event of Default shall have occurred and be continuing.  The Administrative Agent shall give the relevant Grantor notice of any action taken pursuant to this subsection when reasonably practicable; <u>provided</u> that the Administrative Agent shall have no liability for the failure to provide any such notice.

(b)     If any Grantor fails to perform or comply with any of its agreements contained herein within the applicable grace periods, the Administrative Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.  No such performance of any covenant or agreement by the Administrative Agent on behalf of any Grantor shall relieve such Grantor of any Default or Event of Default.

(c)     The expenses of the Administrative Agent incurred in connection with actions undertaken as provided in this Section, together with interest thereon at the rate for Default Interest from the date of payment by the Administrative Agent to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Administrative Agent on demand.

(d)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof and in compliance herewith.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

**Section 8.2     <u>Duty of the Administrative Agent</u>**.  The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals with similar property for its own account and shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which comparable secured parties accord comparable collateral. Neither the Administrative Agent, any other Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Administrative Agent and the other Secured Parties hereunder are solely to protect the Administrative Agent's and the other Secured Parties' interests in the Collateral and shall not impose any duty upon the Administrative Agent or any other Secured Party to exercise any such powers.  The Administrative Agent and the other Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor

for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment.  To the fullest extent permitted by applicable law, the Administrative Agent shall be under no duty whatsoever to make or give any presentment, notice of dishonor, protest, demand for performance, notice of non-performance, notice of intent to accelerate, notice of acceleration, or other notice or demand in connection with any Collateral, or to take any steps necessary to preserve any rights against any Grantor or other Person or ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not it has or is deemed to have knowledge of such matters. Each Grantor, to the extent permitted by applicable law, waives any right of marshaling in respect of any and all Collateral, and waives any right to require the Administrative Agent or any other Secured Party to proceed against any Grantor or other Person, exhaust any Collateral or enforce any other remedy which the Administrative Agent or any other Secured Party now has or may hereafter have against any Grantor or other Person.

**Section 8.3**    **Filing of Financing Statements**.  Pursuant to the UCC and any other applicable law, each Grantor authorizes the Administrative Agent, its counsel or its representative, at any time and from time to time, to file or record financing statements, continuation statements, amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Administrative Agent reasonably determines appropriate to perfect the security interests of the Administrative Agent under this Agreement. Additionally, each Grantor authorizes the Administrative Agent, its counsel or its representative, at any time and from time to time, to file or record such financing statements that describe the collateral covered thereby as "all assets of the Grantor", "all personal property of the Grantor" or words of similar effect.  A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

**Section 8.4**    **Authority of the Administrative Agent**.  Each Grantor acknowledges that the rights and responsibilities of the Administrative Agent under this Agreement with respect to any action taken by the Administrative Agent or the exercise or non-exercise by the Administrative Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Administrative Agent and the other Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Administrative Agent and the Grantors, the Administrative Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

**Section 8.5**    **Releases of Collateral**.  Subject to any applicable approval rights of the Lenders under the Credit Agreement, the Administrative Agent may release any of the Collateral from this Agreement without altering, varying or diminishing in any way the force, effect, lien, pledge or security interest of this Agreement as to any Collateral not expressly released, and the security interests created under this Agreement shall continue on all Collateral not expressly released.

**Section 8.6**    **Quiet Enjoyment of Distributors**.  The Administrative Agent acknowledges its security interests in the Collateral pursuant to this Agreement and the other Collateral Documents may be subject to rights of Quiet Enjoyment (as defined below) of the Distributors (which are not Affiliates of any Loan Party) under existing and future Distribution Agreements.  For the purpose hereof, "Quiet Enjoyment" shall mean, in connection with the rights of a Distributor which is not an Affiliate of any Loan Party under a Distribution Agreement, the Administrative Agent's agreement that its rights in the Collateral (held for the benefit of the Secured Parties) are subject to the rights of such Distributor to distribute, exhibit and/or exploit the Items of Product licensed to it under such Distribution Agreement,

24

and to receive prints, tapes and other delivery items and/or to have access to preprint material, master tapes and other items to which such Distributor is entitled in connection therewith, and that, even if the Administrative Agent (for the benefit of the Secured Parties) shall become the owner of the Collateral in case of an Event of Default, the Administrative Agent's ownership rights shall be subject to the rights of such Distributor under such agreement, subject to a reservation by the Administrative Agent (for the benefit of the Secured Parties) of any rights available to the applicable Loan Party if such Distributor is in default under the applicable Distribution Agreement.  The Administrative Agent agrees that, upon the reasonable request of a Loan Party, it will provide written confirmation (in form and substance reasonably acceptable to the Administrative Agent) of such rights of Quiet Enjoyment to such Distributors under the Distribution Agreements.

