# EXHIBIT 4

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3         Civil Action No. 1:20-cv-02391-PGG-OTW
 4
     _____
 5
     EMIGRANT BANK; AND PACIFIC MERCANTILE
 6   BANK,
 7                Plaintiffs,
 8   -against-
 9   SUNTRUST BANK; TRUIST BANK; AND DOES 1
     THROUGH 10, INCLUSIVE,
10
                  Defendants.
11   _____
12
13
14           VIDEO-RECORDED DEPOSITION OF
15           JUAN RAMON de JESUS-CABALLERO
16                (Taken by Plaintiffs)
17             Charlotte, North Carolina
18            Wednesday, October 11, 2023
19                    9:36 a.m.
20
21
22
23
24
     Reported stenographically by
25   V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR
```

```
                                                       Page 2

 1                     APPEARANCES
 2
     ON BEHALF OF THE PLAINTIFFS:
 3            GARY E. GANS, Esquire
              Quinn Emanuel Urquhart & Sullivan, LLP
 4            865 S. Figueroa Street, 10th Floor
              Los Angeles, California 90017
 5            (213) 443-3000
              garygans@quinnemanuel.com
 6
              DANIEL LOUD, Esquire
 7            Quinn Emanuel Urquhart & Sullivan, LLP
              51 Maidson Avenue, 22nd Floor
 8            New York, New York 10010
              (212) 849-7000
 9            danielloud@quinnemanuel.com
10
     ON BEHALF OF THE DEFENDANTS SUNTRUST BANK AND
11   TRUIST BANK:
              DAVID TETRICK, JR., Esquire
12            King & Spalding LLP
              1180 Peachtree Street, NE, Suite 1600
13            Atlanta, Georgia 30309
              (404) 572-3526
14            dtetrick@kslaw.com
15
16   Also Present:
17            SAMEER KAPOOR, Esquire
              Truist Bank
18
19            AMANDA SMITH, Videographer
20
21
22
23
24
25
```

Page 3

1   VIDEO-RECORDED DEPOSITION OF JUAN RAMON
2   de JESUS-CABALLERO, a witness called on behalf of
3   the Plaintiffs, before V. Dario Stanziola, CCR
4   (GA)(NJ), RPR, CRR, Notary Public, in and for the
5   State of North Carolina, held at the law offices
6   of King & Spalding LLP, 300 South Tryon Street,
7   Suite 1700, Charlotte, North Carolina, on
8   Wednesday, October 11, 2023, commencing at 9:36
9   a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 58

1   about Virgo's involvement and what Virgo was
2   doing?
3        A.    Not necessarily.  My recollection of
4   the situation is that at the time senior lenders
5   didn't really care who was involved as long as
6   the process was running in the direction we were
7   expecting.  What it says there is that apparently
8   Virgo was involved in changing the scope of what
9   this party -- specific party was engaged for.
10            So we should have known that the scope
11  was changed because clearly we had some
12  expectations.  But whether it was Virgo or
13  Alchemy, I don't think at the time it mattered to
14  us.
15       Q.    Okay.  The next paragraph says,
16  Ultimately interference by Virgo and steady
17  attempt to influence the outcome of negotiations
18  and retain control of the business resulted in
19  the failure to consummate a transaction with any
20  of the prospects and a Chapter 7 bankruptcy
21  filing on July 1, 2016.
22            Do you see that?
23       A.    I do.
24       Q.    What -- what did you mean by
25  interference by Virgo?

