# EXHIBIT 6



# M E M O R A N D U M

**ATTORNEY-CLIENT PRIVILEGED**
**ATTORNEY WORK PRODUCT**
**CONFIDENTIAL**

August 1, 2017

| | |
|---|---|
| **To:** | SunTrust Bank |
| **From:** | Akin Gump Strauss Hauer & Feld, LLP; Hemming Morse, LLP |
| **Re:** | *In re Our Alchemy, LLC*, Case No. 16-11596 – Analysis of Potential Claims |

## I. OVERVIEW

SunTrust Bank ("SunTrust" or the "Agent") serves as Administrative Agent in connection with that certain Amended and Restated Revolving Credit and Term Loan Agreement, dated as of July 9, 2015 (the "Credit Agreement"), by and among Our Alchemy, LLC ("Alchemy"), as the borrower, and the lenders party thereto (together with SunTrust, the "Lenders"). The Credit Agreement amended a Revolving Credit and Term Loan Agreement, dated as of September 4, 2014 (the "Original Credit Agreement"), by and among the same parties. The Credit and Term Loan Agreement is guaranteed by Calrissian LP ("Calrissian"), pursuant to the Guaranty and Security Agreement, dated September 4, 2014 (the "Guaranty Agreement," and together with the Credit Agreement, the "Loan Documents"). Calrissian is a subsidiary of Virgo Investment Group, LLC and certain of its affiliates (collectively, "Virgo").

On July 1, 2016 (the "Alchemy Petition Date"), Alchemy filed a petition seeking liquidation under chapter 7 of the Bankruptcy Code (the "Alchemy Petition"). On February 15, 2017 (the "Calrissian Petition Date"), Calrissian filed a petition for relief under chapter 11 of the Bankruptcy Code. The purpose of this memo is to give an overview of what potential claims SunTrust or the Lenders may be able to bring against Alchemy, Calrissian, or Virgo.

In connection with the preparation of this document, Akin Gump and Hemming Morse reviewed a large number of Alchemy documents received from the Alchemy bankruptcy trustee. Additionally, we conducted interviews with relevant individuals at Alchemy, SunTrust, and at least one other Lender. We also reviewed the interim decision in the Nu Image Arbitration (defined below), the Collateral Review commissioned by SunTrust in November 2015, and certain Virgo documents that were provided by Calrissian's counsel.



SunTrust Bank
August 1, 2017
Page 2

## Potential Claims and Defenses

We believe that there are a few claims that are potentially colorable and worth considering:

- Guaranty claim against Calrissian (and veil pierce to Virgo)
- Fraud against Virgo, Calrissian, or Alchemy
- Fraudulent transfer against Alchemy, Calrissian
- Preference
- Breach of Fiduciary Duty

### II. BACKGROUND

#### a. 2014 Purchase by Calrissian and Loan by Lenders

On August 18, 2014, Calrissian entered into an agreement (the "August 2014 Purchase Agreement") with Nu Image Holdings and certain of its affiliates and other equity holders (collectively, "Sellers") to purchase Alchemy (prior to 04/22/16 d/b/a Millennium Entertainment, LLC) (the "August 2014 Transaction"). For its part, Virgo—as Calrissian's parent—contributed the entire purchase price; this contribution included an approximately $15 million bridge loan (the "2014 Bridge Loan") which was to later be repaid by the Lenders.

On September 4, 2014, Alchemy, as borrower, entered into the Original Credit Agreement with the Lenders and SunTrust, as both a Lender and Agent. As a condition of the Original Credit Agreement, Calrissian agreed, via the Guaranty Agreement, to unconditionally and irrevocably guarantee all of Alchemy's obligations under the Original Credit Agreement. The original amount lent under the Original Credit Agreement was $31,200,000, consisting of a $20 million term loan and an $11,200,000 initial revolver draw. Those funds were primarily used to repay (1) the 2014 Bridge Loan and (2) the then-outstanding loan to Pacific Mercantile Bank ("PMB") in the amount of approximately $14.3 million.

#### b. Anderson Transaction

On May 7, 2015, Alchemy entered into an asset purchase agreement (the "May 2015 Purchase Agreement") with ANconnect LLC ("ANconnect"), the physical distribution arm of Anderson Media Corporation, which is an affiliate of Anderson Merchandisers, LLC



SunTrust Bank
August 1, 2017
Page 3

("Anderson"). Pursuant to the May 2015 Purchase Agreement, Alchemy agreed to purchase and assumed from ANconnect certain assets and liabilities of ANconnect's business.

