# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

February 21, 2024

**VIA ECF**
Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 2204
New York, NY 10007

      Re:    *Emigrant Bank, et al. v. SunTrust Bank, et al.*, No. 1:20-cv-02391-PGG-OTW

Dear Judge Gardephe:

      We represent Defendant Truist Bank, successor by merger to SunTrust Bank ("Truist"). We write to request a conference concerning Truist's anticipated motion for summary judgment on all remaining counts in Plaintiffs' operative Complaint and Truist's counterclaims.

      This case arises from a borrower's default under a syndicated loan, a guarantor's default under a guaranty, and Plaintiffs' quixotic attempt to sue anyone and everyone, including loan nonparties, rather than admit their "failure of diligence." Ex. A (Hr'g Tr., *Emigrant Bank et al. v. Virgo Investment Group, LLC et al.,* No. 654350/2021 (N.Y. Sup. Ct., N.Y. Cnty.), at 34). Discovery revealed why Plaintiffs are so piqued. The underlying loan was one of Plaintiff Emigrant Bank's ("Emigrant") first investments through its affiliate Aperture Media Partners, led by its CEO Jared Underwood. Ex. B (Underwood Tr. 207:3-8). After the borrower went bankrupt about a year into the loan, Mr. Underwood offered to slash his salary in half with certain compensation deferred until he improved Aperture's total return—and Emigrant accepted. *Id.* 209:17 – 210:5. Since then, Mr. Underwood has led a multi-forum campaign to find a way to pin blame on the borrower's private equity sponsor, including by asking Truist, Plaintiff Pacific Mercantile Bank ("PMB"), and nonparty Preferred Bank (the fourth lender) to sue the sponsor. *See* Ex. C (Underwood 30(b)(6) Dep. Ex. 36). Only PMB agreed, and it did so only after Emigrant granted PMB a full release and indemnity for any liability incurred as a result of the suit. Ex. D (Emigrant-PMB Agreement).

      Plaintiffs then sued Truist here for not suing the sponsor upon demand. But the undisputed facts demonstrate that Plaintiffs' claims fail, and Truist is entitled to summary judgment.

**I.    Background**

      Truist was administrative agent—and Plaintiffs, Truist, and Preferred were the lenders—under a credit agreement (the "Credit Agreement") with borrower Our Alchemy, LLC ("Alchemy"). ECF 45, ¶¶ 2, 4. Alchemy's 100% owner, Calrissian LP, executed a guaranty of the loan (the "Guaranty"). *Id.* ¶ 3. Virgo Investment Group, LLC ("VIG") was Alchemy's private equity sponsor and has certain affiliates relevant to this case:

    (1)   Virgo Societas Partnership III (Onshore), L.P. ("Virgo Onshore"), an investor in Calrissian;
    (2)   Virgo Societas Partnership III (Offshore), L.P. ("Virgo Offshore"), another Calrissian investor; and
    (3)   Virgo Service Company LLC, Calrissian's general partner ("VSC"). *Id.* ¶ 29.

After Alchemy defaulted under the Credit Agreement, Truist accelerated the debt, and Alchemy and Calrissian each filed for bankruptcy. *Id.* ¶ 73. After Alchemy filed for bankruptcy, Truist retained the consulting firm Hemming Morse LLP, at Plaintiffs' recommendation, to analyze Alchemy's finances and identify potential claims. Ex. E (Underwood Dep. Ex. 11); Ex. F (Ray Dep. Ex. 77). The resulting memorandum concluded that, while there were some "*potentially* colorable" claims, Truist was "still seeking information that would help establish an overall element of injustice or unfairness," as required to hold any entity liable as Calrissian's alter ego. Ex. G (Ray Dep. Ex. 71 at 2, 4–5) (emphasis added). "[B]ased on the evidence we have seen to date," the memo said, "we do not believe that it is likely that such claims would be successful," and the "next logical step would be to request discovery from" VIG and certain of its affiliates in Calrissian's bankruptcy case. *Id.* at 9, 10. Truist worked with Plaintiffs to seek discovery and, later, move to compel. Ex. H (TRUIST_00046707); Ex. I (*In re Calrissian LP,* Doc. 72, No. 17-10356 (Bankr. D. Del.), ECF 72). The bankruptcy court, however, stayed the motion upon the appointment of a Chapter 7 trustee, and the lenders never received the discovery before the bankruptcy case closed. Ex. J (*In re Calrissian LP,* No. 17-10356, ECF 103).

