# EXHIBIT 7

Page 1

1           UNITED STATES DISTRICT COURT
2           SOUTHERN DISTRICT OF NEW YORK
3
4   _____
                                    )
5   EMIGRANT BANK and PACIFIC       )
    MERCANTILE BANK,                )
6                                   )
            Plaintiffs,             )
7                                   )Case No.
        vs.                         )1:20-cv-02391-PGG-OTW
8                                   )
    SUNTRUST BANK; TRUIST BANK;     )
9   and DOES 1 through 10,          )
    inclusive,                      )
10                                  )
            Defendants.             )
11  _____)
12
13
14              DEPOSITION OF REX BOWRING
15              Tuesday, December 5, 2023
16
17
18
19
20
21
22  Reported by:
23  KATHLEEN E. BARNEY
24  CSR No. 5698
25

```
                                          Page 2
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
 4   _____
                                    )
 5   EMIGRANT BANK and PACIFIC      )
     MERCANTILE BANK,               )
 6                                  )
             Plaintiffs,            )
 7                                  )Case No.
        vs.                         )1:20-cv-02391-PGG-OTW
 8                                  )
     SUNTRUST BANK; TRUIST BANK;    )
 9   and DOES 1 through 10,         )
     inclusive,                     )
10                                  )
             Defendants.            )
11   _____)
12
13            Deposition of REX BOWRING, taken on
14   behalf of Plaintiffs, beginning at 9:03 a.m. and
15   ending at 7:01 p.m. on Tuesday, December 5, 2023,
16   before KATHLEEN E. BARNEY, Certified Shorthand
17   Reporter No. 5698.
18
19
20
21
22
23
24
25
```

```
                                              Page 3

 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4

 5        QUINN EMANUEL URQUHART & SULLIVAN, LLP

 6        BY:  GARY GANS

 7             KAYLA ROONEY

 8        Attorneys at Law

 9        865 South Figueroa Street

10        10th Floor

11        Los Angeles, California 90017

12        garygans@quinnemanuel.com

13

14

15   For Defendants:

16

17        KING & SPALDING

18        BY:  DAVID TETRICK  (Via Zoom)

19        Attorney at Law

20        1180 Peachtree Street, NE

21        Suite 1600

22        Atlanta, Georgia  30309

23        dtetrick@kslaw.com

24

25
```

Page 4

1   APPEARANCES (continued):

2

3   Videographer:

4

5        STEVEN TOGAMI

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page 212

1     A    Yes.

2     Q    The first sentence, it says:

3               "Bowring advised that it is his

4          understanding that Virgo set up

5          Calrissian as a stand-alone entity,

6          the purpose of which was to own ME."

7          Do you see that?

8     A    Yes.

9     Q    And do you understand ME is Millennium

10   Entertainment?

11    A    Yes.

12    Q    Okay.  And that is true, that it was your

13   understanding that Virgo set up Calrissian as a

14   stand-alone entity, the purpose of which was to own

15   ME?

16    A    That was my understanding.

17    Q    Okay.  Then it says:

18               "He advised that the same 12 to

19          15 people operate both Calrissian and

20          Virgo.  He states that he never knew

21          if he was dealing with Calrissian or

22          Virgo, and he was not aware of any

23          difference between the two entities."

24          That was also your understanding; is that

25   right?

Page 213

1     A    Yes.

2     Q    And so it was your experience that the same

3  people operated Virgo and -- well, I don't know if

4  they operated -- let me start again.

5          Do you know if anybody actually was operating

6  Calrissian?

7     A    I did not, no.

8     Q    So you just dealt with the same group of --

9  dealt with the group of people from Virgo?

10    A    Yes.

11    Q    Okay.  And I think we've gone through this,

12 but you didn't have an understanding that anybody

13 worked at Calrissian independent of Virgo?

14    A    Yes.

15    Q    Okay.  And did you ever know whether

16 Calrissian had any independent offices?

17    A    I was not aware of any independent offices.

18    Q    And did you ever see any Calrissian email

19 address?

