# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

May 13, 2024

**VIA ECF**
Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square, Room 2204
New York, NY 10007

    Re: *Emigrant Bank, et al. v. SunTrust Bank, et al.*, No. 1:20-cv-02391-PGG-OTW

Dear Judge Gardephe:

  We represent Defendant Truist Bank, successor by merger to SunTrust Bank ("Truist"). We write in response to the Court's Order (ECF 175), directing the parties and the Virgo Intervenors to provide supplemental submissions regarding the impact on this litigation of the default judgment that Truist recently obtained in New York state court against Calrissian LP and Virgo Service Company LLC ("VSC") (ECF 158-16).

  The judgment, which Truist is domesticating in California, demonstrates Truist's persistent advancement of the Lenders' interests, it clears the way for post-judgment discovery from the California-based Virgo Intervenors, and it underscores that Plaintiffs have not suffered any harm because California law permits the addition of judgment debtors on an alter ego theory for 10 years after the judgment's entry.

## I. Introduction

  For the eight years since borrower Our Alchemy, LLC ("Alchemy") defaulted on its loans, Truist has acted to protect and advance the interests of the lenders ("Lenders") under the Credit Agreement (ECF 45-1) and enforce the Guaranty Agreement executed by Calrissian (ECF 45-2). First, in August 2016, it commenced the case that ultimately led to the default judgment against Calrissian and its general partner, VSC. Then, in September 2016, Truist hired Plaintiffs' hand-picked forensic accountant to review Alchemy's records and identify potential claims versus other parties. Based on that investigation, Plaintiffs knew by 2017 that Truist lacked evidence to support a necessary element of an alter ego claim versus Virgo Investment Group ("VIG") and its affiliates. So, Truist pursued that discovery in Calrissian's bankruptcy, but it was stymied by the appointment of a Chapter 7 Trustee, followed by the Calrissian Trustee's decision not to pursue the case and the bankruptcy court's eventual closure of the case.

  Plaintiffs then demanded that Truist sue VIG, VSC, and two VIG-managed funds under an alter ego theory despite the lack of evidence. Truist refused to file that lawsuit. But it identified a different claim soundly grounded in fact and law—holding VSC liable for Calrissian's breach of the Guaranty Agreement under Delaware partnership law—and obtained a $73 million default

judgment in the Lenders' favor against Calrissian and VSC earlier this year. So, Truist has obtained a judgment against one of the VIG affiliates Plaintiffs demanded that Truist sue—and has filed the New York judgment in California to domesticate it there, where VSC and the Virgo entities are located. California law authorizes judgment creditors to add alleged alter egos as judgment debtors, even where the original judgment is a sister-state judgment, for 10 years following the date of the judgment. Once the judgment is domesticated, Truist will be able to seek discovery in aid of execution from the judgment debtors and other VIG affiliates. Thus, due to Truist's vigilance, the Lenders still have the opportunity to recover from VIG and its affiliates if they were, in fact, Calrissian's alter ego, through proceedings in California state court.

This diligence contrasts starkly with Plaintiffs' failure to take action rather than diligently pursuing discovery from Virgo entities. (*See* ECF 176, at 9–13.) Despite their insistence that Truist should haphazardly sue "Virgo" as Calrissian's alter ego, Plaintiffs revealed at the April 11 hearing that they didn't *really* want discovery from Virgo—instead, they want the Court to *presume* that Virgo affiliates were Calrissian's alter ego. (ECF 170-1, at 3:14–17.) Regardless of whether Plaintiffs' flip-flop reflects concern that discovery from Virgo entities would not produce alter ego evidence, or something else, it underscores their lack of a viable claim against Truist or damages while alter ego claims remain available in appropriate post-judgment proceedings in California.

## II.     Background

Truist, Plaintiffs Emigrant Bank and Pacific Mercantile Bank ("PMB"), and non-party Preferred Bank were the Lenders to Alchemy, as borrower under the Credit Agreement. (ECF 45-1.) Calrissian was a guarantor under the Guaranty Agreement. (ECF 45-2.) VSC was Calrissian's general partner. (*See id.* at 39.) As of 2014, Virgo Societas Partnership III (Onshore), L.P. ("Virgo Onshore") held 44.50% of the limited partnership interests in Calrissian, and Virgo Societas Partnership III (Offshore), L.P. ("Virgo Offshore") held an additional 46.38%. (ECF 162-1, Report of Plaintiffs' Expert Mark Rule, at 10.) Two other entities held the remaining 9.12%. (*Id.*)

