# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-4003
Tel: +1 212 556 2100
Fax: +1 212 556 2222
www.kslaw.com

September 9, 2025

**VIA ECF**

Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe:

  We represent Defendant Truist Bank, successor by merger to SunTrust Bank ("Truist"). We write to oppose Plaintiffs Emigrant Bank ("Emigrant") and Pacific Mercantile Bank's ("PMB") letter regarding their anticipated motion for partial summary judgment, ECF 222, and to urge the Court to deny any such motion.

  In 2016, Plaintiffs pressured Truist to retain their hand-picked forensic accountant to assess potential claims the Lenders[1] could bring against Virgo Investment Group ("VIG"), Calrissian's private equity sponsor. Plaintiffs' chosen forensic accountant did not find evidence to support the second element of an alter ego claim (misuse of the corporate form to commit fraud or injustice), and Truist pursued other avenues for obtaining potential evidence. Rather than wait for evidence to emerge in the lawsuit Truist brought against Calrissian, Plaintiffs demanded Truist proceed without additional facts and sue VIG and then-unspecified affiliates under an alter ego theory. Truist declined, Plaintiffs sued Truist, and now, five years later, Plaintiffs seek summary judgment primarily based on facts and evidence the forensic accountant considered insufficient to support a claim that some Virgo entities were Calrissian's alter ego.

  Ultimately, evidence might emerge that VIG or Virgo Service Company are liable as Calrissian's alter ego. Indeed, Truist is pursuing post-judgment discovery in California to determine whether there is evidence to assert such a claim. But Plaintiffs' position here, in their pursuit of a dispositive ruling, rests on a combination of facts known to all parties when the Credit Agreement was executed and haphazard contentions that only highlight the fact-dependent nature of alter ego liability. Calrissian's lack of assets other than its ownership of Alchemy, VIG's control over Calrissian, and myriad transactions between Virgo affiliates and Calrissian were all known to the Lenders when Plaintiffs' hand-picked accountant failed to find evidence supporting the fraud or injustice necessary to establish an alter ego relationship. Plaintiffs knew more documents were needed. But while Plaintiffs failed to obtain tax returns, governance documents, and similar key documents from the alleged alter egos while purporting to prove up their alter ego claim here, Truist is in the process of obtaining those documents in California—which the Lenders will have ***before***

---

[1] Capitalized terms not defined have the meanings ascribed to them in Truist's August 26, 2025 letter. ECF 220.

September 9, 2025
Page 2

they need to assert a potential alter ego claim. Plaintiffs have once again put the cart before the horse in seeking to shift blame for their losses.

Plaintiffs' other arguments similarly miss the mark. Truist has introduced uncontroverted *documentary* evidence establishing how a scrivener's error was introduced into the Credit Agreement. Likewise, Plaintiffs cannot seriously contend that filing a lawsuit against VIG or its affiliates did not create the risk of exposure to Truist—especially where, as here, Plaintiff PMB *demanded and received from Plaintiff Emigrant* a release and indemnification for losses incurred before agreeing to allow Emigrant to sue VIG on its behalf. The Court should scrutinize Plaintiffs' assertions and exhibits, and it should ultimately deny Plaintiffs' contemplated motion.

I.  **Plaintiffs Are Not Entitled to Partial Summary Judgment as to Portions of Truist's Defenses Regarding Alleged Alter Ego Status (Truist's Second and Tenth Defenses)**

Plaintiffs bear the burden to prove they were actually and proximately damaged by Truist's alleged breach of contract—i.e., they must prove that the "alter ego" lawsuit they demanded Truist file would have led to a successful recovery upon establishing that one or more of the four specified Virgo entities were Calrissian's alter ego. *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) ("a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages") (emphasis removed).

