**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EMIGRANT BANK AND PACIFIC MERCANTILE BANK,<br>Plaintiffs,<br>v.<br>SUNTRUST BANK; TRUIST BANK; AND DOES 1 THROUGH 10 INCLUSIVE,<br>Defendants. | Civil Action No. 1:20-cv-02391-PGG-OTW |

**TRUIST BANK'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page(s)


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

I. Factual Background ..... 2

A. Our Alchemy. ..... 2

B. The Original Credit Agreement. ..... 2

C. The Amended Credit Agreement and Term Loan Joinder Agreement. ..... 3

D. Our Alchemy Becomes Unable to Pay and Petitions for Bankruptcy Protection. ..... 4

E. Truist Acts to Maximize the Lenders' Recovery. ..... 4

F. Plaintiffs' Hand-Picked Forensic Accountant Fails to Identify Any Fraud or Injustice as Needed to Pursue an Alter Ego Claim. ..... 4

G. Emigrant Seeks an Outsized Recovery in a Cost-Sharing Agreement and Provides PMB a Broader Release than Truist Requested. ..... 5

H. Plaintiffs Demand that Truist Sue "Virgo." ..... 6

I. Truist Sues and Obtains a Judgment Against VSC. ..... 6

J. Truist Distributes Funds Received from the Bankruptcy Trustee. ..... 7

II. Procedural Background ..... 7

LEGAL STANDARD ..... 8

ARGUMENT AND CITATION TO AUTHORITY ..... 9

I. The Court Should Grant Summary Judgment on All Counts Because Plaintiffs Fail to Raise an Issue of Material Fact to Overcome the Limitation of Liability Provision. ..... 9

A. Plaintiffs Fail to Adduce Evidence to Overcome the Limitation of Liability Provision as to Counts I and III. ..... 10

B. Plaintiffs Fail to Adduce Evidence to Overcome the Limitation of Liability Provision as to Counts IV and VI. ..... 11

II. The Court Should Grant Summary Judgment on Counts I and III Because the Undisputed Facts Establish that Truist Did Not Breach the Loan Documents. ................ 12

A. Plaintiffs Lacked "Written Demand" Rights Under the Credit Agreement Because Specified Events of Default Occurred. ............................... 12

B. Truist Has "Sole Discretion" and Is "Under No Obligation" to Sue Virgo to Seek Recovery of the Collateral. ......................................................... 13

C. The Automatic Stay Barred the Requested Alter Ego Claims. ............................ 14

III. The Court Should Grant Summary Judgment on Counts I and III Because Plaintiffs Failed to Adduce Evidence to Establish They Were Harmed or Damaged by Truist's Alleged Breaches. ........................................................................ 16

A. Plaintiffs Must Establish Damage Caused By the Alleged Contractual Breaches. ......................................................................................... 16

B. Plaintiffs Adduced No Evidence to Establish They Suffered Any Harm or Damage from Truist Not Suing VSC, Virgo Offshore, Virgo Onshore, or VIG. ................................................................................... 17

C. Plaintiffs Failed to Adduce Evidence Sufficient to Establish that Any Virgo Entity Would Have Been Liable Under Plaintiffs' Proposed Theories. ................................................................................................ 20

D. Plaintiffs Did Not Seek—and Cannot Now Seek—Nominal Damages. .............. 23

IV. Plaintiffs Raise No Issue of Material Fact as to Distributions (Counts IV and VI). ........................................................................................................ 25

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................9

*Antioch Co. Litig. Tr. v. Morgan*,
2014 WL 1365949 (S.D. Ohio Apr. 7, 2014)....................25

*Baccellieri v. HDM Furniture Indus., Inc.*,
2013 WL 1088338 (Del. Super. Ct. Feb. 28, 2013), *aff'd,* 74 A.3d 653 (Del. 2013)....................22

*Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*,
2007 WL 1988150 (S.D.N.Y. July 10, 2007)....................24

*Brevet Direct Lending - Short Duration Fund, L.P. v. Aprio LLP*,
213 N.Y.S.3d 294 (1st Dep't 2024)....................9, 10

*Care Travel Co. v. Pan Am. World Airways, Inc.*,
944 F.2d 983 (2d Cir. 1991)....................17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................8, 16

*In re Chantel*,
2015 WL 3988985 (B.A.P. 9th Cir. July 1, 2015), *aff'd*, 693 F. App'x 723 (9th Cir. 2017), and *aff'd*, 694 F. App'x 508 (9th Cir. 2017)....................15

*Cottam v. Glob. Emerging Cap. Grp., LLC*,
2021 WL 1222120 (S.D.N.Y. Mar. 31, 2021), *aff'd sub nom. Cottam v. 6D Glob. Techs., Inc.,* 2022 WL 16908708 (2d Cir. Nov. 14, 2022)....................25

*Deutsche Bank Tr. Co. of Americas v. Tri-Links Inv. Tr.*,
74 A.D.3d 32 (1st Dep't 2010)....................11

*eCommerce Indus., Inc. v. MWA Intel., Inc.*,
2013 WL 5621678 (Del. Ch. Sept. 30, 2013)....................21, 22

*In re Emoral, Inc.*,
740 F.3d 875 (3d Cir. 2014)....................15

*Fujitsu Ltd. v. Fed. Express Corp.*,
247 F.3d 423 (2d Cir. 2001)....................8

*Gould Paper Corp. v. Madisen Corp.*,
614 F. Supp. 2d 485 (S.D.N.Y. 2009)....................24

*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*,
970 F.2d 1138 (2d Cir. 1992), *aff'd*, 510 U.S. 86 (1993)....................12

*Harrison v. Soroof Int'l, Inc.*,
320 F. Supp. 3d 602 (D. Del. 2018)....................15

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008)....................8

*Jonas v. Estate of Leven*,
116 F. Supp. 3d 314 (S.D.N.Y. 2015)....................20

*K. Bell & Assocs. v. Lloyd's Underwriters*,
827 F. Supp. 985 (S.D.N.Y. 1993)....................16

*Kuroda v. SPJS Holdings., L.L.C.*,
971 A.2d 872 (Del. Ch. 2009)....................22

*LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*,
173 F.3d 454 (2d Cir. 1999)....................17, 19

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
84 N.Y.2d 430 (1994)....................9, 10, 11

*MMA Meadows at Green Tree, LLC v. Millrun Apartments, LLC*,
130 A.D.3d 529 (1st Dep't 2015)....................20

*Mobil Oil Corp. v. Linear Films, Inc.*,
718 F. Supp. 260 (D. Del. 1989)....................21

*Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*,
2022 WL 211981 (2d Cir. Jan. 25, 2022)....................24

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Cap., Inc.*,
30 N.Y.3d 572 (2017)....................10

*Ostrolenk Faber LLP v. Lagassey*,
2020 WL 30350 (S.D.N.Y. Jan. 2, 2020)....................14

*Otto Candies, LLC v. KPMG, LLP*,
2020 WL 4917596 (Del. Ch. Aug. 21, 2020)....................22, 23

*Matter of Part 60 Put-Back Litig.*,
36 N.Y.3d 342 (2020)....................9

*People by James v. N. Leasing Sys., Inc.*,
133 N.Y.S.3d 389 (Sup. Ct. N.Y. Cnty. 2020), *aff'd*, 142 N.Y.S.3d 36 (2021) ......................23