Section 8.7     **Assignment by the Administrative Agent**.  The Administrative Agent may from time to time assign its rights and obligations (including the security interests created) under this Agreement to a successor administrative agent appointed in accordance with the Credit Agreement, and such successor shall be entitled to all of the rights and remedies of the Administrative Agent under this Agreement in relation thereto.

Section 8.8     **Secured Parties**.  Each Secured Party that is not a party to the Credit Agreement who obtains the benefit of this Agreement shall be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of the Credit Agreement, and with respect to the actions and omissions of the Administrative Agent hereunder or otherwise relating hereto that do or may affect such Secured Party, the Administrative Agent and each of its Affiliates shall be entitled to all of the rights, benefits and immunities conferred under Article IX of the Credit Agreement.

# ARTICLE IX

## SUBORDINATION OF INDEBTEDNESS

Section 9.1     **Subordination of All Guarantor Claims**.  As used herein, the term "Guarantor Claims" shall mean all debts and obligations of the Borrower or any Subsidiary of the Borrower to any Grantor, whether such debts and obligations now exist or are hereafter incurred or arise, or whether the obligation of the debtor thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or obligations be evidenced by note, contract, open account, or otherwise, and irrespective of the Person or Persons in whose favor such debts or obligations may, at their inception, have been or may hereafter be created, or the manner in which they have been or may hereafter be acquired.  After the occurrence and during the continuation of an Event of Default, no Grantor shall receive or collect, directly or indirectly, from any obligor in respect thereof any amount upon the Guarantor Claims.

Section 9.2     **Claims in Bankruptcy**.  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief or other insolvency proceedings involving the Borrower or any Subsidiary of the Borrower, the Administrative Agent on behalf of the Secured Parties shall have the right to prove their claim in any proceeding, so as to establish their rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Each Grantor hereby assigns such dividends and payments to the Administrative Agent for the benefit of the Secured Parties for application against the Secured Obligations as provided under Section 8.2 of the Credit Agreement.  Should the Administrative Agent or any other Secured Party receive, for application upon the Secured Obligations, any such dividend or payment which is otherwise payable to any Grantor, and which, as between such Grantor, shall constitute a credit upon the Guarantor Claims, then upon payment in full of the Secured Obligations and termination of all Commitments, the intended recipient shall become subrogated to the rights of the Administrative Agent and the other

Secured Parties to the extent that such payments to the Administrative Agent and the other Secured Parties on the Guarantor Claims have contributed toward the liquidation of the Secured Obligations, and such subrogation shall be with respect to that proportion of the Secured Obligations which would have been unpaid if the Administrative Agent and the other Secured Parties had not received dividends or payments upon the Guarantor Claims.

Section 9.3   **Payments Held in Trust**.  In the event that, notwithstanding Section 9.1 and Section 9.2, any Grantor should receive any funds, payments, claims or distributions which are prohibited by such Sections, then it agrees (a) to hold in trust for the Administrative Agent and the other Secured Parties an amount equal to the amount of all funds, payments, claims or distributions so received, and (b) that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions except to pay them promptly to the Administrative Agent, for the benefit of the Secured Parties; and each Grantor covenants promptly to pay the same to the Administrative Agent.

Section 9.4   **Liens Subordinate**.  Each Grantor agrees that, until the Secured Obligations are paid in full and all Commitments have terminated, any Liens securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any Liens securing payment of the Secured Obligations, regardless of whether such encumbrances in favor of such Grantor, the Administrative Agent or any other Secured Party presently exist or are hereafter created or attach.  Without the prior written consent of the Administrative Agent, no Grantor, during the period in which any of the Secured Obligations are outstanding and all Commitments have terminated, shall (a) exercise or enforce any creditor's right it may have against any debtor in respect of the Guarantor Claims, or (b) foreclose, repossess, sequester or otherwise take steps or institute any action or proceeding (judicial or otherwise, including, without limitation, the commencement of or joinder in any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any Lien held by it.

Section 9.5   **Notation of Records**.  Upon the request of the Administrative Agent, all promissory notes and all accounts receivable ledgers or other evidence of the Guarantor Claims accepted by or held by any Grantor shall contain a specific written notice thereon that the indebtedness evidenced thereby is subordinated under the terms of this Agreement.

# ARTICLE X

## MISCELLANEOUS

Section 10.1   **Notices**.  All notices and other communications provided for herein shall be given in the manner and subject to the terms of Section 10.1 of the Credit Agreement; provided that any such notice, request or demand to or upon any Guarantor shall be addressed to such Guarantor at its notice address set forth on Schedule 1.