```
                                                      Page 59
 1        A.   Well, clearly, if we refer to the prior
 2   paragraph, they changed their scope of the
 3   engagement.
 4        Q.   Okay.  And you consider that to be
 5   interfering in the process, right?
 6        A.   At the time we did, yes.
 7        Q.   And that interference by Virgo resulted
 8   in a failure to consummate a transaction with any
 9   of the prospects to refinance the company, right?
10        A.   It appears so, yes.
11        Q.   And resulted in a bankruptcy
12   eventually, right?
13        A.   Yes.
14        Q.   Do you think that it was wrong for
15   Virgo to be excessively involved unbeknownst to
16   the senior lenders and to interfere in an attempt
17   to influence the transaction or retain control of
18   Alchemy?
19             MR. TETRICK:  Object to the form of the
20        question as vague and ambiguous.
21        A.   Could you please repeat the question?
22        Q.   Sure.
23             Do you think that it was wrong for
24   Virgo to be excessively involved, unknown to the
25   senior lenders, and to interfere in an attempt to
```

Page 60

1    influence the transaction and retain control of
2    Alchemy for itself?
3             MR. TETRICK:  Same objection.
4        A.   I do.
5        Q.   Now, you were involved in calls with
6    other potential financiers like Morgan Stanley
7    with -- with Virgo, right?
8        A.   Again, seven years ago, plus, so hard
9    for me to confirm how many calls or what calls I
10   was involved in.  At the time the financial
11   advisor, Carl Marks, which I seem to remember was
12   engaged as a CRO, chief restructuring officer,
13   had engaged Peter Hoffman to run a process.  And
14   Peter Hoffman was selected by the bank group with
15   particular endorsement from one of your clients,
16   Aperture, as somebody with extensive knowledge of
17   the industry and contacts in the industry.  And
18   the idea was that they would try to find options.
19            And so options were sort of brought.
20   It may have included not just the
21   recapitalization of the business, but also the
22   possible sale of the business is an -- if an
23   interested party would come forward with an offer
24   that was acceptable to the lenders.
25            So most of the conversations with these

Page 61

1  potential parties were ran by Peter Hoffman as
2  part of a, you know, process.  And so at some
3  point there may have been some parties, like
4  Morgan Stanley that's referenced in the memo,
5  that came up with a proposal.  My recollection is
6  that none of the proposal were really acceptable
7  to the bank group and/or obviously the parties
8  involved.  So there may have been some
9  conversations involving Morgan Stanley and/or
10 Virgo to see if something could be structured to
11 salvage the business and avoid a liquidation.
12      Q.   When you refer to the parties involved,
13 what you were saying is the proposal was not
14 acceptable to the bank group or the parties
15 involved.  The parties involved include Virgo,
16 right?
17      A.   It would include some representatives
18 of Virgo, yes.
19      Q.   Okay.  And Virgo you understood was
20 controlling Alchemy at that point, right?
21      A.   I understand Virgo owned, through
22 several layers, Alchemy.
23      Q.   And controlled Alchemy, right?
24           MR. TETRICK:  Objection to the form of
25      the question, asked and answered.

Page 62

1   A.   I believe Virgo was involved.
2   Q.   Okay.  Do you believe that Virgo
3   controlled the management of Alchemy at that
4   point?
5        MR. TETRICK:  Object to the form of the
6      question, vague and ambiguous, calls for a
7      legal conclusion.
8   A.   I believe Virgo or members of Virgo or
9   representatives of Virgo, however you want to
10  refer to them, were involved in the
11  decision-making process.
12  Q.   Okay.  Let's talk about the credit
13  agreement.  And maybe let's -- let's mark that an
14  exhibit.
15       MR. LOUD:  Amended or --
16       MR. GANS:  The amended.
17       (Exhibit PX002: Amended And Restated
18      Revolving Credit and Term Loan Agreement
19      dated as of July 9, 2015 marked for
20      identification, as of this date.)
21  Q.   I'd like to have marked as Exhibit PX
22  002 the amended credit agreement in this case.
23       All right.  You're familiar with the
24  amended and restated revolving credit and term
25  loan agreement that's in front of you?