In order to purchase the assets sold in the May 2015 Purchase Agreement, Alchemy borrowed additional funds from the Lenders under the Credit Agreement. Subject to the terms of the Credit Agreement, SunTrust and the other Lenders (including Emigrant) provided Alchemy with certain revolving and credit term loan facilities in an aggregate principal amount of up to $59,500,000, which amount Calrissian again unconditionally and irrevocably guaranteed. As part of the Anderson purchase, OA Investment Partners—a Virgo affiliate—gave a bridge loan of approximately $10 million and was repaid in July 2015 (the "2015 Bridge Loan").

### III.   ANALYSIS OF POTENTIAL CLAIMS

#### a.   Contract Claim via Veil Piercing

Prior to the Alchemy Petition Date, Alchemy had been in default under the Loan Documents by, among other things, failing to prepay certain obligations under the Credit Agreement, failing to maintain an EBITDA of at least $17,400,000 and failing to maintain at least $2,000,000 of liquidity as required under the terms of the Credit Agreement.

As a result of the existing defaults, and as permitted by the terms of the Credit Agreement, on June 15, 2016, SunTrust (on behalf of itself and the Lenders) notified Alchemy and Calrissian that all obligations owed under the Credit Agreement were due and payable. Calrissian has never paid SunTrust any amounts owed under the terms of the Loan Documents. Accordingly, on August 5, 2016, SunTrust, in its capacity as Agent, commenced a civil action against Calrissian New York state court for breach of contract. As a result of Calrissian's bankruptcy, that action is stayed.

Notwithstanding the stay and Calrissian's bankruptcy petition, SunTrust may be able to assert this contract claim against Virgo. Because Virgo is not a party to the Guaranty Agreement, SunTrust would need to show that the corporate veil of Calrissian should be pierced, allowing SunTrust to pursue claims against Calrissian's owner Virgo.

Calrissian is a Delaware LLC, and therefore the test for veil piercing will be pursuant to Delaware law. *See In re Washington Mutual, Inc.*, 418 B.R. 107, 113 (Bankr. D. Del. 2009) (holding that a court sitting in Delaware would look to the place of incorporation to determine veil piercing liability). Calrissian is a Delaware limited partnership, and therefore Delaware veil



SunTrust Bank
August 1, 2017
Page 4

piercing principles would apply.  *See In re Adelphia Communc'ns Corp.*, 376 B.R. 87, 93-94 (Bankr. D. Del. 2007) ("There is nothing about the nature of a limited liability partnership . . . that would preclude recourse to equitable remedies, including veil piercing . . . .").

To pierce the corporate veil under Delaware law, a plaintiff must show two things: (i) that an entity or individual had "complete dominion or control over another entity such that the latter no longer has a legal or independent significance of its own" and (ii) that the corporate structure has been used to "cause fraud or similar injustice".  *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999).

The first element focuses on how an entity operates and a particular defendant's relationship to that operation, and examines such factors as:

- Whether the entity was adequately capitalized for the corporate undertaking;

- Whether the entity was solvent;

- Whether dividends were paid;

- Whether records were kept, officers and directors functioned properly, and other formalities were observed;

- Whether the dominant holder siphoned entity funds; and

- Whether, in general, the entity simply functioned as a façade for a dominant holder.

*United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D. Del. 1988).  In the case of single-purpose entities, such as certain LLCs and LPs, somewhat less emphasis is placed on whether or not the entity observed proper formalities, since fewer formalities are legally required.  *NetJets Aviation, Inc. v. LHC Communc'ns, LLC*, 537 F.3d 168, 178 (2d Cir. 2008).[1]

The second element requires an overall element of injustice or unfairness.  Two of the most common types of veil piercing actions are (1) usurpation of entity assets and (2) blurring of entity formalities as inducement to transact.  In the first type of case, a court will pierce the veil of an entity where its owner siphons its assets and leaves it with the liabilities.  In the second type, a plaintiff is able to pierce the veil where it relies on representations from the owner that

---

[1] While we believe that this is likely to be a "direct" claim that can be brought by the Lenders, we are aware that the trustee is also investigating a veil piercing claim and it is possible that a court would determine that this claim belongs to the estate, forcing us to share any recoveries with other constituents.