Undeterred by this lack of evidence, Emigrant pushed the lenders to agree to a cost-sharing and recovery-splitting agreement allowing Emigrant's lawyers to sue "Virgo," with Emigrant getting outsized recoveries for advancing attorney's fees despite the other lenders still paying for experts and other litigation costs. Ex. C. None initially agreed. PMB eventually agreed, but only after Emigrant agreed to (1) fund *all* of PMB's litigation expenses; (2) provide a complete release of claims against PMB; and (3) indemnify PMB for any liability incurred due to suing Virgo. Ex. D, at 3–4. Three days later, Plaintiffs demanded that Truist either: (1) agree to Emigrant's cost-sharing proposal, but without a release like the one Emigrant gave PMB; or (2) sue unspecified "Virgo" entities for breach of the Guaranty as Calrissian's alter ego or principal. ECF 45-7.

Truist rejected the cost-sharing agreement absent a release. ECF 37-1, at 1. Truist also explained that it would not file—nor could Plaintiffs force Truist to file—the requested lawsuit because, *inter alia*, "'the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose [it] to liability[,]'" which "includes filing potentially frivolous lawsuits." *Id.* at 2 (quoting ECF 45-1). Truist believed that filing the demanded lawsuit could expose it to liability, including "that it could . . . be exposed to liability for pursuing what could be frivolous litigation." Ex. M (de Jesus-Caballero 30(b)(6) Tr. 228:4 – 229:4).

II.    **Plaintiffs Fail to Raise an Issue of Material Fact as to Claims Based on Their Demand that Truist Sue "Virgo" (Counts I and III; Counterclaims I and II)**

    A.    **The Credit Agreement and the Guaranty Bar Plaintiffs' Claims.**

*First*, the Guaranty provides that, upon a default, "the Administrative Agent may, ***in its sole discretion***, . . . sue for . . . any money or property at any time payable or receivable on account

of . . . any of the Collateral, **but shall be under no obligation to do so**." ECF 45-2, § 7.4 (emphasis added). The "Collateral" includes Calrissian's "personal and real property" (*id.* § 3.1), including "cash, securities, accounts and contract rights" (*id.* § 1.2). The Guaranty separately reiterates that Truist shall not be "liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so," nor "under any obligation . . . to take any other action whatsoever with regard to the Collateral[.]" *Id.* § 8.2.

Plaintiffs contend that Truist should have sued "Virgo" for breaching the Guaranty as Calrissian's alter ego—a theory that "Virgo" *is* Calrissian, that the legal separateness of the entities should be ignored, and that "Virgo's" assets should be available to pay Calrissian's obligations. *Cf. Sea Metro. S.A. v. DGM Commodities Corp.*, 2013 WL 3990922, at *6 (E.D.N.Y. Aug. 2, 2013) (alter ego "stands in the shoes" of the entity with direct liability); *Ostrolenk Faber LLP v. Lagassey*, 2020 WL 30350, at *6 (S.D.N.Y. Jan. 2, 2020) (defendant entitled to rely on contract right of alleged alter ego). Under Plaintiffs' theory, "Virgo's" assets *are* Calrissian's and thus, "Collateral." But Truist cannot be liable for failure to collect on "Virgo's" assets because, under the Guaranty, it had "sole discretion" whether to sue to collect Collateral but was "under no obligation" to do so.

***Second***, even if the Guaranty did not bar Plaintiffs' claims, under the Credit Agreement, "the Administrative Agent shall not be required to take any action that, in its opinion[, . . .] may expose [it] to liability[.]" ECF 45-1, § 9.2. Undisputed evidence establishes Truist believed that filing the proposed lawsuit may have been frivolous and could have exposed it to liability. Ex. M (de Jesus-Caballero 30(b)(6) Tr. 228:4 – 229:4). Truist was not alone in that concern: Plaintiff PMB demanded from Emigrant—and received—full indemnification for any liability incurred due to suing "Virgo." Ex. D, at 3–4. Truist thus had no obligation to file the suit Plaintiffs demanded.