20    A    Not that I recall.

21    Q    Skipping to the last paragraph, it says:

22            "The initial funds to purchase ME

23         came from other partners, but flowed

24         through Calrissian."

25         Do you see that?

Page 214

1    A    Yes.

2    Q    And you talked earlier about who put up the

3    money to purchase Millennium.

4         Do you remember that?

5    A    My understanding, yes.

6    Q    So how do you know that the initial funds to

7    purchase Millennium came from other partners, but

8    flowed through Calrissian?

9    A    Because I was told by Virgo partners that

10   they had these two other investment partnerships and

11   these people invested in these partnerships,

12   contributed the funds for this acquisition at Virgo.

13   Q    Which Virgo partners told you that?

14   A    I believe -- I believe those questions were

15   answered through -- it would have been either Mark

16   Perez or Brian Wade.

17   Q    Okay.  Skipping to the next page, there's a

18   heading of "Borrowing Base Certificates."

19        Do you see that?

20   A    Yes.

21   Q    The first paragraph under that heading says:

22             "Bowring advised that following

23        the acquisition of ME/Alchemy, they

24        were required to submit borrowing

25        based certificates (BBCs) to SunTrust

```
                                        Page 215
 1          Bank as administrative agent for the
 2          other lenders.  He advised that the
 3          BBCs were submitted to SunTrust on a
 4          monthly basis and a compliance
 5          certificate was submitted on a
 6          quarterly basis."
 7          That's true, as you've testified earlier,
 8   right?
 9      A   Yes.
10      Q   Skipping a paragraph, it says:
11             "Bowring would submit draft BBCs
12          to Matt Roland at SunTrust, and they
13          would have" -- "and they would then
14          have discussions regarding them.  Once
15          they were made final, the BBCs would
16          typically be signed by Lee and
17          occasionally Avagliano.  After Lee and
18          Avagliano were no longer with Alchemy,
19          for several months the BBCs were
20          signed by Scott Guthrie."
21          So all of that is true other than the name is
22   Matt Rowand, not Matt Roland.  Is that your
23   understanding?
24          MR. TETRICK:  Object to the form of the
25   question.  Mischaracterizes previous testimony.
```

Page 299

1   Alchemy was known as as of 2014, right?

2      A    Yes.

3      Q    So then let's turn to -- I want to get you

4   the correct page number.  Give me just one second.

5           Okay.  I'd like you to turn to the back of

6   the document.  It's about 45 pages in, and the Bates

7   label that you're looking for is 215461.

8      A    I have an EB22 -- I mean EB00215461?

9      Q    Right.  Let me have you turn -- I'm sorry,

10  not turn, but go up a few pages before then to

11  215456.

12     A    Yes.

13     Q    And do you see the signature blocks on that

14  page?

15     A    Yes.

16     Q    And do you see that the guarantors are

17  identified as Calrissian LP and Millennium Media

18  Services, Inc.?

19     A    I see guarantors, yes, as those two

20  companies.

21     Q    And who signed on behalf of Calrissian LP?

22     A    From what I look at, it appears to be Jesse

23  Watson, titled "Manager."

24     Q    And the entity that is above his signature is

25  Virgo Service Company, LLC; is that right?

```
                                            Page 300
 1      A    Yes.
 2      Q    Are you familiar with the entity named Virgo
 3   Service Company, LLC?
 4      A    No.
 5      Q    And -- but you are familiar with Calrissian
 6   LP, right?
 7      A    I'm aware of an entity called Calrissian, but
 8   I don't know the exact legal distinctions.  Because
 9   when I dealt with it on email, it was Calrissian
10   Virgo.  But for me and my staff, we were treating
11   Virgo Calrissian as one and the same as far as my
12   perspective.  I didn't understand or didn't
13   understand completely all of the nuances of the
14   companies.
15      Q    But you were never an employee of Calrissian,
16   right?
17      A    Never.
18      Q    And you were never an officer of Calrissian?
19      A    Yes, never.  Correct.
20      Q    During your time as an employee of Our
21   Alchemy, did you have access to Calrissian's
22   financial statements?
23      A    No.
24      Q    I wanted to ask you about some of your
25   testimony earlier today, and specifically what I
```

Page 301

1   wanted to ask about was testimony that was pretty

2   early on in the day.