Alchemy defaulted under the Credit Agreement, and Calrissian defaulted under the Guaranty Agreement. Truist then served a notice of acceleration of the debt on Alchemy and Calrissian. (ECF 45-6.) Plaintiffs supported that decision, even though they knew Alchemy would likely enter bankruptcy as a result. (Ex. A, Newbrough Tr. (Oct. 31, 2023) 86:10–25.) Alchemy shortly thereafter filed for bankruptcy protection. *In re Our Alchemy, LLC*, No. 16-11596 (Bankr. D. Del.), ECF 1 (July 1, 2016). Truist subsequently executed a Sharing and Reimbursement Agreement with the Alchemy Bankruptcy Trustee, ensuring that the Lenders would have a recognized claim of no less than $46 million. *Id.*, ECF 226-2 (Sept. 15, 2016). Plaintiffs supported Truist's decision to enter the Sharing and Reimbursement Agreement. (Ex. A, Newbrough Tr. 23:25 – 24:8; Ex. B, Lender Email Chain.) Within weeks of Alchemy's bankruptcy filing, Truist circulated to the Lenders, including Plaintiffs, a draft complaint against Calrissian for breach of the Guaranty Agreement. (Ex. C, Newbrough Ex. 7.) Plaintiffs wanted Truist to file the lawsuit against Calrissian. (Ex. A, Newbrough Tr. 98:5 – 99:1.) Truist filed that lawsuit (the "Guaranty Action") days later, on August 5, 2016. *Truist Bank v. Calrissian LP*, Index No. 654148/2016 (N.Y. Sup. Ct., N.Y. Cnty., Aug. 5, 2016), Dkt. 2.

Truist also retained forensic accountant Dan Ray and the consulting firm Hemming Morse, LLP, at Plaintiffs' recommendation, to analyze Alchemy's finances and identify potential claims.

(ECF 158-5; Ex. 158-6.)  The resulting memorandum concluded that, while there were some "*potentially* colorable" claims, Truist was "still seeking information that would help establish an overall element of injustice or unfairness," as required to hold any entity liable as Calrissian's alter ego. (ECF 158-7, Aug. 1, 2017 Memo, at 3, 5–6 (emphasis added).)  "[B]ased on the evidence we have seen to date," the memo said, "we do not believe that it is likely that such claims would be successful," and the "next logical step would be to request discovery from" VIG and its affiliates in Calrissian's bankruptcy case. (*Id.* at 10, 11.)

Knowing that additional evidence was needed to assert alter ego claims, Plaintiff Emigrant Bank surreptitiously retained former Alchemy controller Rex Bowring as a consultant in January 2018.  (Ex. D, Jan. 19, 2018 Bowring Consulting Agreement.)  Yet Plaintiffs did not disclose this engagement to Truist until December 2023, despite Plaintiffs now claiming that he has evidence relevant to the alter ego issues.[1]  (*See* Ex. E, Bowring Tr. 15:4–22, 268:16 – 269:22, 272:9 – 273:23.)  Although Plaintiffs withheld any new "evidence" Mr. Bowring could have provided, Truist worked with Plaintiffs to serve discovery requests and move to compel in the Calrissian bankruptcy to determine if evidence necessary to assert alter ego claims existed. (ECF 158-9, May 18, 2018 Motion to Compel).  In August 2018, the Bankruptcy Court stayed the motion to compel upon the appointment of a Chapter 7 trustee, and the Lenders never received the requested discovery in the Calrissian bankruptcy. (ECF 158-10, Bankruptcy Court Order.)

Undeterred by the lack of evidentiary support for the alter ego claim, and again without providing any new "evidence" from Mr. Bowring, Emigrant pushed the Lenders to agree to a cost-sharing and recovery-splitting agreement allowing Emigrant's lawyers to sue Virgo entities, with Emigrant getting outsized recoveries for advancing attorney's fees despite the other Lenders still paying for experts and other litigation costs. (ECF 158-3.)  None initially consented.  PMB eventually agreed, but only after Emigrant agreed to (1) fund all of PMB's litigation expenses; (2) provide a complete release of claims against PMB; and (3) indemnify PMB for any liability incurred due to suing Virgo. (ECF 158-4, Emigrant-PMB Agreement, at 4–5.)  Three days later, Plaintiffs demanded that Truist either: (1) agree to Emigrant's cost-sharing proposal, but without a release like the one Emigrant gave PMB; or (2) sue unspecified "Virgo" entities for breach of the Guaranty as Calrissian's alter ego or principal. (ECF 45-7, Plaintiffs' Dec. 13, 2019 Demand.)  Plaintiffs later specified four entities they wanted Truist to sue on an alter ego theory: VIG, VSC, Virgo Onshore, and Virgo Offshore.  Truist rejected the cost-sharing agreement absent a release (like that given to PMB) and did not file the requested alter ego lawsuit. (ECF 37-1.)  By not filing the demanded lawsuit in 2019, without evidentiary support, Truist avoided the preclusion of those alter ego claims via early dismissal.