Because Calrissian is a Delaware limited partnership, ECF 223-6, at 11, Delaware law governs the alter ego analysis. *See MMA Meadows at Green Tree, LLC v. Millrun Apartments, LLC*, 130 A.D.3d 529, 530 (1st Dep't 2015). To succeed on an alter ego theory under Delaware law, a plaintiff must show that the "corporate structure cause[d] fraud or similar injustice"—effectively, that the entity was "a sham and exist[ed] for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001).[2]

In 2016, at Plaintiffs' insistence, Truist retained forensic accountant Dan Ray of Hemming Morse to assess whether the Lenders had claims against Virgo entities. ECF 158-5; ECF 158-6. Mr. Ray's work did not produce sufficient evidence of fraud or injustice to support an alter ego claim, and the Lenders sought more documents through bankruptcy proceeding discovery.[3] ECF 158-7, at 10–11. Plaintiffs now focus on a handful of facts about the Virgo entities—including numerous facts known when Mr. Ray conducted his work—to stitch together their alter ego assertion. But they have not brought forth evidence of commingling of funds, evidence that Lenders believed Calrissian had material cash assets, or evidence that a Virgo entity took cash out of Calrissian for improper reasons or at a time when the entity knew Calrissian was insolvent.

---

[2] New York law requires Plaintiffs to prove that a Virgo Entity used Calrissian's separate legal existence "to commit a fraud or wrong against [Plaintiffs] which resulted in [Plaintiffs'] injury." *Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 141 (1993).

[3] Mr. Ray had every reason to find evidence to support Plaintiffs' desired alter ego claims, as he was the brother-in-law of PMB's outside counsel at the time—a fact Plaintiffs withheld from Truist as they discussed information that Mr. Ray could "back channel[]" to support claims that Plaintiffs wanted to bring *against Truist*. Ex. 1 (Underwood Dep. Ex. 19).

September 9, 2025
Page 3

Plaintiffs cite no cases awarding summary judgment on alter ego issues under remotely similar circumstances. Indeed, the primary case upon which Plaintiffs rely is a decision denying a motion to dismiss where the court ultimately held that the defendant was *not* an alter ego, despite allegedly improper loan repayments. *See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 526 (S.D.N.Y. 2014) (denying motion to dismiss); *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 410 (S.D.N.Y. 2015) (rejecting veil-piercing claim). Plaintiffs' other cases are similarly inapposite. *E.g.*, *Elghourab v. Vista JFK, LLC*, 2022 WL 17771995, at *2 (E.D.N.Y. Sept. 2, 2022) (post-judgment turnover proceeding regarding entity purporting to have hundreds of employees but zero assets); *Ventresca Realty Corp. v. Houlihan*, 41 A.D.3d 707, 709 (2d Dep't 2007) (sham entity had *no* assets or bank account despite employing hundreds of people).

Indeed, *Elghourab* is instructive only insofar as it underscores that Truist's approach in keeping the Lenders' potential alter ego claims alive was entirely proper. In *Elghourab*, the plaintiff first obtained a judgment against the direct defendant. 2022 WL 17771995, at *1. It then pursued and obtained post-judgment discovery before moving to enforce the judgment against non-parties in a turnover proceeding. *Id.* at *1–2. That approach is nearly identical to Truist's. Truist prudently obtained a $73 million judgment against Calrissian and VSC (one of the alleged alter ego entities) and is pursuing post-judgment discovery in California to obtain discovery ***without risking a potentially claim-dispositive motion to dismiss*** and to determine if sufficient evidence of fraud or injustice in the misuse of Calrissian's corporate form exists to support adding any of the remaining three alleged alter egos as judgment debtors. ECF 220, at 4–5. *Elghourab* thus entirely fails to support Plaintiffs' summary judgment arguments and serves only to underscore Plaintiffs' lack of damages stemming from Truist's prudent approach.

While Truist carefully pursues the exact evidence needed to assert a potential alter ego claim against specific entities, Plaintiffs seek summary judgment on the alter ego issue without even identifying *which* alleged alter egos committed which wrongful acts, as would be required to hold any of them liable as an alter ego. Plaintiffs tacitly recognize this failure by claiming that Truist purportedly referred to Virgo entities collectively as "Virgo" in "requesting that a trustee pursue an alter ego claim in the Calrissian bankruptcy." ECF 222, at 3 n.1. Plaintiffs' deflection tactic overreaches. Truist ***never requested that the Trustee sue any Virgo entity as Calrissian's alter ego***, and the document Plaintiffs cite does not include any such request. *Contra* ECF 222-14.