*Petroterminal de Panama, S.A. v. Houston Cas. Co.*,
114 F. Supp. 3d 152 (S.D.N.Y. 2015).........................................................................13

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
842 F.2d 1466 (3d Cir. 1988)....................................................................................22

*In re Pisculli*,
426 B.R. 52 (Bankr. E.D.N.Y. 2010).........................................................................15

*PXP Producing Co. LLC v. MitEnergy Upstream LLC*,
342 A.3d 402 (Del. Ch. 2025)...............................................................................21, 22

*Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*,
2002 WL 1203836 (S.D.N.Y. June 4, 2002) ........................................................12, 13

*Sea Metro. S.A. v. DGM Commodities Corp.*,
2013 WL 3990922 (E.D.N.Y. Aug. 2, 2013)...............................................................14

*In re Sunstates Corp. S'holder Litig.*,
788 A.2d 530 (Del. Ch. 2001)...............................................................................20, 21

*In re The Heritage Org., L.L.C.*,
413 B.R. 438 (Bankr. N.D. Tex. 2009).......................................................................19

*Townsquare Media, Inc. v. Regency Furniture, Inc.*,
2022 WL 4538954 (S.D.N.Y. Sept. 28, 2022), *on reconsideration in part*,
2023 WL 6289984 (S.D.N.Y. Sept. 27, 2023)...............................................................8

*Ullman-Briggs, Inc. v. Salton, Inc.*,
754 F. Supp. 1003 (S.D.N.Y. 1991)............................................................................16

*Venture Grp. Enters., Inc. v. Vonage Bus. Inc.*,
2024 WL 4502995 (S.D.N.Y. Oct. 16, 2024)..............................................................24

*Wenske v. Blue Bell Creameries, Inc.*,
2018 WL 5994971 (Del. Ch. Nov. 13, 2018) ..............................................................22

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
752 A.2d 1175 (Del. Ch. 1999)...................................................................................20

*Zarin v. Reid & Priest*,
184 A.D.2d 385 (1st Dep't 1992) ...............................................................................18

**Statutes**

6 Del. C. § 17-303 ....................17, 18

6 Del. C. § 17-403 ....................17

11 U.S.C. § 362 ....................15

11 U.S.C. § 541 ....................15

**Other Authorities**

Fed. R. Civ. P. 56 ....................8, 16

Fed. R. Bankr. P. 2004 ....................5

## PRELIMINARY STATEMENT

Plaintiffs Emigrant Bank ("Emigrant") and Pacific Mercantile Bank ("PMB" and, collectively with Emigrant, "Plaintiffs") and Defendant Truist Bank, successor by merger to Defendant SunTrust Bank ("Truist"), are lenders who made a syndicated loan to Our Alchemy, LLC ("Borrower"). Truist was also the administrative agent under the loan documents. Borrower defaulted and petitioned for bankruptcy relief. Truist perfected a claim on the lenders' behalf in the bankruptcy case, which remains pending, and has distributed funds to the lenders that it has received from the bankruptcy trustee. On behalf of the lenders, Truist also filed a lawsuit against the Borrower's parent ("Guarantor") and its general partner.

Plaintiffs, however, demanded that Truist separately file a lawsuit against the private equity sponsor of Borrower and Guarantor, even though that sponsor was not a party to any of the loan documents. Plaintiffs demanded that Truist sue the sponsor under an "alter-ego" theory or under an undefined "principal-agent" theory of liability.

Truist declined to do so at that time because, based on the information the lenders possessed when Plaintiffs made the demand, Truist believed the lenders lacked sufficient evidence to support these theories. Instead, Truist diligently pursued its action against the Guarantor and its general partner (one of the entities Plaintiffs demanded Truist sue as an alter ego), obtained a $73 million judgment against the Guarantor and its general partner, domesticated the judgment in California, and obtained post-judgment discovery from the Guarantor's general partner relating to the private equity sponsor and affiliates. Rather than suing first and asking questions later, Truist set the stage for obtaining discovery that could support a pleading that might avoid a potential dismissal. Truist's efforts to collect the judgment continue in California.

Plaintiffs say none of this is enough. Plaintiffs wanted to be in a lawsuit immediately. So, when Truist did not sue the sponsor as soon as Plaintiffs demanded it, Plaintiffs sued Truist for

alleged breach of the loan documents—even though Truist was pursuing multiple other paths to recovery. Plaintiffs thus seek to hold Truist liable for declining to pursue one particular path of recovery, which was lacking in evidentiary support, even though Truist perfected bankruptcy claims and sued the Guarantor and its general partner (and eventually obtained a $73 million judgment). Plaintiffs' unprecedented position contradicts the credit agreement's terms, is barred by the contractual limitation of liability provision, and fails for want of damages caused by Truist's alleged inaction. Accordingly, the Court should grant Truist's motion for summary judgment.

## BACKGROUND

### I. Factual Background

#### A. Our Alchemy.

Truist is the administrative agent under a credit agreement pursuant to which four sophisticated lenders loaned money to Our Alchemy, LLC ("Alchemy"). Truist's Statement of Undisputed Material Facts ("SUMF") ¶ 1. Alchemy was an independent film and video distribution company, formerly known as Millennium Entertainment, LLC. SUMF ¶ 3. The four lenders were SunTrust Bank (now Truist, as successor by merger to SunTrust Bank[1]), PMB, Emigrant, and non-party Preferred Bank ("Preferred") (collectively, the "Lenders"). SUMF ¶ 17.

#### B. The Original Credit Agreement.

In 2014, a special purpose vehicle known as Calrissian LP ("Calrissian") purchased Alchemy. SUMF ¶¶ 4–6. Calrissian was sponsored by the private equity firm Virgo Investment Group, LLC ("VIG"). SUMF ¶ 6. An affiliate of VIG, Virgo Service Company, LLC ("VSC") was Calrissian's general partner. SUMF ¶¶ 7, 8. Calrissian's limited partners were Virgo Societas

[1] On December 6, 2019, SunTrust Bank merged with and into Branch Banking and Trust Company to become Truist Bank. SUMF ¶ 2.

Partnership III (Onshore), L.P. ("Virgo Onshore"); Virgo Societas Partnership III (Offshore), L.P. ("Virgo Offshore"), and Santa Rita Entertainment, LLC. SUMF ¶ 9.

As part of the 2014 acquisition, Alchemy executed a Term Loan and Revolving Credit Agreement dated September 4, 2014 (the "2014 Credit Agreement"). SUMF ¶ 11. Truist, PMB, and Preferred were the lenders under the 2014 Credit Agreement, with Truist serving as the administrative agent. SUMF ¶ 12.

**C. The Amended Credit Agreement and Term Loan Joinder Agreement.**

In May 2015, Alchemy acquired certain assets of physical and digital media company ANConnect, LLC ("ANConnect"). SUMF ¶ 14. In connection with the transaction, on July 9, 2015, Alchemy executed an Amended and Restated Term Loan and Revolving Credit Agreement with Truist, PMB, and Preferred (the "2015 Credit Agreement"). SUMF ¶ 15. Emigrant became a Lender to Alchemy under the 2015 Credit Agreement a day later by executing a Term Loan Joinder Agreement dated July 10, 2015. SUMF ¶ 16. When Emigrant joined the credit facility, it did not believe Calrissian kept significant cash on hand and understood that the investment structure involved "mov[ing] money in and out of [Calrissian] as needed." SUMF ¶¶ 23, 24; Fowler Decl., Ex. 9 (Emigrant 30(b)(6) Tr.) at 125:20–24.