Section 10.2   **Waiver**.  No failure on the part of the Administrative Agent or any other Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, remedy, power or privilege under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  The exercise by the Administrative Agent of any one or more of the rights, powers and remedies herein shall not be construed as a waiver of any other rights, powers and remedies, including, without limitation, any rights of set-off.  No waiver of any provision of this Agreement or consent to any departure by any Grantor therefrom shall in any event be effective unless the

26

same shall be permitted by Section 10.3, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.

**Section 10.3    Amendments in Writing**.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 10.2 of the Credit Agreement.

**Section 10.4    Payment of Expenses, Indemnification**.

(a)    Each Grantor agrees to pay or promptly reimburse the Administrative Agent and each other Secured Party for all advances, charges, costs and expenses (including, without limitation, all costs and expenses of holding, preparing for sale and selling, collecting or otherwise realizing upon the Collateral and all attorneys' fees, legal expenses and court costs) incurred by any Secured Party in connection with the exercise of its respective rights and remedies hereunder, including, without limitation, any advances, charges, costs and expenses that may be incurred in any effort to enforce any of the provisions of this Agreement or any obligation of any Grantor in respect of the Collateral or in connection with (i) the preservation of the Lien of, or the rights of the Administrative Agent or any other Secured Party under, this Agreement, (ii) any actual or attempted sale, lease, disposition, exchange, collection, compromise, settlement or other realization in respect of, or care of, the Collateral, including all such costs and expenses incurred in any bankruptcy, reorganization, workout or other similar proceeding, or (iii) collecting against such Grantor under the guarantee contained in Article II or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which such Grantor is a party.

(b)    Each Grantor agrees to pay, and to save the Administrative Agent and the other Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, court costs and outside attorneys' fees and any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement) incurred because of, incident to, or with respect to the Collateral (including, without limitation, any exercise of rights or remedies in connection therewith) or the execution, delivery, enforcement, performance or administration of this Agreement, to the extent the Borrower would be required to do so pursuant to Section 10.3 of the Credit Agreement.

(c)    All amounts for which any Grantor is liable pursuant to this Section shall be due and payable by such Grantor to the Administrative Agent or any Secured Party upon demand.

**Section 10.5    Successors and Assigns**.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Administrative Agent and the other Secured Parties, the future holders of the Loans, and their respective successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent and the Lenders.

**Section 10.6    Governing Law; Submission to Jurisdiction**.

(a)    This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be construed in accordance with

205551474 v2

and be governed by the law (without giving effect to the conflict of law principles thereof except for Sections 5-1401 and 5-1402 of the New York General Obligations Law) of the State of New York.

(b)     Each Grantor hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the United States District Court for the Southern District of New York, and of the Supreme Court of the State of New York sitting in New York county, and of any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such District Court or such New York state court or, to the extent permitted by applicable law, such appellate court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any other Secured Party may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

(c)     Each Grantor irrevocably and unconditionally waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding described in subsection (b) of this Section and brought in any court referred to in subsection (b) of this Section.  Each of the parties hereto irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to the service of process in the manner provided for notices in Section 10.1.  Nothing in this Agreement or in any other Loan Document will affect the right of any party hereto to serve process in any other manner permitted by law.

**Section 10.7   WAIVER OF JURY TRIAL**.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF ANY PARTY HERETO TO THE WAIVER OF ITS RIGHTS TO TRIAL BY JURY.

**Section 10.8   Acknowledgments**.

(a)     Each Grantor hereby acknowledges that:

(i)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(ii)     neither the Administrative Agent nor any other Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Grantors, on the one hand, and the Administrative Agent and the other Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(iii)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Lenders.

(b)     Each of the parties hereto specifically agrees that it has a duty to read this Agreement and the other Loan Documents to which it is a party and agrees that it is charged with notice and knowledge of the terms of this Agreement and the other Loan Documents to which it is a party; that it has in fact read this Agreement and the other Loan Documents to which it is a party and is fully informed and has full notice and knowledge of the terms, conditions and effects of this Agreement and the other Loan Documents to which it is a party; that it has been represented by independent legal counsel of its choice throughout the negotiations preceding its execution of this Agreement and the other Loan Documents to which it is a party; and has received the advice of its attorney in entering into this Agreement and the other Loan Documents to which it is a party; and that it recognizes that certain of the terms of this Agreement and other Loan Documents to which it is a party result in one party assuming the liability inherent in some aspects of the transaction and relieving the other party of its responsibility for such liability.  Each Grantor agrees and covenants that it will not contest the validity or enforceability of any exculpatory provision of this Agreement or the other Loan Documents to which it is a party on the basis that such Grantor had no notice or knowledge of such provision or that the provision is not "conspicuous".