```
                                                    Page 124
 1        Q.    Okay.
 2        A.    I think SunTrust understood that could
 3   pursue a complaint against Calrissian and one
 4   specific Virgo company, that being the one named
 5   in this Amended Complaint, Virgo Service Company,
 6   LLC.
 7        Q.    Okay.
 8        A.    So singular, not plural.
 9        Q.    Now, by that point SunTrust knew that
10   Calrissian had no assets, right?
11        A.    That is correct.
12        Q.    And so there would be no reason to --
13   well, let me back up.  So after the bankruptcy
14   closed, the lawsuit was reopened; is that your
15   understanding?
16        A.    Amended.  It's an Amended Complaint.
17        Q.    During the -- is it your understanding
18   that during the pendency of the Calrissian
19   bankruptcy that the lawsuit against Calrissian
20   was stayed?
21        A.    Yes.
22        Q.    And after the bankruptcy was closed,
23   then there was no longer a stay; is that your
24   understanding as well?
25        A.    Yes, after bankruptcy is discharged,
```

1    Q.   Do you understand the question?
2    A.   I do not.
3    Q.   Wasn't beautifully asked.  I have to
4  agree with Mr. Tetrick on that.
5         When SunTrust was evaluating whether to
6  sue Virgo at the request of Emigrant and Pacific
7  Mercantile, wasn't it concerned about whether
8  there was evidence that Virgo had acted
9  wrongfully?
10        MR. TETRICK:  Object to the form of the
11    question as ambiguous.
12   A.   When SunTrust was considering whether
13 or not to sue Virgo at the request of Pacific
14 Mercantile Bank and Aperture, we considered a
15 number of factors, not the least of which is
16 whether there was any basis for suing them and
17 the likelihood, based on advice of counsel
18 following the Dan Ray investigation, as to
19 whether or not there were valid claims that could
20 be reasonably pursued.
21        And, quite frankly, valid claims that
22 could be reasonably pursued that were not already
23 being pursued by the trustee.  So there are a lot
24 of factors considered in that decision process,
25 all of which were done with counsel and, quite

1  frankly, the end result on advice of counsel.
2       Q.   One of the factors that you thought
3  about at the time was whether there was evidence
4  that Virgo had acted wrongfully, right?
5       A.   One of the factors was whether there
6  were facts that would lead to an actual claim as
7  opposed to a potentially colorable claim with
8  limited likelihood of success as pointed out by
9  counsel with the collaboration of Mr. Ray
10 following Mr. Ray's assessment.
11      Q.   Okay.  Can you answer my question now,
12 please?
13      A.   I believe I've answered your question.
14      Q.   Okay.  That wasn't quite the question.
15           One of the factors that you thought
16 about was whether there was evidence that Virgo
17 had acted wrongfully; isn't that correct?
18           MR. TETRICK:  Object to the form of the
19        question.
20      Q.   And I can go back and ask the -- start
21 again, if that helps.
22           When SunTrust was evaluating whether to
23 sue Virgo at the request of Emigrant and Pacific
24 Mercantile, weren't you concerned about whether
25 there was evidence that Virgo acted wrongfully?

Page 258

1          MR. TETRICK:  And object to the form of
2      the question, lack of foundation, vague and
3      ambiguous.
4      A.   We were concerned as to whether or not
5  Virgo had acted wrongfully in a way that would
6  lead to an actual claim as opposed to a
7  potentially colorable claim with limited
8  likelihood of success as concluded by counsel
9  based on their interaction with Dan Ray and Dan
10 Ray having spent several months looking into the
11 available information.
12     Q.   When you were considering whether Virgo
13 had acted wrongfully in a way that would lead to
14 an actual claim, did you consider the fact that
15 Mr. Perez had asked Baker Tilly to delete the
16 statement that Millennium appears to have low
17 quality of earnings and delete the opinion that
18 the focus on EBITDA might be misleading to be
19 wrongful conduct?
20         MR. TETRICK:  Object to the form of the
21     question as vague and ambiguous.
22     A.   I'm not sure I follow that question as
23 asked.  Apologies for that.
24     Q.   Certainly.  No, I apologize that the
25 question wasn't clear.  Let me try it again.

Page 259

1  When you were considering whether Virgo
2  had acted wrongfully in a way that could lead to
3  an actual claim, did you consider the fact that
4  Mr. Perez had asked Baker Tilly to delete the
5  statement that Millennium appears to have a low
6  quality of earnings and delete the opinion that
7  the focus on EBITDA might be misleading?
8      A.  We considered a wide range of factors.
9  The arbitration report was already available and
10 was part of the discussions.  It was also
11 available to Mr. Ray and -- who looked into some
12 of these matters and discussed them with Akin
13 Gump.  So in a general level, yes, it was part of
14 the consideration.
15     Q.  And as part of the consideration, you
16 thought that it was wrongful that Virgo did that,
17 that it asked Baker Tilly -- Baker Tilly to
18 delete the statement about low quality of
19 earnings and delete the statement about EBITDA,
20 right?
21     A.  In a general sense, yes, it seems wrong
22 to me.
23     Q.  All right.  Let's turn to page six of
24 the interim award, which is Exhibit 22.  First
25 full paragraph says, To fund the purchase Virgo