Confidential                                                                                                         EB00197994



SunTrust Bank
August 1, 2017
Page 5

the owner stands behind the pierced entity. This type of relief is typically more difficult to get in contract cases than in tort cases, where a prospective plaintiff will have had an opportunity to have conducted diligence prior to entering in to the contract.

      We have discovered certain facts that may be helpful in asserting a veil piercing claim. First, with respect to independent legal significance, it seems clear that Virgo is closely affiliated with Calrissian, and with Alchemy. In an interview with Rex Bowring, former Controller of Alchemy, we learned that the same 12-15 people operate both Calrissian and Virgo. From Mr. Bowring's perspective, he was never clear with which entity he was dealing at any given time. He may have been told that certain decisions regarding Alchemy were being made by Calrissian and Virgo. Additionally, Bowring indicated that there may have been overlap between Virgo and the management of *Alchemy*, further diminishing the independent legal significance of Calrissian. Bowring noted that, at a certain point in 2015, he began taking instructions directly from Guthrie and Perez at Virgo, and that Perez in particular was making a number of strategic decisions at Alchemy. Finally, according to Bowring, it was Virgo that determined that Alchemy should seek bankruptcy protection, and pressured Alchemy to file on the Alchemy Petition Date.

      We are still seeking information that would help establish an overall element of injustice or unfairness. It appears as though the only money that Virgo ever took out of Calrissian was the repayment of the 2014 Bridge Loan and the 2015 Bridge Loan. However, it is important to note that we have not received complete banking or general ledger records from Alchemy, which would help us determine conclusively whether or not there were some other assets sent upstream to Virgo. Overall, approximately $80 million was invested into Alchemy via equity and debt financing, and we have not yet seen a concise explanation of how the company's available cash dropped to $0. We also have not seen clear statements made by Virgo individuals that would suggest to either SunTrust or one of the other Lenders that Virgo was also going to stand behind Calrissian and further backstop the Guaranty Agreement. Absent some additional facts, we believe that it will be difficult to establish that there was an abuse of the corporate form such that we could hold Virgo responsible for the balance of the loans.

      b. **Fraud**

      The Agent may also have claims for fraud against both Alchemy and Virgo in connection with representations made to SunTrust about the credit risk of the loan.

      To succeed in bringing a fraud claim, SunTrust will need to establish (1) a material representation or omission of a fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to

Confidential EB00197995



SunTrust Bank
August 1, 2017
Page 6

the plaintiff.  *See Tropical Sales Corp. v. Yext, Inc.*, 2017 WL 1048086 (S.D.N.Y. March 17, 2017); *Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1202 (E.D. Cal. 2013).

   During the lending process, there were various representations made to the Lenders. While we have not yet seen evidence that Virgo or its representatives were relaying known falsehoods, we have identified a few areas of focus for additional discovery.

   We have the option of pursuing Virgo's internal communications that predate the August 2014 Transaction.  There is an arbitration (the "Nu Image Arbitration") pending currently between Virgo and the Sellers that arises out of that transaction.  The Sellers allege that they are still owed money from the deal.  For their part, Virgo alleges that they were duped into purchasing Alchemy at an inflated price by deceptive financials coordinated by the Sellers.  As part of its interim award issued on March 28, 2017, the arbitrator found that Virgo was made aware of the low quality of Alchemy's earnings, but nevertheless pushed for the deal.  Virgo's attorneys believe that the arbitrator badly misinterpreted the facts, and Virgo is pursuing an appeal to the Nu Image Arbitration decision.  We believe that it is at least possible that communications among Virgo employees discussing the risks of proceeding with the transaction would help SunTrust establish that contrary statements made to SunTrust and the Lenders were *knowingly false*.

   The best evidence we have seen on this point regards Alchemy's decision to withhold a February 2016 post-transaction payment to Nu Image—an issue currently being litigated in the arbitration.  If, as Alchemy claims in the arbitration, it was concerned with Nu Image's entitlement to that payment based on fraud on the part of Nu Image, it begs the question of when Alchemy first became aware of that alleged fraud, and whether its failure to disclose such concerns to the Lenders is actionable in its own right.  Beyond that, however, we have not seen any evidence that would suggest which statement, if any, would be knowingly false, and it is at least as possible that there is not a claim.