***Third***, the Credit Agreement eliminates Plaintiffs' "written demand" rights upon an Event of Default "described in subsection (h) or (i) of" Section 8.1. ECF 45-1, § 8.1. Subsection (i) creates an Event of Default when Calrissian or Alchemy "become unable to pay, shall admit in writing its inability to pay, or shall generally fail to pay, its debts as they become due[.]" *Id.* § 8.1(i). Here, Calrissian and Alchemy became unable to pay, and failed to pay, their debts as they became due. ECF 45, ¶ 53; Ex. N (Newbrough 30(b)(6) Dep. 44:5–7). Plaintiffs' claims thus fail.

### B. The Automatic Stay Barred Any Alter Ego Claims.

Plaintiffs' claims also fail because the automatic stay created by the Calrissian bankruptcy barred Truist from asserting claims when Plaintiffs made their demand. *See* ECF 45-7. On the date of the demand, December 13, 2019, Calrissian was in bankruptcy. Ex. O (Pls.' Resp. to Req. for Admis. 4). A claim brought at that time against any Virgo Entity as Calrissian's alleged alter ego would have violated the automatic stay and been subject to dismissal and sanctions. *See* 11 U.S.C. § 362; *In re Our Alchemy, LLC*, No. 16-11596 (Bankr. D. Del.), ECF 1009 (barring Plaintiffs from asserting claims under the theory that certain Virgo "Parties" were Alchemy's alter ego while Alchemy's bankruptcy was pending). Plaintiffs thus lack damages based on their demand, and their claim is barred by the Credit Agreement, which provides that Truist need not take an action "that may be in violation of the automatic stay." ECF 45-1, § 9.2.

### C. In Any Event, Threshold Issues Defeat Plaintiffs' Claims as to Three of Their Four Proposed Virgo Defendants.

February 21, 2024
Page 4

After initially failing to identify the specific parties they wanted Truist to sue, Plaintiffs now contend Truist should have sued four entities: Virgo Service Company; Virgo Onshore; Virgo Offshore; and VIG (the "Virgo Entities"). Ex. K (Emigrant's Resp. to Interrog. 17); Ex. L (PMB's Resp. to Interrog. 17). Plaintiffs' claims as to three of those entities fail due to threshold issues.

***First***, Truist has already obtained a judgment against VSC for the full amount owed under the Credit Agreement, plus principal and interest—in excess of $73 million. Ex. P (*Truist Bank f/k/a SunTrust Bank v. Calrissian LP et al.,* No. 654148/2016, Doc. 113 (N.Y. Sup. Ct., N.Y. Cnty.)). Truist's prosecution of a different (successful) theory of liability against VSC means Plaintiffs cannot establish any damages based on Truist's refusal to sue VSC under their pet theory.

***Second***, Plaintiffs fail to raise an issue of material fact that Truist could have successfully sued Virgo Offshore and Virgo Onshore, two of Calrissian's limited partners. Ex. Q (Underwood 30(b)(6) Dep. Ex. 51 at VIG_SUBPOENA_000025). Under Delaware law, which governs here, a plaintiff cannot hold a limited partner liable for a limited partnership's debt unless it establishes, among other things, that "transact[ed] business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner." 6 Del. § 17-303(a). Plaintiffs adduced no evidence that they or any of the lenders believed that Virgo Offshore or Virgo Onshore was Calrissian's general partner. ECF 45-2, at 39. To the contrary, the Guaranty and Forbearance Agreement both identify VSC as Calrissian's general partner. *See* ECF 45-2 (Guaranty); ECF 45-5 (Forbearance Agreement). Thus, Plaintiffs' claims based on Truist failing to sue VSC, Virgo Onshore, or Virgo Offshore fail as a matter of law.

### D. Plaintiffs Failed to Adduce Evidence Establishing that Calrissian Existed as a Sham to Perpetuate Fraud as Required to Establish Alter Ego Liability.

"Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). "Delaware law requires that the fraud or injustice be found in the *defendant's use of the corporate form itself*." *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 620 (D. Del. 2018) (emphasis in original). "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184.