3          You testified to the effect that Virgo was

4   the borrower, but that the loan was constructed so

5   that Alchemy would be the legally responsible

6   entity.

7          Do you remember giving that answer?

8      A   That was my understanding at the time.  And I

9   believe I used the term that Virgo negotiated the

10  deal, and it was basically paraphrasing Alchemy -- I

11  mean Virgo, and Virgo people were responsible for

12  negotiating the deal.  And then they pushed the loan

13  down on Millennium Entertainment.  It's a vernacular

14  term I used that, okay, it's our Millennium

15  Entertainment debt.

16         But that was my understanding.  Whether they

17  were negotiating it on their behalf or the behalf of

18  Millennium Entertainment, but they were negotiating

19  the deal and then it got pushed down as Millennium

20  Entertainment's loan.

21     Q   And when you're referring to "the deal" in

22  your answer there, are you referring to the

23  arrangement that eventually became the original

24  credit agreement that you have in front of you as

25  Defendants' Exhibit 93?

```
                                              Page 302
 1      A    Yes.
 2      Q    And you understand that the original credit
 3  agreement governed the relationship between the
 4  borrower and the lenders after it was signed, right?
 5      A    Yes.
 6      Q    Until it was amended and restated in 2015,
 7  right?
 8      A    Yes.
 9      Q    After which the amended credit agreement
10  controlled the relationship between the lenders and
11  the borrowers, right?
12      A    Yes.
13      Q    So what's the basis of your understanding
14  that Virgo was the borrower, but I think your term
15  was "pushed it down on Alchemy"?  What is the basis
16  of your understanding there?
17      A    My understanding is they were negotiating the
18  deal, the loan and all of the terms of the deal and
19  negotiating it and basically putting the whole deal
20  together.
21           Because all the time I was -- emails and
22  whatnot, receiving emails from Mark Perez, we need
23  this, we need that information or what.  And they
24  were -- my understanding, they were -- initially
25  they were negotiating the loan agreement and
```

Page 303

1    everything from based on all of the information and

2    emails and requests for information, it was all

3    going back to -- via Mark Perez and/or, you know,

4    the lawyers that were working on the deal.  But what

5    I understood, that it was going through Mark Perez

6    and everything, direction and information that we

7    were providing.

8        Q    So is this an understanding that you reached

9    on your own, or did you get this information from

10   somebody else?

11       A    Information talking to other people, I

12   believe John Avagliano, and discussing it and

13   saying, you know, they're handling it, they're

14   taking the lead on it, negotiating for this.  And so

15   let's be a part and provide the information that

16   they need so the deal can be closed for Millennium

17   Entertainment.

18       Q    And were these negotiations that you're

19   describing the negotiations with the lenders to the

20   original credit agreement?

21       A    That was my understanding.

22       Q    And do you know why Virgo did not want to be

23   the borrower under the amended credit agreement?

24       A    No, I do not.

25       Q    Do you -- do you understand how it is that

```
                                         Page 304
 1   Calrissian became the guarantor under the original
 2   credit agreement?
 3       A    No, I do not.
 4       Q    I should have asked you this earlier, but
 5   during the time that you were employed as controller
 6   at Our Alchemy, did you have access to Calrissian's
 7   bank accounts?
 8       A    No.
 9       Q    Did you have any signature authority over
10   Calrissian's bank accounts?
11       A    No.
12       Q    Let me ask you to take a look at the document
13   that has been marked as Defendants' Exhibit 95.
14   That's the amended complaint.
15       A    Okay.  Yes, I have it.
16       Q    Have you seen this document before today?
17       A    No, I have not.
18       Q    You did not review this in preparation for
19   your deposition?
20       A    No, I did not.
21       Q    Would you please turn to page 10.
22       A    Would that be listed as page 10 of this
23   document at the bottom?
24       Q    I hope so, yes.
25       A    Yes, I'm there.
```