Instead, Truist persistently pursued a judgment in the Guaranty Action and identified legally sound ways to preserve potential recoveries for the Lenders.  Truist determined that it could assert a claim for breach of the Guaranty Agreement against VSC, as Calrissian's general partner, because general partners are liable for partnership debts under Delaware partnership law.  *See* 6 Del. C. §§ 17-303(a) & 17-403(b).  Plaintiffs failed to identify this basis for holding VSC liable, though VSC was one of the four entities Plaintiffs alleged were Calrissian's alter ego. (ECF 158-11, Emigrant Resp. to Interrog. 17; ECF 158-12, PMB Resp. to Interrog. 17.)  Truist moved to

---

[1] Plaintiffs' proffered expert, Mr. Rule, relies on dozens of Mr. Bowring's statements and emails in his December 14, 2023 report.  (*See* ECF 162-1.)

amend the complaint in the Guaranty Action to add VSC as a defendant (ECF 37-4), and the New York court granted the motion on October 5, 2020 (ECF 52-7). Truist filed the amended complaint in the Guaranty Action on October 15, 2020, and it served VSC with the amended complaint on October 21, 2020. *Truist Bank v. Calrissian LP*, Index No. 654148/2016, Dkt. 49 & Dkt. 59.

After Calrissian and VSC did not respond to the amended complaint in the Guaranty Action, Truist moved for a default judgment. *Id.*, Dkt. 64. On November 4, 2021, the New York court entered an order granting Truist's motion for default judgment as to liability, and it referred the issue of damages to a special referee. (ECF 52-8.) Truist promptly requested that the special referee decide the issue of damages on the papers. *Truist Bank v. Calrissian LP*, Index No. 654148/2016, Dkt. 90. Upon an order of the special referee, Truist filed supplemental papers seeking a damages award. *Id.*, Dkt. 93. On May 22, 2023, the special referee entered a report and recommendation that the Court enter a money judgment in Truist's favor, against Calrissian and VSC, in the amount of $71,977,685.52, plus interest and attorney's fees. *Id.*, Dkt. 99. Truist timely moved for an order confirming the special referee's report and recommendation. *Id.*, Dkt. 100. The New York court entered an order that granted Truist's motion to confirm and directed Truist to file a settlement of judgment. *Id.*, Dkt. 105. Truist filed the settlement of judgment on September 15, 2023. *Id.*, Dkt. 109. The Court filed the judgment on January 2, 2024, reflecting an updated damages calculation of $73,261,846.88, and Truist served the judgment on Calrissian and VSC on January 16, 2024. *Id.*, Dkt. 113; Dkt. 115.

**III.   Discussion**

    **A.   Domestication and Discovery**

During discovery, Plaintiffs derided the Guaranty Judgment as a "complete waste of the Lender's money." (*See* Ex. F, De Jesus-Caballero Tr. 137:12–13, 138:13–14, 138:22–23.) Plaintiffs are wrong. First, obtaining a judgment was important because judgment creditors can seek discovery or collect on defendants' assets in New York. *See, e.g.*, CPLR § 5223; *Petrocelli v. Petrocelli Elec. Co., Inc.*, 121 A.D.3d 596 (1st Dep't 2014); *ICD Group, Inc. v. Israel Foreign Trade Co. (USA)*, 224 A.D.2d 293, 294 (1st Dep't 1996). Indeed, PMB witness Debra Newbrough admitted that PMB supported Truist maintaining the Guaranty Action because she believed that the Lenders "need to sue the guarantor to protect" their contractual rights, and that PMB believed that a judgment against Calrissian could be enforced against "Virgo." (Ex. A, Newbrough Tr. 99:13 – 100:5.)