Plaintiffs' mischaracterization of evidence goes to the heart of their factual allegations, as they falsely suggest there was a ███████████████████████████████ following VIG's receipt of a draft diligence report in July 2014. Yet Plaintiffs' own exhibit undisputedly shows the ███████████████████████████████ was decided *before* VIG received the diligence report. ECF 222-1, at 6 (stating, as of July 21, 2014, ███████████████████████████████; ECF 222-2 (transmission of draft report on July 22, 2014).[4] Plaintiffs' dubious assertions cannot justify summary judgment.

---

[4] Plaintiffs' characterizations of other facts are similarly unfounded. For example, they suggest that Virgo Onshore and Virgo Offshore had "substantially the same ███████," but the undisputed evidence shows that VIG and its related persons own only 1 percent of Virgo Offshore and of Virgo Onshore—a fact Plaintiff's own expert admitted he had no basis to dispute. Ex. 2 (Sheppard Dep. Tr. 43:12 – 44:2; 45:19 – 46:6). In addition, Plaintiffs suggest that Virgo

September 9, 2025
Page 4

Plaintiffs' "siphoning" allegations do not change this result. Plaintiffs' only support for their contention that Virgo "siphoned cash from both Alchemy and Calrissian" is the repayment of promissory notes. But Plaintiffs do not even attempt to suggest that the promissory notes were illusory, nor do they identify any evidence showing that the payment caused Calrissian's bankruptcy. *See* ECF 222, at 2. Moreover, Plaintiffs' letter incredibly suggests—for the first time, a decade after the promissory notes were made and nine years into Alchemy's bankruptcy—that the promissory notes breached the Lenders' first-priority security interests, without explaining the alleged breach or why they never demanded that Truist pursue claims based on that allegation.[5] *Id.*

In sum, the portions of Truist's Second and Tenth Defenses pertaining to alter ego issues are "supported by evidence from which a reasonable jury could find the defense applicable" such that "summary judgment must be denied." *See Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, 2018 WL 3364388, at *1 (S.D.N.Y. July 9, 2018) (quotation omitted).

## II. Plaintiffs Are Not Entitled to Summary Judgment Regarding Truist's Scrivener's Error Defense (Truist's Eighth Defense)

The Credit Agreement permits the Required Lenders to demand that the Administrative Agent take certain actions upon specified events of default. ECF 45-1 § 8.1. As written, however, that provision creates a carve-out that **bars** the Required Lenders from purporting to force the Administrative Agent to act upon the occurrence of an event of default described in Section 8.1(h) or Section 8.1(i). *Id.* Section 8.1(h) creates an event of default for an involuntary bankruptcy or receivership proceeding that is not dismissed within 60 days. *Id.* § 8.1(h). Section 8.1(i), meanwhile, creates an event of default when Calrissian or Alchemy "become unable to pay, shall admit[] in writing its inability to pay, or shall generally fail to pay, its debts as they become due[.]" *Id.* § 8.1(i). An event of default under Section 8.1(i) plainly occurred, as **both** Calrissian and Alchemy both became unable to pay, and failed to pay, their debts as they became due. ECF 45, ¶ 53; ECF 158-14, at 44:5–7. Accordingly, under the Credit Agreement as written, Plaintiffs lacked the right to compel Truist to act under Section 8.1, defeating their breach claims arising from their purported written demand. *See* ECF 220, at 3.[6]

---

by citing a fraction of a sentence, when the witness's answer continued with the response that " ███████ ." ECF 222-8, at 108:21–109:13 (emphasis added). Establishing alter ego liability requires careful, forthright fact analysis, not half-truths or mischaracterizations.

[5] Similarly, Plaintiffs fail to explain how ███████ constitutes abuse of *Calrissian's* corporate form to commit fraud or injustice, especially given that Plaintiffs concede that ███████ *Contra* ECF 222, at 2, 4. Indeed, none of the cases Plaintiffs cite in support of their argument that the Virgo entities used Calrissian to commit the requisite wrongdoing are on point because none considers alter ego issues in the context of the use of a "HoldCo" structure in the private equity industry.