With the execution of the 2015 Credit Agreement and the Term Loan Joinder Agreement, the four Lenders committed to provide Alchemy with a total of $59.5 million of principal in term loans and revolving credit facilities. SUMF ¶ 18. Truist was the largest lender, providing 36.67% of the total debt, while PMB committed 26.67%, and Emigrant committed 25%. SUMF, ¶ 19. The 2015 Credit Agreement was secured by a Guaranty and Security Agreement, executed by Calrissian (the "Guaranty"). SUMF ¶ 12.

### D. Our Alchemy Becomes Unable to Pay and Petitions for Bankruptcy Protection.

After acquiring the ANConnect assets, Alchemy's performance deteriorated. SUMF, ¶ 27. By January 19, 2016, Truist notified Alchemy that Events of Default under the 2015 Credit Agreement had occurred no later than December 31, 2015. SUMF, ¶ 31.

On June 15, 2016, Truist accelerated the unpaid debt. SUMF, ¶ 32. Alchemy failed to repay the debt and filed a Chapter 7 bankruptcy petition on July 1, 2016. SUMF, ¶ 33. Truist executed a Sharing and Reimbursement Agreement with the trustee (the "Bankruptcy Trustee"), thus perfecting a bankruptcy claim for the Lenders of no less than $46,307,642, representing the total outstanding debt owed to the Lenders. SUMF, ¶¶ 34–36. Alchemy's bankruptcy case remains pending. SUMF, ¶ 37.

### E. Truist Acts to Maximize the Lenders' Recovery.

After Alchemy's bankruptcy, Truist sued Calrissian for breach of the Guaranty on August 5, 2016 in the New York state court (the "Guaranty Action"). SUMF, ¶ 45. Calrissian filed a Chapter 11 bankruptcy petition on February 15, 2017. SUMF, ¶ 46. The Calrissian bankruptcy petition automatically stayed the Guaranty Action until January 14, 2020, after the bankruptcy court closed Calrissian's case without a discharge of debts. SUMF, ¶¶ 47–49.

### F. Plaintiffs' Hand-Picked Forensic Accountant Fails to Identify Any Fraud or Injustice as Needed to Pursue an Alter Ego Claim.

After Alchemy filed for bankruptcy, Truist retained the consulting firm Hemming Morse LLP, at Plaintiffs' recommendation, to analyze Alchemy's and Calrissian's finances and identify potential claims. SUMF, ¶¶ 50, 51. Plaintiffs' hand-picked Hemming Morse forensic accountant, who was the brother-in-law of PMB's then-counsel,[2] "didn't proffer any opinion" about whether

[2] PMB did not disclose this fact to Truist. SUMF, ¶ 53.

"litigation should go forward" or whether there was a potentially colorable alter-ego claim against any Virgo entity. SUMF, ¶¶ 52, 54; Fowler Decl., Ex. 21 (Ray Tr.) at 27:22–28:6; 212:11–214:22. In a memorandum summarizing Hemming Morse's work, Truist's then-outside counsel noted that, while there were some "*potentially* colorable" claims, Truist was "still seeking information that would help establish an overall element of injustice or unfairness," as required to hold any entity liable as Calrissian's alter ego. SUMF, ¶ 55; Fowler Decl., Ex. 22 (Aug. 1, 2017 Memorandum) at 2, 4–5 (emphasis added).

In the Calrissian bankruptcy, Truist sought additional information by moving to compel Virgo Onshore, Virgo Offshore, and VIG to produce documents pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. SUMF, ¶ 56. The bankruptcy court, however, closed the Calrissian bankruptcy case without addressing Truist's motion for discovery. SUMF, ¶ 57.

### G. Emigrant Seeks an Outsized Recovery in a Cost-Sharing Agreement and Provides PMB a Broader Release than Truist Requested.

Though the Lenders possessed no more evidence to support potential claims than they had in 2016, by August 2018, Emigrant began pushing the Lenders to sue "Virgo" anyway. Emigrant proposed a recovery-shifting agreement among all the Lenders, which would authorize Emigrant's lawyers to sue "Virgo" and give Emigrant an outsized share of the recovery. SUMF, ¶¶ 58–60. Emigrant purported to justify the outsized recovery by offering to advance attorney's fees, but Emigrant demanded the other Lenders to pay equally for experts and other litigation costs. SUMF, ¶ 60. None of the Lenders initially agreed. SUMF, ¶¶ 61, 62, 65. Truist made a counterproposal to add a proposed release, which excluded any alleged intentional wrongdoing. SUMF, ¶¶ 63, 64. Plaintiffs rejected Truist's counterproposal. SUMF, ¶¶ 67.

Over a year after Emigrant's initial proposal, on December 10, 2019, PMB became the only Lender to agree to a recovery-shifting agreement with Emigrant, but it did so only after

demanding—and obtaining Emigrant's agreement—that Emigrant must (1) fund *all* of PMB's litigation expenses; (2) provide a complete release of claims against PMB; and (3) indemnify PMB for any liability incurred due to suing Virgo—far more sweeping conditions than those in the limited release Truist requested. SUMF, ¶¶ 65, 66. *Compare* Fowler Decl., Ex. 29 (Emigrant-PMB Agreement) at § 3.1 (releasing "any claims, whether known or unknown" and providing that the "waiver and release is intended to be construed as broadly and comprehensively as the law permits") *with* Fowler Decl., Ex. 28 (Apr. 10, 2019 email) at -840 (carving out "claims arising from intentional harms or willful misconduct performed jointly with Virgo" and containing no comparable broad-construction directive).

### H. Plaintiffs Demand that Truist Sue "Virgo."

On December 13, 2019, Plaintiffs then demanded that Truist either: (1) agree to Emigrant's recovery-shifting proposal—but without a release like the one Emigrant gave PMB; or (2) sue unspecified "Virgo" entities for breach as Calrissian's alter ego or principal. SUMF, ¶ 68.

On January 3, 2020, Truist declined both proposals. SUMF, ¶¶ 70, 71. Truist advised Emigrant that it was "not aware of persuasive evidence that would help establish an overall element of injustice or unfairness perpetrated by Virgo through an abuse of the corporate form" and that Emigrant's demand was unsupported by any additional evidence. SUMF, ¶ 72; Fowler Decl., Ex. 31 (Jan. 3, 2020 Ltr.), at -899.

### I. Truist Sues and Obtains a Judgment Against VSC.

After Calrissian's bankruptcy case closed without a discharge of debts, Truist amended the complaint in the Guaranty Action to add VSC, Calrissian's general partner, as a defendant in the case. SUMF, ¶¶ 48, 76. Truist alleged that VSC, as the general partner, was liable for Calrissian's debt under the Guaranty as a matter of Delaware partnership law. SUMF, ¶ 77.