(c)     Each Grantor warrants and agrees that each of the waivers and consents set forth in this Agreement are made voluntarily and unconditionally after consultation with outside legal counsel and with full knowledge of their significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which such Grantor otherwise may have against any other Grantor, the Administrative Agent, the other Secured Parties or any other Person or against any Collateral.  If, notwithstanding the intent of the parties that the terms of this Agreement shall control in any and all circumstances, any such waivers or consents are determined to be unenforceable under applicable law, such waivers and consents shall be effective to the maximum extent permitted by law.

**Section 10.9   Additional Grantors**.  Each Person that is required to become a party to this Agreement pursuant to Section 5.14 of the Credit Agreement and is not a signatory hereto shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Person of an Assumption Agreement in the form of Annex I.

**Section 10.10  Set-Off**.  Each Grantor agrees that, in addition to (and without limitation of) any right of set-off, bankers' lien or counterclaim a Secured Party may otherwise have, each Secured Party shall have the right and be entitled (after consultation with the Administrative Agent), at its option, to offset (i) balances held by it or by any of its Affiliates for account of any Grantor or any of its Subsidiaries at any of its offices, in dollars or in any other currency, and (ii) Obligations then due and payable to such Secured Party (or any Affiliate of such Secured Party), which are not paid when due, in which case it shall promptly notify the Borrower and the Administrative Agent thereof, provided that such Secured Party's failure to give such notice shall not affect the validity thereof.

**Section 10.11  Releases**.

(a)    Release Upon Payment in Full.  This Agreement shall remain in full force and effect until the irrevocable payment in full in cash of all of the Secured Obligations and the irrevocable termination of the Credit Agreement and all of the Commitments, at which time this Agreement shall automatically terminate (other than obligations under this Agreement which expressly survive such termination) and, upon the request and at the sole expense of the Borrower, the Administrative Agent shall forthwith release its security interests hereunder and shall execute and deliver all UCC termination statements and/or other documents reasonably requested by the Borrower to evidence such termination, all without recourse, representation, warranty or other assurance of any kind.

(b)    Further Assurances.  If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Credit Agreement, then the Administrative Agent, at the request and sole expense of such Grantor, shall promptly execute and deliver to such Grantor all releases or other documents reasonably necessary for the release of the Liens created hereby on such Collateral and the Capital Stock of such Grantor, all of which shall be made without recourse, representation, warranty or other assurance of any kind.  At the request and sole expense of the Borrower, a Grantor shall be released from its obligations hereunder in the event that all the Capital Stock of such Grantor shall be sold, transferred or otherwise disposed of in a transaction expressly permitted by the Credit Agreement; provided that the Borrower shall have delivered to the Administrative Agent, at least 10 Business Days prior to the date of the proposed release, a written request for release identifying the relevant Grantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Borrower stating that such transaction is in compliance with the Credit Agreement and the other Loan Documents.

(c)    Retention in Satisfaction.  Except as may be expressly applicable pursuant to Section 9-620 of the UCC, no action taken or omission to act by the Administrative Agent or the other Secured Parties hereunder, including, without limitation, any exercise of voting or consensual rights or any other action taken or inaction, shall be deemed to constitute a retention of the Collateral in satisfaction of the Secured Obligations or otherwise to be in full satisfaction of the Secured Obligations, and the Secured Obligations shall remain in full force and effect, until the Administrative Agent and the other Secured Parties shall have applied payments (including, without limitation, collections from Collateral) towards the Secured Obligations in the full amount then outstanding or until such subsequent time as is provided in subsection (a) of this Section.

**Section 10.12  Reinstatement**.  To the extent that any payments on the Secured Obligations or proceeds of any Collateral are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver or other Person under any bankruptcy law, common law or equitable cause, then, to such extent, the Secured Obligations so satisfied shall be revived and continue as if such payment or proceeds had not been received and the Administrative Agent's and the other Secured Parties' Liens, security interests, rights, powers and remedies under this Agreement and each other applicable Collateral Document shall continue in full force and effect, and the obligations of each Grantor under this Agreement (including, without limitation, with respect to the guarantee contained in Article II and the provision of collateral herein) shall continue to be effective, or be reinstated, as the case may be.  In such event, this Agreement and each other applicable Collateral Document shall be automatically reinstated and each Grantor shall take such action as may be reasonably requested by the Administrative Agent and the other Secured Parties to effect such reinstatement.  In furtherance of the provisions of this Section, and not in limitation of any other right which the Administrative Agent or any other Secured Party may have at law or in equity against the Borrower, a Guarantor or any other Person by virtue hereof, upon any failure of the Borrower to pay any Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice or otherwise,