   Similarly, there may be a similar claim relating to the Anderson transaction.  First, it seems that it may be the case that Alchemy was withholding certain fees payable to Anderson as early as June 2015.  We have not conclusively determined the basis for such withholding, but it may be that Alchemy was already aware of the precarious nature of the transaction.  We would like to review any quality of earnings reports that were prepared regarding Anderson, as well as any communications that Virgo had about such reports (which may be similar to their alleged concern in the Nu Image transaction).

   We have also learned that, following the transaction, certain fee income that was being collected from customers by Anderson was not being remitted to Alchemy.  This was done in

Confidential EB00197996



SunTrust Bank
August 1, 2017
Page 7

part because Anderson was attempting to use those funds as an offset against money it believed it was owed by Alchemy. Alchemy, in turn, was not paying those funds to Anderson because it suspected that there may have been fraud in consummating the deal. As with the Nu Image concerns, it would be interesting to know what Alchemy knew and when. But, also similarly to the Nu Image transaction, there is no statement that we are aware of today that would establish a good cause of action for fraud.

Additionally, we have the option of pursuing Virgo communications concerning the borrowing base certificates. These are the monthly status reports provided to the Lenders by Alchemy that include company performance data, helping the Lenders monitor the health of their loans. In light of interviews that we have conducted with Alchemy and SunTrust employees familiar with the borrowing base certificates, we think that it is at least possible that certain of the numbers—including those relating to the return of inventory by customers—were presented inaccurately in light of all the information available to Alchemy and Virgo at the time. It is important to note that we have not yet seen an email or other written evidence that Virgo and Alchemy were anything more than overly optimistic. It is possible that internal Virgo emails would provide additional fodder for a potential suit, but—as with the communications predating the deal—this is speculative and we have not seen any evidence that would suggest that a successful claim is "probable".

      c.  **Fraudulent Transfer**

Although we are not aware of any transfers from Alchemy and Calrissian to Virgo—other than the repayment of the 2014 Bridge Loan—any amounts that were transferred could be challenged as fraudulent under sections 544 or 548 of the Bankruptcy Code. This would include any management fees that were paid through Calrissian to Virgo. These claims would be estate claims, and would be brought in conjunction with the bankruptcy trustee for either Alchemy or Calrissian.[2]

Under 11 U.S.C. § 548(a)(1)(B), a bankruptcy trustee may avoid a transfer if the debtor (i) received less than reasonably equivalent value in exchange for such transfer and (ii) was insolvent on the date that such transfer was made or obligation was incurred. Section 544(b) provides that the trustee may avoid a transfer "that is voidable under applicable law," allowing for similar relief to be sought using state law, which typically extends past § 548's two year statute of limitations. The exact time that Alchemy and Calrissian became insolvent would be disputed, but it is reasonable to assume that the Anderson transaction—the last major transaction

---

[2] A Calrissian trustee has not yet been named and Calrissian continues to be a debtor in possession. It is possible that SunTrust or one of the other Lenders could assert this claim on behalf of Calrissian's bankruptcy estate.



SunTrust Bank
August 1, 2017
Page 8

by Alchemy as operating company—certainly pushed the companies into insolvency. Thus, just prior to that transaction would be the latest point in time that Alchemy and Calrissian could still be considered solvent. Determining whether or not there was reasonably equivalent value given is a necessarily fact-intensive exercise that would require additional discovery. At the very least, we would challenge the 2014 Bridge Loan and the 2015 Bridge Loan, forcing Alchemy and Virgo to demonstrate that reasonably equivalent value was given in connection with the repayment of those loans. While there is some caselaw that suggests that the existence of a pre-existing debt would make these repayments *per se* reasonably equivalent value, other Delaware cases have suggested that the proper test is a more flexible "facts and circumstances" inquiry, which is more likely to get us to discovery. If we pursue this claim, we would coordinate with the Alchemy trustee to search for additional transfers that could be challenged.

    d.  **Preference**

A bankruptcy trustee for Alchemy's or Calrissian's estate may also have claims for preference against any creditors who were paid shortly before the bankruptcy. Under 11 U.S.C. § 547, a trustee may avoid any transfer of an interest of the debtor made within 90 days before the date of filing the petition. A court would consider a claim relating to transactions dating back to one year prior to the respective petition dates so long as the transfer went to an insider. To establish that a creditor is a non-statutory insider, a plaintiff must demonstrate both "a close relationship between debtor and … anything other than closeness to suggest that any transactions were not conducted at arm's length." *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396-397 (3d Cir. 2009). A creditor will be held to an insider standard only "where it is found that it dominated and controlled the debtor." *In re KDI Holdings, Inc.*, 277 B.R. 492, 511 (Bankr. S.D.N.Y. 1999); *see also In re Champion Ent. Inc.*, 2010 WL 3522132, at *6 (Bankr. D. Del. Sept. 1 2010) (insider status may be "established by facts showing that the lender dictated day-to-day management and operation of the debtor or made decisions for the debtor regarding replacement of management or filing for bankruptcy.")