Here, Plaintiffs have not adduced evidence that any Virgo Entity used Calrissian's corporate form itself to cause any fraud or injustice, or that Calrissian existed for no other purpose than as a vehicle for fraud. To the contrary, the Credit Agreement authorized, among other things, Alchemy's use of loan funds to "finance its ongoing working capital needs." ECF 45-1, § 5.11. Nor have Plaintiffs adduced any other evidence that any Virgo Entity used Calrissian to engage in any misrepresentations or other injustice akin to fraud. Accordingly, Plaintiffs have failed to create a question of material fact as to whether the lawsuit they demanded would have been successful in establishing that any Virgo Entity was Calrissian's alter ego. Plaintiffs thus cannot establish that they were damaged by Truist's alleged breach.

### E. Plaintiffs Failed to Adduce Evidence that Virgo Investment Group, Virgo Onshore, or Virgo Offshore Were Liable as a Matter of Agency Law.

Plaintiffs' alternative theory—that Truist sue "Virgo" for breach of contract as Calrissian's "principal"—also fails. "It is hornbook law that, ordinarily, only parties to a contract may be liable for breach of that contract." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *3 (Del. Ch. Nov. 13, 2018). "Agency law does not negate or otherwise alter that fundamental tenet of contract law. Under the doctrine of vicarious liability, a principal may be liable for torts committed by an agent acting within the scope of the agency relationship, i.e., where the agent's tortious conduct is undertaken pursuant to the agency relationship. Delaware, however, has not extended the doctrine of vicarious liability to breach of contract claims." *Id.* (footnotes omitted). Plaintiffs thus lack damages because any claim based on agency law would have failed as a matter of law.

### F. The Undisputed Facts Establish Truist Did Not Act with Gross Negligence in Refusing to Bring the Demanded Lawsuit.

The Credit Agreement provides that "[t]he Administrative Agent shall not be liable for any action taken or not taken by it . . . in the absence of its own gross negligence or willful misconduct." ECF 45-1, § 9.2. In its order on Truist's motion to dismiss, the Court concluded that Plaintiffs plead sufficient facts to overcome that limitation on liability "[b]y alleging that SunTrust insisted on obtaining a general release before performing its contractual obligations." ECF 65, at 38. The undisputed evidence, however, establishes that Truist requested a release in response to Emigrant's *commercial cost-sharing and revenue-splitting proposal*, which was distinct from Plaintiffs' demand that Truist sue "Virgo." ECF 37-1, at 1. Indeed, Plaintiff PMB demanded (and received) an *even broader* release from Emigrant before it would agree to Emigrant's commercial proposal. Ex. D, at 3–4. And Truist did, in fact, successfully sue VSC (on a theory soundly grounded in law and fact) and obtained a judgment against VSC without ever receiving the release Truist requested in the separate commercial context. Ex. P. Accordingly, Plaintiffs lack evidence that Truist acted with gross negligence or willful misconduct in declining to file the demanded lawsuit, and the contractual limitation of liability provision thus bars Plaintiffs' Counts I and III.

### III. Plaintiffs Raise No Issue of Material Fact as to Distributions (Counts IV and VI)

Plaintiffs also allege breaches of contract based on Truist's distribution of certain funds. ECF 45, ¶¶ 121–28, 135–41. In their Initial Disclosures, Plaintiffs failed to disclose any damages caused by this breach and represented that "Plaintiffs will provide Defendants with an expert damages report[.]" Ex. R (Pls.' Initial Disclosures, ¶ 19). Truist's first interrogatory demanded that Plaintiffs "Identify, for each category of damages You seek, the amount of damages for which You allege that Defendants are liable." On May 30, 2023, Plaintiffs responded that the interrogatory was "premature" and that they "will submit expert materials in accordance with the Federal Rules of Civil Procedure, the Local Rules," and any other rules or Court scheduling orders. Ex. S (Pls.' Resp. to Interrog. 1). Plaintiffs' experts, however, offered no "damages report" and no calculation whatsoever for the damages Plaintiffs allegedly suffered as a result of Truist's alleged distribution-of-funds breach. Plaintiffs have thus failed to put forth necessary evidence of damage for their reimbursement claims.

### IV. Conclusion

For the foregoing reasons, Truist requests permission to move for summary judgment.

February 21, 2024
Page 6

                                               Respectfully submitted,

                                               */s/ David Tetrick*
                                               David Tetrick
                                               *Counsel for Truist Bank,*
                                               *successor by merger to SunTrust Bank*

cc:       All Counsel of Record via ECF