Second, as a money judgment from a sister state, the Guaranty Action default judgment may be domesticated and enforced in California for 10 years following entry of the sister state judgment.[2] Cal. Civ. Proc. Code §§ 337.5, 1710.15. The Guaranty Action judgment may be domesticated in a California Superior Court in a county where any judgment debtor resides. *See id.* § 1710.20. VSC previously identified its principal place of business as Burlingame, California, which is in San Mateo County, so Truist has petitioned the Superior Court there to domesticate the Guaranty Action judgment. (Ex. G, Notice of Entry of Judgment on Sister State Judgment.)

---

[2] Because VSC and the other Virgo entities are, or were, located in California, pursuing discovery in California is likely necessary in the absence of any offices or records being located in New York.

Once the California court approves Truist's domestication of the sister-state judgment, Truist intends to initiate discovery in aid of enforcement of the judgment. California law "provides several mechanisms that permit a judgment creditor to examine the judgment debtor or a third party," allowing judgment creditors to obtain "relevant information about a judgment debtor's property and business affairs from a third party[.]" *Shrewsbury Mgmt., Inc. v. Superior Ct.*, 244 Cal. Rptr. 3d 595, 600, 602 (Cal. Ct. App. 2019); *see also* Cal. Civ. Proc. Code §§ 708.110–708.130. Among other things, "any person with information leading to the enforcement of the judgment" may "be subpoenaed to testify in an examination proceeding in the same manner as a trial witness." *Yolanda's, Inc. v. Kahl & Goveia Com. Real Est.*, 217 Cal. Rptr. 3d 625, 629 (Cal. Ct. App. 2017). Likewise, judgment creditors may serve document subpoenas to third parties. *Shrewsbury Mgmt.*, 244 Cal. Rptr. 3d at 602. These procedures provide a clear path to seek discovery in aid of execution of the judgment from Calrissian, VSC, VIG, several VIG affiliates, and potentially certain officers or employees of those entities.

### B. Potential to Add Alter Egos as Judgment Debtors Through 2033

California courts may amend judgments to add alter egos as judgment debtors "at any time so that the judgment will properly designate the real defendants." *Dow Jones Co. v. Avenel*, 198 Cal. Rptr. 457, 460 (Cal. Ct. App. 1984). A judgment creditor may add a judgment debtor as an alter ego even where the judgment is a sister state judgment that has been domesticated in California. *Blizzard Energy, Inc. v. Schaefers*, 286 Cal. Rptr. 3d 658, 669 (Cal. Ct. App. 2021). A judgment creditor may "proceed by a motion" to add a judgment debtor, *or* it may "proceed by complaint in an independent action on the judgment." *Lopez v. Escamilla*, 262 Cal. Rptr. 3d 152, 153 (Cal. Ct. App. 2020). The addition of a judgment debtor on an alter ego theory is subject to the 10-year statute of limitations for enforcement of judgments, not the underlying statute of limitations for breach of contract. *Id.* at 153–54. California courts have specified that, "[e]ven if [the judgment creditor] could have pursued a theory of alter ego [in the underlying action], there was no bar to doing so after judgment." *Wells Fargo Bank, N.A. v. Weinberg*, 173 Cal. Rptr. 3d 113, 118 (Cal. Ct. App. 2014).

Accordingly, the Guaranty Action default judgment ensures that the Lenders can still pursue a recovery from VIG, Virgo Onshore, or Virgo Offshore on a theory they were Calrissian's alter egos, through 2033. And by not suing in 2019 or 2020, when Plaintiffs knew they lacked evidence to support an element of an alter ego claim, Truist's decision ensured that no dismissal order would preclude future attempts to hold those entities liable in the future.

### IV. Conclusion

Truist filed the Guaranty Action years before Plaintiffs filed this case. Calrissian's years-long bankruptcy case and the New York Supreme Court's pandemic-related backlog combined to delay entry of judgment against Calrissian and VSC until earlier this year. Now, Truist is pursuing enforcement of that judgment in California, with a clearly defined avenue to pursue discovery from VSC's affiliates, including VIG. And California permits judgment creditors like Truist to move to add judgment debtors on alter ego theories for 10 years after entry of the judgment—i.e., through 2033 in this case. Thus, the Guaranty Judgment paints a stark contrast between Truist's prudence, which resulted in a concrete and actionable result, and Plaintiffs' speculative, unripe claims here against Truist for not accomplishing the same result by different means.

May 13, 2024
Page 6

        Respectfully submitted,

        <u>/s/ David Tetrick, Jr.</u>
        David Tetrick, Jr. (admitted *pro hac vice*)
        *Counsel for Truist Bank,*
        *successor by merger to SunTrust Bank*

cc:    All Counsel of Record via ECF