[6] Plaintiffs incorrectly suggest that the carve-out does not apply if other events of default also occur. ECF 222, at 5. That interpretation is untenable, as it would nullify the carve-out in Section 8.1. If Alchemy or Calrissian are "unable to" pay their debts as they become due, additional events of default under other provisions would necessarily co-exist. *E.g.*, 45-1 § 8.1(a)-(d) (timely loan and interest payments, performance of financial covenants). Plaintiffs' construction would render the carve-out meaningless because there would *always* be additional events of default that would allow the Required Lenders to force the administrative agent to act, even if specific carve-out events occurred.

September 9, 2025
Page 5

If the Court were to reform the Credit Agreement due to any alleged scrivener's error relating to Section 8.1, however, the scrivener's error is that the reference to Sections 8.1(h) and (i) was intended to be a reference to Sections 8.1(g) and (h)—the two bankruptcy-related events of default. As a result, the carve-out would still apply, and Truist would have a successful defense to Plaintiffs' claims.

Section 8.1(g) creates an event of default upon Calrissian or Alchemy voluntarily petitioning for bankruptcy relief or liquidation. ECF 45-1 § 8.1(g). The evidence is clear that the carve-out referenced Sections 8.1(h) and (i) during the drafting process when those sections contained the two bankruptcy-related events of default (voluntary bankruptcies or involuntary bankruptcies not dismissed after 60 days). ECF 160-6, at 110–11. Undisputed documentary evidence shows that counsel for the Borrower sent a revised version of the Credit Agreement that removed one of the events of default and re-numbered the bankruptcy-related events of default as subsections (g) and (h). ECF 160-7, at 2, 116-117. In making that change, however, the parties failed to update the cross-reference later in Section 8.1 regarding the carve-out. *Id.* at 118. This evidence, which Plaintiffs do not address, is more than sufficient to preclude summary judgment as to whether a scrivener's error occurred and whether Truist's Eighth Defense succeeds.

### III. Plaintiffs Are Not Entitled to Summary Judgment as to the Portion of Truist's Defense Regarding the Administrative Agent's Opinion (Truist's Third Defense)[7]

Section 9.2 of the Credit Agreement provides that "the Administrative Agent shall not be required to take any action that, in its opinion . . . may expose the Administrative Agent to liability." ECF 45-1, § 9.2. Plaintiffs confuse the standard under the Credit Agreement. The question under the Credit Agreement is not whether the action "*would have* exposed [Truist] to liability." *Compare* ECF 222, at 5 (emphasis added), *with* ECF 45-1 § 9.2 (referring to opinion that the action "*may expose*" Truist to liability) (emphasis added). The question is whether Truist believed there was a *risk* that a *court* could conclude that the lawsuit was frivolous or otherwise subject Truist to liability for bringing the suit. While Truist might not have believed an alter ego claim was "frivolous," a court might not share Truist's view, and may impose liability for bringing a claim where, as here, Plaintiffs' hand-picked forensic accountant failed to identify evidence supporting the second element of an alter ego claim. Indeed, PMB's demand for a release and indemnification from Emigrant shows that Plaintiffs themselves understood that bringing an alter ego claim "may expose" the suing party (or parties) to liability. ECF 158-4, at 3–4.[8]

### IV. Conclusion

For the foregoing reasons, the Court should deny Plaintiffs' contemplated motion for partial summary judgment.

---

[7] Truist will not assert the portion of its Third Defense regarding the advice of counsel.
[8] In addition, contrary to Plaintiffs' false assertion, Truist never concluded that the alter ego claims were, in fact, "colorable." *Contra* ECF 222, at 5. The memo and testimony Plaintiffs cite are both clear that the claims were "*potentially* colorable," but only if the Lenders obtained new evidence of wrongdoing—which they never obtained before Plaintiffs filed suit. ECF 222-28, at 256:05-257:10; ECF 222-30, at 2, 4–5, 10–11.

September 9, 2025
Page 6

                                                  Respectfully submitted,

                                                  */s/ David Tetrick*
                                                  David Tetrick
                                                  *Counsel for Truist Bank,*
                                                  *successor by merger to SunTrust Bank*

cc:      All Counsel of Record via ECF