On November 3, 2021, Truist obtained a default judgment as to liability against Calrissian and VSC. SUMF, ¶ 78. On January 2, 2024, the Court entered a final judgment in favor of Truist, in its capacity as administrative agent, for $71,977,685 as of May 31, 2023, plus post-judgment interest at the contractual default of $10,356.14 per day until October 2, 2023 and 9 percent per annum thereafter. SUMF, ¶ 79. Truist domesticated the judgment in California and has obtained post-judgment discovery from VSC. SUMF, ¶¶ 80–82.

**J. Truist Distributes Funds Received from the Bankruptcy Trustee.**

In late 2020 and early 2021, Truist received two distributions from the Bankruptcy Trustee totaling $1,194,137.01. SUMF, ¶¶ 84, 85. Truist applied $955,854.47 to reimbursable administrative agent expenses and distributed the remaining $238,282.54 to the Lenders. SUMF, ¶ 86.

## II. Procedural Background

Plaintiffs filed the Complaint on March 18, 2020. SUMF, ¶ 87. The Complaint asserted three causes of action based on Truist's refusal to file the demanded lawsuit: (1) breach of the Credit Agreement, (2) breach of the implied covenant of good faith and fair dealing, and (3) breach of the Term Loan Joinder Agreement. *Id.*

On September 27, 2021, Plaintiffs filed the Amended Complaint. SUMF, ¶ 88. The Amended Complaint included the three causes of action in the original Complaint, and it added an additional three causes of action based on Truist's distribution of certain funds received from the Bankruptcy Trustee: (4) breach of the Credit Agreement, (5) breach of the implied covenant of good faith and fair dealing, and (6) breach of the Term Loan Joinder Agreement. *Id.*

On March 27, 2023, the Court granted in part and denied in part Truist's motion to dismiss the Amended Complaint. SUMF, ¶ 89. The Court dismissed Plaintiffs' two claims asserting

breaches of the implied covenant of good faith and fair dealing (Count II and Count V), but denied the motion as to Plaintiffs' breach-of-contract claims (Counts I, III, IV, and VI). *Id.*

Plaintiffs served their Initial Disclosures on April 27, 2023. SUMF, ¶ 90. In their Initial Disclosures, Plaintiffs failed to identify the damages they sought and instead represented that "Plaintiffs will provide Defendants with an expert damages report in accordance with the Court's Case Management Plan and Scheduling Order, or any modifications to that schedule that are subsequently entered by the Court." SUMF, ¶ 91.

Plaintiffs served amended Initial Disclosures on July 15, 2024, after the close of party fact discovery and initial expert discovery. SUMF, ¶ 95; *see* ECF 106, at 5 (party fact discovery closed on October 31, 2023); *id.* at 4 (initial expert discovery closed on February 14, 2024). For Counts IV and VI, Plaintiffs asserted they are entitled to either $135,615.62 or $124,641.95. SUMF, ¶ 96.

## <u>LEGAL STANDARD</u>

Summary judgment is appropriate when there is no genuine issue of material fact, and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The moving party bears the initial burden of showing "the absence of a genuine issue of material fact," and then the burden shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 323–24). The non-movant "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation and citation omitted).

"[W]here the burden of proof at trial would fall on the nonmoving party, the moving party can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Townsquare Media, Inc. v. Regency Furniture, Inc.*, 2022 WL 4538954, at *20 (S.D.N.Y. Sept. 28, 2022), *on reconsideration in part*, 2023 WL 6289984

(S.D.N.Y. Sept. 27, 2023) (quotation marks omitted). And "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT AND CITATION TO AUTHORITY

### I. The Court Should Grant Summary Judgment on All Counts Because Plaintiffs Fail to Raise an Issue of Material Fact to Overcome the Limitation of Liability Provision.

The Credit Agreement provides that "[t]he Administrative Agent shall not be liable for any action taken or not taken by it . . . in the absence of its own gross negligence or willful misconduct." SUMF, ¶ 44; Fowler Decl., Ex. 7 (2015 Credit Agreement) at § 9.2. Plaintiffs failed to adduce evidence to establish gross negligence or willful misconduct by Truist.

"Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must smack of intentional wrongdoing or evince a reckless indifference to the rights of others." *Brevet Direct Lending - Short Duration Fund, L.P. v. Aprio LLP*, 213 N.Y.S.3d 294, 296 (1st Dep't 2024) (affirming summary judgment). "Willful misconduct" requires conduct that is "tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties." *See Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,* 84 N.Y.2d 430, 438 (1994) (concluding that "plaintiff's proof was insufficient as a matter of law to establish that defendant willfully intended to inflict harm on plaintiff through its abandonment of the contract"). A plaintiff seeking to overcome a liability limitation thus must adduce evidence that the breaching party engaged in "truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." *Id.*; *see also Matter of Part 60 Put-Back Litig.*,

36 N.Y.3d 342, 352 (2020) (gross negligence differs in kind, not only degree, from claims of ordinary negligence).

"[C]ourts must honor contractual provisions that limit liability or damages" because they "represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities." *Nomura Home Equity Loan, Inc. v. Nomura Credit & Cap., Inc.*, 30 N.Y.3d 572, 581-82 (2017); *Metro. Life Ins.*, 84 N.Y.2d at 436 (the parties "may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made").

### A. Plaintiffs Fail to Adduce Evidence to Overcome the Limitation of Liability Provision as to Counts I and III.

Plaintiffs adduced no evidence sufficient to establish gross negligence or willful misconduct with respect to Counts I and III.

While Plaintiffs' Amended Complaint survived a motion to dismiss by referencing Truist's proposal for a release in 2019, the fully developed record and undisputed facts defeat Plaintiffs' claims. Truist requested a limited release in response to Emigrant's commercial, recovery-shifting proposal—not based on a mere demand that Truist sue "Virgo." SUMF, ¶¶ 59, 60, 63, 64, 68, 70. Moreover, Plaintiff PMB *itself* requested a release with *even broader protections* from Emigrant, including full indemnification rights, in response to the same proposal—and Emigrant agreed to those provisions. SUMF, ¶ 65, 66. Plaintiffs cannot treat a release that Truist requested as part of a commercial exchange, whereby Emigrant would receive an outsized recovery, as evidence of "intentional wrongdoing or evince[ing] a reckless indifference to the rights of others" as required to establish gross negligence, especially where one plaintiff requested and received a broader release. *See Aprio*, 213 N.Y.S.3d at 296. Plaintiffs' alleged harm stemmed from Truist's unwillingness to sue "Virgo" immediately. But Plaintiffs have failed to adduce any evidence of conduct "tortious in nature" in which Truist "willfully intends to inflict harm on plaintiff[s]," *see*

*Metro. Life Ins.*, 84 N.Y.2d at 438, by declining to file the demanded lawsuit. *See Deutsche Bank Tr. Co. of Americas v. Tri-Links Inv. Tr.*, 74 A.D.3d 32, 39 & n.2 (1st Dep't 2010) (holding that record contained no evidence of gross negligence or willful misconduct by the agent, and that unsubstantiated allegations of fraud and misconduct were insufficient to overcome gross negligence or willful misconduct exclusion to indemnification provision).