30

each Guarantor hereby promises to and will, upon receipt of written demand by the Administrative Agent on behalf of itself and/or any of the other Secured Parties, forthwith pay or cause to be paid to the Administrative Agent (for the benefit of itself and/or the other Secured Parties, as applicable), in cash an amount equal to the unpaid amount of such unpaid Obligations with Default Interest thereon from the due date thereof, and thereupon the Administrative Agent shall assign such Obligation, together with all security interests, if any, then held by the Administrative Agent in respect of such Obligation, to the Guarantor or Guarantors making such payment; such assignment to be subordinate and junior to the rights of the Administrative Agent (on behalf of the Secured Parties) with regard to amounts payable by the Borrower in connection with the remaining unpaid Obligations and to be pro tanto to the extent to which the Obligation in question was discharged by the Guarantor or Guarantors making such payments.

**Section 10.13  Acceptance**.  Each Grantor hereby expressly waives notice of acceptance of this Agreement, acceptance on the part of the Administrative Agent and the other Secured Parties being conclusively presumed by their request for this Agreement and delivery of the same to the Administrative Agent.

**Section 10.14  Counterparts; Integration**.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart to this Agreement or any other Loan Document by facsimile transmission or by electronic mail in pdf format shall be as effective as delivery of a manually executed counterpart hereof, and the parties waive any right they may have to object to said treatment.  This Agreement, the Engagement Letter, the Fee Letter, the other Loan Documents, and any separate letter agreements relating to any fees payable to the Administrative Agent and its Affiliates constitute the entire agreement among the parties hereto and thereto and their affiliates regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters..

**Section 10.15  Survival**.  All covenants, agreements, representations and warranties made by each Grantor herein and in any notices or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Administrative Agent and the other Secured Parties and shall survive the execution and delivery of this Agreement and the Credit Agreement and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any other Secured Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as any of the Obligations are outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Section 10.4 shall survive, and remain in full force and effect regardless of, the repayment of the Obligations and the termination of the Credit Agreement and the Commitments.

**Section 10.16  Severability**.  Any provision of this Agreement held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 10.17  Waiver of Effect of Corporate Seal**.  Each Grantor represents and warrants that it is not required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Requirement of Law, agrees that this Agreement is delivered by such Grantor under seal and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

205551474 v2

**Section 10.18 <u>Captions</u>**.   Captions and section headings appearing herein and in the table of contents hereto are included solely for convenience of reference and are not intended to affect the construction of or be taken into consideration in interpreting any provision of this Agreement.

## ARTICLE XI

### <u>KEEPWELL</u>

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this <u>Article XI</u> for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this <u>Article XI</u>, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until this Agreement has been terminated pursuant to <u>Section 10.11(a)</u>. Each Qualified ECP Guarantor intends that this <u>Article XI</u> constitute, and this <u>Article XI</u> shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

205551474 v2

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

<u>**BORROWER**</u>:

MILLENNIUM ENTERTAINMENT, LLC

By:_____

Name:\_\_Bill Lee_____

Title:\_\_\_Chief Executive Officer\_\_\_\_\_

<u>**GUARANTORS**</u>:

CALRISSIAN LP

By: Virgo Service Company LLC
Its: General Partner

    By:_____

    Name: Jesse Watson
    Title: Manager

MILLENNIUM MEDIA SERVICES, INC.

By:_____

Name:\_\_Bill Lee_____

Title:\_\_\_Chief Executive Officer_____

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWER:**

MILLENNIUM ENTERTAINMENT, LLC

By:_____
Name:_ Bill Lee _____
Title:___ Chief Executive Officer _____

**GUARANTORS:**

CALRISSIAN LP

By: Virgo Service Company LLC
Its: General Partner

By:_____
Name: Jesse Watson
Title: Manager

MILLENNIUM MEDIA SERVICES, INC.

By:_____
Name:__ Bill Lee _____
Title:____ Chief Executive Officer _____

Acknowledged and Agreed to as of the date hereof:

**ADMINISTRATIVE AGENT**:

SUNTRUST BANK,
as Administrative Agent

By: _____
Name:    J. Matthew Howard
Title:        Vice President

**SCHEDULE 1**

**Notice Addresses**

To each Guarantor:

Calrissian LP
c/o Virgo Investment Group LLC
555 Twin Dolphin Drive, Suite 615
Redwood Shores, California 94065
Attention: Mark A. Perez
Facsimile Number: 650-461-9117
Email: mperez@virgo-llc.com