While we are likely to establish that Virgo was an insider at Alchemy, it may be more difficult to find a transaction to attack. The 2014 Bridge Loan should qualify as a payment to an insider, but was made more than a year prior to the petition date. The 2015 Bridge Loan is within the one year window, but OA Investments Partners may have a defense to being an insider, and they will argue that the Lenders' payment to Alchemy at the time was a contemporaneous exchange for new value, such that the transfer cannot be avoided. As with the fraudulent conveyance claim, we would work with the bankruptcy trustee to attempt to identify additional transfers that could be attacked.

    e.  **Breach of Fiduciary Duty**

Confidential EB00197998



SunTrust Bank
August 1, 2017
Page 9

There may also be a breach of fiduciary duty claim that can be brought against Alchemy's directors, or against Virgo for either aiding and abetting a breach of fiduciary duty or for controlling shareholder liability. This claim would be an estate claim, and would need to be brought by the trustee on behalf of the estate. It is a requirement that, in making business decisions, the directors of a corporation will act "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Typically, this duty is owed in light of what actions would be in the best interests of shareholders; however, in certain situations—such as when the company is insolvent—directors also owe fiduciary duties to the creditors of the corporation. *Adlerstein v. Wertheimer*, 2002 WL 205684, at *11 (Del. Ch. Jan. 25, 2002). While the presumption in a given case is typically that a transaction must only have some rational purpose—otherwise known as the "business judgment rule"—this presumption can be rebutted, in which case courts will scrutinize the transaction for "entire fairness," requiring both a fair price and a fair process. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995).

The "entire fairness" standard applies automatically when there is a transaction involving a controlling stockholder. *Kahn v. Lynch Commc'ns Sys., Inc. v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110 (Del. 1994). Although *Lynch* is often applied in the context of a merger, it has been used in other contexts, including with respect to amendments to a loan. *See Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592 (Del. Ch. Sept. 28, 2015).

As with the above potential claims, there are not any definitive facts that we have found that would make it more likely than not that a breach of fiduciary duty claim would succeed. Neither the August 2014 Transaction nor the Anderson purchase were deals that were done with Alchemy parties standing on both sides—a hallmark of a "duty of loyalty" claim. Nor has our review of the Alchemy documents turned up any decision that we believe could be confidently challenged as being a breach of fiduciary duty and materially damaging to Alchemy.

## IV. CONCLUSION AND NEXT STEPS

Overall, we believe that the Lenders may have at least colorable claims—but not necessarily strong ones. The loans soured quickly as Alchemy floundered, and there is enough Virgo involvement in connection with both transactions to raise the specter of control, such that Virgo could have to compensate Lenders for their losses. However, based on the evidence we have seen to date, we do not believe that it is likely that such claims would be successful. We think that it is about 50% likely that a complaint alleging these claims could survive a motion to dismiss, but, given the dearth of "hot" documents, the chances are considerably less that these



SunTrust Bank
August 1, 2017
Page 10

claims would win at trial. We have not seen anything to rebut a defense that Virgo was just as blindsided by Alchemy's poor performance as the Lenders.

      The next logical step would be to request discovery from Virgo. Because Alchemy and Calrissian are in bankruptcy, we can serve Virgo with 2004 Requests, rather than having to initiate a new lawsuit in order to attempt to obtain their documents. We believe that it would cost approximately $80,000 to serve requests, conduct a probable discovery fight with Virgo, and review whatever documents we receive from them. It is impossible to predict whether Virgo has documents that would materially bolster the proposed claims. However, given the absence of any specific evidence already uncovered that we think may lead to more promising discovery, we do not view it as any more likely than 50/50 that such a document exists. We may try, but would recommend that we have a conversation with the other Lenders before undertaking such an expense.