Put another way, Plaintiffs failed to create a triable issue of fact that Truist engaged in "truly culpable, harmful conduct." *Metro. Life Ins.*, 84 N.Y.2d at 438. Indeed, Plaintiffs failed to adduce any evidence that Truist committed even "intentional nonperformance of the Agreement motivated by financial self-interest," as Truist had the *largest* financial interest among the Lenders to recover the amounts owed under the Credit Agreement. *See id.*; SUMF, ¶ 18.

### B. Plaintiffs Fail to Adduce Evidence to Overcome the Limitation of Liability Provision as to Counts IV and VI.

Plaintiffs' attempt to avoid the limitation of liability provision as to their claims based on Truist's distribution of funds to the Lenders fares no better.

Plaintiffs adduced no evidence at all suggesting improper motives, gross negligence, or willful misconduct by Truist in its calculation and application of the distributions at issue. Plaintiffs also failed to proffer any expert damage calculation to support their claimed damages stemming from Truist's application of the distributions, as they repeatedly represented they would. SUMF, ¶¶ 92, 93. Without that, Plaintiffs cannot maintain Counts IV and VI in the face of the limitation of liability provision.

Accordingly, Plaintiffs lack evidence to overcome the limitation of liability provision as to Counts I, III, IV, and VI. The Court should therefore grant summary judgment in Truist's favor on all counts.

## II. The Court Should Grant Summary Judgment on Counts I and III Because the Undisputed Facts Establish that Truist Did Not Breach the Loan Documents.

The interpretation of the Credit Agreement, the Term Loan Joinder Agreement, and the Guaranty "is a question of law for the court." *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1147–48 (2d Cir. 1992), *aff'd*, 510 U.S. 86 (1993) (affirming grant of summary judgment). Courts must "interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless" and seek to "avoid reading into an agreement a duty not anticipated by the parties." *Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) (granting defendants' motion for summary judgment as to plaintiffs' indemnity demand).

Courts should grant summary judgment "[w]here the language of a contract is clear." *Harris Tr. & Sav. Bank,* 970 F.2d at 1147. "[T]he fact that one party may have a different interpretation of the language does not make it any less plain." *Id.*

Here, the plain contractual language defeats Counts I and III.

### A. Plaintiffs Lacked "Written Demand" Rights Under the Credit Agreement Because Specified Events of Default Occurred.

Section 8.1 of the Credit Agreement provides that Plaintiffs have no "written demand" rights if an Event of Default "described in subsection (h) or (i) of" Section 8.1 occurs. SUMF, ¶¶ 73, 74; Fowler Decl., Ex. 7 (2015 Credit Agreement) at § 8.1 (creating written demand rights for defaults "other than an event described in subsection (h) or (i) of this Section"). Subsection (i) creates an Event of Default when Calrissian or Alchemy "become unable to pay, shall admit in writing its inability to pay, or shall generally fail to pay, its debts as they become due[.]" SUMF, ¶ 28; Fowler Decl., Ex. 7 (2015 Credit Agreement) at § 8.1(i).

Here, undisputed evidence establishes that *both* Calrissian and Alchemy became unable to pay, and failed to pay, their debts as they became due. SUMF, ¶ 30. In fact, Plaintiff PMB's

corporate designee testified that an Event of Default has occurred under subsection (i). SUMF, ¶ 75. Under the plain language of Section 8.1, that occurrence eliminated Plaintiffs' ability to demand that Truist file the requested lawsuit.

Additional Events of Default do not resurrect Plaintiffs' written demand right. Plaintiffs suggest that, even if a carve-out event occurred under Section 8.1, they could still force Truist to act whenever some other Event of Default occurred. That reading cannot be correct. When Alchemy or Calrissian are "unable to" pay their debts as they become due, other Events of Default—such as timely loan and interest payments or performance of financial covenants—would almost necessarily co-exist. *See, e.g.,* Fowler Decl., Ex. 7 (2015 Credit Agreement) at § 8.1(a)-(d) (timely loan and interest payments, performance of financial covenants). If those additional Events of Default were enough to restore Plaintiff's demand rights, then the carve-out for the Events of Default in Sections 8.1(h) and (i) would be meaningless. *See Rutgerswerke,* 2002 WL 1203836 at *7; *Petroterminal de Panama, S.A. v. Houston Cas. Co.*, 114 F. Supp. 3d 152, 160 n.4 (S.D.N.Y. 2015) (declining to limit the applicability of an exclusion provision to certain types of insurance claims because doing so would render the provision meaningless).

Accordingly, Plaintiffs lacked the right to make a written demand under Section 8.1.

**B. Truist Has "Sole Discretion" and Is "Under No Obligation" to Sue Virgo to Seek Recovery of the Collateral.**

In any event, the parties agreed in the Guaranty that, upon a default, "the Administrative Agent may, ***in its sole discretion***, . . . sue for . . . any money or property at any time payable or receivable on account of . . . any of the Collateral, ***but shall be under no obligation to do so***." SUMF, ¶ 42, Fowler Decl., Ex. 6 (Guaranty) at § 7.4 (emphasis added). The "Collateral" includes Calrissian's "personal and real property," including "cash, securities, accounts and contract rights." SUMF, ¶ 43, Fowler Decl., Ex. 6 (Guaranty) at §§ 1.2, 3.1. The Guaranty separately

reiterates that Truist shall not be "liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so," nor "under any obligation . . . to take any other action whatsoever with regard to the Collateral[.]" SUMF, ¶ 44; Fowler Decl., Ex. 6 (Guaranty) at § 8.2.

Here, Plaintiffs contend Truist should have sued Virgo affiliates as Calrissian's alter ego, Am. Compl., ¶¶ 106, 118, a theory that the affiliates are one and the same with Calrissian, such that legal separateness should be ignored and "Virgo's" assets *are* Calrissian's assets, available to pay Calrissian's obligations. *Cf. Sea Metro. S.A. v. DGM Commodities Corp.*, 2013 WL 3990922, at *6 (E.D.N.Y. Aug. 2, 2013) (alter ego "stands in the shoes" of the entity with direct liability); *Ostrolenk Faber LLP v. Lagassey*, 2020 WL 30350, at *6 (S.D.N.Y. Jan. 2, 2020) (defendant entitled to rely on contract right of alleged alter ego). Plaintiffs' legal theory thus assumes that Virgo's assets *are* Calrissian's property. *See* Fowler Decl., Ex. 6 (Guaranty) at § 7.4. The Guaranty deliberately entrusts Truist, as the Administrative Agent, with the "sole discretion" to sue to collect Collateral, a contractual mechanism designed to avoid competing attempts to attack the Collateral in the event of the Borrower's or Guarantor's insolvency—exactly the problem Plaintiffs caused here. Truist properly exercised its "sole discretion" to sue to collect Collateral by perfecting bankruptcy claims and suing Calrissian and VSC in the Guaranty Action; Plaintiffs have no right to interfere with Truist's discretion to seek recovery on the Collateral through those mechanisms. *See* Fowler Decl., Ex. 6 (Guaranty) at § 8.2

**C. The Automatic Stay Barred the Requested Alter Ego Claims.**

Moreover, Truist cannot be required to take any action "that may be in violation of the automatic stay." SUMF, ¶ 20; Fowler Decl., Ex. 7 (Amended Credit Agreement) at § 9.2 ("the Administrative Agent shall not be required to take any action . . . that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law"). In this case, the automatic stay

created by the Calrissian bankruptcy barred Truist from asserting claims that any Virgo entity was Calrissian's alter ego when Plaintiffs made their demand on December 13, 2019. SUMF, ¶ 69.