Millennium Media Services, Inc.
5900 Wilshire Boulevard, Floor 18
Los Angeles, California 90036
Attention: Bill Lee
Facsimile Number: 323-937-0750
Email: blee@millenniumentertainment.me


with copies (which shall not constitute notice) to:

Stroock & Stroock & Lavan LLP
2029 Century Park E
Los Angeles, California 90067
Attention: Schuyler M. Moore, Esq.
Facsimile Number: 310-556-5959
Email: smoore@stroock.com

SCHEDULE 2

**Pledged Securities**

| Owner | Issuer | Class/Type of Capital Stock | No. of Shares/ Interests | Certificated? (Y/N) | Percentage of Issuer's Capital Stock included in the Pledged Securities |
|---|---|---|---|---|---|
| Calrissian LP | Millennium Entertainment, LLC | Membership interest | N/A | No | 100% |
| Millennium Entertainment, LLC | Millennium Media Services, Inc. | Common shares | 1,000 | Yes | 100% |

**SCHEDULE 3**

**Filing Offices**

**Uniform Commercial Code Filings (UCC-1)**

| Grantor | Filing Office |
|---|---|
| Calrissian LP | Delaware Secretary of State |
| Millennium Entertainment, LLC | Delaware Secretary of State |
| Millennium Media Services, Inc. | California Secretary of State |

SCHEDULE 4

**Grantor Information**

| Legal Name | Jurisdiction of Organization | Chief Executive Office (or Sole Place of Business) | Location of Records and Goods | Tax ID No. | Organization No. |
|---|---|---|---|---|---|
| 1)<br>**2)** Calrissian LP | 3)<br>4)  Delaware | 5)<br>6)  555 Twin Dolphin Drive, Suite 615<br>7)  Redwood Shores, CA 94065<br>8) | 9)<br>10)  555 Twin Dolphin Drive, Suite 615<br>11)  Redwood Shores, CA 94065 | 12)<br>13)  47-1510751 | 14)<br>15)  5580361 |
| Millennium Entertainment, LLC | Delaware | 5900 Wilshire Boulevard, Floor 18<br>Los Angeles, California 90036 | 5900 Wilshire Boulevard, Floor 18<br>Los Angeles, California 90036<br><br>Certain goods are stored at the following laboratories:<br><br>• Academy Film Service, 11824 Sheldon Street, Sun Valley, California 91352<br>• Bonded Services, 3205 Burton Avenue, Burbank, California 91505<br>• Digital Post Services, 712 Seward Street, Hollywood, California 90038<br>• Inception Digital Services, 29219 Canwood Street, Suite 220, Agoura Hills, California 91301<br>• Foto-Kem Industries, Inc., 2801 W. Alameda Avenue, Burbank, CA 91505<br>1. | 27-2190708 | 16)<br>17)  480305 |

| Legal Name | Jurisdiction of Organization | Chief Executive Office (or Sole Place of Business) | Location of Records and Goods | Tax ID No. | Organization No. |
|---|---|---|---|---|---|
| Millennium Media Services, Inc. | California | 5900 Wilshire Boulevard, Floor 18 Los Angeles, California 90036 | 5900 Wilshire Boulevard, Floor 18 Los Angeles, California 90036<br><br>Certain goods are stored at the following laboratories:<br><br>• Academy Film Service, 11824 Sheldon Street, Sun Valley, California 91352<br>• Bonded Services, 3205 Burton Avenue, Burbank, California 91505<br>• Digital Post Services, 712 Seward Street, Hollywood, California 90038<br>• Inception Digital Services, 29219 Canwood Street, Suite 220, Agoura Hills, California 91301<br>• Foto-Kem Industries, Inc., 2801 W. Alameda Avenue, Burbank, CA 91505 2. | 26-4388192 | 18)<br>19) C3179898 |

**SCHEDULE 5**

**Prior Names and Prior Chief Executive Offices**

| Grantor | Prior Names | Prior Chief Executive Offices |
|---|---|---|
| Millennium Entertainment, LLC | Nu Image (Delaware), LLC<br>Nu Image Delaware, Inc. | 6423 Wilshire Boulevard<br>Los Angeles, California 90048 |
| Millennium Media Services, Inc. | Consolidated Video Services, Inc. | 2000 Avenue of the Stars, #410<br>Los Angeles, California 90067 |

**SCHEDULE 6**

### Patents and Patent Licenses

None.

EXHIBIT D TO CREDIT AGREEMENT

**SCHEDULE 7**

## Vehicles

None.

**ANNEX I**

**Form of Assumption Agreement**

      **THIS ASSUMPTION AGREEMENT**, dated as of [_____] (this "Assumption Agreement"), is made by [*NAME OF NEW SUBSIDIARY*], a [*state of incorporation*] [*corporation*] (the "Additional Grantor"), in favor of SUNTRUST BANK, as administrative agent (in such capacity, the "Administrative Agent") for the Secured Parties.  All capitalized terms not defined herein shall have the meanings assigned to them in the Guaranty and Security Agreement.