Section 362(a) of the Bankruptcy Code imposes a broad automatic stay upon a debtor's filing of a petition for bankruptcy protection. *See* 11 U.S.C. § 362(a). The automatic stay prohibits "any act to obtain possession of . . . or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(3). Under the Bankruptcy Code, the property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also Miller v. ANConnect, LLC*, No. 18-50633-JTD, ECF 264 (Bankr. D. Del. Oct. 13, 2022) (barring Emigrant and PMB from pursuing causes of action against Virgo-affiliated parties "on the basis that the party was the alter ego of the Debtors").

Because an alter ego of a bankruptcy debtor is considered to have no substantive existence separate from the debtor, such an alter ego's property is considered the debtor's own property. *In re Chantel*, 2015 WL 3988985, at *6 (B.A.P. 9th Cir. July 1, 2015), *aff'd*, 693 F. App'x 723 (9th Cir. 2017), and *aff'd*, 694 F. App'x 508 (9th Cir. 2017); *In re Pisculli*, 426 B.R. 52, 61 (Bankr. E.D.N.Y. 2010) (assets of an alter ego of debtor at the time of filing the bankruptcy petition are property of the estate). Accordingly, courts have held that alter ego claims belong to the bankruptcy estate because, if successful, they could benefit all creditors. *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 627 (D. Del. 2018); *see also In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014). An alter ego action against a bankrupt debtor therefore violates the automatic stay and is subject to dismissal. *Id.*

Here, Plaintiffs' claims necessarily fail because, when they made their written demand on December 13, 2019, the automatic stay barred Truist from asserting alter ego claims. SUMF, ¶ 69. Section 9.2 of the Credit Agreement therefore defeats Plaintiffs' claims.

## III. The Court Should Grant Summary Judgment on Counts I and III Because Plaintiffs Failed to Adduce Evidence to Establish They Were Harmed or Damaged by Truist's Alleged Breaches.

Even if the Court were to conclude that the limitation of liability provision and other contractual provisions do not defeat Plaintiffs' claims based on the undisputed fact record, the Court should nonetheless grant summary judgment as to Counts I and III because Plaintiffs have failed to adduce evidence sufficient to establish they suffered any actual harm or damage.

### A. Plaintiffs Must Establish Damage Caused by the Alleged Contractual Breaches.

The elements for breach of contract are: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach." *K. Bell & Assocs. v. Lloyd's Underwriters*, 827 F. Supp. 985, 988 (S.D.N.Y. 1993).[3]

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322. "It is well-settled that a plaintiff in a contract action must demonstrate both that his damages were caused by the alleged breach and that the alleged loss is capable of proof with reasonable certainty." *Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008 (S.D.N.Y. 1991) (citing *Lexington Prods., Ltd. v. B.D. Comms., Inc.*, 677 F.2d 251, 253 (2d Cir. 1982)).

---

[3] New York law governs whether Truist breached the Credit Agreement or Term Loan Joinder Agreement. SUMF, ¶¶ 21, 22; Fowler Decl., Ex. 7 (Amended Credit Agreement) at § 10.5(a); Fowler Decl., Ex. 8 (Term Loan Joinder Agreement) at ¶ 14.

"[D]amages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.'" *Care Travel Co. v. Pan Am. World Airways, Inc.*, 944 F.2d 983, 994 (2d Cir. 1991). "[C]ausation is required to recover damages for breach of contract . . . . Under New York law, in fact, the failure to prove damages is fatal to a plaintiff's breach of contract cause of action." *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999) (applying New York law) (cleaned up). Plaintiffs have failed to meet their burden, as detailed herein.

### B. Plaintiffs Adduced No Evidence to Establish They Suffered Any Harm or Damage from Truist Not Suing VSC, Virgo Offshore, Virgo Onshore, or VIG.

Plaintiffs assert that Truist should have sued four entities as Calrissian's alter ego or on a principal-agent theory: VSC, Virgo Onshore, Virgo Offshore, and VIG. SUMF, ¶ 94. Plaintiffs, however, cannot establish any harm or damage for the alleged failure to sue any of those entities. First, Truist *did* sue VSC and obtained a $73 million judgment against it, and Plaintiffs adduced no evidence they suffered any harm because Truist sued under a different legal theory. SUMF, ¶ 79. Second, the Lenders could not have recovered any money from Virgo Offshore or Virgo Onshore as a matter of law. Third, Plaintiffs cannot establish any harm from a failure to sue VIG, [redacted]. SUMF, ¶ 98.

#### 1. Truist Sued and Obtained a $73 Million Judgment Against VSC.

Plaintiffs adduced no evidence that Truist caused them any damage by successfully suing VSC under a Delaware partnership theory rather than under an alter-ego or principal-agent theory.

As detailed above, Truist asserted a claim against VSC for breach of the Guaranty under the theory that VSC was liable under Delaware partnership law as Calrissian's general partner. SUMF, ¶¶ 76, 77; *see* 6 Del. C. §§ 17-303(a) & 17-403(b). After Calrissian and VSC did not

respond, Truist obtained a default judgment as to liability. SUMF, ¶ 78. Truist then obtained a final judgment of $73,261,846.88, plus post-judgment interest. SUMF, ¶ 79.

Truist has thus obtained from VSC exactly what Plaintiffs sought with respect to VSC: a final judgment for the entirety of the amount Calrissian owed under the Guaranty. That Truist obtained the judgment under a different legal theory—Delaware partnership law, rather than an alter-ego or principal-agent theory—is irrelevant. *See Zarin v. Reid & Priest*, 184 A.D.2d 385, 387 (1st Dep't 1992) (dismissing action where malpractice plaintiff "ignore[d] the fact that the legal defense actually interposed by defendant law firm actually prevailed," holding plaintiff could not demonstrate actual damages). Plaintiffs adduced no evidence that Truist's different legal theory resulted in a different judgment, hindered enforcement, or otherwise reduced the Lenders' ability to recover from VSC. Plaintiffs offered no testimony, adduced no documentary evidence, and proffered no expert opinion that the Lenders could have (let alone would have) recovered more from VSC had Truist sued VSC in early 2020 using an alter-ego or principal-agent theory. Accordingly, Plaintiffs lack any evidence of harm or damage based on Truist's decision to sue VSC under a different theory than what Plaintiffs suggested.

**2. Virgo Offshore and Virgo Onshore Cannot Be Held Liable as Alter Egos Absent Facts Plaintiffs Failed to Adduce.**

The undisputed evidence also establishes that Plaintiffs suffered no damage based on Truist's alleged failure to sue Virgo Onshore or Virgo Offshore.