      **WHEREAS**, Millennium Entertainment, LLC, a Delaware limited liability company (the "Borrower"), the lenders from time to time parties thereto and the Administrative Agent have entered into a Revolving Credit and Term Loan Agreement, dated as of September 4, 2014 (as amended, restated, supplemented, replaced, increased, refinanced or otherwise modified from time to time, the "Credit Agreement");

      **WHEREAS**, in connection with the Credit Agreement, the Borrower and certain of its Subsidiaries have entered into the Guaranty and Security Agreement, dated as of September 4, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty and Security Agreement"), in favor of the Administrative Agent for the benefit of the Secured Parties;

      **WHEREAS**, the Credit Agreement requires the Additional Grantor to become a party to the Guaranty and Security Agreement; and

      **WHEREAS**, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Guaranty and Security Agreement;

      **NOW, THEREFORE**, it is agreed:

      **SECTION 1**.  Guaranty and Security Agreement.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 10.9 of the Guaranty and Security Agreement, hereby becomes a party to the Guaranty and Security Agreement as a Grantor thereunder with the same force and effect as if originally named therein as a Grantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor thereunder and expressly grants to the Administrative Agent, for the benefit of the Secured Parties, a security interest in all Collateral now owned or at any time hereafter acquired by such Additional Grantor to secure all of such Additional Grantor's obligations and liabilities thereunder.  The information set forth in Schedule A hereto is hereby added to the information set forth in Schedules 1 through 7 to the Guaranty and Security Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Article V of the Guaranty and Security Agreement is true and correct on and as of the date hereof (after giving effect to this Assumption Agreement) as if made on and as of such date.

      **SECTION 2**.  Governing Law.   THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF EXCEPT FOR SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) OF THE STATE OF NEW YORK.

**IN WITNESS WHEREOF**, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

**[*NAME OF ADDITIONAL GRANTOR*]**

By:_____

Name:_____

Title:_____

Acknowledged and Agreed to as of the date hereof:

**ADMINISTRATIVE AGENT:**

SUNTRUST BANK, as Administrative Agent

By:_____

Name:_____

Title:_____

**SCHEDULE A**

**Supplement to Schedules to**
**<u>Guaranty and Security Agreement</u>**

**ANNEX II**

**Form of Supplement**

**THIS SUPPLEMENT TO GUARANTY AND SECURITY AGREEMENT**, dated as of [_____] (this "Supplement"), is made by [*NAME OF GRANTOR*], a [*state of incorporation*] [*corporation*] (the "Grantor"), in favor of SUNTRUST BANK, as administrative agent (in such capacity, the "Administrative Agent") for the Secured Parties. All capitalized terms not defined herein shall have the meanings assigned to them in the Guaranty and Security Agreement.

**WHEREAS**, [Millennium Entertainment, LLC, a Delaware limited liability company (the "Borrower")][the Grantor], the lenders from time to time parties thereto and the Administrative Agent have entered into a Revolving Credit and Term Loan Agreement, dated as of September 4, 2014 (as amended, restated, supplemented, replaced, increased, refinanced or otherwise modified from time to time, the "Credit Agreement");

**WHEREAS**, in connection with the Credit Agreement, the [Borrower][Grantor] and certain of its Subsidiaries[, including the Grantor,] have entered into the Guaranty and Security Agreement, dated as of September 4, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty and Security Agreement"), in favor of the Administrative Agent for the benefit of the Secured Parties; and

**WHEREAS**, it is a condition precedent to the continued extension of the Loans under the Credit Agreement that the Grantor grant to the Administrative Agent a security interest in all of its Additional Pledged Collateral (as defined below), and the Grantor wishes to fulfill said condition precedent;

**NOW, THEREFORE**, in consideration of the premises and in order to ensure compliance with the Credit Agreement, the Grantor hereby agrees as follows:

**SECTION 1.**   Additional Pledge.  As collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations, the Grantor hereby:

(a)   pledges, assigns and transfers to the Administrative Agent, and grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a continuing security interest in, and a right to set off against, any and all right, title and interest of such Grantor in, to and under all of the following property, whether now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest, wherever located or situated, and whether now existing or hereafter coming into existence (collectively, the "Additional Pledged Collateral"):

(i)   the shares of Capital Stock and Stock Equivalents more particularly described in Schedule A hereto and the certificates, if any, evidencing such shares (the "Additional Pledged Securities") and all cash, instruments and other property from time to time received, receivable or otherwise distributed in exchange for any and all of such Additional Pledged Securities; and