Under operative Delaware law, a plaintiff cannot hold a limited partner (like Virgo Onshore or Virgo Offshore) liable for the debt of a limited partnership (like Calrissian) unless it establishes that it "transact[ed] business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner." 6 Del. C. § 17-303(a). This is the sole mechanism for holding limited partners liable for a Delaware limited partnership's

obligations, rendering alter-ego and principal-agent theories inapplicable as to these entities. *See In re The Heritage Org., L.L.C.*, 413 B.R. 438, 514 n.64 (Bankr. N.D. Tex. 2009) ("Given the similarity of the Texas and Delaware statutory schemes for limited partnerships, this Court concludes that the alter ego theory cannot be used to attempt to pierce the entity veil of Steadfast or Tikchik to reach their respective limited partners.").

Plaintiffs adduced no evidence that the Lenders believed Virgo Offshore or Virgo Onshore was Calrissian's general partner. Accordingly, Plaintiffs cannot establish any damage from any failure to sue Virgo Onshore or Virgo Offshore under an alter-ego or principal-agent theory.

#### 3. Even if Plaintiffs Could Establish VIG's Liability, [redacted] Could Not Have Satisfied a Judgment.

Finally, Plaintiffs cannot show that they were harmed when their demanded lawsuit did not proceed against VIG. Plaintiffs served their demand for Truist to sue "Virgo" on December 13, 2019. SUMF, ¶ 68. Plaintiffs' expert conceded that [redacted]. SUMF, ¶ 98; Fowler Decl., Ex. 43 (Sheppard Tr.) at 95:20–96:9 [redacted]). The 2015 Credit Agreement, however, required the payment of all legal fees and other costs Truist incurred in any lawsuit or collection action before any distributions would be made to Plaintiffs. SUMF, ¶ 83. Plaintiffs adduced no evidence that they could have recovered *any* funds from a suit against VIG. Thus, Plaintiffs cannot establish any harm or damage from Truist's failure to sue VIG under an alter-ego or principal-agent theory.

Because Plaintiffs adduced no evidence sufficient to establish they were harmed by the failure to sue VSC, Virgo Offshore, Virgo Onshore, or VIG, the Court should grant summary judgment on Counts I and III in Truist's favor. *See LNC Invs.*, 173 F.3d at 465.

### C. Plaintiffs Failed to Adduce Evidence Sufficient to Establish that Any Virgo Entity Would Have Been Liable Under Plaintiffs' Proposed Theories.

Even if the Court were to overlook the threshold issues as to establishing damages with respect to any lawsuit against VSC, Virgo Onshore, Virgo Offshore, or VIG, Plaintiffs have not adduced evidence sufficient to establish that they have been harmed by Truist's failure to sue any Virgo entity under an alter-ego or principal-agent theory. To establish they suffered any harm from a failure to sue, Plaintiffs must show (1) the lawsuit would have been successful and (2) the Lenders would have recovered a sufficient amount to lead to distributions to Plaintiffs. Plaintiffs failed to adduce evidence to meet this burden.

#### 1. Plaintiffs Have Not Adduced Evidence to Establish Harm or Damage with Respect to the Alleged Liability of *Any* Virgo Entity.

Delaware law governs whether an entity is treated as the alter ego of Calrissian, which is a Delaware limited partnership. *MMA Meadows at Green Tree, LLC v. Millrun Apartments, LLC*, 130 A.D.3d 529, 530 (1st Dep't 2015) ("Delaware law applies to plaintiffs' attempt to pierce the corporate veils of Millrun (a Delaware limited liability company) and MCAP II and III (Delaware limited partnerships)."); *Jonas v. Estate of Leven,* 116 F. Supp. 3d 314, 330 (S.D.N.Y. 2015) ("It is well-settled that New York's choice-of-law rules dictate that 'the law of the state of incorporation determines when the corporate form will be disregarded.'").

Under Delaware law, a plaintiff asserting an alter-ego claim must establish that the primarily liable party's "corporate structure cause[d] fraud or similar injustice" to the point that the primarily liable entity (here, Calrissian) was "a sham and exist[ed] for no other purpose than as a vehicle for fraud." *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (quotation omitted); *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001) (granting summary judgment for defendant because plaintiff failed to adduce facts to support alter ego theory). A breach of contract, while "in some sense, an

injustice," "does not supply the necessary fraud or injustice." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989).

Delaware law provides that veil-piercing is reserved for the "exceptional case." *See eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *27 (Del. Ch. Sept. 30, 2013) (no "exceptional case" where alleged alter egos operated under "common central management" of one parent). Undercapitalization or insolvency alone does not warrant piercing the veil. *PXP Producing Co. LLC v. MitEnergy Upstream LLC*, 342 A.3d 402, 417 (Del. Ch. 2025). Nor does a multi-tiered investment structure in which a parent forms subsidiaries as holding companies for business ventures—such arrangements reflect functional corporate roles, not abuse of the corporate form. *See id.* at 419 (allegations that company's members were mere holding companies "amount[ed] to little more than frustration that the Company's familial structure ma[de] it difficult for Petitioner to collect").

Here, Plaintiffs failed to adduce evidence that can meet the applicable standard. Moreover, Plaintiffs were aware of Calrissian's role as a special purpose vehicle. PMB described Calrissian as a [redacted] SUMF, ¶ 25; Fowler Decl., Ex. 10 (PMB's Resps. and Objs. to Truist's Second Set of Interrogs.), at 8; Fowler Decl., Ex. 11 (PMB 30(b)(6) Tr.) at 70:16–71:2. Likewise, Emigrant's corporate representative admitted that Emigrant did not believe Calrissian kept significant cash on hand to pay the loan balance and understood that the investment structure involved "mov[ing] money in and out of [Calrissian] as needed." SUMF, ¶¶ 23, 24; Fowler Decl. Ex. 9 (Emigrant 30(b)(6) Tr.) at 125:20–24.

Plaintiffs thus failed to adduce evidence sufficient to establish that an alter-ego lawsuit would have been successful. *See In re Sunstates*, 788 A.2d at 534; *Mobil Oil*, 718 F. Supp. at 268;

*eCommerce*, 2013 WL 5621678, at *27; *PXP Producing*, 342 A.3d at 417. Plaintiffs thus failed to raise a triable issue of fact that they have been damaged by Truist declining to bring such a suit.

**2. Plaintiffs Failed to Adduce Evidence That Any Virgo Entity Was Liable Under Agency Law.**

Plaintiffs' alternative theory—that a "Virgo" entity is liable for breach of contract as Calrissian's "principal"—fails as a matter of law. Delaware law "has not extended the doctrine of vicarious liability" under agency law "to breach of contract claims." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *3 (Del. Ch. Nov. 13, 2018); *accord Kuroda v. SPJS Holdings., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009). Accordingly, any lawsuit against any Virgo entities as Calrissian's principal to hold it liable for breach of contract would have failed, and Plaintiffs suffered no damages from Truist's decision not to pursue this theory.

Even if Plaintiffs' theory were viable, they fail to raise a genuine issue of material fact. *See Baccellieri v. HDM Furniture Indus., Inc.*, 2013 WL 1088338, at *3 (Del. Super. Ct. Feb. 28, 2013), *aff'd,* 74 A.3d 653 (Del. 2013) ("[I]f the facts are undisputed, or if there is no genuine issue of material fact, agency can be decided as a matter of law[.]"). An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent; the agent accepts the undertaking; and there is an understanding between the parties. *Id.* at *3 & n.12. To hold a principal liable for its agent's actions, a plaintiff must establish that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship. *Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *11 (Del. Ch. Aug. 21, 2020). The critical inquiry is the nexus between the agency relationship and the underlying wrong. *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988) ("*Not only must an arrangement exist between the two corporations* so that one acts on

behalf of the other and within usual agency principles, *but the arrangement must be relevant to the plaintiff's claim of wrongdoing*." (emphasis in original)).