(ii)   all other Collateral (as defined in the Guaranty and Security Agreement) relating to the Additional Pledged Securities; and

Annex II

(b)        concurrently herewith delivers to the Administrative Agent (or a Person designated by the Administrative Agent) all certificates and instruments representing or evidencing any Additional Pledged Securities that constitute Pledged Certificated Stock, accompanied by an undated stock power or other equivalent instrument of transfer (in such other form that is acceptable to the Administrative Agent) covering such certificates or instruments duly executed in blank by such Grantor, any required transfer tax stamps and such other instruments or documents relating thereto as the Administrative Agent or its counsel shall reasonably request to effect the pledge of the Additional Pledged Securities to the Administrative Agent.

SECTION 2.    Representations and Warranties.  The Grantor hereby (a) represents and warrants that it is the legal and beneficial owner of the Additional Pledged Collateral, free and clear of any lien, security interest, option or other charge or encumbrance except for the security interest created by the Guaranty and Security Agreement as supplemented by this Supplement; and (b) restates each representation and warranty set forth in Article V of the Guaranty and Security Agreement, as supplemented by this Supplement, as of the date hereof with respect to the Additional Pledged Collateral.

SECTION 3.    Additional Pledged Collateral.   By execution and delivery of this Supplement, the Additional Pledged Collateral shall become a part of the Collateral referred to in the Guaranty and Security Agreement and shall secure the Secured Obligations as if such Additional Pledged Collateral were Collateral on the Closing Date, and shall be subject to all of the terms and conditions governing Collateral under the Guaranty and Security Agreement.   From and after the date hereof, Schedule 2 to the Guaranty and Security Agreement is hereby deemed amended to add the Additional Pledged Collateral thereto.

SECTION 4.    Binding Effect.  This Supplement shall become effective when it shall have been executed by the Grantor and thereafter shall be binding upon the Grantor and shall inure to the benefit of the Administrative Agent and the Secured Parties.  Upon the effectiveness of this Supplement, this Supplement shall be deemed to be a part of and shall be subject to all of the terms and conditions of the Guaranty and Security Agreement.  The Grantor shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Administrative Agent and the Lenders.

SECTION 5.    Governing Law.   THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF EXCEPT FOR SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW) OF THE STATE OF NEW YORK.

SECTION 6.    Execution in Counterparts.  This Supplement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart to this Supplement by facsimile transmission or by electronic mail in pdf format shall be as effective as delivery of a manually executed counterpart hereof, and the parties waive any right they may have to object to said treatment.

**IN WITNESS WHEREOF**, the Grantor has caused this Supplement to be duly executed and delivered by its duly authorized officer as of the date first above written.

[*NAME OF GRANTOR*]

By:_____

Name:_____

Title:_____

Acknowledged and Agreed to as of the date hereof:

**ADMINISTRATIVE AGENT:**

SUNTRUST BANK, as Administrative Agent

By:_____

Name:_____

Title:_____

**SCHEDULE A**

**<u>Additional Pledged Securities</u>**

| Owner | Issuer | Class/Type of Capital Stock | No. of Shares/ Interests | Certificated? (Y/N) |
|-------|--------|------------------------------|--------------------------|----------------------|
|       |        |                              |                          |                      |

205551474 v2

ANNEX III

### Form of Acknowledgment and Consent

The undersigned hereby acknowledges receipt of a copy of the Guaranty and Security Agreement, dated as of September 4, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement"), made by MILLENNIUM ENTERTAINMENT, LLC, a Delaware limited liability company, and the other Grantors parties thereto for the benefit of SUNTRUST BANK, as administrative agent (the "Administrative Agent").  The undersigned agrees for the benefit of the Administrative Agent and the Secured Parties defined therein as follows:

1.      The undersigned will be bound by the terms of the Agreement relating to the Pledged Securities issued by the undersigned and will comply with such terms insofar as such terms are applicable to the undersigned.

2.      The undersigned will notify the Administrative Agent promptly in writing of the occurrence of any of the events described in Section 6.8(a) of the Agreement with respect to the Pledged Securities issued by the undersigned.

3.      The terms of Sections 7.1(c) and 7.6 of the Agreement shall apply to it, *mutatis mutandis*, with respect to all actions that may be required of it pursuant to Sections 7.1(c) or 7.6 of the Agreement with respect to the Pledged Securities issued by the undersigned.

*[NAME OF ISSUER]*

By: _____

Name:
Title:

Address for Notices:
[_____]
[_____]
Attention: [_____]
Telecopy Number: [_____]