Here, Plaintiffs do not identify which Virgo entity supposedly was Calrissian's principal. Instead, their theory appears to be that Calrissian signed the Guaranty once, but somehow bound four other, unspecified entities. Plaintiffs adduced no evidence to support that implausible theory. Put simply, Plaintiffs adduced no facts showing any "basis here for holding that [Calrissian] acted as the agent of [Virgo] *when it committed the alleged wrongful acts that give rise to the [] liability*"—i.e., executing the Guaranty, under Plaintiffs' theory. *Otto Candies,* 2020 WL 4917596, at *12 (emphasis in original).[4]

Plaintiffs' failure to adduce evidence to support either litigation theory they proposed against *any* Virgo entity is an independent basis for the Court to grant summary judgment in Truist's favor on Counts I and III.

### D. Plaintiffs Did Not Seek—and Cannot Now Seek—Nominal Damages.

Plaintiffs have *never* requested an award of nominal damages in six years of this litigation. In their Complaint filed on March 18, 2020, Plaintiffs sought "[c]ompensatory damages, in an amount in excess of $26,000,000"—not nominal damages. ECF 1, at 25. In their Amended Complaint dated September 27, 2021, Plaintiffs again requested "[c]ompensatory damages, in an amount in excess of $26,000,000," but did not request nominal damages. Am. Compl., at 33.

---

[4] Even if New York law applied, the Court should reach the same result. A plaintiff seeking to demonstrate a principal-agent relationship must adduce "evidence of a principal's consent that the agent act on the principal's behalf and under the principal's control." *People by James v. N. Leasing Sys., Inc.*, 133 N.Y.S.3d 389, 400 (Sup. Ct. N.Y. Cnty. 2020), *aff'd*, 142 N.Y.S.3d 36 (2021) ("overall management or supervisory control" insufficient for agency relationship). Plaintiffs have not adduced any evidence of the requisite consent by any of the four entities.

The same is true of Plaintiffs' discovery responses. In response to Truist's first interrogatory, which requested that Plaintiffs identify "for each category of damages You seek, the amount of damages for which You allege that Defendants are liable," Plaintiffs did not identify nominal damages. SUMF, ¶¶ 92, 93. In their initial disclosures dated April 27, 2023, Plaintiffs specified that they seek "compensatory damages" but did not identify any request for nominal damages. SUMF, ¶ 101. In their amended initial disclosures dated July 15, 2024, which were served ***after the close of party fact discovery***, Plaintiffs again specified that they seek "compensatory damages" but did not request nominal damages. SUMF, ¶ 102.

Even if Plaintiffs claim now that they are entitled to nominal damages, their failure to request that relief in their pleadings or in discovery precludes that argument. *Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.,* 2007 WL 1988150, at *21 (S.D.N.Y. July 10, 2007) (although plaintiff suggested at summary judgment its entitlement to nominal damages for breach of a confidentiality agreement, its counterclaims pleaded actual, not nominal, damages and plaintiff had not adequately presented evidence of damages, requiring dismissal); *see Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.,* 2022 WL 211981, at *3 (2d Cir. Jan. 25, 2022) (plaintiff's failure to request nominal damages before the district court may waive the right to seek nominal damages later).

Accordingly, any request for nominal damages now cannot save Plaintiffs' claims after their failure to establish any harm or damage with respect to Counts I and III.[5]

[5] If the Court were to allow Counts I and III to survive based on potential nominal damages, Plaintiffs' recovery should be capped at $1, consistent with precedent in this Court. *See, e.g.*, *Gould Paper Corp. v. Madisen Corp.*, 614 F. Supp. 2d 485, 490–91 (S.D.N.Y. 2009) (precluding party from proving breach of contract damages after close of discovery and holding that, "[a]t trial, defendants may only seek nominal damages—$1.00."); *Venture Grp. Enters., Inc. v. Vonage Bus. Inc.*, 2024 WL 4502995, at *7 (S.D.N.Y. Oct. 16, 2024) (denying counterclaimant's request for

**IV. Plaintiffs Raise No Issue of Material Fact as to Distributions (Counts IV and VI).**

In Counts IV and VI, Plaintiffs allege breaches of contract based on Truist's distribution of funds received from the Bankruptcy Trustee in 2020 and 2021. Plaintiffs assert that they are entitled to either $135,615.62 or $124,641.95 in damages arising from Truist's reimbursement of its fees, plus interest. SUMF, ¶ 96. Plaintiffs adduced no fact evidence, nor have they proffered any expert damages opinion, to support their claim. Indeed, Plaintiffs' expert regarding these claims, Robert Colvin, entirely failed to calculate any damages.[6] SUMF, ¶ 100.

Plaintiffs have thus failed to raise a triable issue of fact as to Counts IV and VI, and the claims should be dismissed.

**CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

---

liquidated damages and awarding $1 for all claimed damages); *Cottam v. Glob. Emerging Cap. Grp., LLC*, 2021 WL 1222120, at *7 (S.D.N.Y. Mar. 31, 2021), *aff'd sub nom. Cottam v. 6D Glob. Techs., Inc.*, 2022 WL 16908708 (2d Cir. Nov. 14, 2022) (where plaintiff had proven the fact of damages but "not provided a sufficiently stable foundation for estimating damages," court denied a request for $19.6 million in damages and awarded $1 in nominal damages).

[6] Plaintiffs cannot circumvent this failure by attempting to rely on the damages computations of Truist's expert (because Truist retains full discretion over whether to call its expert at trial), or by arguing now that their damages can be proven through non-expert proof. A plaintiff's reliance on the defendant's expert and failure to retain its own damages expert leaves the plaintiff with no way to prove damages, warranting summary judgment for the defendant. *See Antioch Co. Litig. Tr. v. Morgan*, 2014 WL 1365949, at *6 (S.D. Ohio Apr. 7, 2014) (plaintiff who represented it would retain experts to quantify damages, and then failed to do so, could not later claim that damages could be proven without an expert).

Dated: September 25, 2026

Respectfully submitted,

______________________________
Kenneth B. Fowler (admitted *pro hac vice)*
Kevin J. O'Brien
Kathryne Hunter
**KING & SPALDING LLP**
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Telephone: (212) 556-2227
Facsimile: (212) 556-2222
kfowler@kslaw.com
kobrien@kslaw.com
khunter@kslaw.com

David Tetrick, Jr. (admitted *pro hac vice)*
**KING & SPALDING LLP**
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-3526
dtetrick@kslaw.com

*Counsel for Defendants SunTrust Bank and Truist Bank*

# LOCAL RULE 7.1(C) CERTIFICATION

I, Kenneth B. Fowler, hereby certify that the foregoing memorandum of law complies with the word count limitations set forth in Rule 7.1(c) of the Local Rules of the United States District Court for the Southern District of New York, and contains 7,981 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and this certificate.

Dated: September 25, 2026
New York, New York

Kenneth B. Fowler